

08 CV 6314

Judge Pauley

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT NEW YORK**

| | |
|---|---|
| SCOTT PONTONE, <br><br> Plaintiff <br><br> vs. <br><br> THE YORK GROUP, INC., <br><br> MILSO INDUSTRIES CORPORATION, <br><br> and <br><br> MATTHEWS INTERNATIONAL CORPORATION, <br><br> Defendants | Docket No. <br><br> JUL 1 4 2008 <br> U.S.D.C. S.D. N.Y. <br> CASHIERS <br><br> **VERIFIED COMPLAINT** |

Plaintiff Scott Pontone, by his attorneys Clifford Chance US LLP, for his Verified Complaint, alleges as follows:

### NATURE OF THE ACTION

1.      This is an action for declaratory and injunctive relief regarding the unreasonable and invalid non-competition and non-solicitation provisions of a contract between Mr. Pontone and his former employers (the "Restrictive Covenants," set forth in Paragraph 31 below).

2.      The Restrictive Covenants are set forth in an agreement entered into in May 2007, upon Mr. Pontone's separation from The York Group, Inc. A true copy of that agreement (the "2007 Amendment") is attached as Exhibit A to this Verified Complaint.

3.      Through the Restrictive Covenants, Defendants The York Group, Inc., Milso Industries Corporation and Matthews International Corporation are attempting to force Mr. Pontone to stay entirely out of the casket manufacturing and distribution business for three years. These three-year, global restrictions have intimidated potential business partners from entering

into new ventures with Mr. Pontone, are unreasonable and unnecessary to protect the legitimate business interests of Defendants, and are invalid under New York law.

4.      One full year of the three-year period has passed.  During that time, Mr. Pontone has fully complied with the Restrictive Covenants.  No legitimate interest justifies forcing Mr. Pontone out of the entire casket distribution business for two additional years.

5.      Through this action, Mr. Pontone seeks a declaration that the Restrictive Covenants are invalid and preliminary and permanent injunctions against their enforcement.

## THE PARTIES

6.      Plaintiff Scott Pontone is a citizen of New York.

7.      Defendant The York Group, Inc. ("York") is a corporation incorporated under the laws of Delaware with its principal place of business in Pittsburgh, Pennsylvania.  York is a subsidiary of Defendant Matthews International Corporation.

8.      Defendant Milso Industries Corporation ("MIC") is a corporation incorporated under the laws of Delaware with its principal place of business in Pittsburgh, Pennsylvania.  MIC is a subsidiary of Defendant York.

9.      Defendant Matthews International Corporation ("Matthews") is a corporation incorporated under the laws of Pennsylvania with its principal place of business in Pittsburgh, Pennsylvania.  Matthews is a publicly-traded company with revenues in fiscal year 2007 of approximately $750 million.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and because the amount in controversy exceeds $75,000.

11.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) and because the parties have by contract consented to the jurisdiction of this Court and waived any objections to venue in this judicial district.

## BACKGROUND

### I.     The Sale of Milso to York

12.     Before 2005, Milso Industries ("Milso") was a family business based in Brooklyn, New York.  Milso was founded by Mr. Pontone's grandparents.  Milso manufactured and sold caskets and other burial products to funeral homes.  Milso is unrelated to MIC and is not a party to this litigation.

13.     Mr. Pontone and several other members of his family were the owners of Milso.  Mr. Pontone was a minority shareholder of Milso.

14.     Mr. Pontone worked for Milso in sales and management roles.  Several other members of Mr. Pontone's extended family also worked for Milso.

15.     Before 2005, York and Milso were competitors.  On or about May 28, 2005, York and Matthews purchased Milso.  In connection with that purchase, Mr. Pontone became the Executive Vice President of the Casket Division of York.  Mr. Pontone's father, Harry Pontone, became President of York.

16.     In connection with the purchase of Milso, York and Matthews entered into an Asset Purchase Agreement (the "APA") and several other agreements with Milso and certain affiliates and shareholders of Milso, including Mr. Pontone.  York and Mr. Pontone also entered into an employment agreement (the "2005 Employment Agreement").  A true copy of the 2005 Employment Agreement is attached as Exhibit B to this Complaint.  A true copy of the APA is attached as Exhibit C to this Complaint.

3

17.     Under the APA, York agreed to buy Milso's casket manufacturing business.  The APA and other agreements entered into in connection with the transaction also provided for contingent payments and bonuses to be paid to the shareholders of Milso (including Mr. Pontone) upon certain conditions.

18.     Under the 2005 Employment Agreement, Mr. Pontone became an employee of York.  Mr. Pontone's term of employment was to continue until September 30, 2010, subject to certain early termination provisions.  The 2005 Employment Agreement also provided that Mr. Pontone would automatically succeed his father when his father ceased to be President of York.

19.     The APA and the 2005 Employment Agreement contained restrictive covenants.  Both agreements included restrictions on competition.   The 2005 Employment Agreement included restrictions on soliciting customers.

20.     The APA and other agreements entered into in connection with the sale of Milso's business to York provided that the President of York would have substantial autonomy and control over York's operations.   Mr. Pontone's father wanted control over York's business because bonuses and contingent payments depended upon the performance of York.

## II.    The Transition of Milso's Relationships to York

21.     Before the sale of Milso, Mr. Pontone conducted sales and marketing activities for Milso.  In that capacity, he had primary responsibility for 30-40 customer accounts, all of which were located in the New York City metropolitan area.

22.     After the sale of Milso, Mr. Pontone's role with York was exclusively managerial. Specifically, Mr. Pontone was Executive Vice President of the Casket Division of York and had supervisory responsibility for York's sales, distribution and marketing functions.

23.    Mr. Pontone did not have primary responsibility for any customer accounts during his employment with York. Mr. Pontone transferred all of the customer accounts for which he had been responsible before the acquisition to sales employees of York.

24.    Following the sale to York, Mr. Pontone and his father worked diligently and in good faith to integrate Milso's operations into York's, to transfer Milso's clients and goodwill to York, and to build York's business.

**III.    The Force-Out of Mr. Pontone**

25.    Matthews did not abide by the terms of the APA, however. In particular, Matthews began increasingly to interfere in the operations of York, contrary to the control provisions bargained-for in the transaction.

26.    Matthews' interference eventually became intolerable. In March 2007 Mr. Pontone and his father sued York for breach of their employment agreements, seeking among other things the contingent payments provided for under acceleration clauses of the APA and their employment agreements.

27.    Two months later, in May 2007, Mr. Pontone and his father settled their lawsuit with York. The terms of the settlement were set forth in a series of agreements executed on or about May 30, 2007. These agreements included the 2007 Amendment.

28.    The principal provisions of the settlement required Mr. Pontone to leave York, by resigning his employment position and relinquishing his right to succeed his father as President of York. In exchange for those substantial concessions, Mr. Pontone was to receive severance compensation of $300,000 per year for three years, paid in installments (the "Severance Payments").

29.    The purpose of the Severance Payments was to compensate Mr. Pontone for his relinquishment of his substantial employment rights. No part of the Severance Payments is

5

related to the Restrictive Covenants. Indeed, Matthews agreed to the Severance Payments only after Mr. Pontone's father agreed to give up his right to a $300,000 per year bonus to which he otherwise would have been entitled under his employment agreement.

## IV.    The Restrictive Covenants

30.    The 2007 Amendment deleted the "Restrictions on Competition" and "Non-Solicitation of Customers and Suppliers" sections of the 2005 Employment Agreement and the corresponding provisions of the APA.

31.    The 2007 Amendment set forth the following new anti-competition and anti-solicitation provisions:

> 4.06.  Restrictions on Competition.  Employee covenants and agrees that during the period of Employee's employment hereunder and for three (3) years following the effective date of Employee's resignation from the Company, Employee shall not engage, directly or indirectly, whether as principal or as agent, officer, director, employee consultant, shareholder, investor, financer or otherwise, alone or in association with any other person, corporation, or other entity in the manufacture, marketing or sale of caskets or any other product of the type presently manufactured, marketed or sold by The York Group, Inc. or [MIC].  Notwithstanding the restrictions in this paragraph, Employee may own, directly or indirectly, solely as an investment, (A) securities of any such entity which are traded on any national securities exchange or NASDAQ if Employee (y) is not a controlling person or a member of a group which controls such entity; and (z) does not directly or indirectly own 2% or more of any class of securities of such entity or (B) interests in mutual funds or similar pooled accounts.
>
> . . .
>
> 4.07.  Non-Solicitation of Customers and Suppliers.  Employee covenants and agrees that during the period of Employee's employment hereunder and for three (3) years following the effective date of Employee's resignation from the Company, Employee shall not directly or indirectly solicit the trade of, or trade with, any customer of The York Group, Inc. or [MIC] with respect to the manufacture, marketing or sale of caskets or any other product of the type presently manufactured, marketed or sold by The York Group, Inc. or [MIC].

(the "Restrictive Covenants").

32.     The Restrictive Covenants on their face impose a three-year ban on Mr. Pontone's participation in the casket manufacturing and distribution industry, without regard to geography.

33.     The Restrictive Covenants are unreasonable and unnecessary to protect any legitimate business interest of York, MIC or Matthews.

34.     At the time of his separation, Mr. Pontone possessed no trade secrets or confidential information of York, MIC, or Matthews that are protected by the Restrictive Covenants.  Nor was Mr. Pontone responsible for any client relationships, as he had transferred all client responsibility to York employees at the time of the acquisition of Milso.

35.     York's and MIC's actual and potential clients are not secret and are easy to identify.  York's and MIC's clients are operators of licensed funeral homes.  Those customers can be found in the classified listings of any telephone directory.  They also can be found in industry publications such as the American Blue Book of Funeral Directors.  In addition, two funeral directory industry associations, the National Funeral Directors Association ("NFDA") and the International Cemetery and Funeral Association, publish membership information that is available on the Internet.

36.     Mr. Pontone was reluctant to agree to the Restrictive Covenants, because he believed them to be unreasonable and unfair.  Rather than continue litigating against a public company with substantial resources, however, he ultimately acquiesced and agreed to the 2007 Amendment as a whole.

**V.     Mr. Pontone's Compliance with the Restrictive Covenants for More Than a Year**

37.     As of May 30, 2007, Mr. Pontone no longer was employed by York, MIC or Matthews.

38.     Between May 30, 2007, and the date of the filing of this Complaint, Mr. Pontone has fully complied with the Restrictive Covenants.

39.    Since January 2008, Mr. Pontone has begun to build a business that offers insurance products to funeral home operators.  To market these insurance products, Mr. Pontone has engaged an independent sales force of eight people.  Seven of these salespersons never worked for Milso, MIC or York.  The eighth had left York to work for a third party before he began working for Mr. Pontone.

40.    Since Mr. Pontone resigned from York, several manufacturers and distributors of burial caskets have approached him about the possibility of engaging in new ventures to market and sell caskets using the same sales force he uses to offer insurance products ("Proposed Ventures").  The Proposed Ventures include possible sales activity in states in which York conducts direct sales activities as well as states in which York has no direct selling activity.

41.    Out of good faith and caution, Mr. Pontone has informed these potential business partners of the Restrictive Covenants.  The prospective partners have stated that they would proceed with the Proposed Ventures only if they could be assured that the Restrictive Covenants will not apply.

42.    By preventing Mr. Pontone from participating in the Proposed Ventures, the Restrictive Covenants are causing Mr. Pontone substantial and irreparable harm.  Mr. Pontone cannot expand the range of products available for sale to include caskets.

43.    A combined insurance and casket line of products would be substantially more attractive to customers and more profitable to Mr. Pontone than the insurance products alone. By excluding Mr. Pontone from the casket business, the Restrictive Covenants are causing him a loss of profit that is difficult to quantify, but that is far greater than $75,000.

44.    By excluding Mr. Pontone from the casket business, the Restrictive Covenants are limiting Mr. Pontone's ability to attract more and better salespeople, further limiting his ability to build his business and increase profits.

45.    The Restrictive Covenants also are injuring third parties. Mr. Pontone's current salespeople are losing opportunities to enhance their earnings. And customers and potential customers in the funeral home industry are deprived of the benefits of marketplace competition and innovation.

46.    If Mr. Pontone engages in the Proposed Ventures, Defendants are likely to attempt to enforce the Restrictive Covenants and to cease making the Severance Payments.

## COUNT 1
### (Declaratory Judgment)

47.    Plaintiff repeats and realleges Paragraphs 1 to 46 as if set forth here in full.

48.    The Restrictive Covenants are unreasonable and unnecessary to protect the legitimate business interests of York, MIC or Matthews.

49.    Defendants have no legitimate interest in being broadly protected from competition by Mr. Pontone or the solicitation of their customers by Mr. Pontone.

50.    Even if Defendants had legitimate interests in May 2007 that merited protection through restrictive covenants, the Restrictive Covenants are unreasonable because they impose greater restraints than are required for the protection of Defendants' legitimate interests, are unreasonable in temporal and geographic scope, impose an undue hardship on Mr. Pontone, and are injurious to the public.

51.    Mr. Pontone is in reasonable fear and apprehension that if he were to engage in one or more of the Proposed Ventures, Defendants would subject him to a meritless lawsuit and cease making the Severance Payments.

52.     Mr. Pontone believes it likely that, upon learning of this Complaint, Defendants improperly will seek to penalize him by halting the Severance Payments due to him under the 2007 Amendment in breach of their obligations.

53.     Wherefore, Mr. Pontone requests this Court to order a speedy hearing and to enter a Declaratory Judgment declaring the Restrictive Covenants invalid and unenforceable and declaring the unpaid balance of the Severance Payments provided for in the 2007 Amendment be paid in full at the times and in the manner provided in the 2007 Amendment.

## COUNT 2
### (Preliminary and Permanent Injunctive Relief)

54.     Plaintiff repeats and realleges Paragraphs 1 to 52 as if set forth here in full.

55.     Absent preliminary and permanent injunctive relief, Mr. Pontone will suffer irreparable harm as a result of his inability to pursue one or more of the Proposed Ventures.

56.     Mr. Pontone does not have an adequate remedy at law.  Because of the nature of Mr. Pontone's lost opportunity should an injunction not issue, it will be difficult or impossible for Mr. Pontone to determine, or therefore, to prove, the precise amount of damages he may suffer.

57.     Wherefore, Mr. Pontone requests this Court to enter preliminary and permanent injunctions preventing and restraining the Defendants and all persons acting on their behalf from (a) seeking to enforce or threatening to enforce the Restrictive Covenants, (b) asserting or implying to third parties that by employing or otherwise engaging in business with Mr. Pontone those third parties may be procuring or facilitating a breach of the Restrictive Covenants, and (c) interrupting or ceasing the Severance Payments.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Pontone requests that this Court grant judgment in his favor as follows:

a.    A Declaration that the Restrictive Covenants are invalid and unenforceable;

b.    A Declaration that the unpaid balance of the Severance Payments provided for in the 2007 Amendment is payable in full at the times and in the manner provided in the 2007 Amendment;

c.    Preliminary and Permanent Injunctions preventing and restraining the Defendants and all persons acting on their behalf from (a) seeking to enforce or threatening to enforce the Restrictive Covenants, (b) asserting or implying to third parties that by employing or otherwise engaging in business with Mr. Pontone those third parties may be procuring or facilitating a breach of the Restrictive Covenants, and (c) interrupting or ceasing the Severance Payments;

d.    Costs of this suit; and

e.    Such other and further relief, including all other available monetary and equitable relief, as the case may require and the Court may deem just and proper.


Dated: New York, New York
       July 14, 2008


                                          Respectfully submitted,

                                          _____
                                          Edmund Aronowitz (EA 0542)
                                          CLIFFORD CHANCE US LLP
                                          31 West 52nd Street
                                          New York, New York  10019
                                          Tel.:   212-878-8000
                                          Fax:    212-878-8375
                                          *Attorney for Plaintiff*
                                          *Scott Pontone*

11

## VERIFICATION

Pursuant to 28 U.S.C. § 1746 and Local Rule 1.10, I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 14, 2008.

Scott Pontone

12

**Exhibit A**

## SECOND AMENDMENT TO THE KEY EMPLOYEE
## EMPLOYMENT AGREEMENT

### AND

### ASSET PURCHASE AGREEMENT

This **SECOND AMENDMENT TO THE KEY EMPLOYEE EMPLOYMENT AGREEMENT AND ASSET PURCHASE AGREEMENT** (this "Amendment") is executed this _30th_ day of May, 2007, by and between The York Group, Inc., a Delaware corporation (the "Company"), Matthews International Corporation ("Matthews"), Milso Industries Corporation ("Milso") and Scott Pontone ("Employee") and further amends the Key Employee Employment Agreement between such parties dated May 28, 2005, as amended by Agreement dated December 8, 2006 (the "Employment Agreement") and certain provisions in the Asset Purchase Agreement dated as of May 28, 2005, as amended by Agreement dated December 8, 2006 (the "Purchase Agreement"), among Milso Industries, Inc., Milso Industries, LLC and SBC Holding Corp. (collectively, the ("Sellers"), the Shareholders signatory thereto, the Company, Midnight Acquisition Corporation and Matthews.

Capitalized terms used in this Agreement and not otherwise defined have the meanings ascribed to those terms in the Employment Agreement or, if not defined there, as defined in the Purchase Agreement.

### W I T N E S S E T H :

WHEREAS, York and Employee wish to amend the Employment Agreement, and certain provisions of the Purchase Agreement, as described below;

NOW THEREFORE, for the consideration described below, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Company and Employee agree that the Employment Agreement and certain provisions of the Purchase Agreement are amended as follows:

### AMENDMENT TO THE EMPLOYMENT AGREEMENT

All provisions of the Employment Agreement remain unchanged unless amended as set forth below:

### ARTICLE I
### EMPLOYMENT

1.01. _Office_. _This paragraph in the Employment Agreement is deleted and replaced by the following paragraph:_

1.01.   Office.   Employee shall remain an officer of the Company only until 5:00 PM EDT on the date on which the remaining Bonus Pool of $8.0 Million is paid by the Company and distributed to the Pool Participants, as provided in Section 1.04 below, *provided* that while Employee remains an officer of the Company, he shall exercise no authority as an officer of the Company or Milso Industries Corporation ("Milso") without the express written permission of their respective boards of directors.   Employee shall execute an Agreement of Voluntary Resignation, in the form attached as Exhibit A, to be effective at 5:00 PM EDT on the date on which the remaining Bonus Pool of $8.0 Million is distributed, and by such Agreement of Voluntary Resignation, Employee shall voluntarily and irrevocably resign all officer, director and any other positions in the Company and in Milso; and, thereafter, neither the Company, Milso, nor any of their subsidiaries or affiliates shall have any obligation to make any payment to Employee except for the Severance Payments described in paragraph 1.03 below.

