# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT NEW YORK

| | |
|---|---|
| SCOTT PONTONE,<br><br>    Plaintiff<br><br>    vs.<br><br>THE YORK GROUP, INC.,<br><br>MILSO INDUSTRIES CORPORATION,<br><br>    and<br><br>MATTHEWS INTERNATIONAL<br>CORPORATION,<br><br>    Defendants | **Docket No.**<br><br>08-cv-6314 (WHP)<br><br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS .........................................................................................................1
I.      Milso Industries and Scott Pontone ........................................................................1
II.     Matthews' Entry  into the Casket Industry .............................................................2
III.    Mr. Pontone's Employment by York and Matthews ..............................................3
IV.     Mr. Pontone's Expected Elevation to the Presidency of York ...............................4
V.      Interference by Matthews in York's Business ........................................................4
VII.    Settlement of the Interference Claims and the Ouster of Mr. Pontone....................5
VIII.   The 2007 Amendment to the Key Employee Employment Agreement ....................5
IX.     The Potential Joint Venture .....................................................................................7

ARGUMENT ..............................................................................................................................8
I.      Mr. Pontone has a Strong Likelihood of Success on the Merits.............................9
A.      No Legitimate Interests Justify the Restrictive Covenants ....................................9
B.      The Three-Year Worldwide Restrictive Covenants are Unreasonable...................13
II.     Mr. Pontone will suffer Irreparable Harm if an Injunction is Not Issued...............16
III     The Court Should Enjoin the Retaliatory Cessation of Mr. Pontone's Benefits ..............18

CONCLUSION............................................................................................................................19

## TABLE OF AUTHORITIES

**CASES**

AM Media Commc'ns Group v. Kilgallen,
    261 F. Supp. 2d 258 (S.D.N.Y. 2003).........................................................12

American Broadcasting Cos. Inc. v. Wolf,
    420 N.E.2d 363 (N.Y. 1981)................................................................9, 19

American Inst. of Chem. Eng'rs v. Reber-Friel Co.,
    682 F.2d 382 (2d Cir.1982)................................................................12

BDO Seidman v. Hirshberg,
    712 N.E. 2d 1220 (N.Y. 1999).............................................................9, 12

Brenntag Int'l Chemicals, Inc. v. Bank of India,
    175 F.3d 245 (2d Cir. 1999)...................................................................8

Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp.,
    369 N.E.2d 4 (N.Y. 1977).................................................................9, 12

Crippen v. United Petroleum Feedstocks, Inc.,
    666 N.Y.S.2d 156 (N.Y. App. Div. 1st Dep't 1997)........................................18

Crown It Servs., Inc. v. Koval-Olsen,
    782 N.Y.S.2d 708 (N.Y. App. Div. 1st Dep't 2004)........................................14

Doninger v. Niehof,
    527 F.3d 41 (2d Cir. 2008)..............................................................8, 18

Doran v. Salem Inn, Inc.,
    422 U.S. 922, 95 S. Ct. 2561, 45 L. Ed. 2d 648 (1975)...................................17

EarthWeb, Inc. v. Schlack,
    71 F. Supp. 2d 299 (S.D.N.Y. 1999).......................................................15

Freedom Holdings, Inc. v. Spitzer,
    408 F.3d 112 (2d Cir. 2005).............................................................8, 17

Garfinkle v. Pfizer, Inc.,
    556 N.Y.S. 2d 322 (N.Y. App. Div. 1st Dep't 1990)........................................14

Great Lakes Carbon Corp. v. Koch Indus., Inc.,
    497 F.Supp. 462 (S.D.N.Y. 1980) ......................................................14, 16

Heartland Sec. Corp. v. Gerstenblatt,
    No. 99 Civ. 3694 (WHP),
    99 Civ. 3858, 2000 WL 303274 (S.D.N.Y. Mar. 22, 2000) ......................10, 12, 14, 15

Jay's Custom Stringing, Inc. v. Yu,
    No. 01 Civ. 1690 (WHP), 2001 WL 761067 (S.D.N.Y. Jul. 6, 2001)...............9, 10, 11

Leo Silfen, Inc. v. Cream,
    278 N.E.2d 636 (N.Y. 1972).....................................................................................11

Marietta Corp. v. Fairhurst,
    754 N.Y.S. 2d 62 (N.Y. App. Div. 3d Dep't 2003).................................................10, 18

Natural Organics, Inc. v. Brown,
    No. 0030852/2002, 2007 WL 2236456 (N.Y. Sup. Ct. Jul. 23, 2007) .................10, 15

Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer
    Pharms.Co.,
    290 F.3d 578 (3d Cir. 2002)........................................................................................17

Reed, Roberts Assocs., Inc. v. Strauman,
    353 N.E.2d 590 (N.Y. 1976)..........................................................................................9

Register.com Inc. v. Verio, Inc.,
    356 F.3d 393 (2d Cir. 2004).........................................................................................17

Silipos, Inc. v. Bickel,
    No. 1:06-cv-02205, 2006 WL 2265055 (S.D.N.Y. Aug. 8, 2006) ...................... passim