1.03.   Cash Compensation.   *This paragraph in the Employment Agreement is deleted in its entirety and replaced by the following paragraph:*

1.03.   Severance Compensation.   In addition to the consideration received by Employee under the Purchase Agreement, all salary, bonuses and expense reimbursements paid or accrued to date to Employee by the Company, and any bonus consideration received under Section 1.04 below, the receipt and sufficiency of which is hereby acknowledged by Employee, the Company agrees to pay the Employee severance compensation of $300,000 per annum ("Severance Payments"), for a period of three (3) years from the date of this Amendment, payable in equal installments every two (2) weeks, until a total of $900,000 in Severance Payments have been made to Employee subject to any required federal or state withholding or other applicable taxes.

1.04.   Performance Based Bonuses.   *This paragraph in the Employment Agreement is deleted in its entirety and replaced by the following paragraph:*

1.04.   Performance Based Bonuses.   On the date that this Amendment and all other documents required by the Company are executed by Employee, by Scott Pontone, and by the Pool Participants named in the Employment Agreement, the Company shall make a final, one-time bonus payment of $8.0 Million, to be distributed among the Pool Participants (as listed under Schedule 1.03) according to the Bonus Allotted Share, if any, of each of the Pool Participants; and the Bonus Allotted Share shall be defined as the percentage allocable to each of the Pool Participants as determined by Harry Pontone in his capacity as President of the Company.   Upon such payment, all obligations of the Company to make bonus payments under this paragraph shall be fully and finally satisfied.

ARTICLE II
TERMINATION

*This Article is deleted in its entirety and is replaced by the following:*

At 5:00 PM EDT on the day of the Company's final, one-time bonus payment of $8.0 Million, described in Section 1.04 above, Employee's written and voluntary resignation from the Company and Milso shall be deemed effective, and the Employee shall have no further employment relationship with the Company, Milso, or any of their subsidiaries and affiliates. Any contractual covenants, promises, representations and/or obligations of the Employee to the

Company and Milso, shall survive such resignation and be unaffected by such resignation, including but not limited to those obligations described in Article IV below.

ARTICLE IV

EMPLOYEE'S COVENANTS AND AGREEMENTS

4.06.    Restrictions on Competition.  *This paragraph in the Employment Agreement is deleted and replaced by the following paragraph.*

4.06.    Restrictions on Competition.  Employee covenants and agrees that during the period of Employee's employment hereunder and for three (3) years following the effective date of Employee's resignation from the Company, Employee shall not engage, directly or indirectly, whether as principal or as agent, officer, director, employee consultant, shareholder, investor, financer or otherwise, alone or in association with any other person, corporation, or other entity in the manufacture, marketing or sale of caskets or any other product of the type presently manufactured, marketed or sold by The York Group, Inc. or Milso.  Notwithstanding the restrictions in this paragraph, Employee may own, directly or indirectly, solely as an investment, (A) securities of any such entity which are traded on any national securities exchange or NASDAQ if Employee (y) is not a controlling person or a member of a group which controls such entity; and (z) does not directly or indirectly own 2% or more of any class of securities of such entity or (B) interests in mutual funds or similar pooled accounts.

4.07.    Non-Solicitation of Customers and Suppliers.  *This paragraph in the Employment Agreement is deleted and replaced by the following paragraph.*

4.07.    Non-Solicitation of Customer and Suppliers.  Employee covenants and agrees that during the period of Employee's employment hereunder and for three (3) years following the effective date of Employee's resignation from the Company, Employee shall not directly or indirectly solicit the trade of, or trade with, any customer of The York Group, Inc. or Milso with respect to the manufacture, marketing or sale of caskets or any other product of the type presently manufactured, marketed or sold by The York Group, Inc. or Milso.

4.08.    Non-Solicitation of Employees.  *This paragraph in the Employment Agreement is deleted and replaced by the following paragraph.*

4.08.    Non-Solicitation of Employees.  Employee agrees that during the period of Employee's employment hereunder and for four (4) years following the effective date of Employee's resignation from the Company, Employee shall not directly or indirectly solicit or induce or attempt to solicit or induce any employee of The York Group, Inc. or Milso to leave either company or hire any such employee.  This paragraph shall not prohibit Employee from engaging in general advertising or solicitation not specifically targeted at any one or more

employees of the Company and shall not prohibit Employee from hiring any employee of the Company that contacts Employee as a result of such general advertising or solicitation.

## AMENDMENT TO THE ASSET PURCHASE AGREEMENT

All provisions of the Purchase Agreement remain unchanged, except (and solely as between Employee and the Company) Sections 12.2 and 12.3, entitled respectively "Covenant Not to Interfere" and "Noncompetition", are deleted and replaced by Sections 4.06, 4.07 and 4.08 as set forth above.

_____
SCOTT PONTONE

**THE YORK GROUP, INC.**

By: _____
Name: D.J. DECARLO
Title: DIRECTOR

**MATTHEWS INTERNATIONAL CORPORATION**

By: _____
Name: D.J. DECARLO
Title: VICE-CHAIRMAN

**MILSO INDUSTRIES CORP.**

By: _____
Name: D.J. DECARLO
Title: DIRECTOR

**Exhibit B**

**May 28, 2005**

## KEY EMPLOYEE
## EMPLOYMENT AGREEMENT

THIS KEY EMPLOYEE EMPLOYMENT AGREEMENT (this "Agreement"), is executed this 28 day of May, 2005, by and between The York Group, Inc., a Delaware corporation (the "Company") and Scott Pontone ("Employee") and is to be effective as of the Closing (as defined in the Asset Purchase Agreement, dated the same date as this Agreement, 2005 (the "Purchase Agreement"), among Milso Industries, Inc., Milso Industries, LLC and SBC Holding Corp. (collectively, the "Sellers"), the Shareholders signatory thereto, the Company, Midnight Acquisition Corporation and Matthews International Corporation ("Matthews")). In the event that the Purchase Agreement is terminated prior to the Closing or if the Closing otherwise does not occur, this Agreement shall be of no force or effect. Capitalized terms used in this Agreement and not otherwise defined have the meanings ascribed to those terms in the Purchase Agreement.

### WITNESSETH:

WHEREAS, concurrently with the execution and delivery of this Agreement, the Company is executing and delivering the Purchase Agreement pursuant to which, upon the terms and subject to the conditions set forth therein, the Company has agreed to purchase certain assets and assume certain liabilities and obligations of the Sellers (the "Transaction");

WHEREAS, pursuant to the Transaction, Employee's employment with Employee's former employer is being terminated, and the Company will only consider providing new employment to Employee if Employee agrees to the terms herein, including the confidentiality, non-solicitation and non-compete terms;

WHEREAS, Employee possesses valuable knowledge and skills that will contribute to the successful operation of the Company's business;

WHEREAS, the Company views the Employee as a key and integral person who is vital to the success of the Company in the future;

WHEREAS, Employee will derive good and valuable consideration in connection with Employee's employment hereunder;

WHEREAS, the Company desires to procure the services of Employee, and Employee is willing to be employed by the Company, upon the terms and subject to the conditions hereinafter set forth;

NOW, THEREFORE, intending to be legally bound, the Company agrees to employ Employee, and Employee hereby agrees to be employed by the Company, upon the following terms and conditions:

### ARTICLE I

### EMPLOYMENT

1.01.    Office. Employee is hereby employed, with effect from the Closing, by the Company and shall perform, for the Company as a whole, duties substantially similar to those performed for the Business as operated on the date of this Agreement by the Sellers and such other duties as may be reasonably assigned to him from time to time by the President of the Company. Throughout the Term, so

1

long as he is employed by the Company, Employee will be a member of the board of directors of the Company. If Harry Pontone ceases for any reason to be President of the Company, then, unless at that time the Performance Standards (as defined below) have not been satisfied as of the end of the Company's most recently-completed fiscal year, Employee shall be President of the Company throughout the balance of the Term. After he becomes President of the Company, Employee shall have all authority customarily associated with that position, including exclusive control over operations, hiring and firing of employees, employee compensation, product pricing, implementation of business strategy and, subject to the written operating business policies of Matthews that are uniformly applicable to all business segments of Matthews, decisions to seek corporate approvals for and to make capital investments; provided that actions with respect to hiring and firing of employees and employee compensation shall be subject to the procedural requirements, such as background checks, written notices and other administrative human resources procedures, but not the substantive requirements, such as any prescribed experience, education level, or operating or production goal requirements, if any, of the standard written operating business policies of Matthews that are uniformly applicable to all business segments of Matthews. After he becomes President of the Company, Employee shall report to the Group President, Bronze and York Casket Division or his superior, and to the Company's board of directors.

1.02. <u>Term</u>. Subject to provisions of Article II hereof, Employee's employment hereunder shall commence as of the Closing, and shall continue until the close of business on September 30, 2010 (the period during which Employee is employed hereunder being hereinafter referred to as the "<u>Term</u>").

1.03. <u>Cash Compensation</u>. As consideration for the services that Employee shall render hereunder, Employee shall be entitled to compensation as follows:

(a) Employee shall be entitled to annual compensation ("<u>Salary</u>") equal to $100,000 ("<u>Base Salary</u>") plus his Allotted Share (as hereinafter defined) of the Compensation Pool (as hereinafter defined) for each Employment Year (as hereinafter defined) that remains after payment of the Base Salaries (as defined in the employment agreement of each Pool Participant) of each Pool Participant (as hereinafter defined). After he becomes President of the Company, Employee's Base Salary shall be $400,000. The Base Salary shall increase each Employment Year by a percentage equal to the percentage increase in the Consumer Price Index, using the Consumer Price Index most recently published prior to January 1 of each year during the Term and comparing it to such index most recently published as of January 1, 2005.

(b) During each Employment Year, Employee's Salary shall be payable twice per month in accordance with the Company's standard pay practices, in an amount equal to 1/24 of the Base Salary plus the product of (x) 1/24 multiplied by (y) the Compensation Pool multiplied by (z) Employee's Allotted Share.

(c) For purposes of this Agreement:

(i) "<u>Allotted Share</u>" means the percentage established for each Employment Year by Harry Pontone, in his capacity as President of the Company, or if Harry Pontone no longer is President, by Employee provided that he is then employed by the Company (in either case after consultation with the board of directors of the Company or its designee), or if Harry Pontone is no longer President and Employee is not then employed by the Company, the percentage established for the preceding Employment Year; provided that, subject to subsection (ii) below, if a Pool Participant's employment hereunder is terminated, such Pool Participant's Allotted Share shall be allocated to the remaining Pool Participants pro rata based upon the Allotted Share of each.

(ii)    "Compensation Pool" means an amount in respect of each Employment Year equal to $1,750,000 (increased each Employment Year by a percentage equal to the percentage increase in the Consumer Price Index, using the Consumer Price Index most recently published prior to January 1 of each year during the Term and comparing it to such index most recently published as of January 1, 2005) less the aggregate of each Pool Participant's Base Salary (as defined in the employment agreement of each Pool Participant). If more than two Pool Participants cease to be employed during the Term, the next and any succeeding termination of employment of any Pool Participant shall result in the Compensation Pool being reduced by the amount of the terminated Pool Participant's Allotted Share of the Compensation Pool in effect in the year of termination. Notwithstanding the foregoing, if Employee shall become President of the Company, the Compensation Pool above shall be reduced by the Base Salary of Employee in effect immediately prior to his becoming President.

(iii)    "Consumer Price Index" means the Consumer Price Index for all urban consumers, as periodically published by the Bureau of Labor Statistics of the U.S. Department of Labor; or, if that index no longer is published, the most comparable index subsequently published , as agreed in good faith by Buyer and the Shareholders' Representative.

(iv)    "Employment Year" means (A) the period beginning on the date of the Closing and ending on the next December 31 occurring thereafter (the "First Employment Year"), (B) each full calendar year during the Term and (C) if the Term does not end on a December 31, the period beginning on the January 1 immediately preceding the end of the Term and ending on the last day of the Term.

(v)    "Pool Participants" means the persons named on Schedule 1.03.

1.04.    Performance Based Bonuses.

(a)  Employee shall be entitled to an annual bonus as follows:

(i)    With respect to each Bonus Year (as hereinafter defined), Employee shall be entitled to an amount equal to the product of (x) the Bonus Pool (as hereinafter defined) for such Bonus Year, if any, multiplied by (y) his Bonus Allotted Share (the "Bonus").

(ii)    The Bonus, if any, shall be due and payable by the Company no later than December 31st of each Bonus Year.

(iii)    For purposes of this Agreement:

(A)    "Adjusted Operating Profit" means, for any period, the net income of the Company and its subsidiaries determined in accordance with GAAP applied consistently with prior periods, excluding (i) any provision for interest expense or income taxes, (ii) any adjustments made for purchase accounting purposes resulting from the Transaction which otherwise would have an impact on Adjusted Operating Profit, including depreciation or amortization resulting from the re-valuation for purchase accounting purposes of tangible and intangible assets acquired in the Transaction and the cost of sales impact related to any re-valuation for purchase accounting purposes of inventory acquired in the

Transaction (but except as provided below, no such adjustments to the calculation of Adjusted Operating Profit shall be made in respect of any acquisitions other than the Transaction), (iii) any non-recurring costs or expenses related to the integration of the Business with the operations of the Company and (iv) all other extraordinary, non-recurring items (as determined in good faith with the agreement of Harry Pontone or Employee, if Employee is then President). In calculating Adjusted Operating Profit, all administrative and financial services performed by Matthews or its Affiliates for the Company (including without limitation accounting, accounts receivable processing, accounts payable processing, payroll processing, human resources and benefits support services, retirement and pension plan administration), shall be charged as an expense at an amount not to exceed the cost to the Business as of the date of this Agreement of any such service. With respect to future acquisitions by the Company, if either Harry Pontone or Employee is the President of the Company, unless the President agrees in writing to include those operating results and the related attributes of the acquisition (such as interest expense, integration costs and depreciation and amortization charges), they shall be excluded from the calculation of Adjusted Operating Profit using such methodologies as shall be agreed in good faith by the President of the Company and Matthews. If the Bonus Pool is determined pursuant to Section 1.02(a)(iii)(C)(2) below (because the Operating Profit is less than $16,000,000), the first $7,500,000 paid from the Bonus Pool shall be disregarded (and therefore not be a charge against net income in calculating Adjusted Operating Profit), but amounts subsequently paid from the Bonus Pool shall be taken into account (and therefore reduce net income) in the fiscal year for which it is accrued. Under no circumstances shall any amounts payable as purchase price pursuant to the Purchase Agreement be treated as charges against net income for purposes of determining Adjusted Operating Profit. If the Bonus Pool is determined pursuant to Section 1.04(a)(iii)(C)(1) below (because Operating Profit is $16,000,000 or greater), the first $7,500,000 paid from the Bonus Pool shall be taken into account (and therefore reduce net income) in the fiscal year for which it is accrued.

(B) "Bonus Allotted Share" means the percentage established for each Bonus Year by Harry Pontone, in his capacity as President of the Company, or if Harry Pontone no longer is President, by Employee provided that he is then employed by the Company (in either case after consultation with the Board of the Company or its designee), or if Harry Pontone is no longer President and Employee is not then employed by the Company, the percentage established for the preceding Bonus Year; provided that if a Pool Participant is not employed by the Company hereunder at the end of a Bonus Year, such Pool Participant's Bonus Allotted Share (to the extent not payable to such Pool Participant pursuant to the provisions of such Pool Participant's employment agreement) shall be allocated to the remaining Pool Participants pro rata based upon the Bonus Allotted Share of each.

(C) The "Bonus Pool" for the applicable Bonus Year shall be determined as follows:

(1)    If the Operating Profit (as defined in the Purchase Agreement) is $16,000,000 or greater:

(x)    with respect to each of the First Bonus Year, the Second Bonus Year and the Third Bonus Year, the Bonus Pool shall be $2,500,000, payable only if the Adjusted Operating Profit for such Bonus Year is equal to or greater than the Operating Profit Target for such Bonus Year; and

(y)    the Bonus Pool for the Fourth Bonus Year (which amount could be zero) shall equal $7,500,000 minus the aggregate amount paid by the Company to the Pool Participants from the Bonus Pools for the First Bonus Year, the Second Bonus Year and the Third Bonus Year, payable only if the aggregate Adjusted Operating Profit for the Third Bonus Year and the Fourth Bonus Year is equal to or greater than the aggregate Operating Profit Target for the Third Bonus Year and the Fourth Bonus Year; provided, however, that if there is no Bonus Pool payable for the Fourth Bonus Year because the above stated test in this subsection (y) is not met, the Bonus Pool for the Fourth Bonus Year nevertheless shall be payable in an amount described below, but only if the aggregate Adjusted Operating Profit for the Fourth Bonus Year is equal to or greater than the Operating Profit Target for such Bonus Year. The Bonus Pool in such case shall equal the lesser of (p) $2,500,000 and (q) $7,500,000 minus the aggregate amount paid by the Company to the Pool Participants from the Bonus Pools for the First Bonus Year, the Second Bonus Year and the Third Bonus Year (which amount could be zero).

(2)    If the Operating Profit (as defined in the Purchase Agreement) is less than $16,000,000:

(x)    with respect to each of the First Bonus Year, the Second Bonus Year and the Third Bonus Year, the Bonus Pool shall be $3,750,000, payable only if the Adjusted Operating Profit for such Bonus Year is equal to or greater than the Operating Profit Target for such Bonus Year; and

(y)    the Bonus Pool for the Fourth Bonus Year (which amount could be zero) shall equal $15,000,000 minus the aggregate amount paid by the Company to the Pool Participants from the Bonus Pools for the First Bonus Year, the Second Bonus Year and the Third Bonus Year, payable only if the aggregate Adjusted Operating Profit for the Third Bonus Year and the Fourth Bonus Year is equal to or greater than the aggregate Operating Profit Target for the Third Bonus Year and the Fourth Bonus Year; provided, however, that if there is no

Bonus Pool payable for the Fourth Bonus Year because the above stated test in this subsection (y) is not met, the Bonus Pool for the Fourth Bonus Year nevertheless shall be payable in an amount described below, but only if the aggregate Adjusted Operating Profit for the Fourth Bonus Year is equal to or greater than the Operating Profit Target for such Bonus Year. The Bonus Pool in such case shall equal the lesser of (p) $3,750,000 and (q) $15,000,000 minus the aggregate amount paid by the Company to the Pool Participants from the Bonus Pools for the First Bonus Year, the Second Bonus Year and the Third Bonus Year (which amount could be zero).