Stanley Tulchin & Assocs. v. Vignola,
    587 N.Y.S.2d 761 (N.Y. App. Div. 2d Dep't 1992).....................................................15

Ticor Title Ins. Co. v. Cohen,
    173 F.3d 63 (2d Cir.1999)............................................................................................12

Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,
    60 F.3d 27 (2d Cir. 1995).............................................................................................18

Victor Temporary Servs. v. Slattery,
    482 N.Y.S.2d 623 (N.Y. App. Div. 4th Dep't 1984)....................................................16

Weissman v. Transcontinental Printing U.S.A., Inc.,
    205 F. Supp. 2d 415 (E.D. Pa. 2002) ..............................................................16, 18, 19

## PRELIMINARY STATEMENT

Plaintiff Scott Pontone submits this Memorandum of Law in support of his Motion for a Preliminary Injunction barring the York Group, Inc. ("York"), Milso Industries Corporation ("MIC") and Matthews International Corporation ("Matthews") and any persons acting on their behalf from enforcing the unreasonable and invalid worldwide restrictive covenants in Mr. Pontone's severance agreement (the "Restrictive Covenants") — which effectively bar Mr. Pontone from participating in an entire industry for three years.[1]

More than a year has passed since Mr. Pontone was forced to resign from his employment with York. During that year, Mr. Pontone has fully complied with the Restrictive Covenants. The covenants are now causing Mr. Pontone substantial hardship, however, by preventing him from expanding his business and entering into new ventures. If the bans are allowed to continue, the ventures will be lost, causing Mr. Pontone and his salespeople irreparable harm. Defendants have no legitimate interest in enforcing these covenants for two additional years. Accordingly, Mr. Pontone respectfully requests this Court to enjoin the enforcement of the Restrictive Covenants pending a full disposition of this matter.

## STATEMENT OF FACTS

I.    **Milso Industries and Scott Pontone**

Mr. Pontone's affiliation with York and Matthews began in May 2005 when those companies purchased Milso Industries ("Milso") and engaged him as an employee. Milso was a family business based in Brooklyn, New York, founded by Mr. Pontone's grandparents. The

---

[1] The restrictive covenants are in the 2007 Amendment to Mr. Pontone's 2005 Employment Agreement and a 2005 Asset Purchase Agreement, which he executed upon his severance. The 2007 Amendment, 2005 Employment Agreement, and Asset Purchase Agreement are attached as Exhibits 4, 5, and 6, respectively, to the Declaration of Edmund Aronowitz in Support of Plaintiff's Motion for Preliminary Injunction.

1

business manufactured and sold caskets and other products to licensed funeral homes throughout the United States. (Declaration of Plaintiff Scott Pontone ("Pl. Decl.") ¶ 1 (attached as Exhibit 1 to the Declaration of Edmund Aronowitz in Support of Plaintiff's Motion for Preliminary Injunction).)

Before 2005, Mr. Pontone and several of his family members were the co-owners of Milso. Mr. Pontone was a minority shareholder in the company. (Pl. Decl. ¶ 10.) Mr. Pontone worked for Milso for more than 17 years in managerial and sales positions. (Pl. Decl. ¶ 4.) During his employment with Milso, Mr. Pontone developed general managerial and marketing skills. Id. He also had primary responsibility for 30-40 customer accounts, all in the New York City metropolitan area. Id.

## II.     Matthews' Entry into the Casket Industry

Before 2001, Matthews was a designer, manufacturer and marketer of custom-made identification products such as cast bronze memorials, and York was the second largest casket manufacturer in the United States. In 2001 Matthews acquired York, and York became a subsidiary of Matthews. (Matthews Annual Report 2001 p.4 (attached as Exhibit 2 to the Declaration of Edmund Aronowitz in Support of Plaintiff's Motion for Preliminary Injunction).) Today, Matthews employs over 4,100 people worldwide and has a presence in fifteen countries on four continents. (Matthews Annual Report 2007 p.2 (attached as Exhibit 3 to the Declaration of Edmund Aronowitz in Support of Plaintiff's Motion for Preliminary Injunction).)

In 2005, seeking to expand their casket manufacturing and marketing operations, Matthews and York acquired Milso. On May 28, 2005, York purchased Milso's business through an Asset Purchase Agreement (the "APA") and other agreements. (Pl. Decl. ¶ 9.)

### III.    Mr. Pontone's Employment by York and Matthews

In connection with York's purchase of Milso's business, Mr. Pontone and York entered into a Key Employee Employment Agreement (the "2005 Employment Agreement"). (Pl. Decl. ¶ 11.)  The term of the 2005 Employment Agreement extended through September 30, 2010. (2005 Employment Agreement art. 1.02.)  Mr. Pontone initially held the position of Executive Vice President of the Casket Division, and was entitled to a seat on York's board of directors. (Pl. Decl. ¶ 11.)  The 2005 Employment Agreement also provided that if Mr. Pontone's father, Harry, ceased for any reason to be President of York, Mr. Pontone would succeed him in that capacity. (Pl. Decl. ¶ 11.)