(D)  "Bonus Year" means each of the following periods:

(1)  the period beginning on October 1, 2006 and ending on September 30, 2007 (the "First Bonus Year");

(2)  the period beginning on October 1, 2007 and ending on September 30, 2008 (the "Second Bonus Year");

(3)  the period beginning on October 1, 2008 and ending on September 30, 2009 (the "Third Bonus Year"); and

(4)  the period beginning on October 1, 2009 and ending on September 30, 2010 (the "Fourth Bonus Year").

(E)  "Operating Profit Target" means:

(1)  with respect to the First Bonus Year, the product of (x) the sum of $16,000,000 plus the lesser of (aa) $22,000,000 and (bb) the actual York Operating Profit for the fiscal year October 1, 2005 through September 30, 2006 multiplied by (y) 1.07 (the "First Year Target");

(2)  with respect to the Second Bonus Year, an amount equal to the product of (x) the First Year Target, multiplied by (y) 1.07 (the "Second Year Target");

(3)  with respect to the Third Bonus Year, an amount equal to the product of (x) the Second Year Target, multiplied by (y) 1.07 (the "Third Year Target"); and

(4)  with respect to the Fourth Bonus Year, an amount equal to the product of (x) the Third Year Target, multiplied by (y) 1.07 (the "Fourth Year Target").

(F)  "York Operating Profit" means the Adjusted Operating Profit for the fiscal year ending September 30, 2006 minus the Operating Profit.

(b)  Upon the occurrence of a Bonus Acceleration Event, an amount equal to (i) $15,000,000 minus (ii) (A) the amount paid by the Buyer under Section 3.1.1 of the Purchase

Agreement plus (B) the aggregate amount paid by the Company to the Pool Participants from the Bonus Pools prior to such Bonus Acceleration Event, shall be immediately due and payable to the Pool Participants employed immediately prior to such Bonus Acceleration Event in accordance with the Bonus Allotted Share of each. Each of the following shall be a "Bonus Acceleration Event":

    (i)    If while Harry Pontone or Employee is President of the Company, his authority, duties or responsibilities as President are materially diminished or reduced by the Company for reasons other than a failure of the Company to meet the Performance Standards (as hereinafter defined); or

    (ii)    the employment of Harry Pontone or Employee is terminated (A) by the Company other than (x) for Cause (as defined in their respective employment agreements with the Company, each dated the date hereof (each a "Pontone Employment Contract")) or (y) pursuant to Section 2.01 or 2.02 of the applicable Pontone Employment Contract, or (B) by Harry Pontone or Employee, respectively, for Good Reason (as defined in the applicable Pontone Employment Contract); or

    (iii)    any of the following shall have occurred: a sale or other disposition of all or substantially of the assets or operations of the Company; a sale or other disposition of a material portion of the assets or operations of the Company to the extent it reasonably could be expected to materially affect the ability to achieve one or more Operating Profit Targets; (provided, that such sale or disposition of a material portion of the assets or operations shall not be considered a Bonus Acceleration Event if prior to such sale or other disposition Matthews provides written notice to Employee and Harry Pontone that such sale or disposition is intended and seeking confirmation that the sale or disposition will not constitute a Bonus Acceleration Event for purposes of this Section 1.04(b), and Employee and Harry Pontone each fails to provide to Matthews written notice within fifteen days after receipt of such notice that he reasonably expects such sale or other disposition to materially affect the ability to achieve one or more Operating Profit Targets); a direct or indirect sale of the Company; any "person," including a "group" (as those terms are used in Sections 13(d) and 14(d) of the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), but excluding Matthews, any entity controlled by or under common control with Matthews, any employee benefit plan of Matthews or any such entity becomes the beneficial owner (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of Matthews representing a majority of either (A) the combined voting power of Matthews' then outstanding securities or (B) the shares of Matthews' common stock then outstanding (in either such case other than as a result of an acquisition of securities directly from Matthews); or any consolidation or merger of Matthews in which the stockholders of Matthews immediately prior to the consolidation or merger, would not, immediately after the consolidation or merger, beneficially own (as that term is defined in Rule 13d-3 under the Exchange Act), directly or indirectly, shares representing in the aggregate 50% or more of the combined voting power of the securities of the corporation issuing cash or securities in the consolidation or merger (or of its ultimate parent corporation, if any); or any sale, lease, exchange or other transfer (in one transaction or a series of transactions contemplated or arranged by any party as a single plan) of all or substantially all of the assets of Matthews.

    (c) The "Performance Standards" shall be deemed satisfied unless the Company's Adjusted Operating Profit for any two consecutive fiscal years beginning not sooner than the

fiscal year ending September 30, 2006 shall have declined by more than 15% per year from the prior fiscal year's Adjusted Operating Profit. For this purpose, the Company's Adjusted Operating Profit for the fiscal year ending September 30, 2005 shall be the Adjusted Operating Profit for the Company for that year, calculated to the extent the Transaction is completed before September 30, 2005 on a pro forma stand-alone basis as if the Transaction has not occurred, plus the product of (x) Adjusted Business Operating Profit, multiplied by (y) 1.33.

      (i)    "Adjusted Business Operating Profit" means the net income of the Business for the nine months ending September 30, 2005, calculated to the extent the Transaction is completed before September 30, 2005 on a pro forma stand-alone basis as if the Transaction had not occurred, excluding (i) any provision for interest expense or income taxes, and (ii) all extraordinary, non-recurring items (as determined in good faith with the agreement of Harry Pontone or Employee, if such person is then President, and if neither is President, with the agreement of Employee). If the Transaction is completed before September 30, 2005, (i) all costs associated with negotiating and implementing the transactions contemplated by the Purchase Agreement, including business integration costs shall be excluded from the calculation of Adjusted Business Operating Profit and (ii) in calculating Adjusted Business Operating Profit, all administrative and financial services performed by Matthews or its Affiliates for the Company (including without limitation accounting, accounts receivable processing, accounts payable processing, payroll processing, human resources and benefits support services, retirement and pension plan administration), shall be charged as an expense at an amount not to exceed the present cost to the Business of any such service.

    1.05.   Employee Benefits. At all times during the term of Employee's employment hereunder, Employee shall (a) be covered by such major medical, group life, disability insurance, hospitalization or health benefit plans and qualified or non-qualified retirement plans as are available generally to executive-level personnel of the Company (including plans of its parent, Matthews International Corporation or any successor parent entity) and (b) be covered by such vacation, illness, fringe benefit programs and similar plans and policies contained in the employee handbook of the Company (or its parent, Matthews International Corporation or any successor parent entity), to the extent Employee is eligible under the terms thereof.

    1.06.   Other Interests. Employee agrees, during the period of his employment by the Company, to devote substantially all of his business time, energy and best efforts to the business and affairs of the Company and its affiliates and not to engage, directly or indirectly, in any other business or businesses, whether or not similar to that of the Company, except with the consent of the Board or as set forth on Schedule 1.06 hereto. The foregoing notwithstanding, the parties recognize and agree that Employee may engage in passive personal investment and charitable activities that do not conflict with the business and affairs of the Company or interfere with Employee's performance of his duties hereunder.

    1.07.   Duty of Loyalty. Employee acknowledges and agrees that he owes a fiduciary duty of loyalty to act at all times in the best interests of the Company, subject to Employee's ability to enforce his rights under this Agreement. In keeping with such duty, Employee shall make full disclosure to the Company of all business opportunities pertaining to the Company's business and shall not appropriate for Employee's own benefit business opportunities concerning the Company's business.

ARTICLE II
TERMINATION

2.01.   Illness, Incapacity.   If during the term of Employee's employment hereunder Employee shall be prevented, in the Company's reasonable judgment, from effectively performing his duties hereunder by reason of illness or disability for a consecutive period of 180 days during any twelve month period, then the Company may, by written notice to Employee, terminate Employee's employment hereunder. Upon delivery to Employee of such notice, Employee's employment and all obligations of the Company under Article I hereof shall forthwith terminate; provided that the Company shall immediately pay to Employee an amount equal to all Base Salary and other benefits earned and accrued and customarily paid under the Company's standard policies (but specifically excluding any rights under Section 1.04 hereof, the entitlement to which shall be governed by such Section) through and including the date of termination (and reimbursement for any expenses incurred through and including the date of such termination) and provided, further, that Employee shall remain eligible to receive a Bonus pursuant to the terms and subject to the conditions of Section 1.04 hereof.  The obligations of Employee under Article IV hereof shall continue notwithstanding termination of Employee's employment pursuant to this Section 2.01.

2.02.   Death.   If Employee dies during the Term, all obligations of the Company hereunder shall terminate; provided that the Company shall, within five business days of receipt of notice of Employee's death, pay to Employee's estate an amount equal to (i) all Base Salary and other benefits earned and accrued through and including the date of termination (and reimbursement for any expenses incurred through and including the date of Employee's death).   If the death occurs during a Bonus Year, the Company also shall pay to Employee's estate, following the end of the Bonus Year and at the same time as payments are made to other Pool Participants, an amount equal to the Bonus Allotted Share Employee would have received if employed throughout the Bonus Year, multiplied by the quotient of (a) the number of days elapsed in that Bonus Year through and including the date of death, divided by (b) 365.

2.03.   Termination by the Company for Cause.   If the Company reasonably determines that Employee (a) has engaged to the material detriment of the Company in gross negligence, gross incompetence or willful misconduct in the performance of his duties and has failed within a reasonable period after written notice thereof to correct such conduct, (b) has repeatedly refused, without proper reason, to perform his duties (including Employee's violation of Matthews' Code of Conduct for employees) and has failed within a reasonable period after written notice thereof to correct such conduct, (c) has committed an act of fraud, embezzlement or willful breach of a fiduciary duty, in each case to the Company (it being understood that in any proceeding to interpret or enforce this Agreement, the Company shall bear the burden of proof in establishing it had the right to terminate Employee pursuant to this clause (c)), (d) has been convicted of (or pleaded no contest to) a crime involving fraud or any felony involving moral turpitude, or (e) has committed a crime of dishonesty or moral turpitude and by reason of publicity with respect to the same has materially and substantially harmed the Company, the Company may, by written notice (which notice shall set forth such breach in reasonable detail) to Employee, terminate Employee's employment hereunder; the Company shall promptly pay Employee any compensation accrued but not yet paid under Section 1.03 hereof through and including the date of such termination (and reimbursement for expenses incurred through and including the date of such termination) and, upon such payment, all obligations of the Company under Article I hereof shall forthwith terminate. The obligations of Employee under Article IV hereof shall continue notwithstanding termination of Employee's employment pursuant to this Section 2.03.

2.04.   Termination by the Company without Cause or by Employee for Good Reason.   Employee's employment hereunder may be terminated at any time by the Company without Cause (except for disability or death, which shall be covered by Sections 2.01 and 2.02 above) by written notice

to Employee and Employee may terminate Employee's employment with the Company for Good Reason. In the event of any such termination of employment, (a) the Company shall immediately pay to Employee (i) an amount equal to all Base Salary and other benefits earned and accrued and customarily paid under the Company's standard policies (but specifically excluding any rights under Section 1.04 hereof, the entitlement to which shall be governed by such Section) through and including the date of termination (and reimbursement for any expenses incurred through and including the date of such termination) and (ii) an amount equal to the product of (x) Employee's most recently determined Bonus Allotted Share as of the date of termination multiplied by (y) $15,000,000 minus (A) the aggregate amount paid by the Buyer under Section 3.1.1 of the Purchase Agreement plus (B) the aggregate amount of Bonus Pools previously paid by the Company pursuant to Section 1.04. The obligations of Employee under Article IV hereof shall continue notwithstanding termination of Employee's employment pursuant to this Section 2.04, but only if and to the extent the Company (1) notifies Employee within sixty days of the date of termination that the Company irrevocably commits to make the Subject Payments and to provide the health-related benefits described in clause (3) below, and (2) pays the Employee an amount equal to his then current Base Salary for and throughout the balance of the period that would have remained in the term had Employee's employment hereunder not been so terminated, no less frequently than Employee was paid Base Salary while working for the Company (the "Subject Payments") and (3) for the period that would have remained in the Term had Employee's employment hereunder not be so terminated, provides Employee with such continuing coverage under the health insurance benefit plans and programs Employee was receiving at the time of such termination of employment. If termination pursuant to this Section 2.04 occurs at a time when Harry Pontone or Employee is President of the Company, the decision to pay the compensation and extend the health benefits described in the preceding sentence shall be made only by the board of directors of the Company or its designee.

For purposes of this Agreement, "Good Reason" shall mean, unless otherwise consented to by Employee, (i) any material reduction of Employee's authority, duties and responsibilities, or the assignment to Employee of duties materially inconsistent with the provisions of Section 1.01 hereof, in either case for reasons other than a failure of the Company to meet Performance Standards; (ii) a reduction in Base Salary of Employee by a person other than Harry Pontone; (iii) the relocation of Employee's office outside of the New York metropolitan area or (iv) the Company's material breach of this Agreement and the failure by the Company to correct such breach within a reasonable period after written notice thereof by Employee.

2.05.  Employee Termination. Employee agrees to give the Company sixty days prior written notice of his voluntary termination of employment with the Company. Following a termination of employment with the Company by Employee without Good Reason, and effective as of the date of such termination, any obligations of the Company to Employee pursuant to Article I hereunder shall cease, other than to provide Employee with all Base Salary and other benefits earned and accrued and customarily paid under the Company's standard policies (but specifically excluding any rights under Section 1.04 hereof, the entitlement to which shall be governed by such Section) through and including the date of termination and reimbursement for any expenses incurred through and including the date of such termination. The obligations of Employee under Article IV hereof shall continue notwithstanding termination of Employee's employment pursuant to this Section 2.05.

2.06.  Deemed Resignations. Any termination of Employee's employment shall constitute an automatic resignation of Employee as an officer of the Company and each affiliate of the Company, and an automatic resignation of Employee from the Board (if applicable) and from the board of directors of any affiliate of the Company and from the board of directors or similar governing body of any corporation, limited liability company or other entity in which the Company or any affiliate holds an equity interest and with respect to which board or similar governing body Employee serves as the Company's or such affiliate's designee or other representative.

## ARTICLE III
## EMPLOYEE'S ACKNOWLEDGMENTS

As used in Article III and Sections 4.01, 4.02, 4.05, 4.08 and 4.09, the term "Company" shall include The York Group, Inc. and the companies directly or indirectly through one or more intermediaries controlled by, in control of, or under common control with, The York Group, Inc.

Employee recognizes and acknowledges that: (a) in the course of Employee's employment by the Sellers, and in the future by the Company, Employee has acquired and will continue to acquire information which could include, in whole or in part, information concerning the Company's sales, sales volume, sales methods, sales proposals, customers and prospective customers, identity of customers and prospective customers, identity of key purchasing personnel in the employ of customers and prospective customers, amount or kind of customers' purchases from the Company, the Company's sources of supply, the Company's computer programs, system documentation, special hardware, product hardware, related software development, the Company's manuals, formulae, processes, methods, machines, compositions, ideas, improvements, inventions or other confidential or proprietary information belonging to the Company or relating to the Company's affairs (collectively referred to herein as the "Confidential Information"); (b) to the extent provided in Article IV hereof, the Confidential Information is the property of the Company; (c) to the extent provided in Article IV hereof, the misappropriation or disclosure of the Confidential Information (other than as directed by the Company) would constitute a breach of trust and could cause irreparable injury to the Company; and (d) it is essential to the protection of the Company's goodwill and to the maintenance of the Company's competitive position that, to the extent provided in Article IV hereof, the Confidential Information be kept secret and that Employee not disclose the Confidential Information to others (other than as directed by the Company) or use the Confidential Information to Employee's own advantage or the advantage of others. Notwithstanding the foregoing, Employee will not have any obligation for any disclosure of Confidential Information if (i) the Company authorizes Employee to disclose such Confidential Information to third parties by prior written authorization executed by the Company; (ii) it is or becomes available to the general public in a publication of general circulation, other than by an act or omission of Employee or any employee, agent, or other person acting for or on behalf of Employee; (iii) used in an action or proceeding brought by Employee or the Company in pursuit of its rights or in exercise of its remedies hereunder or (iv) required by applicable law or it is ordered to be disclosed by a court, administrative agency, or other governmental body with jurisdiction over the parties hereto, provided that, subject to applicable law, Employee will first have provided the Company with prompt written notice of such required disclosure and will take reasonable steps to allow the Company to seek a protective order with respect to the confidentiality of the information required to be disclosed (Employee will promptly cooperate with and assist the Company in connection with obtaining such protective order).

Employee further recognizes and acknowledges that it is essential for the proper protection of the business of the Company that Employee be restrained to the extent provided in Article IV hereof (a) from soliciting or inducing any employee of the Company to leave the employ of the Company, (b) from hiring or attempting to hire any employee of the Company, (c) from soliciting the trade of or trading with the customers and suppliers of the Company for any business purpose other than in connection with Employee's duties hereunder, and (d) from competing against the Company for a reasonable period following the termination of Employee's employment with the Company.

## ARTICLE IV
## EMPLOYEE'S COVENANTS AND AGREEMENTS

4.01.    Non-Disclosure of Confidential Information.  Employee agrees to hold and safeguard the Confidential Information in trust for the Company, its successors and assigns and agrees that he or she

shall not, without the prior written consent of the Company, misappropriate or disclose or make available to anyone for use outside the Company's organization at any time, either during his employment with the Company or subsequent to the termination of his employment with the Company for any reason, including without limitation termination by the Company for Cause or without Cause, any of the Confidential Information, whether or not developed by Employee, except as required in the performance of Employee's duties to the Company. Without limitation, Employee shall not be permitted to remove Confidential Information from Company computer servers to use for any personal purpose.

Notwithstanding the above restriction, Employee will not have any obligation for any disclosure of Confidential Information if (i) the Company authorizes Employee to disclose such Confidential Information to third parties by prior written authorization executed by the Company; (ii) it is or becomes available to the general public in a publication of general circulation, other than by an act or omission of Employee or any employee, agent, or other person acting for or on behalf of Employee; (iii) used in an action or proceeding brought by Employee or the Company in pursuit of its rights or in exercise of its remedies hereunder or (iv) required by applicable law or it is ordered to be disclosed by a court, administrative agency, or other governmental body with jurisdiction over the parties hereto, provided that, subject to applicable law, Employee will first have provided the Company with prompt written notice of such required disclosure and will take reasonable steps to allow the Company to seek a protective order with respect to the confidentiality of the information required to be disclosed (Employee will promptly cooperate with and assist the Company in connection with obtaining such protective order).