During his employment with York, Mr. Pontone used the knowledge and skills he had developed at Milso for the benefit of York and Matthews. (Pl. Decl. ¶ 16.)  Mr. Pontone's role at York was purely in management — he transitioned all of the customer accounts he managed at Milso to other York employees, and introduced his former Milso customers to employees of York and Matthews.  (Pl. Decl. ¶¶ 15, 18.)  In this manner, Mr. Pontone helped York institutionalize its own relationships with Milso's customers and obtain the benefit of Milso's goodwill.  At the same time, because his new position at York had no sales component and was solely managerial, Mr. Pontone did not form relationships with other York customers. (Pl. Decl. ¶ 16.)  While he remained at York, his contacts with customers generally were limited to a few isolated social encounters and to interactions at industry conventions, where he supported the marketing activities of the York personnel who had primary responsibility for the accounts. (Pl. Decl. ¶ 15.)

3

#### IV.    Mr. Pontone's Expected Elevation to the Presidency of York

At the time of York's purchase of Milso, Mr. Pontone anticipated that he would eventually become president of York. (Pl. Decl. ¶ 11.) Mr. Pontone's father, Harry Pontone, became president of York upon York's purchase of Milso, and Mr. Pontone's 2005 Employment Agreement provided that Mr. Pontone would succeed his father. (2005 Employment Agreement art. 1.01.) At that time, Mr. Pontone also would be entitled to a minimum annual salary of $400,000 through the expiration of the term of his employment in September 2010. (2005 Employment Agreement art. 1.03(a).)

#### V.    Interference by Matthews in York's Business

The employment agreements provided that whomever was serving as President of York would have substantial autonomy and control over most aspects of York's operations. (Pl. Decl. ¶ 11 and 2005 Employment Agreement. art. 1.01.) Mr. Pontone and his father wanted those provisions because a substantial component of their compensation was based on York's performance. (Pl. Decl. ¶ 12.) To protect these rights, their employment agreements provided for the immediate acceleration of bonuses in the event of interference with their autonomy and control. (2005 Employment Agreement art. 1.04(b).)

Soon after the purchase of Milso, however, Mr. Pontone and his father began to disagree with representatives of Matthews about York's business strategy. (Pl. Decl. ¶ 19.) In particular, Mr. Pontone believed that the Matthews representatives were overly concerned with achieving quarterly earnings targets, leading them to push for actions that were not in the long-term interests of York's business. Id. Mr. Pontone also believed the Matthews management style was unduly formal and hierarchical, which stifled the entrepreneurial approach they believed was needed to grow York's business. Id.

4

These disagreements continued, and in March 2007 Mr. Pontone and his father sued York for breach of their employment agreements and invoked their bonus acceleration clauses. Id.

## VII. Settlement of the Interference Claims and the Ouster of Mr. Pontone

In May 2007, Mr. Pontone and York settled their lawsuit. York and Matthews agreed to pay a substantial portion of the money that Mr. Pontone and his father sought. (Pl. Decl. ¶ 20.) However, Matthews was unwilling to cease its involvement in the management of York. Accordingly, Matthews demanded that the Mr. Pontone and his father relinquish their management rights or leave York altogether. (Pl. Decl. ¶ 21.) Unwilling to assume a more subordinate role, Mr. Pontone was effectively forced out of his position at York.

## VIII. The 2007 Amendment to the Key Employee Employment Agreement

As part of the settlement, Mr. Pontone, York[2] and Matthews executed an amendment to the 2005 Employment Agreement and the APA, titled the Second Amendment to the Employment Agreement and Asset Purchase Agreement (the "2007 Amendment"). (Pl. Decl. ¶ 21.) The 2007 Amendment implemented many of the terms of the settlement, including the termination of Mr. Pontone and the payment of compensation.

The 2007 Amendment deleted the original restrictive covenants from the 2005 Employment Agreement and the APA. The 2007 Amendment included new restrictive covenants — the Restrictive Covenants at issue in this case — which provided as follows:

> 4.06. Restrictions on Competition. Employee covenants and agrees that during the period of Employee's employment hereunder and *for three (3) years following the effective date of Employee's resignation from the Company, Employee shall not engage, directly or indirectly, whether as principal or as agent, officer, director, employee consultant, shareholder, investor, financer or otherwise, alone or in association with any other person, corporation, or other entity in the*

---

[2] MIC, a wholly owned subsidiary of York created after the Milso acquisition, also was a party to the 2007 Amendment. For the sake of convenience and to avoid confusion, this memorandum references only York and Matthews unless there is a need to make reference to MIC.

manufacture, marketing or sale of caskets or any other product of the type presently manufactured, marketed or sold by The York Group, Inc. or Milso. Notwithstanding the restrictions in this paragraph, Employee may own, directly or indirectly, solely as an investment, (A) securities of any such entity which are traded on any national securities exchange or NASDAQ if Employee (y) is not a controlling person of; or a member of a group which controls such entity; and (z) does not directly or indirectly own 2% or more of any class of securities of such entity or (B) interests in mutual funds or similar pooled accounts.