4.02.   Disclosure of Works and Inventions/Assignment of Patents.   Employee shall disclose promptly to the Company or its nominee any and all works, inventions, discoveries and improvements authored, conceived or made by Employee during Term and related to the Company ("Employee Works"), and hereby assigns and agrees to assign all his interest therein to the Company or its nominee. The parties agree that the intent of the foregoing is not to provide for the Company ownership of personal inventions or materials (like writings or artwork) created by Employee that do not relate to the Company and are not created using Company assets. Whenever requested to do so by the Company, Employee shall execute any and all applications, assignments or other instruments which the Company shall deem necessary to apply for and obtain Letters Patent or Copyrights of the United States or any foreign country or to otherwise protect the Company's interest in such Employee Works. Such obligations shall continue beyond the Term with respect to Employee Works authored, conceived or made by Employee during the Term, and shall be binding upon Employee's assigns, executors, administrators and other legal representatives. Employee agrees that in the event of publication by Employee of written or graphic materials related to the business or activities of the Company, the Company will retain and own all rights in said materials, including right of copyright. The parties agree that the intent of the foregoing is not to provide for Company ownership of personal inventions or materials (like writings or artwork) created by the Employee that do not relate to the Company and are not created using Company assets.

4.03.   Business Opportunities.   Employee agrees to be a loyal employee of the Company. Employee agrees that he shall not usurp any corporate opportunities of the Company.

4.04.   Compliance.   Employee shall be required to adhere to the internal control standards and codes of conduct as defined by the Sarbanes-Oxley Act of 2002, established regulatory standards and published Matthews' policies, to the extent applicable by their terms to Employee.

4.05.   Return of Materials.   Upon the termination of Employee's employment with the Company for any reason, including without limitation termination by the Company for Cause or without Cause, Employee shall promptly deliver to the Company all correspondence, drawings, blueprints, manuals, letters, notes, notebooks, reports, flowcharts, programs, proposals and any documents concerning the Company's customers or concerning products or processes used by the Company and,

without limiting the foregoing, will promptly deliver to the Company any and all other documents or materials containing or constituting Confidential Information.

4.06.    Restrictions on Competition.

(a)  Employee covenants and agrees that (i) during the period of Employee's employment hereunder, (ii) for three (3) years after the end of the term of this Agreement under Section 1.02 hereof and (iii) if applicable in accordance with subsections (b), (c) or (d) below, for an additional period equal to what would have been the then remaining term of this Agreement had this Agreement not been otherwise terminated (the "Applicable Term") plus three (3) years (such total period in each of subsection (i), (ii) and (iii) above being referred to herein as the "Non-Compete Period"), Employee shall not engage, directly or indirectly, whether as principal or as agent, officer, director, employee, consultant, shareholder, investor, financer or otherwise, alone or in association with any other person, corporation or other entity, in any Competing Business. For purposes of this Agreement, the term "Competing Business" shall mean any person, corporation or other entity which manufactures, markets or sells caskets, urns, memorials or cremation equipment.

(b)  If the Employee voluntarily ceases employment with the Company, including as set forth under Section 2.05 hereof, Employee shall remain subject to Section 4.06(a) for the Non-Compete Period without any further payment due by the Company to Employee beyond the payments required under Section 2.05.

(c)  If Employee is terminated pursuant to Section 2.04, Employee shall remain subject to Section 4.06(a) for the Non-Compete Period, to the extent provided therein.

(d)  If Employee is terminated pursuant to Section 2.01 or Section 2.03, Employee shall remain subject to Section 4.06(a) for the Non-Compete Period without any further payment due to Employee by the Company beyond the payments requirements under Section 2.01 or Section 2.03, as the case may be.

Notwithstanding the restrictions contained in this Section 4.06, Employee may own, directly or indirectly, solely as an investment, (A) securities of any such entity which are traded on any national securities exchange or NASDAQ if Employee (y) is not a controlling person of, or a member of a group, which controls such entity; and (z) does not, directly or indirectly own 2% or more of any class of securities of such entity or (B) interests in mutual funds or similar pooled accounts.

4.07.    Non-Solicitation of Customers and Suppliers.  Employee agrees that while employed hereunder he shall not, directly or indirectly, solicit the trade of, or trade with, any customer, prospective customer or supplier of the Company with respect to the manufacture or sale of caskets, urns, memorials or cremation products for any business purpose other than for the benefit of the Company. Employee further agrees that following the termination of Employee's employment with the Company, to the same extent and for the same period (if any) that the Employee continues to be subject to the restrictions of Section 4.06, Employee shall not, directly or indirectly, solicit the trade of, or trade with, any customers or prospective customers or suppliers of the Company with respect to the manufacture or sale by the Company of caskets, urns, memorials or cremation products, or the supplies necessary to manufacture the same.

4.08.    Non-Solicitation of Employees.  Employee agrees that following termination of Employee's employment with the Company, and to the same extent and for the same period (if any) that the Employee continues to be subject to the restrictions of Section 4.06, Employee shall not, directly or

indirectly, solicit or induce, or attempt to solicit or induce, any employee of the Company to leave the Company for any reason whatsoever, or hire any such employee. This Section 4.08 will not prohibit Employee from engaging in general advertising or solicitation not specifically targeted at any one or more employees of the Company and shall not prohibit Employee from hiring any employee of the Company that contacts Employee as a result of such general advertising or solicitation.

4.09.  <u>Non-Disparagement</u>. During Employee's employment with the Company and following any termination of employment with Company, (a) Employee agrees not to disparage, either orally or in writing, the Company, any of its business, products, services or practices, or any of their directors, officers, agents, representatives, stockholders, employees or affiliates and (b) the Company agrees not to, and agrees to cause its directors, officers, agents, representatives, stockholders, employees and affiliates not to, disparage Employee, either orally or in writing.

## ARTICLE V
## <u>EMPLOYEE'S REPRESENTATIONS AND WARRANTIES</u>

5.01.  <u>No Prior Agreements</u>.  Employee represents and warrants that he is not a party to or otherwise subject to or bound by the terms of any contract, agreement or understanding which in any manner would limit or otherwise affect his ability to perform his obligations hereunder, including without limitation any contract, agreement or understanding containing terms and provisions similar in any manner to those contained in Article IV hereof.  Employee further represents and warrants that his employment with the Company will not require him to disclose or use any confidential information belonging to prior employers or other persons or entities.

5.02.  <u>Employee's Abilities</u>.  Employee acknowledges that it would cause the Company serious and irreparable injury and cost if Employee were to use his ability and knowledge in competition with the Business in breach of the obligations contained in Article IV.

5.03.  <u>Remedies</u>.  In the event of a breach by Employee of the terms of this Agreement, the Company shall be entitled, if it shall so elect, to institute legal proceedings to obtain damages for any such breach, or to enforce the specific performance of this Agreement by Employee and to enjoin Employee from any further violation of this Agreement and to exercise such remedies cumulatively or in conjunction with all other rights and remedies provided by law.  Employee acknowledges, however, that the remedies at law for any breach by him of the provisions of this Agreement may be inadequate and that the Company shall be entitled to injunctive relief against him in the event of any breach.

## ARTICLE VI
## MISCELLANEOUS

6.01.  <u>Authorization to Modify Restrictions</u>.  It is the intention of the parties that the provisions of Article IV hereof shall be enforceable to the fullest extent permissible under applicable law, but that the unenforceability (or modification to conform to such law) of any provision or provisions hereof shall not render unenforceable, or impair, the remainder thereof.  If any provision or provisions hereof shall be deemed invalid or unenforceable, either in whole or in part, this Agreement shall be deemed amended to delete or modify, as necessary, the offending provision or provisions and to alter the bounds thereof in order to render it valid and enforceable.

6.02.  <u>Entire Agreement</u>.  This Agreement and the Purchase Agreement represent the entire agreement of the parties with respect to the subject matter hereof and this Agreement may be amended only by a writing signed by each of them; provided that any such amendment which affects Section 1.04 hereof shall require the prior written consent of (i) Harry Pontone, in his capacity as President of the

Company, or (ii) if Harry Pontone no longer is President, Employee, provided that he is then employed by the Company, or (iii) if Harry Pontone is no longer President and Employee is not then employed by the Company, each of the individuals set forth on Schedule 1.03 hereto that are then employed by the Company.

6.03.    Governing Law.  This agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to the principles of conflict of laws thereof.

6.04.    Jurisdiction Venue and Service of Process.  Each party (a) agrees that any suit, action or proceeding arising out of or relating to this Agreement shall be brought solely in the state or federal courts of Pittsburgh, Pennsylvania or New York, New York; (b) consents to the exclusive jurisdiction of each such court in any suit, action or proceeding relating to or arising out of this Agreement; (c) waives any objection that it may have to the laying of venue in any such suit, action or proceeding in any such court; and (d) agrees that service of any court paper may be made in such manner as may be provided under applicable laws or court rules governing service of process.

6.05.    Counterparts, Section Headings.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.  The section headings of this Agreement are for convenience of reference only and shall not affect the construction or interpretation of any of the provisions hereof.

*Signature page follows.*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement or caused this Agreement to be executed the day and year first above written.

SCOTT PONTONE

Address:

16 Fox Hall Place

Scarsdale NY 10583

THE YORK GROUP, INC.

By: _____

Name:
Title:

IN WITNESS WHEREOF, the parties hereto have executed this Agreement or caused this Agreement to be executed the day and year first above written.

_____

SCOTT PONTONE

Address:

_____

_____

_____


THE YORK GROUP, INC.

By: _____

Name:
Title:

## SCHEDULE 1.03

## <u>POOL PARTICIPANTS</u>

1. Harry Pontone

2. Louis Pontone

3. Michael Pontone

4. Steven Pontone

5. Scott G. Pontone

6. Thomas Pontone

7. Andrew Pontone, Jr.

SCHEDULE 1.06

<u>PERMITTED ACTIVITIES</u>

1.    Real estate investments and management as currently conducted by Employee through subsidiaries of SBC Holding Corporation.

# Exhibit C

EXECUTION COPY

ASSET PURCHASE AGREEMENT

BY AND AMONG

THE YORK GROUP, INC.,

MIDNIGHT ACQUISITION CORPORATION,

MILSO INDUSTRIES, INC.,

MILSO INDUSTRIES, LLC,

SBC HOLDING CORPORATION,

THE SHAREHOLDERS IDENTIFIED HEREIN AND

MATTHEWS INTERNATIONAL CORPORATION

MAY 28, 2005

# TABLE OF CONTENTS

**Page**

ARTICLE I        CERTAIN DEFINITIONS ................................................................. 1

| | | |
|---|---|---|
| 1.1 | Accounts Receivable | 1 |
| 1.2 | Accrued Expenses | 1 |
| 1.3 | Adjustment Target Date | 1 |
| 1.4 | Affiliate | 1 |
| 1.5 | Agreement | 2 |
| 1.6 | Ancillary Agreements | 2 |
| 1.7 | Applicable Laws | 2 |
| 1.8 | Assignment and Assumption Agreement | 2 |
| 1.9 | Assumed Contracts | 2 |
| 1.10 | Assumed Liabilities | 2 |
| 1.11 | Assumed Real Property Leases | 2 |
| 1.12 | Balance Sheet | 2 |
| 1.13 | Balance Sheet Date | 2 |
| 1.14 | Base Cash Consideration | 2 |
| 1.15 | Base Operating Profit | 2 |
| 1.16 | Bill of Sale | 2 |
| 1.17 | Books and Records | 2 |
| 1.18 | Buyer Damages | 2 |
| 1.19 | Buyer Indemnitees | 2 |
| 1.20 | Business | 2 |
| 1.21 | Business Day | 2 |
| 1.22 | Buyer | 2 |
| 1.23 | CERCLA | 2 |
| 1.24 | Closing | 2 |
| 1.25 | Closing Balance Sheet | 2 |
| 1.26 | Closing Date | 3 |
| 1.27 | Closing Date Cash Consideration | 3 |
| 1.28 | Closing Inventory | 3 |
| 1.29 | Closing Working Capital | 3 |
| 1.30 | Code | 3 |
| 1.31 | Confidential Information | 3 |

NYA 730432.9

**TABLE OF CONTENTS**
**(continued)**

| | | Page |
|---|---|---|
| 1.32 | Confidentiality Agreement | 3 |
| 1.33 | Consideration | 3 |
| 1.34 | Contingent Consideration Payment | 3 |
| 1.35 | Contract | 3 |
| 1.36 | Employees | 3 |
| 1.37 | Employment Agreements | 3 |
| 1.38 | Encumbrance | 3 |
| 1.39 | Environment | 3 |
| 1.40 | Environmental Laws | 3 |
| 1.41 | Environmental Liabilities and Costs | 4 |
| 1.42 | Environmental Permits | 4 |
| 1.43 | ERISA | 4 |
| 1.44 | ERISA Plans | 4 |
| 1.45 | Escrow Agent | 4 |
| 1.46 | Escrow Agreement | 4 |
| 1.47 | Escrow Amount | 4 |
| 1.48 | Escrow Fund | 4 |
| 1.49 | Excluded Assets | 4 |
| 1.50 | Excluded Liabilities | 4 |
| 1.51 | GAAP | 4 |
| 1.52 | Governmental Authority | 4 |
| 1.53 | Hazardous Substances | 4 |
| 1.54 | HSR Act | 5 |
| 1.55 | Indemnified Party | 5 |
| 1.56 | Indemnifying Party | 5 |
| 1.57 | Indemnity Period | 5 |
| 1.58 | Independent Accounting Firm | 5 |
| 1.59 | Inventory | 5 |
| 1.60 | Key Employees | 5 |
| 1.61 | Knowledge or to the knowledge of Sellers | 5 |
| 1.62 | Lease | 5 |
| 1.63 | Lease Consent | 5 |

- ii -

**TABLE OF CONTENTS**
**(continued)**

Page

| 1.64 | Leased Property | 5 |
| 1.65 | Losses | 5 |
| 1.66 | Machinery and Equipment | 5 |
| 1.67 | Material Adverse Effect | 5 |
| 1.68 | Matthews | 5 |
| 1.69 | Operating Profit | 6 |
| 1.70 | Other Leases | 6 |
| 1.71 | Party | 6 |
| 1.72 | Payables | 6 |
| 1.73 | Pension Plan | 6 |
| 1.74 | Permits | 6 |
| 1.75 | Permitted Encumbrances | 6 |
| 1.76 | Person | 7 |
| 1.77 | Plans | 7 |
| 1.78 | Prepaid Expenses | 7 |
| 1.79 | Products | 7 |
| 1.80 | Proprietary Rights | 7 |
| 1.81 | Purchased Assets | 7 |
| 1.82 | Real Property | 7 |
| 1.83 | Real Property Leases | 7 |
| 1.84 | Release | 7 |
| 1.85 | Remedial Action | 7 |
| 1.86 | Seller and Sellers | 7 |
| 1.87 | Security Deposits | 7 |
| 1.88 | Seller Damages | 7 |
| 1.89 | Seller Indemnitees | 8 |
| 1.90 | Shareholder | 8 |
| 1.91 | Subsidiary | 8 |
| 1.92 | Supply Letter Agreement | 8 |
| 1.93 | Tax Returns | 8 |
| 1.94 | Taxes | 8 |
| 1.95 | Working Capital Calculation | 8 |

NYA 730432.9

**TABLE OF CONTENTS**
**(continued)**

|  |  |  | Page |
|---|---|---|---|
| ARTICLE II | TRANSFER OF ASSETS AND PROPERTIES; CLOSING | | 8 |
| 2.1 | Purchased Assets | | 8 |
| 2.3 | Equitable Assignment | | 11 |
| 2.4 | Closing | | 11 |
| ARTICLE III | PURCHASE PRICE | | 12 |
| 3.1 | Purchase Price | | 12 |
| 3.2 | Allocation of Purchase Price | | 13 |
| 3.3 | Transfer Taxes | | 13 |
| 3.4 | Proration of Taxes and Certain Charges | | 13 |
| 3.5 | Escrow Agreement | | 14 |
| 3.6 | Adjustment to Seller's Consideration | | 15 |
| ARTICLE IV | ASSUMPTION OF LIABILITIES; EMPLOYEE MATTERS | | 16 |
| 4.1 | General Limitation on Assumption of Liabilities | | 16 |
| 4.2 | Assumed Liabilities and Obligations | | 17 |
| 4.3 | Offers of Employment | | 17 |
| 4.4 | Other Employee Benefits | | 18 |
| 4.5 | Employment Taxes | | 19 |
| ARTICLE V | CLOSING | | 19 |
| 5.1 | Deliveries by Sellers | | 19 |
| 5.2 | Deliveries by Buyer | | 20 |
| 5.3 | Escrow Fund Delivery | | 20 |
| 5.4 | Delivery of Possession | | 20 |
| ARTICLE VI | REPRESENTATIONS AND WARRANTIES OF SELLERS AND THE SHAREHOLDERS | | 20 |
| 6.1 | Organization, Good Standing and Power | | 20 |
| 6.2 | Authorization of Agreement and Enforceability | | 21 |
| 6.3 | No Violation; Consents | | 21 |
| 6.4 | Financial Statements | | 21 |
| 6.5 | Accounts Receivable | | 21 |
| 6.6 | Inventory | | 22 |
| 6.7 | Absence of Certain Changes or Events | | 22 |
| 6.8 | Title to Properties; Absence of Liens and Encumbrances | | 22 |