4.07.  <u>Non-Solicitation of Customer and Suppliers</u>.  Employee covenants and agrees that during the period of Employee's employment hereunder and *for three (3) years following the effective date of Employee's resignation from the Company, Employee shall not directly or indirectly solicit the trade of, or trade with, any customer of The York Group, Inc. or Milso with respect to the manufacture, marketing or sale of caskets or any other product of the type presently manufactured, marketed or sold by The York Group, Inc. or Milso.*

(emphases added) (2007 Amendment arts. 4.06 and 4.07).

Matthews' and York's reasons for seeking these three-year, worldwide restrictions were a mystery to Mr. Pontone.  (Pl. Decl. ¶ 22.)  At the time of the settlement, Matthews and York did not suggest that Mr. Pontone possessed any confidential or trade secret information — and he did not.  (Pl. Decl. ¶ 25.)  During the two years that Mr. Pontone was employed with York, he transferred his knowledge to York and allowed York to institutionalize new relationships with former Milso clients.  Nor could Mr. Pontone unfairly compete for York's or Mathews' customers in the future by trading unfairly on the goodwill of York or Mathews.  Indeed, six Pontone family members, including Mr. Pontone's father, remained employed by York, and York and Matthews retained complete control over the Milso brand.  (Pl. Decl. ¶ 27.)  Finally, nothing about Mr. Pontone's skills were special or unique.  (Pl. Decl. ¶ 6.)  In short, Matthews and York had no legitimate reason to restrain Mr. Pontone in this manner — other than vindictiveness or fear of competition in the casket industry.

Mr. Pontone was reluctant to agree to the Restrictive Covenants, believing them to be unfair.  (Pl. Decl. ¶ 22.)  Rather than continue to litigate against parties with the resources of

6

York and Matthews, and out of consideration for his family members who continued working for York, he eventually acquiesced in the agreement as a whole. Id. The parties completed their settlement on May 30, 2007.

## IX.    The Potential Joint Venture

Beginning several months after he left York, Mr. Pontone started a business that offers insurance products to funeral home operators. (Pl. Decl. ¶ 28.) Insurance is a different product from that sold by York, Matthews, and Milso — indeed, insurance sales require a license that those companies do not have — and this new venture did not violate the Restrictive Covenants. Id. In the few months that he has been engaged in the business, it has been reasonably successful.

In early 2008, different casket manufacturers have approached Mr. Pontone regarding a potential joint venture to market caskets using the same sales force that Mr. Pontone used to offer insurance products (the "Proposed Ventures"). (Pl. Decl. ¶ 30.) Out of an abundance of caution, Mr. Pontone advised these manufacturers of the existence of the Restrictive Covenants. Id. The manufacturers responded that they are unwilling to proceed without assurance that those provisions will not apply to the proposed venture. Id.

The Restrictive Covenants are imposing substantial and irreparable harm on Mr. Pontone. (Pl. Decl. ¶ 34.) The proposed combined product offering (insurance products and caskets) is an innovative product that should be attractive to customers, who will receive, if not one-stop shopping, then at least "fewer-stops" shopping for their needs. Id. This enhanced convenience would be a competitive advantage and would result in increased profits, which the Restrictive Covenants are preventing Mr. Pontone from pursuing. Id. Moreover, the ability to offer his sales force the opportunity to sell both insurance products and caskets to funeral homes would

increase Mr. Pontone's attractiveness as an employer. Id.  Under the Restrictive Covenants, he is losing an opportunity to attract more and better salespeople, causing immeasurable economic loss and hindering the growth of his business.

The Restrictive Covenants also are imposing substantial harm on Mr. Pontone's sales force and on his prospective customers.  (Pl. Decl. ¶ 35.)  Mr. Pontone's salespeople are losing an opportunity to enhance their earnings; new jobs that the Proposed Ventures otherwise would have created will not become available; and customers and prospective customers will be deprived of the benefits of market competition and innovation. Id.

## ARGUMENT

A preliminary injunction should be granted where the moving party demonstrates (1) that it will suffer irreparable harm if the requested relief is not granted and (2) either (i) a likelihood of success on the merits or (ii) a sufficiently serious question going to the merits to make them fair ground for litigation with a balance of hardships tipping decidedly in the movant's favor. Doninger v. Niehof, 527 F.3d 41, 47 (2d Cir. 2008); Brenntag Int'l Chemicals, Inc. v. Bank of India, 175 F.3d 245, 249 (2d Cir. 1999).  Mr. Pontone has a strong likelihood of succeeding on the merits because the Restrictive Covenants are not necessary to protect a legitimate interest of York or Matthews and are unreasonable in duration and geographic scope.  Moreover, the loss of a promising business opportunity is a well-recognized irreparable harm, as no court can restore Mr. Pontone's position if the Restrictive Covenants are allowed to stand.  See, e.g., Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112, 114 (2d Cir. 2005) ("An anticipated loss of market share growth may suffice as an irreparable harm.").