- iv -

NYA 730432.9

**TABLE OF CONTENTS**
**(continued)**

Page

| | | | |
|---|---|---|---|
| 6.9 | | Proprietary Rights | 23 |
| 6.10 | | Contracts and Commitments | 23 |
| 6.11 | | Permits, Licenses | 24 |
| 6.12 | | Compliance with Laws | 24 |
| 6.13 | | Legal Proceedings | 24 |
| 6.14 | | Absence of Undisclosed Liabilities | 25 |
| 6.15 | | Books and Records | 25 |
| 6.16 | | Employees | 25 |
| 6.17 | | Labor Matters, etc | 25 |
| 6.18 | | Employee Benefit Plans and Related Matters | 25 |
| 6.19 | | No Finder | 26 |
| 6.20 | | Interest in Business | 27 |
| 6.21 | | Condition of Assets | 27 |
| 6.22 | | Affiliate Transactions; Loans | 27 |
| 6.23 | | Environmental Matters | 27 |
| 6.24 | | Sufficiency of Assets | 28 |
| 6.25 | | Territorial Restrictions | 28 |
| 6.26 | | Leased Property | 28 |
| 6.27 | | Suppliers; Raw Materials | 28 |
| 6.28 | | Customers | 29 |
| 6.29 | | Product Warranties | 29 |
| 6.30 | | Absence of Certain Business Practices | 29 |
| 6.31 | | Taxes | 29 |
| 6.32 | | Thomas Pontone | 30 |
| ARTICLE VII | | REPRESENTATIONS AND WARRANTIES OF BUYER | 30 |
| 7.1 | | Organization, Good Standing, Power | 30 |
| 7.2 | | Authorization of Agreement and Enforceability | 30 |
| 7.3 | | No Violations; Consents | 30 |
| 7.4 | | Legal Proceedings | 30 |
| 7.5 | | Availability of Funds | 31 |
| 7.6 | | No Finder | 31 |
| ARTICLE VIII | | COVENANTS OF SELLERS PRIOR TO CLOSING DATE | 31 |

- v -

NYA 730432.9

## TABLE OF CONTENTS
### (continued)

Page

| | | | |
|---|---|---|---|
| 8.1 | Required Actions | 31 |
| 8.2 | Prohibited Actions | 33 |
| 8.3 | No Merger, Etc. | 34 |
| 8.4 | TP Settlement Documents | 34 |
| ARTICLE IX | COVENANTS OF BUYER PRIOR TO CLOSING DATE | 34 |
| 9.1 | Required Actions | 34 |
| 9.2 | Investigation | 35 |
| 9.3 | Approvals, Consents | 35 |
| 9.4 | Access to Information | 35 |
| ARTICLE X | CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER | 35 |
| 10.1 | Accuracy of Representations and Warranties | 35 |
| 10.2 | Performance of Agreement | 36 |
| 10.3 | Sellers' Certificates | 36 |
| 10.4 | Secretary's Certificates | 36 |
| 10.5 | Injunction | 36 |
| 10.6 | Actions and Proceedings | 36 |
| 10.7 | HSR Act Waiting Period | 36 |
| ARTICLE XI | CONDITIONS PRECEDENT TO THE OBLIGATIONS OF SELLERS | 36 |
| 11.1 | Accuracy of Representations and Warranties | 36 |
| 11.2 | Performance of Agreement | 36 |
| 11.3 | Buyer's Certificate | 36 |
| 11.4 | Secretary's Certificate | 36 |
| 11.5 | Injunction | 37 |
| 11.6 | Actions or Proceedings | 37 |
| 11.7 | HSR Act Waiting Period | 37 |
| ARTICLE XII | OBLIGATIONS AFTER THE CLOSING DATE | 37 |
| 12.1 | Confidentiality | 37 |
| 12.2 | Covenant Not to Interfere | 37 |
| 12.3 | Noncompetition | 37 |
| 12.4 | Transition of Employees | 38 |
| 12.5 | Administrative Assistance by Seller | 38 |
| 12.6 | Further Assurances | 38 |

NYA 730432.9

**TABLE OF CONTENTS**
**(continued)**

| | | | Page |
|---|---|---|---|
| 12.7 | | Retention of and Access to Records; Cooperation | 38 |
| 12.8 | | Accounts Receivable Payment | 38 |
| 12.9 | | Use of Business Name | 38 |
| 12.10 | | Operation of Business | 38 |
| 12.11 | | Director Appointments | 39 |
| ARTICLE XIII | TERMINATION | | 39 |
| 13.1 | | Termination of Agreement | 39 |
| 13.2 | | Return of Documents | 40 |
| 13.3 | | Effect of Termination | 40 |
| ARTICLE XIV | SURVIVAL OF REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION | | 40 |
| 14.1 | | Survival of Representations and Warranties | 40 |
| 14.2 | | Sellers' Agreement to Indemnify | 40 |
| 14.3 | | Sellers' and Shareholders' Agreement to Indemnify | 41 |
| 14.4 | | Limitations on Sellers' and Shareholders' Indemnity | 41 |
| 14.5 | | Buyer's Agreement to Indemnify | 42 |
| 14.6 | | Limitation on Buyer's Indemnity | 42 |
| 14.7 | | Third Party Indemnification | 43 |
| 14.8 | | Payment of Indemnification Obligations | 43 |
| 14.9 | | Interest on Unpaid Obligations | 43 |
| 14.10 | | Cooperation with Proceedings | 44 |
| 14.11 | | Treatment of Indemnification Payments | 44 |
| 14.12 | | Exclusive Remedy | 44 |
| ARTICLE XV | GENERAL | | 44 |
| 15.1 | | Expenses | 44 |
| 15.2 | | Publicity | 44 |
| 15.3 | | Waivers | 44 |
| 15.4 | | Binding Effect; Benefits | 44 |
| 15.5 | | Bulk Transfers Laws | 45 |
| 15.6 | | Notices | 45 |
| 15.7 | | Entire Agreement | 45 |
| 15.8 | | Counterparts | 46 |

NYA 730432.9

**TABLE OF CONTENTS**
**(continued)**

Page

15.9      Headings................................................................................................46

15.10    Matters of Construction, Interpretation and the Like ........................46

15.11    Governing Law and Choice of Forum...............................................46

15.12    WAIVER OF RIGHT TO TRIAL BY JURY ....................................46

15.13    Severability.........................................................................................46

15.14    Successors and Assigns.......................................................................46

15.15    Shareholders .......................................................................................47

15.16    Guaranty .............................................................................................47

EXHIBITS

Exhibit A-1      Real Property Descriptions

Exhibit A-2      Form of Real Property Lease

Exhibit B        Escrow Agreement

Exhibit C        Employment Agreement

Exhibit D        Supply Letter Agreement

- viii -

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT (this "Agreement") dated as of May 26 , 2005 by and among The York Group, Inc., a Delaware corporation ("York"), Midnight Acquisition Corporation, a Delaware corporation ("Subsidiary") (York and Subsidiary are collectively referred to herein as "Buyer"), Milso Industries, Inc., a New York corporation ("Milso Inc."), Milso Industries, LLC, an Indiana limited liability company ("Milso LLC"), SBC Holding Corporation, a New York corporation ("SBC") (each of Milso Inc., Milso LLC and SBC shall also be referred to herein as a "Seller" and collectively as "Sellers"), the shareholders and members of Sellers identified on the signature pages of this Agreement (solely for the purposes described in Section 3.5, 4.3.1, 8.1, 8.2, 8.4, 12.1, 12.3, 12.8, 14.3, 14.4.4, 15.1 through 15.4 and 15.6 through 15.15) (collectively, the "Shareholders") and Matthews International Corporation, a Pennsylvania corporation ("Matthews").

### RECITALS:

This Agreement sets forth the terms and conditions upon which Buyer has agreed to purchase from Sellers, and Sellers have agreed to sell to Buyer, substantially all of the assets used by Sellers in the conduct of the Business (as that term is hereafter defined) (the "Contemplated Transaction").

At the time of the execution and delivery of this Agreement, the Real Property Leases and the Employment Agreements have been executed and delivered by the parties thereto; provided that the same shall only become effective as of the Closing Date.

In consideration of the mutual agreements, covenants, representations and warranties contained herein, and in reliance thereon, Buyer, Sellers and the Shareholders, intending to be legally bound, hereby agree as follows:

### ARTICLE I

### CERTAIN DEFINITIONS

As used herein, the following terms shall have the following meanings:

1.1     Accounts Receivable shall mean as of any date all accounts receivable associated with the Business as of such date, other than any account receivable due from an Affiliate of a Seller including, but not limited to, loans and interest receivables (except for loans related to life insurance policies).

1.2     Accrued Expenses shall mean as of any date accrued payroll and benefits, taxes (other than income taxes) and other accrued expenses associated with and incurred in the ordinary course of the Business as would appear on a balance sheet of the Business as of such date, including those described in Schedule 1.2, but excluding any amounts payable to Affiliates of Sellers or Shareholders, other than their accrued but unpaid salaries, wages, vacation and sick pay, incentive compensation and any other similar current liabilities, obligations and commitments and employment-related expense reimbursement obligations, any compensation to Employees or others contingent solely upon or payable solely as a result of the Contemplated Transaction.

1.3     Adjustment Target Date shall have the meaning given to such term in Section 3.6.1.

1.4     Affiliate shall mean with respect to any Person, any other Person, who, directly or indirectly, controls, is controlled by or is under common control with the Person.

1

1.5    Agreement shall mean this Asset Purchase Agreement.

1.6    Ancillary Agreements shall mean the documents referred to in Section 5.1 and 5.2.

1.7    Applicable Laws shall mean the applicable provisions of all (i) constitutions, treaties, statutes, laws (including the common law), rules, regulations, ordinances, codes or orders of any Governmental Authority, (ii) Governmental Approvals and (iii) orders, decisions, injunctions, judgments, awards and decrees of or agreements with any Governmental Authority, in each case as in effect on the date of this Agreement.

1.8    Assignment and Assumption Agreement shall have the meaning given to such term in Section 5.1.4.

1.9    Assumed Contracts shall have the meaning given to such term in Section 2.1.2.

1.10    Assumed Liabilities shall have the meaning given to such term in Section 4.2.

1.11    Assumed Real Property Leases shall have the meaning given to such term in Section 2.1.2.

1.12    Balance Sheet shall mean the balance sheet of the Business as of March 31, 2005.

1.13    Balance Sheet Date shall mean March 31, 2005.

1.14    Base Cash Consideration shall have the meaning given to such term in Section 3.1.

1.15    Base Operating Profit shall mean $16,000,000.

1.16    Bill of Sale shall have the meaning given to such term in Section 5.1.3.

1.17    Books and Records shall have the meaning given to such term in Section 6.15.

1.18    Buyer Damages shall have the meaning given to such term in Section 14.2.

1.19    Buyer Indemnitees shall have the meaning given to such term in Section 14.2.

1.20    Business shall mean the sales, marketing, manufacture and distribution of products and services in the death care industry as presently conducted by Sellers.

1.21    Business Day shall mean any day other than a Saturday, Sunday or any day on which banks located in the State of New York are authorized or required to be closed for the conduct of regular banking business.

1.22    Buyer shall have the meaning given to such term in the preamble of this Agreement.

1.23    CERCLA shall mean the Comprehensive Environmental Response, Compensation and Liability Act, as amended, 42 U.S.C. 9601 et seq.

1.24    Closing shall have the meaning given to such term in Section 2.4.

1.25    Closing Balance Sheet shall have the meaning given to such term in Section 3.6.1.

1.26    Closing Date shall have the meaning given to such term in Section 2.4.

1.27    Closing Date Cash Consideration shall have the meaning given to such term in Section 3.1.

1.28    Closing Inventory shall mean all Inventory used or held for use in the Business on the Closing Date.

1.29    Closing Working Capital shall mean cash and cash equivalents, Inventory, Accounts Receivable, Prepaid Expenses and Security Deposits securing performance by the Business of obligations due to be paid or performed within one year of the Closing Date (but not other Security Deposits)), which are being purchased by the Buyer under this Agreement, minus Accrued Expenses and Payables which are being assumed by Buyer under this Agreement. Closing Working Capital shall be calculated in accordance with Schedule 1.29 attached to this Agreement (the "Matthews Accounting Policies").

1.30    Code shall mean the Internal Revenue Code of 1986, as it may be amended from time to time, and any successor thereto. Any reference herein to a specific section or sections of the Code shall be deemed to include a reference to any corresponding provision of future law.

1.31    Confidential Information shall have the meaning given to such term in Section 12.1.

1.32    Confidentiality Agreement shall mean the Confidentiality Agreement dated as of September 10, 2004 between Matthews and Milso Inc.

1.33    Consideration shall have the meaning given to such term in Section 3.1.

1.34    Contingent Consideration Payment shall have the meaning given to such term in Section 3.1.1.

1.35    Contract shall mean any contract, agreement, indenture, note, bond, loan, instrument, lease, sublease, license, sub license, commitment or other arrangement or agreement, whether oral or written.

1.36    Employees shall have the meaning given to such term in Section 6.18.1.

1.37    Employment Agreements shall mean the employment agreements attached as Exhibit C to this Agreement, each of which by its terms will take effect upon the Closing.

1.38    Encumbrance shall mean any claim, lien, pledge, option, charge, easement, security interest, deed of trust, mortgage, right-of-way, encroachment, building or use restriction, conditional sales agreement, encumbrance or other right of third parties, whether voluntarily incurred or arising by operation of law, and includes any agreement to give any of the foregoing in the future, and any contingent sale or other title retention agreement or lease in the nature thereof.

1.39    Environment shall mean soil, surface waters, groundwaters, land, sediments, surface or subsurface strata, ambient air, and any other environmental medium.

1.40    Environmental Laws shall mean all Applicable Laws relating to pollution, natural resources, protection of the Environment or public health and safety or exposure of persons to Hazardous Substances applicable to the parties to this Agreement, including, without limitation, Applicable Laws relating to the manufacture, processing, distribution, use, sale, treatment, storage, release, disposal,

3

handling or transportation of Hazardous Substances or the operation, handling and disposal of medical and biological waste.

1.41    Environmental Liabilities and Costs shall mean all Losses, whether direct or indirect, known or unknown, current or potential, past, present or future, imposed by, under or pursuant to Environmental Laws, including, without limitation, all Losses related to Remedial Actions, and all fees, disbursements and expenses of counsel, experts, personnel and consultants based on, arising out of or otherwise in respect of: (i) the ownership or operation of the Business or the Real Property by a Seller, or any of their predecessors or Affiliates prior to the Closing Date; (ii) the environmental conditions existing on the Closing Date on, at, under, from, above, or about any Real Property or any other assets, equipment or facilities currently or previously owned, leased or operated by a Seller, or any of their predecessors or Affiliates; and (iii) the transportation, disposal or other disposition prior to the Closing Date of any Hazardous Substances, other wastes or recycled or reclaimed materials generated by a Seller.

1.42    Environmental Permits shall mean any federal, state and local permit, license, registration, consent, order, administrative consent order, certificate, approval or other authorization with respect to a Seller necessary for the conduct of the Business as currently conducted under any Environmental Law.

1.43    ERISA shall mean the Employee Retirement Income Security Act of 1974, as amended.

1.44    ERISA Plans shall mean defined benefit pension plans and defined contribution pension plans qualified under Section 401(a) of the Code.

1.45    Escrow Agent shall mean the Escrow Agent as defined in the Escrow Agreement.

1.46    Escrow Agreement shall have the meaning given to such term in Section 3.5.1.

1.47    Escrow Amount shall have the meaning given to such term in Section 3.5.1.

1.48    Escrow Fund shall mean the amount of the Escrow Amount then held by the Escrow Agent subject to the Escrow Agreement.

1.49    Excluded Assets shall mean those assets that are not included in the sale contemplated hereby and as are further defined in Section 2.2.

1.50    Excluded Liabilities shall mean all liabilities related to the Business that are not Assumed Liabilities.

1.51    GAAP shall mean, as of the applicable date, United States generally accepted accounting principles.

1.52    Governmental Authority shall mean any United States, foreign, international, supranational, national, provincial, regional, federal, state, municipal or local government, any instrumentality, subdivision, court, administrative or regulatory agency or commission or other authority thereof, or any quasi-governmental or private body exercising any regulatory, taxing, importing or other governmental or quasi-governmental authority.

1.53    Hazardous Substances shall mean any substance that: (i) is or contains asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum or petroleum derived substances or wastes, radon gas or related materials, lead-based paint or microbial matter, (ii) requires investigation,

4

removal or remediation under any Environmental Law, or is defined, listed or identified as a "hazardous waste," "hazardous substance," "solid waste," "pollutant" or "contaminant" thereunder, or (iii) is toxic, explosive, corrosive, flammable, infectious, radioactive, carcinogenic, mutagenic, or otherwise hazardous and is regulated by any Governmental Authority or Environmental Law.

1.54    HSR Act shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, 15 U.S.C. Section 18a, and the rules promulgated thereunder.

1.55    Indemnified Party shall have the meaning given to such term in Section 14.7.1.

1.56    Indemnifying Party shall have the meaning given to such term in Section 14.7.1.

1.57    Indemnity Period shall have the meaning given to such term in Section 14.1.

1.58    Independent Accounting Firm shall have the meaning given to such term in Section 3.6.2.

1.59    Inventory shall mean all inventories of raw materials, supplies, work in process and finished products used or held for use in the Business.

1.60    Key Employees shall mean Harry Pontone, Louis Pontone, Michael Pontone, Steven Pontone, Scott G. Pontone, Thomas Pontone (son of Louis Pontone) and Andrew G. Pontone.

1.61    Knowledge or to the knowledge of Sellers (or similar phrases) shall mean the actual knowledge of Harry Pontone, Louis Pontone, Michael Pontone, Steven Pontone, Scott G. Pontone, Thomas Pontone (son of Louis Pontone) and Andrew G. Pontone.

1.62    Lease shall have the meaning given to such term in Section 6.26.

1.63    Lease Consent shall have the meaning given to such term in Section 8.1.7.

1.64    Leased Property shall mean the real property leased by Sellers as lessee and used in connection with the Business as more fully described in Schedule 6.26 hereof.

1.65    Losses shall mean all losses, costs, claims, liabilities, fines, penalties, damages and expenses, including interest which may be imposed in connection therewith and court costs and reasonable fees and disbursements of counsel and consultants, but after taking into account any insurance proceeds received by the party incurring the Losses (net of any premium increases resulting therefrom), any net tax benefits to such party resulting therefrom and any reserves on the books and records relating thereto.

1.66    Machinery and Equipment shall have the meaning given to such term in Section 2.1.1.

1.67    Material Adverse Effect shall mean any state of facts, events, changes or effects that materially impairs the conduct or operation of the Business taken as a whole, other than as a result of (A) changes in economic or business conditions generally or in the burial and memorialization products industry specifically, (B) changes in Applicable Laws impacting the burial and memorialization products industry generally or (C) changes or effects resulting in whole or in part from the execution, announcement or performance of this Agreement or the transactions contemplated by this Agreement.