## I.    Mr. Pontone has a Strong Likelihood of Success on the Merits

Anticompetitive covenants in employment agreements are strongly disfavored under New York law, and receive careful judicial scrutiny. American Broadcasting Cos. Inc. v. Wolf, 420 N.E.2d 363, 367-68 (N.Y. 1981); Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp., 369 N.E.2d 4, 6 (N.Y. 1977); Jay's Custom Stringing, Inc. v. Yu, No. 01 Civ. 1690 (WHP), 2001 WL 761067 at *5 (S.D.N.Y. Jul. 6, 2001) (Pauley, J.) ("Restrictive covenants are generally disfavored by law and are only enforced under limited circumstances."). For a restrictive covenant to be valid, it must satisfy an "overriding requirement of reasonableness." Reed, Roberts Assocs., Inc. v. Strauman, 353 N.E.2d 590, 592 (N.Y. 1976). In particular, an anticompetitive covenant in an employment contract is appropriate only if the covenant is: (1) necessary to protect the employer's legitimate interests; (2) reasonable in time and area; (3) not unreasonably burdensome to the employee; and (4) not harmful to the general public. Id. at 593. "A violation of any prong renders the covenant invalid." BDO Seidman v. Hirshberg, 712 N.E. 2d 1220, 1223 (N.Y. 1999).

The Restrictive Covenants fail every test of reasonableness under New York law. They are unnecessary to protect any legitimate interest, unreasonable in time and scope, unreasonably burdensome to Mr. Pontone, and harmful to the general public.

### A.    No Legitimate Interests Justify the Restrictive Covenants

If a restrictive covenant is not necessary to protect an employer's legitimate interests, that ends the inquiry and any purported restraint is entirely invalid. "An employer may assert only four types of 'legitimate interests' under the first prong of the BDO Seidman standard: (1) protection of trade secrets; (2) protection of confidential customer information; (3) protection of an employer's client base; and (4) protection against irreparable harm where an employee's

9

services are unique or extraordinary." Silipos, Inc. v. Bickel, No. 1:06-cv-02205, 2006 WL 2265055 at *6 (S.D.N.Y. Aug. 8, 2006); see also Heartland Sec. Corp. v. Gerstenblatt, No. 99 Civ. 3694 (WHP), 99 Civ. 3858, 2000 WL 303274, at *5 (S.D.N.Y. Mar. 22, 2000) (Pauley, J.) (same). The Restrictive Covenants are unnecessary to protect any of these interests.

First, Mr. Pontone has no knowledge of any of Defendants' trade secrets. (Pl. Decl. ¶ 25.) The definition of trade secrets in this context is narrow. "[T]rade secret protection will not attach to customer information that easily can be recalled or obtained from the customers themselves." Jay's Custom Stringing, Inc., 2001 WL 761067 at *6. "'Mere knowledge of the intricacies of a business operation' does not qualify." Silipos, Inc., 2006 WL 2265055 at *3 (citation omitted). Moreover, "business or financial information, such as market reports, do not trigger the trade-secrets legitimate interest." Id. at *4. Nor does "information regarding 'market strategies'" or "pricing data." Id. (citing Marietta Corp. v. Fairhurst, 754 N.Y.S. 2d 62, 67 (N.Y. App. Div. 3d Dep't 2003)). To be "trade secret" in this context, the information must be of a type that a competitor would be able to use "to gain an unfair advantage" over the employer. Id. "Absent any wrongdoing, it cannot be said that a former employee should be prohibited from utilizing his knowledge and talents in a particular area." Natural Organics, Inc. v. Brown, No. 0030852/2002, 2007 WL 2236456 at *5 (N.Y. Sup. Ct. Jul. 23, 2007).

Mr. Pontone possesses none of Defendants' trade secret information. (Pl. Decl. ¶ 25.) During his employment at York, he had supervisory responsibility for sales, distribution and marketing functions — which are not functions that inherently expose one to trade secret information. The principal players in the burial casket business are well known, and their product ranges are generally similar. (Pl. Decl. ¶ 7.) Accordingly, companies in the industry compete principally on the basis of price and quality of service — which involve trade secrets. (Pl. Decl.

¶ 7.) Moreover, during the course of his employment, Mr. Pontone used the knowledge and skills he developed at Milso for the benefit of York. (Pl. Decl. ¶ 16.) He did not develop any new knowledge or skills during his employment at York, and York provided no training for him. Id. When he was forced out of York, Mr. Pontone did not hold anything that he thought of as York's trade secrets, confidential customer lists, or other proprietary information; and neither Matthews nor York suggested that he had any such information or material or asked him to return it. (Pl. Decl. ¶ 25.) In any event, in the year since Mr. Pontone has left York, any knowledge he obtained has become stale. See Jay's Custom Stringing, Inc., 2001 WL 761067 at *6 (nine-month old knowledge of former employer's costs and prices was likely to be outdated).