1.68    Matthews shall mean Matthews International Corporation, a Pennsylvania corporation.

1.69    Operating Profit shall mean, for the fiscal year ending September 30, 2006 only, the net income of the Business determined on a pro forma stand alone basis, but otherwise determined in accordance with GAAP, excluding (i) any provision for interest expense or income taxes, (ii) any adjustments made for purchase accounting purposes resulting from the Contemplated Transaction which otherwise would have an impact on Operating Profit, including in depreciation and amortization resulting from the re-valuation for purchase accounting purposes of tangible and intangible assets acquired in the Contemplated Transaction and the cost of sales impact related to the re-valuation for purchase accounting purposes of any inventory acquired in the Contemplated Transaction (but except as provided below, no such adjustments to the calculation of Operating Profit shall be made in respect of any acquisitions other than the Contemplated Transaction) and (iii) any non-recurring costs or expenses related to the integration of the Business with the operations of Buyer or Matthews and (iv) all other extraordinary, non-recurring items (as determined in good faith with the agreement of Harry Pontone or Scott Pontone). If the Closing occurs after October 1, 2005, the Operating Profit shall be annualized by taking the Operating Profit for the period beginning on the day following the Closing Date through and including September 30, 2006 and multiplying it by a fraction, the numerator of which shall be 365 and the denominator of which shall be the number of days in such period. In calculating Operating Profit all administrative and financial services performed by Matthews or its Affiliates for the Business (including without limitation accounting, accounts receivable processing, accounts payable processing, payroll processing, human resources and benefits support services, retirement and pension plan administration), and shall be charged as an expense at an amount not to exceed the cost to the Business as of the date of this Agreement of any such service. With respect to future acquisitions by the Buyer, if either Harry Pontone or Scott Pontone is the President of the Company, unless the President agrees in writing to include those operating results and the related attributes of the acquisition (such as interest expense, integration costs and depreciation and amortization charges), they shall be excluded from the calculation of Operating Profit using such methodologies as shall be agreed in good faith by the President of the Company and Matthews. Under no circumstances shall any amounts payable as purchase price pursuant to this Agreement be treated as charges against net income for purposes of calculating Operating Profit.

1.70    Other Leases shall mean the leases, subleases, licenses and occupancy agreements pursuant to which any Seller or Shareholder is a lessor, sublessor or licensor of any part of the Real Property.

1.71    Party shall mean any Seller, Shareholder or Buyer, individually, as the context so requires, and the term "Parties" shall mean Sellers, Shareholders and Buyer together.

1.72    Payables as of any date shall mean any of the trade accounts payable incurred in the ordinary course and associated with the Business as of such date, other than accounts payable to any Affiliate of Sellers or Shareholders.

1.73    Pension Plan shall mean a pension plan as defined in Section 3(2) of ERISA which is not an individual account plan as defined in Section 3(34) of ERISA.

1.74    Permits shall have the meaning given to such term in Section 6.11.

1.75    Permitted Encumbrances shall mean with respect to any Purchased Asset any (a) defect in title that does not materially adversely impacts the use of such Purchased Asset or the operation of the Business, (b) Encumbrances securing Assumed Liabilities, (c) Encumbrances securing the performance of bids, tenders, leases, contracts (other than for the repayment of debt), statutory obligations, surety, customs and appeal bonds and other obligations of like nature, incurred as an incident to and in the ordinary course of the Business, (d) Encumbrances imposed by law, such as carriers', warehouseman's, mechanics', materialmen's, landlords', laborers' suppliers' and vendors' liens, incurred in good faith in

6

the ordinary course of the Business and securing obligations which are not yet due or which are being contested in good faith by appropriate proceedings, each of which proceedings is set forth on Schedule 1.75, (e) extensions, renewals and replacements of Encumbrances referred to in (a) through (d) of this sentence; provided that any such extension, renewal or replacement Encumbrance shall be limited to the property or assets covered by the Encumbrance extended, renewed or replaced and that the obligations secured by any such extension, renewal or replacement Encumbrance shall be in an amount not greater than the amount of the obligations secured by the original Encumbrance extended, renewed or replaced, none of which, individually or in the aggregate, have a Material Adverse Effect.

1.76    Person shall mean any natural person, firm, partnership, joint venture, limited liability company, association, corporation, trust, business trust, unincorporated organization, Governmental Authority or other entity.

1.77    Plans shall have the meaning given to such term in Section 6.18.

1.78    Prepaid Expenses as of any date shall mean Sellers' rights to receive goods, services or other benefits in connection with the Business, to the extent paid for and not yet received.

1.79    Products shall mean any of the products manufactured, marketed, sold or distributed by any Seller in the conduct of the Business as of the Closing Date.

1.80    Proprietary Rights shall have the meaning given to such term in Section 6.9.1.

1.81    Purchased Assets shall have the meaning given to such term in Section 2.1.

1.82    Real Property shall mean the real property related to any lease assumed by or entered into by Buyer in connection with the transaction contemplated by this Agreement, including the Real Property Leases with the Sellers, the Shareholders, or their Affiliates.

1.83    Real Property Leases shall mean leases with respect to the Real Property owned by the Sellers or their Affiliates and described in Exhibit A-1, in substantially the form of Exhibit A-2 to this Agreement.

1.84    Release shall mean any releasing, disposing, discharging, injecting, spilling, leaking, leaching, pumping, dumping, emitting, escaping, emptying, seeping, dispersal, migration, transporting, placing and the like, including without limitation, the moving of any materials through, into or upon, any land, soil, surface water, ground water or air, or otherwise entering into the environment.

1.85    Remedial Action shall mean all actions required to (i) clean up, remove, treat or in any other way remediate any Hazardous Substances; (ii) prevent the release of Hazardous Substances so that they do not migrate or endanger or threaten to endanger public health or welfare or the environment; or (iii) perform studies, investigations and care (including any financial responsibility requirement) related to any such Hazardous Substances.

1.86    Seller and Sellers shall have the meaning given to such terms in the preamble of this Agreement.

1.87    Security Deposits shall have the meaning given to such term in Section 2.1.15.

1.88    Seller Damages shall have the meaning given to such term in Section 14.5.4

7

1.89    Seller Indemnitees shall have the meaning given to such term in Section 14.5.

1.90    Shareholder shall have the meaning given to such term in the preamble of this Agreement.

1.91    Subsidiary shall have the meaning given to such term in the preamble of this Agreement.

1.92    Supply Letter Agreement shall mean an agreement in the form of Exhibit D.

1.93    Tax Returns shall mean all federal, state, local, and foreign Tax returns, declarations, statements, reports, schedules, forms, and information returns and any amended Tax Returns relating to Taxes.

1.94    Taxes shall mean all taxes, duties, charges, fees, levies or other assessments imposed by any taxing authority, including, without limitation, income, gross receipts, value-added, excise, withholding, personal property, real estate, sale, use, ad valorem, license, lease, service, severance, stamp, transfer, payroll, employment, customs, duties, alternative, add-on, minimum, estimated and franchise taxes (including any interest, penalties or additions attributable to or imposed on or with respect to any such assessment).

1.95    Working Capital Calculation shall have the meaning given to such term in Section 3.6.1.

## ARTICLE II

## TRANSFER OF ASSETS AND PROPERTIES; CLOSING

2.1    Purchased Assets.  Subject to the terms and conditions of this Agreement, and except as otherwise expressly provided in this Agreement, at the Closing, Sellers shall sell and convey to Buyer, free and clear of all Encumbrances (other than Permitted Encumbrances), and Buyer shall purchase and accept from Sellers, all of Sellers' rights, title and interest in and to the assets, properties and rights of every kind and description, real, personal and mixed, tangible and intangible, wherever situated which are used or useful in the conduct of the Business (such rights, title and interests in and to all such assets, properties and rights being collectively referred to in this Agreement as the "Purchased Assets"), including, without limitation, the following:

2.1.1    Equipment, Machinery and other Tangible Personal Property.  All machinery, equipment, leasehold improvements, trucks, automobiles, supplies, materials, office furniture and office equipment, computing and telecommunications equipment and other items of personal property that are owned or leased by Sellers and used primarily in connection with the Business, wherever located, including those set forth in Schedule 2.1.1 hereto (but excluding any asset listed on Schedule 2.1.1 and subsequently disposed of without breach of any covenant contained in this Agreement) ("Machinery and Equipment");

2.1.2    Contracts Relating to the Business.  To the extent transferable, (a) all leases (including leases and subleases of leased real property ("Assumed Real Property Leases") and of Machinery and Equipment) and (b) all other Contracts primarily related to the Business set forth on Schedule 2.1.2A (the "Assumed Contracts"), but excluding any Contract listed on Schedule 2.1.2B and any Contract subsequently terminated without breach of any covenant contained in this Agreement;

8

2.1.3    Customer Lists, Sales and Marketing Materials.  All customer lists, sales data, catalogs, brochures, supplier names, mailing lists, art work, photographs and advertising material that relate primarily to the Business, whether in electronic form or otherwise;

2.1.4    Permits, Licenses.  All governmental permits, licenses, registrations, orders and approvals relating primarily to the Business and in existence on the Closing Date, including those listed in Schedule 2.1.4 hereto, to the extent such permits, licenses, registrations, orders and approvals are transferable to Buyer;

2.1.5    Trade Secrets.  All trade secrets, secret processes and procedures, engineering, production, assembly, design, installation, other technical drawings and specifications, working notes and memos, market studies, consultants' reports, technical and laboratory data, competitive samples, engineering prototypes, and all similar property of any nature, tangible or intangible, of Sellers relating to the Business;

2.1.6    Intellectual Property.  All patents, trademarks, trademark registrations, trade names, service marks, copyrights and copyright registrations described in Schedule 2.1.6;

2.1.7    Property, Personnel and Accounting Records.  To the extent transferable under applicable law, all other records of Sellers relating to the Business, including property records and copies of personnel records of Employees who become employees of Buyer; provided, however, that Seller shall be entitled to retain copies of all such records;

2.1.8    Goodwill.  All right, title and interest of Sellers in and to the goodwill incident to the Business;

2.1.9    Cash and Cash Equivalents.  All cash and cash equivalents of the Business on the Closing Date;

2.1.10   Inventory.  All Closing Inventory;

2.1.11   Accounts Receivable.  All Accounts Receivable existing on the Closing Date;

2.1.12   Prepaid Expenses.  Except as set forth in Section 2.2.1, all Prepaid Expenses of, or for the benefit of, the Business on the Closing Date including those described in Schedule 2.1.12, to the extent the benefits thereof are transferable to Buyer;

2.1.13   Computer Software.  To the extent transferable, all computer applications software, owned or licensed, whether for general business usage (e.g., accounting, word processing, graphics, spreadsheet analysis, etc.) or specific, unique-to-the-business usage (e.g., order processing, manufacturing, process control, shipping, etc.) and all computer operating, security or programming software, owned or licensed by Sellers and used primarily in the Business;

2.1.14   Other Intangible Assets.  All other assets (including all causes of action, rights of action, contract rights and warranty and product liability claims against third parties, all telephone numbers, telecopier numbers, websites, domain names, and email addresses) that are owned by Sellers and used primarily in the Business, regardless of whether any value is ascribed thereto in the Sellers' financial statements; and

9

2.1.15  Security Deposits.  All prepaid security deposits related to the Assumed Contracts ("Security Deposits").

Notwithstanding the foregoing provisions of this Section 2.1, the transfer of the Purchased Assets pursuant to this Agreement shall not include the assumption of any liability or obligation related to the Purchased Assets, unless such liability or obligation is expressly included in the Assumed Liabilities.

2.2    Excluded Assets.  Notwithstanding anything to the contrary in this Agreement, the Purchased Assets shall not include any of Sellers' rights, title or interests in the following (collectively, the "Excluded Assets"):

2.2.1    Any insurance policies maintained by Sellers with respect to the Business or any of its employees or any Shareholder and all of Sellers' prepaid insurance premiums and insurance deposits and rights to refunds or adjustments in respect of periods prior to the Closing Date with respect to insurance premiums and insurance deposits and all rights to insurance proceeds or other insurance Contract recoveries in respect of periods prior to the Closing Date;

2.2.2    All bank accounts and all accounts receivable from Affiliates of Sellers existing on the Closing Date;

2.2.3    All consideration paid, payable or deliverable to Sellers pursuant to this Agreement, except such funds as may be payable to the Buyer pursuant to the Escrow Agreement;

2.2.4    All claims that Sellers may have against any third Person with respect to any Excluded Asset;

2.2.5    Claims for refunds of Taxes and other governmental charges to the extent such refunds (i) are in respect of Taxes for which the Buyer could not be held liable and which could not result in a lien on a Purchased Asset or (ii) relate to periods ending on or prior to the Closing Date, whether or not relating to the Business;

2.2.6    All property and assets listed on Schedule 2.2.6 and any proceeds from the disposition thereof;

2.2.7    All (i) shares of capital stock or other equity or other ownership interests of any Person that are owned by Seller or any Affiliate of any Seller or securities convertible into, exchangeable or exercisable for shares of capital stock or other equity or other ownership interests of any Person and (ii) corporate seals, minute books, charter documents, stock transfer records, record books, original Tax and financial records and such other files, books and records relating to any of the Excluded Assets or to the organization, existence or capitalization of any Seller or of any other Person;

2.2.8    All Machinery and Equipment and Inventory transferred, consumed or otherwise disposed of by Sellers in the ordinary course of the Business before the Closing Date;

2.2.9    Except for the Assumed Real Property Leases, and subject to the provisions of the Real Property Leases, any interest in real property;

2.2.10   The Contracts listed on Schedule 2.1.2B hereof; and

10

2.2.11  All rights of Sellers under this Agreement and the Ancillary Agreements and any Contract entered into pursuant to the provisions of this Agreement.

2.3     Equitable Assignment.

2.3.1    Notwithstanding anything to the contrary contained in this Agreement, other than Section 10.7 and 11.7, to the extent that the sale, assignment, transfer, conveyance or delivery or attempted sale, assignment, transfer, conveyance or delivery to Buyer, as contemplated hereunder, of any Purchased Asset is prohibited by its terms or by any Applicable Laws or would require any governmental or any third party consent or approval, and any such consent or approval shall not have been obtained prior to the Closing (a "Delayed Consent"), this Agreement shall not constitute a sale, assignment, transfer, conveyance or delivery, or any attempted sale, assignment, transfer, conveyance or delivery, thereof and (subject to the conditions expressly set forth in this Agreement) the parties nonetheless shall complete the Closing.  Following the Closing, the Parties shall use commercially reasonable efforts and shall cooperate with each other, to obtain promptly each Delayed Consent (but Sellers shall not be required to incur any material expense or make any material commitment in connection therewith).  Pending receipt of each Delayed Consent with respect to a Purchased Asset or if any such Delayed Consent is not obtained, the Parties hereto shall cooperate with each other in any reasonable and lawful arrangements (each an "Equitable Arrangement"), effectively transferring to Buyer from and after the Closing, the rights and benefits of, and entitlements to exercise the Sellers' rights under, and effectively causing the Buyer to assume all Assumed Liabilities with respect to, such Purchased Asset and operations of the Business as if such assets and operations had been transferred by Sellers to Buyer at the Closing and any liabilities or obligations associated with the arrangements specifically established by Buyer and Sellers pursuant to this Section 2.3.  Once each Delayed Consent with respect to a Purchased Asset is obtained, the Sellers shall assign, transfer, convey and deliver, or cause to be assigned, transferred, conveyed and delivered, such Purchased Asset to Buyer; provided that no additional consideration shall be paid by Buyer to Sellers for such relevant Purchased Asset.   This Section 2.3 shall not affect Sellers' obligations under Section 8.1.6 or Section 8.1.7 hereof or Buyer's obligations under Section 9.3 hereof.

2.3.2    If (i) an Assumed Real Property Lease is not conveyed to Buyer at Closing, (ii) any Delayed Consent is not received with respect to such Assumed Real Property Lease within 90 days of Closing and (iii) the Parties are not able to reach an Equitable Arrangement with respect to such Assumed Real Property Lease within 90 days of Closing, at Buyer's cost and expense, Seller shall take such actions as may be reasonably requested by Buyer to place Buyer in actual possession and control of any Purchased Assets located at the property subject to such Assumed Real Property Lease.

2.4     Closing.  Subject to the satisfaction or waiver, if permissible, of the conditions set forth in Articles X and XI (other than those conditions that by their nature are to be fulfilled only at the Closing, but subject to the fulfillment or waiver of such conditions), the closing of the Contemplated Transaction (the "Closing") shall take place at the offices of Clifford Chance, New York, New York, no later than ten (10) days after the date that the waiting period, if any, under Title II of the HSR Act applicable to the purchase and sale of the Purchased Assets has terminated or expired (or if that day is not a Business Day, on the next succeeding Business Day), or on such other date as may be agreed upon by Buyer and Sellers (the "Closing Date").

11

## ARTICLE III

## PURCHASE PRICE

3.1    <u>Purchase Price</u>.  The consideration for the Purchased Assets shall be $95,000,000 (the "<u>Base Cash Consideration</u>"), plus the Contingent Consideration Payment, if any, plus the assumption of the Assumed Liabilities (together, the "<u>Consideration</u>"), subject to adjustment after the Closing as provided in Section 3.6 below.  The Base Cash Consideration, less the Escrow Amount (the "<u>Closing Date Cash Consideration</u>"), shall be paid at the Closing to Sellers by wire transfer of immediately available funds to such bank account or accounts as shall be specified in written instructions delivered to Buyer by SBC at least three Business Days prior to the Closing.

3.1.1    <u>Contingent Consideration</u>.  Sellers shall be eligible for a further payment, in addition to the Base Cash Consideration, of $7.5 million (the "<u>Contingent Consideration Payment</u>").  The Contingent Consideration Payment will be payable only if the Operating Profit of the Business exceeds the Base Operating Profit.  As promptly as reasonable practicable after September 30, 2006, but in any event before November 30, 2006, Buyer shall deliver to Sellers a calculation of the Operating Profit showing in reasonable detail the basis therefor (the "<u>Operating Profit Statement</u>").  Buyer shall deliver to Sellers any supporting documentation for the Operating Profit Statement promptly upon request.