Second, Mr. Pontone does not possess Defendants' confidential client information. (Pl. Decl. ¶ 25.) "Generally, where the customers are readily ascertainable outside the employer's business as prospective users or consumers of the employers services or products, . . . protection will not attach and courts will not enjoin the employee from soliciting his employer's customers." Leo Silfen, Inc. v. Cream, 278 N.E.2d 636, 639 (N.Y. 1972) (citations omitted).

Defendants' client base is readily ascertainable and not subject to protection. All of Defendants' actual and potential customers are operators of licensed funeral homes. This is an easy client base to identify. They can be found in the classified listings of any telephone directory or in an industry publication such as the American Blue Book of Funeral Directors. (Pl. Decl. ¶ 5.) In addition, two funeral directory industry associations, the National Funeral Directors Association ("NFDA") and the International Cemetery and Funeral Association, publish membership information that is available online over the Internet. Id. This information is not confidential and does not warrant protection through a restrictive covenant.

*Third*, Mr. Pontone's services are not "special or unique." "In order to justify a restrictive covenant, an employer must show more than simply that the employee excels at his work or that his services are of high value to his employer[.]" Heartland Sec. Corp., 2000 WL 303274 at *8. Special and unique services usually are rendered by individuals with special talents such as "musicians, professional athletes, actors and the like." Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 70 (2d Cir.1999). "Employees who do not fit such categories can qualify [as special or unique] if the employer establishes that the employee's 'services are of such character as to make his replacement impossible or that the loss of such services would cause the employer irreparable injury.'" AM Media Commc'ns Group v. Kilgallen, 261 F. Supp. 2d 258, 264 (S.D.N.Y. 2003) (quoting Am. Inst. of Chem. Eng'rs v. Reber-Friel Co., 682 F.2d 382, 390 n. 9 (2d Cir.1982) (citations omitted)).

Mr. Pontone, though personable and a good salesman, is not in the same category as a performing artist or a professional athlete. (Pl. Decl. ¶ 6.) Nor are his services irreplaceable — indeed, Defendants willingly forced him out of their employ. Defendants can hardly say now that his services are so unique that their loss is an irreparable harm.

*Finally*, the Restrictive Covenants are not justified by any legitimate need to protect Defendants' client base. "Protection of customer relationships is a legitimate interest when the employee must work closely with the client or customer over a long period of time, especially when his services are a significant part of the total transaction." Silipos, 2006 WL 2265055 at *5. Employers are not entitled to "baldly restrain competition" to protect their client base. Columbia Ribbon, 369 N.E.2d at 6. Rather, employers may protect their client base from *unfair* competition. BDO Seidman, 712 N.E. 2d at 1224. "If the employee abstains from unfair means in competing for those clients, the employer's interest in preserving its client base against the

competition of the former employee is no more legitimate and worthy of contractual protection than when it vies with unrelated competitors for those clients." Id. This case is as far removed as can be from the paradigm of an employee who gains relationships with customers that are hard to find, with the assistance, support and funding of his employer, and who then sets up his own shop and solicits his former employer's customers. That conduct may be unfair. Mr. Pontone's clearly is not.

The Restrictive Covenants are not justifiable by any legitimate need to protect Defendants' client base from competition. It has been more than three years since York acquired Milso. During that time, Mr. Pontone transferred his client relationships entirely to York and Matthews, and was engaged in little to no direct client contact. (Pl. Decl. ¶ 17.) Competition for Defendants' client base now would be entirely fair.

In sum, Defendants have none of the four interests that would legitimately justify a restrictive covenant. For this reason alone, the covenants are invalid.

**B.      The Three-Year Worldwide Restrictive Covenants are Unreasonable**

The Restrictive Covenants also are invalid because they are unreasonable in scope. They prohibit Mr. Pontone from "engag[ing], directly or indirectly, . . . in the manufacture, marketing or sale of caskets or any other product of the type presently manufactured, marketed or sold by the York Group, inc. or [MIC]," for three years, without geographic limitation. (2007 Amendment art. 4.06.) They also prohibit Mr. Pontone from directly or indirectly soliciting or trading with "any customer of the York Group or [MIC] with respect to the manufacture, marketing or sale of caskets or any other product of the type presently manufactured, marketed or sold by The York Group, Inc. or [MIC]," again without geographic limitation, for three years. (2007 Amendment art. 4.07.) In short, these provisions impose a three-year ban on Mr.

13

Pontone's participation in the manufacture, marketing, or sale of caskets. No legitimate interest justifies restrictions of this scope and duration.

The global reach of the Restrictive Covenants is inherently unreasonable. "New York courts rarely find worldwide restrictions reasonable in any context." Silipos, 2006 WL 2265055, at *6; see also Garfinkle v. Pfizer, Inc., 556 N.Y.S. 2d 322 (N.Y. App. Div. 1st Dep't 1990) (summarily affirming the unreasonableness of a worldwide restriction); Great Lakes Carbon Corp. v. Koch Indus., Inc., 497 F.Supp. 462, 471 (S.D.N.Y. 1980) (same); see also Heartland Sec. Corp., 2000 WL 303274 at *7 (finding restrictive covenant with duration of two years and covering "the entire earth" to be unreasonable as a matter of law). York and MIC do not even compete globally — they operate only in twenty-six states. (Pl. Decl. ¶ 14.) Prior to joining York more than three years ago, Mr. Pontone directly serviced customers only in the New York metropolitan area. (Pl. Decl. ¶ 4.) There is no justifiable basis for the geographic scope of these covenants.