3.1.2    Sellers may dispute the calculation of the Operating Profit, but only on the basis that the Operating Profit was not arrived at in accordance with the terms of this Agreement; <u>provided, however</u>, that Sellers shall have notified Buyer in writing of each disputed item, specifying the amount thereof in dispute and setting forth, in reasonable detail, the basis for such dispute, within twenty (20) Business Days following delivery the Operating Profit Statement.  In the event of such dispute, Buyer and Sellers shall attempt to reconcile their differences, and any resolution by them as to any disputed amounts shall be final, binding and conclusive upon Buyer and Sellers.  If Buyer and Sellers are unable to reach a resolution with such effect within twenty (20) days after receipt of such written notice of dispute, Buyer and Sellers shall submit the items remaining in dispute for resolution to an accounting firm independent of Buyer and Sellers mutually acceptable to Buyer and Sellers (the "<u>Independent Accounting Firm</u>"), which shall, within thirty (30) days after such submission, determine and report to Buyer and Sellers upon such remaining disputed items, and such report shall be final, binding and conclusive.  Buyer and Sellers will furnish or cause to be furnished to the Independent Accounting Firm such work papers and other documents and information reasonably relating to the disputed issues as the Independent Accounting Firm may reasonably request and as are reasonably available to that party or its agents and will be afforded the opportunity to present to the Independent Accounting Firm any material relating to the disputed issues and to discuss the issues with the Independent Accounting Firm.  The Independent Accounting Firm shall be authorized to resolve only those items remaining in dispute between Buyer and Sellers, in accordance with the provisions of this Section 3.1.2 within the range of differences between Buyer's position and Seller's position.  The fees and expenses of the Independent Accounting Firm shall be allocated between Buyer and Sellers in the same proportion that the aggregate amount of all such remaining disputed items so submitted to the Independent Accounting Firm that is unsuccessfully disputed by each such party (as finally determined by the Independent Accounting Firm) bears to the total amount of such remaining disputed items so submitted.

3.1.3    The Operating Profit Statement shall be deemed final for purposes of Section 3.1.1 upon the earliest of (i) the failure of Sellers to notify Buyer of a dispute within twenty (20) Business Days following the delivery of the Operating Profit Statement to Sellers,

NYA 730432.9

(ii) the resolution of all disputes, pursuant to Section 3.1.2 by Buyer and Sellers, and (iii) the resolution of all disputes, pursuant to Section 3.1.2, by the Independent Accounting Firm. Within five (5) Business days of the Contingent Consideration Payment being deemed final, such payment shall be made in accordance with written wire instructions provided to Buyer from Sellers.

3.2    Allocation of Purchase Price.    Seventy-two percent of the Consideration shall be allocated to the Purchased Assets of SBC and Milso Inc. and twenty-eight percent of the Consideration shall be allocated to the Purchased Assets of Milso LLC. Within a reasonable period of time following Closing, Buyer and Sellers shall agree on the allocation of the Consideration among the Purchased Assets, which allocation shall be consistent with Section 1060 of the Code and the rules and regulations thereunder (the "Tax Allocation"). Except as required by Applicable Law, Buyer and Sellers agree to use the Tax Allocation in filing all required forms under Section 1060 of the Code, and all other Tax Returns. For the avoidance of doubt, the Tax Allocation shall not be made prior to the Closing on account of the Contingent Consideration unless and until such consideration is payable under Section 3.1.1, and if such consideration becomes so payable the parties shall allocate the amount of such consideration solely to goodwill and going concern value. Buyer and Sellers further agree that the payment of the Closing Date Cash Consideration and the Contingent Consideration to Sellers contemplated by Article III may be made to a single Seller that is designated by SBC in writing as being authorized to act as agent for all Sellers, whereupon each Seller shall be deemed to have received the Cash Consideration allocable to the Purchased Assets owned by such Seller in accordance with the allocation determination under this Section 3.2. In connection with the determination of the foregoing Tax Allocation, the parties shall cooperate with each other and provide such information as any of them shall reasonably request. The parties will each report the federal, state and local and other Tax consequences of the purchase and sale contemplated hereby (including the filing of Internal Revenue Service Form 8594) in a manner consistent with the Tax Allocation.

3.3    Transfer Taxes.    Buyer (on the one hand) and Sellers (on the other) each shall bear 50% of the cost of all Taxes (excluding Taxes based on or measured by income, which shall be solely the responsibility of the Sellers) that are or may be imposed by any government or political subdivision thereof and that are payable or arise as a result of this transfer of the Purchased Assets, notwithstanding the Party upon which such Taxes are actually imposed. Buyer and Sellers shall jointly prepare any Tax Returns relating to such Taxes, and the party or parties responsible for filing each such return will file that return. Buyer and Sellers shall cooperate with each other in determining the amount of such Taxes payable and in preparing and filing the applicable Tax Returns. Buyer shall furnish to Sellers properly completed exemption certificates for any Taxes from which Buyer claims to be exempt.

3.4    Proration of Taxes and Certain Charges.    Except as otherwise expressly provided in this Agreement, all real property Taxes, personal property Taxes or similar ad valorem obligations levied with respect to the Purchased Assets for any taxable period that includes the day before the Closing Date and ends on or after the Closing Date, whether imposed or assessed before or after the Closing Date, shall be prorated between Sellers and Buyer as of 12:01 A.M. on the Closing Date. If any Taxes subject to proration are paid by Buyer, on the one hand, or Sellers, on the other hand, the proportionate amount of such Taxes paid (or in the event a refund of any portion of such Taxes previously paid is received, such refund) shall be paid promptly by (or to) the other after the payment of such Taxes (or promptly following the receipt of any such refund). Except as otherwise expressly provided in this Agreement, all installments of special assessments or other charges on or with respect to the Purchased Assets payable by Sellers for any period in which the Closing Date shall occur, including base rent, common area maintenance, royalties, all municipal, utility or authority charges for water, sewer, electric or gas charges, garbage or waste removal, and cost of fuel, shall be apportioned as of the Closing Date and each party shall pay its proportionate share promptly upon the receipt of any bill, statement or other charge with

NYA 730432.9

respect thereto. If such charges or rates are assessed either based upon time or for a specified period, such charges or rates shall be prorated as of 12:01 A.M. on the Closing Date. If such charges or rates are assessed based upon usage of utility or similar services, such charges shall be prorated based upon meter readings taken on the Closing Date. Except as otherwise expressly provided in this Agreement, all amounts due or paid pursuant to the terms of the Assumed Contracts, for any period in which the Closing Date shall occur shall be prorated as of 12:01 A.M. on the Closing Date.

3.5     Escrow Agreement.

3.5.1   An amount equal to $10 million (the "Escrow Amount") shall be deposited by wire transfer of immediately available funds with the Escrow Agent, under an escrow agreement to be entered into on the Closing Date by the Escrow Agent, Sellers and Buyer substantially in the form of Exhibit B (the "Escrow Agreement"). The Escrow Fund shall be used for indemnity purposes as set forth in Article XIV, to ensure the retention of Key Employees as described herein and for payment of the Closing Working Capital Adjustment, if any. On the date that is ten (10) days following the end of the Indemnity Period, any remaining amounts in the Escrow Fund not subject to pending claims shall be distributed to the Sellers pursuant to the terms and conditions set forth herein and in the Escrow Agreement and the Shareholder's Representative and Buyer shall direct the Escrow Agent to make such distributions in an instruction letter executed by the Shareholders' Representative and Buyer, which instruction letter shall set forth the amount to be distributed to the Shareholders and the wire instructions with respect to each such payment. The Shareholders' Representative and Buyer shall each instruct the Escrow Agent to, and use commercially reasonable efforts to cause the Escrow Agent to, keep confidential all information relating to this Agreement and the Escrow Agreement; provided that, (a) at the request of the Shareholders' Representative or Buyer such information may be disclosed to the Shareholders' Representative and Buyer, (b) such information may be disclosed as required by Applicable Law and (c) such information may be disclosed in an action or proceeding brought by the Escrow Agent, a Seller, Shareholder or Buyer in pursuit of its rights or in exercise of its remedies under this Agreement or the Escrow Agreement. Each Shareholder agrees and acknowledges that the Shareholder Representative (as defined in the Escrow Agreement) shall have the full power and authority to act on their behalf.

3.5.2   Shareholders' Representative. By executing and delivering this Agreement, each Shareholder hereby irrevocably agrees that the Shareholders' Representative shall be entitled to take any action under Article III and Article XIV of this Agreement without consultation with, notice to, or agreement by, such Shareholder, including the exercise of the power to (i) agree to, negotiate, enter into settlements and compromises of and comply with orders of courts with respect to claims under this Article XIV of this Agreement or the Escrow Agreement, (ii) resolve any claims under this Article XIV of this Agreement or the Escrow Agreement, and (iii) take all actions necessary in the judgment of the Shareholders' Representative for the accomplishment of the foregoing and all of the other terms, conditions and limitations of this Agreement and the Escrow Agreement and the transactions contemplated hereby and thereby. Each Shareholder will be bound by all actions taken by the Shareholders' Representative in connection with this Agreement or the Escrow Agreement and the transactions contemplated hereby and thereby. The Shareholders' Representative will incur no liability to any Shareholder (i) with respect to any action taken or suffered by it in reliance upon any notice, direction, instruction, consent, statement or other document believed by it to be genuine and to have been signed by the proper Person (and shall have no responsibility to determine the authenticity thereof), nor (ii) for any other action or inaction taken pursuant to this Agreement, except for its own willful misconduct or bad faith. In all questions arising under this Agreement or the Escrow Agreement and the transactions contemplated hereby or thereby, the Shareholders' Representative may rely on the

14

advice of counsel, and the Shareholders' Representative will not be liable to any Shareholder for anything done, omitted or suffered in good faith.

3.6    Adjustment to Seller's Consideration.   The Consideration to be paid to Sellers shall be subject to adjustment after Closing Date as follows:

3.6.1    Closing Balance Sheet.

(i)    As soon as practicable, but in no event later than ninety (90) days following the Closing Date (the "Adjustment Target Date"), Buyer shall deliver to Sellers a Closing Balance Sheet of the Business as of the Closing Date ("Closing Balance Sheet") and a reasonably detailed calculation of the Closing Working Capital (the "Working Capital Calculation"). The Closing Balance Sheet shall be audited and prepared in accordance with GAAP and the Matthews Accounting Policies, without giving effect to the Contemplated Transaction. Buyer shall also deliver to Sellers any supporting documentation for the Closing Balance Sheet and the Working Capital Calculation to the Sellers promptly upon request.

(ii)    Buyer shall grant such access to the Business and Buyer shall make financial personnel of the Business and Buyer available to Sellers and its agents after the Closing Date during reasonable business hours and as shall be reasonably required to verify the Closing Balance Sheet and the Working Capital Calculation. The cost of preparation of the Closing Balance Sheet and the Closing Working Capital shall be paid by Buyer.

3.6.2    Disputes.

(i)    Subject to clause (ii) of this Section 3.6.2, the Closing Balance Sheet and the calculation of Closing Working Capital delivered by Buyer shall be final, binding and conclusive.

(ii)    Sellers may dispute the Closing Balance Sheet and the Working Capital Calculation, but only on the basis that (A) the amounts reflected on the Closing Balance Sheet and in the Working Capital Calculation were not arrived at in accordance with this Agreement and (B) such nonconformance caused the Closing Working Capital to vary by more than $50,000 from the amount which it would have been after giving effect to the amounts disputed by Sellers; provided, however, that Sellers shall have notified Buyer in writing of each disputed item, specifying the amount thereof in dispute and setting forth, in reasonable detail, the basis for such dispute, within twenty (20) Business Days following delivery of the Closing Balance Sheet and Working Capital Calculation to Sellers. In the event of such dispute, Buyer and Sellers shall attempt to reconcile their differences, and any resolution by them as to any disputed amounts shall be final, binding and conclusive upon Buyer and Sellers. If Buyer and Sellers are unable to reach a resolution with such effect within twenty (20) days after receipt of such written notice of dispute, Buyer and Sellers shall submit the items remaining in dispute for resolution to an accounting firm independent of Buyer and Sellers mutually acceptable to Buyer and Sellers (the "Independent Accounting Firm"), which shall, within thirty (30) days after such submission, determine and report to Buyer and Sellers upon such remaining disputed items, and such report shall be final, binding and conclusive. Buyer and Sellers will furnish or cause to be furnished to the Independent Accounting Firm such work papers and other documents and information reasonably relating to the disputed issues as the Independent Accounting Firm may reasonably request and as are reasonably available to that party or its agents and will be afforded the opportunity to present to the Independent Accounting Firm any material relating to the disputed issues and to discuss the issues with the Independent Accounting Firm. The Independent

15

Accounting Firm shall be authorized to resolve only those items remaining in dispute between Buyer and Sellers, in accordance with the provisions of this Section 3.6 within the range of differences between Buyer's position and Sellers' position. The fees and expenses of the Independent Accounting Firm shall be (i) allocated between Buyer and Sellers in the same proportion that the aggregate amount of all such remaining disputed items so submitted to the Independent Accounting Firm that is unsuccessfully disputed by each such party (as finally determined by the Independent Accounting Firm) bears to the total amount of such remaining disputed items so submitted.

3.6.3  <u>Adjustment to Sellers Consideration</u>. The Closing Balance Sheet and the Working Capital Calculation shall be deemed final for purposes of this Section 3.6 upon the earliest of (i) the failure of Sellers to notify Buyer of a dispute within twenty (20) Business Days following the delivery of the Closing Balance Sheet and the Working Capital Calculation to Sellers, (ii) the resolution of all disputes, pursuant to Section 3.6.2(ii), by Buyer and Sellers, and (iii) the resolution of all disputes, pursuant to Section 3.6.2(ii), by the Independent Accounting Firm. Within five (5) Business Days of the Closing Balance Sheet and the Working Capital Calculation being deemed final, an adjustment to the Consideration shall be made as follows:

(i)  If the Closing Working Capital is less than $21,000,000, the difference, up to $2,500,000, shall be paid by wire transfer from the Escrow Fund to an account specified by Buyer.

(ii)  If the Closing Working Capital is equal to or greater than $21,000,000, no adjustment to the Consideration shall be made.

(iii)  Buyer and the Shareholder's Representative shall promptly give a joint written instruction to the Escrow Agent specifying the dollar amounts to be paid from the Escrow Fund as determined under this Section 3.6.3, if any. Any such payment shall be made without regard to the "Qualifying Claim" and "deductible" provided for in Section 14.4.1.

## ARTICLE IV

## ASSUMPTION OF LIABILITIES; EMPLOYEE MATTERS

4.1  <u>General Limitation on Assumption of Liabilities</u>. Except for Permitted Encumbrances and as otherwise provided in Section 4.2 below, Sellers shall transfer the Purchased Assets to Buyer free and clear of all Encumbrances, and without any assumption of liabilities and obligations, and Buyer shall not, by virtue of its purchase of the Purchased Assets or otherwise, assume or become responsible for any liabilities or obligations of Sellers or any other Person. For purposes of this Section 4.1, the phrase "liabilities and obligations" shall include, without limitation, any direct or indirect indebtedness, guaranty, endorsement, claim, loss, damage, deficiency, cost, expense, obligation or responsibility, fixed or unfixed, known or unknown, asserted or unasserted, choate or inchoate, liquidated or unliquidated, secured or unsecured.

16

4.2    Assumed Liabilities and Obligations.  Subject to the other provisions hereof, at the Closing, Buyer shall assume or accept assignment from Sellers and thereafter pay, perform or discharge the following, and only the following, liabilities and obligations, excluding any liabilities and obligations to Affiliates of Sellers other than as reflected on the Closing Balance Sheet (as finally determined pursuant to Section 3.6.3) (collectively, the "Assumed Liabilities"):

4.2.1    All liabilities, obligations and commitments of Sellers under the Assumed Contracts, to the extent incurred or arising after the Closing (to the extent not arising from a breach of Sellers or their Affiliates before the Closing);

4.2.2    All liabilities, obligations and commitments of Sellers accruing after the Closing Date under the permits and licenses identified in Schedule 2.1.4; provided that Buyer shall not assume or discharge any obligation relating to a breach of the terms of any permit or license (including the failure to procure any required permit or license) that occurred prior to the Closing Date or is caused by the assignment thereof to Buyer at the Closing;

4.2.3    The Payables and Accrued Expenses reflected on the final Closing Balance Sheet (as finally determined pursuant to Section 3.6.3);

4.2.4    All service obligations and all express or implied warranty obligations of Sellers to repair or replace defective goods sold by the Business under the terms of any written contract, commitment or sale transaction entered into in the ordinary course of business relating to products shipped prior to the Closing Date; provided, that such obligations do not exceed $100,000 in the aggregate and provided further, that Buyer assumes no obligation of Sellers for incidental or consequential damages or for any personal injury, or for intellectual property infringement, the sole warranty obligation of Buyer assumed hereunder being the obligation to repair or replace defective goods;

4.2.5    All liabilities, obligations and commitments of any nature or description which arise from or are incurred in connection with the operation of the Business, or the ownership, use or operation of the Purchased Assets, by Buyer or its Affiliates following the Closing; and

4.2.6    All accrued but unpaid salaries, wages, vacation and sick pay, incentive compensation and any other similar current liabilities, obligations and commitments of Seller with respect to the Transferred Employees, each as reflected on the Closing Balance Sheet.

Except for the obligations expressly assumed by Buyer pursuant to the foregoing provisions of this Section 4.2, it is understood and agreed that Buyer does not and will not assume or become obligated to pay or perform with respect to third parties any debts, liabilities, contracts or other obligations of Sellers or their Affiliates, or intercompany liabilities among Sellers and their Affiliates, whether now existing or hereafter arising, for which Sellers or any of their Affiliates is or may become liable however arising, including without limitation obligations arising pursuant to the law of contracts, tort, strict liability or other applicable laws, rules, regulations, or ordinances.  Without limiting the scope of the foregoing, Excluded Liabilities shall include, but are not limited to (i) any Environmental Liabilities and Costs accrued prior to the Closing Date or (ii) any liabilities or obligations of the Sellers or the Business for Taxes accrued prior to the Closing Date.

4.3    Offers of Employment.  The following shall apply with respect to employment matters:

4.3.1    Sellers will use all reasonable efforts to cause the employees employed by Sellers to make available their employment services to Buyer.  For a period of two (2) years from the

17

Closing Date, Sellers and Shareholders will not, and will not permit any of their Affiliates to, solicit, offer to employ or retain the services of or otherwise interfere with the relationship of Buyer with any Person employed by or otherwise engaged to perform services for Buyer in connection with the operation of Business.