The three-year duration also is unreasonable. Of course, Mr. Pontone has complied with these covenants for more than a year — and courts routinely find that, where there is a legitimate interest on the part of the former employer in need of protection, single-year restrictive covenants are reasonable, see e.g. Crown It Servs., Inc. v. Koval-Olsen, 782 N.Y.S.2d 708, 710 (N.Y. App. Div. 1st Dep't 2004) (finding "no serious dispute" that a one-year limitation is reasonable). Restrictive covenants of greater duration raise serious questions, however. See, e.g., Great Lakes Carbon Corp., 497 F. Supp. at 471 (holding three year geographically unlimited restriction on competition unreasonable in scope and duration). Under the circumstances, where Mr. Pontone was forced to resign by Defendants and the interests in need of protection are limited at best, a restriction beyond one year is simply not reasonable.

Courts have found similar covenants to be unreasonable under similar circumstances. In Silipos, the former Executive Vice President and shareholder of a company entered into an employment agreement with one-year worldwide non-competition and non-solicitation provisions. 2006 WL 2265055 at *1. Unlike Mr. Pontone, the employee in Silipos maintained direct contact with the new venture's customers, distributors, and vendors. Id. Nonetheless, the court found the one-year geographic restriction to be facially unreasonable, because its worldwide scope, its bar on "direct[] and indirect[]" competition, and its ban on conduct "over and above solicitation of clients" were unsupportable. Id. at *6. Similarly, the New York courts have found a non-competition provision that "would have impermissibly prevented [the employee] from working in his chosen field for three years" was invalid and unenforceable. Stanley Tulchin & Assocs. v. Vignola, 587 N.Y.S.2d 761, 763 (N.Y. App. Div. 2d Dep't 1992). This Court has found similarly. see also Heartland Sec. Corp., 2000 WL 303274 at *8 (finding limitless geographic restrictive covenants of two and four year lengths "patently unreasonable and unenforceable"); Natural Organics, 2007 WL 2236456 at *4 (finding an 18-month covenant to be "unreasonably broad on its face"); EarthWeb, Inc. v. Schlack, 71 F. Supp. 2d 299, 313 (S.D.N.Y. 1999) (finding a one-year restrictive covenant too long in the internet industry).

Even if York and Matthews could conjure some legitimate interest that required protection from unfair competition by Mr. Pontone, the amount of protection required would be very modest. Certainly, any need for protection has now expired. Since May 2007, Mr. Pontone has had no involvement with York. (Pl. Decl. ¶ 21.) York and Matthews have had ample time to further institutionalize the former Milso customer relationships with the continued help of Mr. Pontone's remaining family members. There is no justification for applying the covenants to Mr. Pontone worldwide for an additional two years.

15

## II.    Mr. Pontone will suffer Irreparable Harm if an Injunction is Not Issued

The continued application of the Restrictive Covenants is imposing an unreasonable burden and irreparable harm on Mr. Pontone, on his salespeople, and on the public. This harm demonstrates that Mr. Pontone is likely to show that the Restrictive Covenants are invalid and unenforceable (under the third and fourth prongs of the BDO Seidman test). It also shows that a preliminary injunction should issue.

A restrictive covenant imposes an undue burden if it "imposes an unreasonable hardship upon the employee in pursuing a livelihood or putting to gainful use the skills and experience acquired." Victor Temporary Servs. v. Slattery, 482 N.Y.S.2d 623, 624-25 (N.Y. App. Div. 4th Dep't 1984). And irreparable harm for the purposes of a preliminary injunction consists of injury that is "actual and imminent, and for which a monetary award cannot be adequate compensation." Tom Doherty Associates, Inc. v. Saban Entm't, Inc., 60 F.3d 27, 37 (2d Cir. 1995) (internal quotations omitted). The burden on Mr. Pontone, his sales force, and his customers and potential customers satisfies both standards.

"[P]owerful considerations of public policy . . . militate against sanctioning the loss of a man's livelihood," Great Lakes Carbon Corp., 497 F. Supp. at 471, and "the removal of a productive and skilled employee from a marketplace" imposes an undue burden on the employee and the public. Weissman v. Transcontinental Printing U.S.A., Inc., 205 F. Supp. 2d 415, 427 (E.D. Pa. 2002). Here, the Restrictive Covenants are preventing Mr. Pontone from pursuing immediate, concrete, productive business ventures for his own profit and that of his employees. Several manufacturers and distributors of burial caskets are interested in combining forces with Mr. Pontone's insurance sales business to provide a new product to the funeral services market. (Pl. Decl. ¶ 30.) When Mr. Pontone disclosed in good faith the existence of the Restrictive

Covenants, those companies said they would not proceed with the Proposed Ventures until their invalidity was clarified. Id. This is an undue burden.