4.3.2   Buyer shall offer employment on and as of the Closing Date, on an at-will basis, to the persons named on Schedule 4.3.2, other than the Key Employees, at base wages or salaries which are no less than those presently in effect as described on Schedule 4.3.2. In addition, for a period of twenty-four months after Closing (other than with respect to group health coverage, for which such period shall be the 12 months following the Closing), the welfare, benefit plans, programs and arrangements and salary and wages provided to any Transferred Employee (as defined below) shall be substantially similar in the aggregate to the programs and arrangements and salary and wages applicable to such employee immediately prior to the Closing Date. In determining any Transferred Employee's eligibility to participate in and vesting under Buyer's defined contribution retirement plans, employee welfare and benefit plans, programs and arrangements, and the level of vacation under Buyer's policies, the Transferred Employees will receive full credit, to the extent legally permitted, for all service with Seller prior to the Closing (to the same extent such Transferred Employees received such credit with respect to such plans, programs and arrangements maintained by Seller). For a period of twenty-four months after Closing, each Transferred Employee shall be entitled to not less than three days of sick pay per year. Buyer will provide group health coverage to the Transferred Employees and their dependents without imposing any pre-existing condition exclusions, waiting periods or actively-at-work requirements except to the extent such requirements were applicable to the Transferred Employee or dependent under an applicable group health plan of Seller immediately prior to the Closing Date. Those employees who accept such offers of employment effective as of the Closing Date shall be referred to herein as the "Transferred Employees." Effective as of the Closing Date, Buyer shall assume the liability of Sellers in respect of the Transferred Employees for accrued but unpaid salaries, wages, vacation and sick pay and incentive compensation, but only to the extent such liability is reflected on the Balance Sheet or arose after the Balance Sheet Date in the ordinary course of business, consistent with the prior practice of Sellers. Buyer shall assume no such liability or obligations with respect to employees who are not Transferred Employees and Sellers shall retain, consistent with their normal employment practices, all liabilities and obligations with respect to such employees. Sellers shall remain responsible for payment of any and all employee termination costs, retention, change in control, severance or other similar compensation or benefits which are or may become payable in connection with the consummation Contemplated Transaction.

4.4   Other Employee Benefits. Sellers agree that, with respect to claims for workers' compensation and all claims under Sellers' employee benefit programs by persons working for the Business arising out of events occurring prior to the Closing, whether reported or unreported as of the Closing and whether insured or uninsured (including, but not limited to, workers' compensation, life insurance, medical and disability programs), Sellers shall, at their own expense, honor or cause its insurance carriers to honor such claims in accordance with the terms and conditions of such programs or applicable workers' compensation statutes. Without limiting the scope of the preceding sentence, Sellers shall be responsible for any and all claims and liabilities arising out of or relating to (i) employment by Sellers of the Employees (other than Transferred Employees as provided in Section 4.3.2), (ii) the termination by Sellers of the employment of any such Employee and (iii) the provision of any employee benefits to such Employees (and their beneficiaries and eligible dependents) attributable to their employment with, or their participation in any plans or programs maintained or contributed to by, Sellers or any of their Affiliates, including, but not limited to, benefits and/or liabilities arising on or before the Closing Date under WARN and/or COBRA which are or may become payable in connection with the

consummation of the Contemplated Transaction. By way of amplification of the definition of "Excluded Liabilities," the Sellers shall remain responsible for the payment of all benefits accrued or claims incurred under the terms of the Sellers' or their Affiliates' Plans (as defined by Section 6.18 below) with respect to any employee, former employee or director of Sellers and their Affiliates, including each Transferred Employee. Buyer shall not at any time assume any liability for the benefits of an active, inactive or terminated, vested or retired participant in any of the Sellers' or its Affiliates' Plans.

The terms of Sections 4.3 and 4.4 are an agreement between the Sellers and the Buyer only. Nothing in Sections 4.3 or 4.4, whether express or implied, confers upon any employee of Sellers or Buyer, any Transferred Employee or any other Person any rights or remedies, including, but not limited to, (A) any right of employment or recall, (B) any right to continued employment for any specified period, or (C) any right to claim any particular compensation, benefit or aggregate of the benefits, of any kind or nature whatsoever, as a result of Sections 4.3 and 4.4.

4.5    Employment Taxes.

4.5.1    For tax purposes only, Sellers and Buyer will (i) treat Buyer as a "successor employer" and Sellers as a "predecessor," within the meaning of Sections 3121(a)(1) and 3306(b)(1) of the Code, with respect to Transferred Employees who are employed by Buyer for purposes of Taxes imposed under the United States Federal Unemployment Tax Act ("FICA") or the United States Federal Insurance Contributions Act ("FUTA") and (ii) cooperate with each other to avoid, to the extent possible, the filing of more than one IRS Form W-2 with respect to each such Transferred Employee for the calendar year within which the Closing Date occurs.

4.5.2    At the request of Buyer with respect to any particular applicable Tax law relating to employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care or other similar Tax other than Taxes imposed under FICA and FUTA, Sellers and Buyer will (i) treat Buyer as a successor employer and Sellers as a predecessor employer, within the meaning of the relevant provisions of such Tax law, with respect to Transferred Employees who are employed by Buyer and (ii) cooperate with each other to avoid, to the extent possible, the filing of more than one individual information reporting form pursuant to each such Tax law with respect to each such Transferred Employee for the calendar year within which the Closing Date occurs.

## ARTICLE V

## CLOSING

5.1    Deliveries by Sellers.  At the Closing, Sellers shall execute and deliver the following instruments:

5.1.1    Certified resolutions of Sellers approving this Agreement and the Ancillary Agreements and all documents and instruments incident thereto;

5.1.2    Duly executed certificates of Sellers as set forth in Sections 10.3 and 10.4 below;

5.1.3    A duly executed bill of sale in a form reasonably acceptable to Buyer and Sellers (the "Bill of Sale");

5.1.4    A duly executed counterpart of assignment and assumption agreement in a form reasonably acceptable to Buyer and Sellers (the "Assignment and Assumption Agreement"),

19

together with all consents of third parties that are required to make each such assignment effective as to such third parties;

5.1.5    A duly executed counterpart of the Escrow Agreement;

5.1.6    Certificates of title to all vehicles included in the Purchased Assets with assignments to Buyer;

5.1.7    Appropriate assignments and transfer documents for the Intellectual Property described on Schedule 2.1.6;

5.1.8    A duly executed counterpart of the Supply Letter Agreement;

5.1.9    Duly executed counterparts of the Real Property Leases;

5.1.10    Appropriate lien releases for all liens and encumbrances on the Purchased Assets, duly executed by Sellers' lenders or other creditors; and

5.1.11    Such additional instruments of conveyance and transfer as Buyer may reasonably require in order to more effectively vest in it, and put it in possession of, the Purchased Assets in accordance with the provisions of this Agreement.

5.2    <u>Deliveries by Buyer</u>.  At the Closing, Buyer shall deliver the following to Sellers:

5.2.1    The Closing Date Cash Consideration, payable in the manner described in Section 3.1;

5.2.2    A duly executed counterpart of the Assignment and Assumption Agreement;

5.2.3    Duly executed certificates of Buyer as set forth in Sections 11.3 and 11.4 below;

5.2.4    A duly executed counterpart of the Escrow Agreement;

5.2.5    A duly executed counterpart of the Supply Letter Agreement;

5.2.6    Duly executed counterparts of the Real Estate Leases; and

5.2.7    Such additional instruments of conveyance and transfer as Sellers may reasonably require in order to more effectively vest in Buyer, and put Buyer in possession of, the Purchased Assets.

5.3    <u>Escrow Fund Delivery</u>.  At the Closing, Buyer shall deliver the Escrow Amount to the Escrow Agent.

5.4    <u>Delivery of Possession</u>.  Prior to the Closing Date, Sellers shall take such actions as may be necessary or appropriate so that on the Closing Date, Buyer shall be placed in actual possession and control of all of the Purchased Assets.

20

NYA 730432.9

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF SELLERS AND THE SHAREHOLDERS

Sellers jointly and severally make the following representations and warranties to Buyer, except as otherwise set forth in written disclosure schedules (the "Schedules") delivered to Buyer on or prior to the date hereof, a copy of which is attached hereto:

6.1    Organization, Good Standing and Power.    Each Seller is a legal entity validly existing under the laws of the jurisdiction of its organization and has the requisite organizational power and authority to own or lease and to operate all of its properties and assets and to carry on its business as it is now being conducted and as presently proposed to be conducted. Each Seller is duly qualified or licensed to do business and is in good standing under the laws of each jurisdiction in which the conduct of its business or the character or location of the properties and assets owned, leased or operated by it requires such qualification, except where the failure to be so qualified would not reasonably be expected to have a Material Adverse Effect. Each Seller has the requisite power and authority to execute and deliver this Agreement and the other documents and instruments to be executed and delivered by such Seller pursuant hereto and to perform its obligations hereunder and thereunder.

6.2    Authorization of Agreement and Enforceability.    The execution and delivery by each Seller of this Agreement and the other documents and instruments to be executed and delivered by such Seller pursuant hereto and the performance of each Seller's respective obligations hereunder and thereunder have been duly authorized by all necessary corporate or other action on the part of each Seller. This Agreement has been duly executed and delivered by each Seller and constitutes, and when executed and delivered each of the other documents and instruments to be executed and delivered by a Seller pursuant hereto will constitute, a valid and binding agreement of such Seller enforceable against such Seller in accordance with its terms.

6.3    No Violation; Consents.    The execution, delivery and performance by each Seller of this Agreement and the Ancillary Agreements, and the consummation of the Contemplated Transaction will not (with or without the giving of notice or the lapse of time, or both) (i) violate any provision of the certificate of incorporation, bylaws, certificate of formation, operating agreement or other equivalent organizational document of any Seller, (ii) violate or, except as required by the HSR Act or applicable bulk sales laws, require any consent, authorization or approval of, or exemption by, or filing under any provision of any law, statute, rule or regulation to which any Seller, the Business or the Purchased Assets are subject, (iii) violate any judgment, order, writ or decree of any court applicable to any Seller, the Business or the Purchased Assets, (iv) conflict with, result in a breach of, constitute a default under, or accelerate or permit the acceleration of the performance required by, or require any consent, authorization or approval under any contract, agreement or instrument to which Seller is a party or any of the Purchased Assets is bound or (v) result in the creation or imposition of any Encumbrance (other than a Permitted Encumbrance) upon the Purchased Assets, which violation, conflict, breach, default, acceleration or Encumbrance, or the failure to make or obtain such filing, consent, authorization or approval, with respect to the matters specified in clauses (ii) through (v) could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

6.4    Financial Statements.    Sellers have delivered to Buyer true and complete copies of (i) the combining balance sheets of SBC and Milso LLC at December 31, 2002, 2003 and 2004 and the related combining statements of operations and shareholders' equity and members' capital for the years then ended, reviewed by Margolin, Miner & Evans LLP, certified public accountants; and (ii) the unreviewed combining balance sheets of SBC and Milso LLC at March 31, 2005 and the related combining statements of operations and shareholders' equity and members' capital for the interim periods then

NYA 730432.9

ended. True and correct copies of such financial statements are attached hereto as <u>Schedule 6.4</u>. The foregoing financial statements have been prepared in accordance with GAAP consistently applied throughout the periods involved except as may be noted therein. Such financial statements, including the related notes, fairly present the financial position of the respective entities referred to therein at the dates indicated and the results of operations and cash flows of those entities for the periods indicated. References in this Agreement to the "<u>Balance Sheet</u>" shall mean the combining balance sheets at March 31, 2005 referred to above, and references in this Agreement to the "<u>Balance Sheet Date</u>" shall be deemed to refer to March 31, 2005.

6.5    <u>Accounts Receivable</u>.    All Accounts Receivable as set forth on the Balance Sheet (i) arose only in the ordinary course of business consistent with past practice for goods sold and delivered or services performed and (ii) are or will be valid and collectible in full at the recorded amounts thereof (subject to no defenses, setoffs or counterclaims) in the ordinary course of business (without resort to litigation or assignment to a collection agency), net of any allowance for bad debts reflected on the Balance Sheet.

6.6    <u>Inventory</u>.    The Inventory as set forth on the Balance Sheet was acquired and maintained in accordance with the regular business practices of the Business and, on the Balance Sheet Date, consisted of new and unused items of a quality and quantity useable or saleable in the ordinary course of business consistent with past practice. Raw materials reflected on the Balance Sheet were valued at purchase costs, and work in progress and finished goods reflected on the Balance Sheet were valued at the lower of cost or market value.

6.7    <u>Absence of Certain Changes or Events</u>.    Except in respect of periods after the date of this Agreement for actions required or expressly permitted under this Agreement, since the Balance Sheet Date, in its conduct of the Business, Sellers have not:

6.7.1    amended in any material respect or terminated any Assumed Contract other than in the ordinary course of the Business consistent with past practice;

6.7.2    incurred any damage or destruction by fire, storm, or similar casualty, whether or not covered by insurance, except as would not reasonably be expected to result in a Material Adverse Effect;

6.7.3    waived or released any rights with respect to the Purchased Assets or the Business, except as would not reasonably be expected to result in a Material Adverse Effect;

6.7.4    transferred or granted any rights to any Proprietary Rights, except as would not reasonably be expected to result in a Material Adverse Effect;

6.7.5    entered into any transaction or made any commitments (for capital expenditures or otherwise) other than in the ordinary course of the Business consistent with past practice;

6.7.6    changed their methods of accounting in respect of the Business other than as required by GAAP or Applicable Law;

6.7.7    increased the compensation of Employees, except following normal review procedures or as reasonably deemed necessary in the ordinary course of the Business consistent with past practice; or

22

6.7.8    except for changes required or expressly permitted pursuant to this Agreement or associated with the announcement or implementation of the transactions provided for in this Agreement and except as would not reasonably be expected to result in a Material Adverse Effect, altered their customary course of dealing with suppliers or customers of the Business.

6.8     Title to Properties; Absence of Liens and Encumbrances. Sellers have the power and right to sell, assign, transfer and deliver, as the case may be, to Buyer the Purchased Assets and, at the Closing, Buyer will acquire all of each Seller's right, title and interest in, to and under all of the Purchased Assets (or in the case of any leased or licensed Purchased Asset, each Seller's rights under such leases or licenses), in each case free and clear of any and all Encumbrances other than Permitted Encumbrances.

6.9     Proprietary Rights.

6.9.1    Schedule 2.1.6 sets forth a correct and complete list of all patents, logos, trademarks, trade names, service marks and applications or registrations therefor used in and material to the Business, and Schedule 6.9 sets forth a correct list of all other inventions, intellectual property and trade secret assets used in and material to the Business (collectively, the "Proprietary Rights").

6.9.2    Seller owns or possesses adequate licenses or other valid right to use all the Proprietary Rights. The Proprietary Rights included in the Purchased Assets constitute all such rights necessary to conduct the Business in accordance with past practice and are being conveyed to Buyer together with the other Purchased Assets. To the Knowledge of the Sellers, the validity of the Proprietary Rights and the rights therein of Sellers have not been questioned in any litigation to which either Seller is a party, nor has any such litigation been threatened. To the Knowledge of the Sellers, the conduct of the Business does not materially conflict with patent rights, licenses, trademark rights, trade name rights, copyrights or other intellectual property rights of others.

6.9.3    Seller has no Knowledge of any material infringement of any Proprietary Rights owned or licensed by Seller. No present or former director, officer, employee or consultant of Seller or any Affiliate of Seller has any ownership interest in any of the Proprietary Rights.

6.9.4    All personnel, including employees, agents, consultants, and contractors, who have contributed to or participated in the conception and development of the Proprietary Rights on behalf of Sellers either (1) have been party to a "work-for-hire" arrangement or agreement with the Seller, in accordance with applicable federal and state law, that has accorded a Seller full, effective, exclusive, and original ownership of all tangible and intangible property thereby arising, or (2) have executed appropriate instruments of assignment in favor of a Seller as assignee that have conveyed to Seller full, effective, and exclusive ownership of all tangible and intangible property thereby arising.

6.10    Contracts and Commitments. Other than Contracts that may be entered into following the date hereof without a breach of this Agreement, no Seller is, with respect to the Purchased Assets or the Business, a party to any written or oral:

6.10.1    agreement, contract or commitment for the future purchase of, or payment for, supplies or products, or for the performance of services by another party, involving in any one case $75,000 or more;

23

6.10.2  agreement, contract or commitment to sell or supply products or to perform services, involving in any one case $75,000 or more;

6.10.3  agreement, contract or commitment continuing over a period of more than six months from the date hereof that exceeds $75,000 in value;

6.10.4  representative, sales agency, dealer or distributor agreement, contract or commitment;

6.10.5  note, debenture, bond, conditional sale agreement, equipment trust agreement, letter of credit agreement, loan agreement or other contract or commitment for the borrowing or lending of money (including without limitation loans to or from employees) or guarantee, pledge or undertaking of the indebtedness of any other Person;

6.10.6  agreement, contract or commitment for any charitable or political contribution;

6.10.7  agreement, contract or commitment limiting or restraining Seller or any successor or assign from engaging or competing in any lines of business with any Person;

6.10.8  license, franchise, distributorship or other agreement, including those that relate in whole or in part to any patent, trademark, trade name, service mark or copyright or to any ideas, technical assistance or other know-how of or used by the Business; or

6.10.9  any other material agreement, contract or commitment not made in the ordinary course of business.

Except for those that have terminated in accordance with their terms or have been terminated without a breach of this Agreement, each of the agreements, contracts, commitments, leases and other instruments, documents and undertakings listed on Schedule 2.1.2A is in full force and effect and constitute valid and binding agreements of the Sellers party thereto, enforceable in accordance with their respective terms against such Seller, and to the Knowledge of Sellers, the other parties thereto.  No consent or approval of any party to any agreement, contract, commitment, lease or other instrument, document or undertaking listed on Schedule 2.1.2A is required for the execution of this Agreement or the consummation of the Contemplated Transaction.  No Seller or, to the Knowledge of Sellers, any other party to any agreement, contract, commitment lease or other instrument, document or undertaking listed on Schedule 2.1.2A is in violation or breach of, or in default under, nor has there occurred any other event or condition that with the passage of time or giving of notice (or both) would constitute a default under, or permit the termination of, any of the same, except in any case referred to in this sentence as would not reasonably be expected to have a Material Adverse Effect.

6.11   Permits, Licenses.  Seller has all material permits, licenses, registrations, orders and approvals of federal, state or local government or regulatory bodies that are required to operate the Business (including without limitation those required under any Environmental Law) (collectively, the "Permits") and Seller is in compliance with the material terms and conditions of the Permits, except as would not reasonably be expected to have a Material Adverse Effect.  Schedule 2.1.4 hereto sets forth a correct and complete list of all material Permits, each one of which is in full force and effect.  To Sellers' Knowledge, no suspension or cancellation of any of the Permits has been threatened and no cause exists for such suspension or cancellation.  Any Permits that cannot be transferred are identified as such on Schedule 2.1.4 hereto.

NYA 730432.9