The immediate loss of a prospective business venture also is an irreparable injury. See Doran v. Salem Inn, Inc., 422 U.S. 922, 932, 95 S. Ct. 2561, 2568, 45 L. Ed. 2d 648 (1975) (issuance of preliminary injunction was not abuse of discretion where movant "would suffer a substantial loss of business" as his irreparable harm); Freedom Holdings, Inc., , 408 F.3d at 114 ("An anticipated loss of market share growth may suffice as an irreparable harm."); Register.com Inc. v. Verio, Inc., 356 F.3d 393, 404 (2d Cir. 2004) (no abuse of discretion in entering injunction to prevent loss of business opportunities); Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co., 290 F.3d 578, 596 (3d Cir. 2002) (loss of market share due to defendant's conduct constitutes irreparable harm). The loss of profit is difficult if not impossible to quantify, because the proposed venture is new and untested. Accordingly, monetary damages cannot compensate for the injury.

If Mr. Pontone cannot proceed with the Proposed Ventures, he will lose the opportunity to offer his existing and future sales force the ability to sell both insurance products and caskets to funeral homes, and thus lose the intangible benefits of being a more attractive employer and attract more and better salespeople, as well as the additional profit that the larger and better sales force would generate. (Pl. Decl. ¶ 34). The proposed combined product offering (insurance products and caskets) should be attractive to customers, who will receive a more convenient product and service. This foregone competitive advantage cannot be repaired.

Moreover, the loss of this opportunity would cause immediate harm to Mr. Pontone's sales force and the public. The salespeople will lose an opportunity to enhance their earnings, and new jobs that the venture otherwise would have created will not become available. (Pl.

17

Decl. ¶35.) The consumers of Mr. Pontone's services also would be deprived of the benefits that should come to them from marketplace competition and innovation. Id.

Furthermore, if a preliminary injunction does not issue, Defendants will enjoy the benefits of their illegal covenants throughout these proceedings — while Mr. Pontone suffers injury for which he cannot be compensated. Accordingly, the balance of hardships tips decidedly in Mr. Pontone's favor. Doninger, 527 F.3d at 47. Although a preliminary injunction is a "drastic remedy which is not routinely granted," Marietta Corp., 754 N.Y.S. 2d at 64 (citation omitted), in cases where the restrictive covenant has been found unreasonable and invalid, courts have granted the employee injunctive relief. See, e.g., Crippen v. United Petroleum Feedstocks, Inc., 666 N.Y.S.2d 156, 157 (N.Y. App. Div. 1st Dep't 1997) (affirming grant of employee's motion for preliminary injunction enjoining enforcement of unreasonable restrictive covenant). This Court should do so here.

## III.    The Court Should Enjoin the Retaliatory Cessation of Mr. Pontone's Benefits

Under the 2007 Amendment, Mr. Pontone is entitled to bi-weekly payments totaling $300,000 per year for three years. (2007 Amendment art. 1.03). Mr. Pontone anticipates that Defendants will attempt to cease these payments in retaliation for his filing this lawsuit, and respectfully requests this Court to enjoin them from doing so.

No portion of these payments is attributable to the Restrictive Covenants. See Weissman, 205 F. Supp. at 430-31 (applying NY law and engaging in a inquiry to determine proportion of payments attributable to a clause). Mr. Pontone's severance payments compensated him for lost compensation — specifically, giving up the payments of more than $400,000 per year that he would have been entitled to under his 2005 Employment Agreement until September 2010. (Pl. Decl. ¶ 24.) Indeed, Defendants agreed to provide the severance compensation only after Mr.

18

Pontone's father agreed to give up his right to a $300,000 per year bonus to which he otherwise would have been entitled under his employment agreement. Id. At no time did the parties suggest that the payments were contingent on Mr. Pontone's compliance with the Restrictive Covenants. Id. Defendants should not be permitted to interrupt them.

### CONCLUSION

The "public policy favoring robust and uninhibited competition should not give way merely because a particular employer wishes to insulate himself from competition." Wolf, 420 N.E.2d at 368. The Restrictive Covenants imposed in connection with Mr. Pontone's forced resignation are invalid and unenforceable. They are unreasonable in scope and duration, and unnecessary to protect any legitimate business interest of Defendants. Each day they remain, Mr. Pontone is suffering irreparable harm. Accordingly, the Court should issue the requested injunction.


Dated: New York, New York
       July 16, 2008


                                        Respectfully submitted,


                                        Edmund Aronowitz (EA 0542)
                                        Clifford Chance US LLP
                                        31 W 52nd St.
                                        New York, New York 10019
                                        Phone: (212) 878-3378
                                        Fax:    (212) 878-8375
                                        E-mail: edmund.aronowitz@cliffordchance.com
                                        *Attorney for Plaintiff*
                                        *Scott Pontone*


19