### UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT NEW YORK

| | |
|---|---|
| SCOTT PONTONE,<br><br>     Plaintiff<br><br>     vs.<br><br>THE YORK GROUP, INC.,<br><br>MILSO INDUSTRIES CORPORATION,<br><br>     and<br><br>MATTHEWS INTERNATIONAL<br>CORPORATION,<br><br>     Defendants | **Docket No.**<br><br>08-cv-6314 (WHP)<br><br><br>**DECLARATION IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

### DECLARATION OF EDMUND ARONOWITZ IN SUPPORT OF
### PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

I, Edmund Aronowitz, declare under penalty of perjury as follows:

1. I am a member of Clifford Chance US LLP, counsel to Scott Pontone, plaintiff in this action. I make this affidavit in support of Plaintiff's Motion for Preliminary Injunction. The facts set forth herein are based upon my personal knowledge, information and belief.

2. Attached hereto as Exhibit 1 is a true and correct copy of the declaration of Plaintiff Scott Pontone.

3. Attached hereto as Exhibit 2 is a true and correct copy of the first four pages of the Matthews International Corporation Annual Report 2001.

4. Attached hereto as Exhibit 3 is a true and correct copy of the first thee pages of the Matthews International Corporation Annual Report 2007.

5.  Attached hereto as Exhibit 4 is a true and correct copy of the Second Amendment to the Employment Agreement and Asset Purchase Agreement dated May 30, 2007.

6.  Attached hereto as Exhibit 5 is a true and correct copy of the Key Employee Employment Agreement dated May 28, 2005.

7.  Attached hereto as Exhibit 6 is a true and correct copy of the Asset Purchase Agreement by and Among The York Group, Inc., et al., dated May 28, 2005.


I hereby declare under penalty of perjury that the foregoing is true and correct. Executed on July 15, 2007.

Edmund Aronowitz (EA 0542)

**Exhibit 1**

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT NEW YORK**

| | |
|---|---|
| SCOTT PONTONE,<br><br>        Plaintiff<br><br>    vs.<br><br>THE YORK GROUP, INC.,<br><br>MILSO INDUSTRIES CORPORATION,<br><br>    and<br><br>MATTHEWS INTERNATIONAL CORPORATION,<br><br>        Defendants | **Docket No.**<br><br>08-cv-6314 (WHP)<br><br><br>**DECLARATION OF SCOTT PONTONE** |

I, Scott Pontone, being competent to testify in all respects, do declare as follows based on my personal knowledge and belief:

1.      Milso Industries ("Milso") was a business founded by my grandparents.  It was based in Brooklyn, New York.

2.      Milso manufactured and sold caskets and other burial products.  Milso marketed and sold its products to operators of licensed funeral homes.

3.      Milso is unrelated to the Milso Industries Corporation ("MIC") that is a defendant in this lawsuit.

4.      I began working for Milso in 1988.  By 2005, I had two roles at Milso: a managerial role and a customer-facing role.  In the customer-facing role, I had primary responsibility for Milso's relationships with approximately 30-40 customers.  All of those customers were located in the New York City metropolitan area.

5.    Because all of Milso's actual and potential customers were operators of licensed funeral homes, the prospects we marketed to were not difficult to identify - they could be found in the classified listings of any telephone directory or in an industry publication such as the American Blue Book of Funeral Directors.    In addition, two funeral directory industry associations, the National Funeral Directors Association ("NFDA") and the International Cemetery and Funeral Association, publish membership information that is available online over the Internet.

6.    I believe I am a good salesman to funeral home operators because I grew up in the business and understand it well.    Many funeral homes are family businesses, just as Milso was before we sold it, and I get along particularly well with the owners of those businesses.    I also was raised to understand the importance of hard work and being responsive to customers' needs. Although I am proud of my marketing and managerial skills, I do not believe there is anything unique about them.

7.    The principal players in the burial casket business are Batesville Casket Company, Aurora Casket Company and Matthews International Corporation ("Matthews"). There also are a number of smaller players.    The products offered by each company in the industry are generally similar.    Companies in the industry compete principally on the basis of price and quality of service.

8.    Before 2005, Milso was a competitor of Matthews and its subsidiary, The York Group, Inc. ("York").

9.    In May 2005 Matthews and York entered into an Asset Purchase Agreement (the "APA") in which they agreed to buy Milso's business.    The transaction was structured as an

2

asset sale in which various Milso entities transferred the assets used in the business to York. The co-owners of the various Milso entities, including myself, also were parties to the APA.

10.     At the time of the sale, my father, several other members of my extended family, and I owned Milso's shares. I was a minority shareholder.

11.     As part of the acquisition, several Milso employees, including my father and I, agreed to stay on as employees of York. I signed a Key Employee Employment Agreement, dated May 28, 2005 (the "2005 Employment Agreement") stating the terms and conditions of my employment with York. Among other things, this agreement provided that:

- My employment was for a term expiring in September 2010.

- Throughout the term, I would be a member of York's board of directors.

- I would be eligible to receive an "earn-out" payment and participate in a bonus pool should the combined York-Milso entity achieve certain financial targets.

- If my father ceased for any reason to be President of York, I would become President of the company.

- My father, while he served as President of York, and then I, as his successor, would have all authority customarily associated with the position of President, including "exclusive control over operations, hiring and firing of employees, employee compensation, product pricing [and] implementation of business strategy."

- Amounts under the bonus pool would immediately become due and payable if York were to diminish or reduce the authority, duties, or responsibilities of the President of the company.

3

12.    We negotiated for the broad management authority and autonomy described above for two reasons. First, we felt that since substantial earn-out and bonus payments were to be contingent on the performance of the combined business, we had to have essentially complete control over operations (so that if we missed the financial targets, it would be our fault and not somebody else's). Second, we valued the culture of the Milso business and wanted to preserve it as much as possible.

13.    There were restrictive covenants included in both the APA and the employment agreements, including mine. We attached little importance to those covenants, however, because we did not intend to leave York. The combined York-Milso business would be managed first by my father and then by me. With the autonomy we were given, we fully expected to be successful. York was an important business unit of Matthews, and for me the opportunity to be part of the management team of a sizeable public company was attractive.

14.    Before Milso was sold, it did business with funeral home customers in states within the Northeast and Middle Atlantic regions (New York, New Jersey, Pennsylvania, Connecticut, Rhode Island, Massachusetts, New Hampshire, Vermont, Maryland, Delaware, the District of Columbia and Northern Virginia) as well as Ohio, Indiana, Kentucky, Oklahoma and Texas. While I worked for York, York continued to operate in those states and also did business with funeral home customers in New Mexico, Louisiana, Arkansas, Mississippi, Alabama, Georgia, Florida, Tennessee, North Carolina, South Carolina, Michigan, West Virginia and Maine. It is my understanding that since I resigned from York, York has closed down direct marketing operations in Delaware, the District of Columbia, Maryland and Arkansas and therefore no longer does business directly with funeral home customers in those territories (although it may sell indirectly in some of those places through wholesale distributors).

4

15.    Following the acquisition of Milso by York, my role at York was exclusively managerial. In my capacity as Executive Vice President of the Casket Division, I had oversight responsibility for sales, distribution and marketing functions. In contrast to my customer facing role at Milso, at York I did not have primary responsibility for any customer accounts. Following the sale of Milso, the customer accounts for which I previously had primary responsibility were re-assigned to others. Accordingly, following the sale of Milso and while I remained at York, my contacts with customers generally were limited to a few isolated social encounters and to interactions at industry conventions, where I supported the marketing activities of the York personnel who had primary responsibility for the accounts.

16.    During the course of my employment with York, I used the knowledge and skills I had developed at Milso for the benefit of York. I did not develop any new knowledge or skills during my employment at York. York did not provide or fund any training for me. And since my role at York was purely managerial, while I was there I did not have the opportunity to develop any new customer relationships.

17.    During my employment with York, I helped transition my previous 30-40 primary customer account relationships to the York employees to whom those accounts had been re-assigned.

18.    During the course of my employment with York, York was able to develop and institutionalize relations with all of the customers I had previously serviced.

19.    Within a short time after York's acquisition of Milso, members of Matthews' management began to interject themselves into the management of the combined York-Milso business. On several occasions in 2006 and 2007, my father and I complained to Matthews that Matthews' interference with the York business was inconsistent with the control rights granted to

us under the terms of agreements entered into at the time of the acquisition.  In particular, we believed that the Matthews representatives were overly concerned with achieving quarterly earnings targets, leading them to push for actions that were not in the long-term interests of York's business.  We also believed the Matthews management style was unduly formal and hierarchical.  This approach would stifle the entrepreneurial spirit needed to grow York's business.  Eventually, we sued York for breach of the agreements, seeking among other things acceleration of the deferred bonus pool payments that remained potentially payable.

20.    The litigation was settled on terms that required York to pay a substantial percentage of the unpaid deferred payments we had claimed in our lawsuit.

21.    As part of the settlement, I agreed to resign from York.  In connection with my resignation, I entered into a Second Amendment to the Key Employee Employment Agreement and Asset Purchase Agreement, dated May 30, 2007 (the "2007 Amendment").

22.    The 2007 Amendment deleted the "Restrictions on Competition" and "Non-Solicitation of Customers and Suppliers" sections of the 2005 Employment Agreement and the corresponding provisions of the APA.  The 2007 Amendment included new Restrictions on Competition and Non-Solicitation of Customers and Suppliers.  I was reluctant to agree to these covenants, because I believed them to be unfair and unnecessary to protect York's and Matthews' legitimate business interests.  Nonetheless, rather than continue to litigate against these well-financed companies, I ultimately agreed to the 2007 Amendment as a whole.

23.    The 2007 Amendment provided that I was to receive severance payments of $300,000 per year for three years, payable in installments ("Severance Payments").  These payments compensated me for giving up the payments of more than $400,000 per year that I

6

would have been entitled to under my 2005 Employment Agreement as President after my father stepped down as President of York and until September 2010.

24.    In the negotiations leading up to the settlement of our litigation, Matthews initially refused my request for this severance compensation. They ultimately agreed to make these payments only after my father agreed to give up his right to a $300,000 per year bonus to which he otherwise would have been entitled under his employment agreement.  I do not recall ever discussing with Matthews the idea that the Severance Payments were contingent on my compliance with the non-compete and non-solicit covenants in the 2007 Amendment, and that was not my understanding of our deal.  Matthews drafted the 2007 Amendment.

25.    At the time I resigned from York, I did not hold anything that I thought of as York's trade secrets, confidential customer lists or other proprietary information.  In connection with my resignation, neither Matthews nor York suggested I had any such information or material or asked me to return it.

26.    Based on the circumstances of my resignation, I believe that York is presently unwilling to employ me in a senior management position similar to the position provided for in my 2005 Employment Agreement.

27.    Since my resignation from York, six other members of my family have continued to work for York.  They, together with other employees of York, have continued to service the customers formerly serviced by me.

28.    Since my resignation from York, I have started a new venture engaged in the sale of insurance products to funeral homes.  This venture has required that I obtain appropriate insurance licenses.  During my entire employment with York, York did not sell (nor was it licensed to sell) insurance products.

29.    Since my resignation from York, I have not engaged in competition with York nor have I solicited any customer, potential customer, or supplier of York with respect to the manufacture or sale of caskets, urns, memorials or cremation products.

30.    Since I resigned from York, I have been approached by several different manufacturers and distributors of burial caskets about the possibility of working with them in various different ways to help them market and sell caskets. The inquiries by these companies covered possible sales activity both in states in which York presently conducts direct sales activities as well as states where York has no direct selling activity. Out of caution, I have told each of those companies about the restrictive covenants in the 2007 Amendment. In response, they have told me that they do not wish to proceed with their proposed ventures until I have clarified to their satisfaction that the ventures would not violate the covenants.

31.    I have engaged a sales force of eight people to work in my new business venture selling insurance to funeral homes. Seven of those salespeople have never worked for York. One of the eight salespeople used to work for Milso and then York, but he had left York and had begun working for someone else before he began working for me.

32.    My sales force presently serves clients in eight states - Missouri, Illinois, Oklahoma, Arkansas, Texas, Louisiana, Tennessee and Georgia. To the best of my knowledge, at the present time York markets burial caskets directly to funeral home customers in five of those states (Oklahoma, Texas, Louisiana, Tennessee and Georgia) but not in the other three (Missouri, Illinois and Arkansas).

33.    I plan to expand the size of my sales force and its geographic coverage. I also plan to expand the range of products it offers for sale. In particular, I wish to arrange with one

8

or more manufacturers or wholesale distributors for a supply of caskets that I can then offer and sell through my sales force to funeral homes.

34.    If the Court does not award me the relief I am seeking, I will be harmed in at least the following ways:

- The prospective suppliers of caskets will be unwilling to pursue the proposals made to me, resulting in a loss of profit. The loss is difficult to quantify, but I think it could be more than $3 million over the remaining term of the restrictive covenants in the 2007 Amendment.

- Offering my existing and prospective future sales force the opportunity to sell both insurance products and caskets to funeral homes will make me an attractive employer. If the Court does not grant the relief I am seeking I will lose this opportunity to attract more and better salespeople. This will cause me an economic loss that is difficult to quantify.

- The proposed combined product offering (insurance products and caskets) should be attractive to customers, who will receive under my new approach, if not one-stop shopping, then at least fewer-stops shopping. If the Court does not grant the relief I am seeking, I will lose this competitive advantage.

35.    I will not be the only party who will suffer harm if the Court does not grant the relief I have requested. My salespeople will lose an opportunity to enhance their earnings; new jobs that my venture otherwise would have created will not in fact become available; and my customers will be deprived of the benefits that should come to them from marketplace competition and innovation.

9

36.   Based on my prior dealings with York, I believe that York will attempt to enforce or threaten to enforce the restrictive covenants contained in the 2007 Amendment.

37.   It will be difficult or impossible for me to determine the precise amount of damages I will suffer on account of lost business opportunities should York enforce or threaten to enforce the unreasonable anticompetitive covenants of the Amendment.

38.   Based on my prior dealings with York, I believe that York may attempt to retaliate against me for filing this lawsuit by ceasing or interrupting the Severance Payments.

I declare under penalty of perjury under the laws of the United States of America that the information set forth above is true and correct.

Scott Pontone, Declarant

**Exhibit 2**

ANNUAL REPORT 2001

MATTHEWS INTERNATIONAL CORPORATION ("Matthews"), founded in 1850 and incorporated in Pennsylvania in 1902, is a designer, manufacturer and marketer principally of custom-made products which are used to identify people, places, products and events. The Company's products and operations are comprised of three business segments:  Bronze, Graphics Imaging and Marking Products. On December 3, 2001, the Company completed the acquisition of The York Group, Inc., a manufacturer of caskets in the United States. ~ The Company and its majority-owned subsidiaries have approximately 3,000 employees.

*Detailed financial information relating to business segments and to domestic and international operations is presented in Note 14 (Segment Information) to the Consolidated Financial Statements.*



> HIGHLIGHTS  > ACHIEVEMENTS

> FINANCIAL HIGHLIGHTS

| Dollar amounts in thousands, except share data | 2001[1] | 2000 | 1999 |
|---|---|---|---|
| **■ OPERATING RESULTS** | | | |
| Sales[2] | $283,282 | $266,987 | $243,370 |
| Operating profit | 53,357 | 47,776 | 40,948 |
| Income before income taxes | 51,458 | 45,938 | 41,277 |
| Net income | 31,599 | 27,923 | 25,016 |
| **■ PER COMMON SHARE[3]** | | | |
| Earnings per share | $1.01 | $ .88 | $ .77 |
| Dividends | .101 | .096 | .091 |
| **■ FINANCIAL POSITION** | | | |
| Total assets | $288,952 | $220,665 | $225,678 |
| Long-term debt, noncurrent | 40,726 | 13,908 | 14,144 |
| Shareholders' equity | 143,716 | 126,856 | 114,622 |

[1] The second quarter of fiscal 2001 included after-tax income of $300 ($.01 per share) from special items which consisted of a pre-tax gain of $7,099 on the sale of a subsidiary and asset impairments, restructuring costs and other special pre-tax charges totaling $6,600 (see Note 17 to the Consolidated Financial Statements).

[2] Net sales for prior periods has been adjusted to reflect the reclassification, in accordance with Emerging Issues Task Force Issue No. 00-10, "Accounting for Shipping and Handling Fees and Costs," of shipping costs billed to customers.

[3] Per share amounts reflect the two-for-one stock split in August 2001.

> FISCAL 2001 ACHIEVEMENTS

> Earnings per share increased 14.87% for fiscal 2001. The Company's average annual increase in earnings per share since 1994 has been 14.6%.

> For the quarter ended September 30, 2001, Matthews increased its quarterly cash dividend to $0.02625 – the seventh dividend increase since the initial public offering in July 1994.

> The closing market price of the Company's stock on September 28, 2001 was $22.06, an increase of 50.2% from the prior fiscal year end. For the seven years ending September 30, 2001, Matthews stock has increased an average of 29.7% per year.

> On August 31, 2001, the Company split its common stock two-for-one. This was the second two-for-one split since the initial public offering in July 1994.

> In October 2001, Matthews was named by *Forbes Magazine* as one of the 200 best small companies in America. This was the second consecutive year that Matthews achieved this recognition.

> In May 2001, Matthews acquired the Commemorative Products business of The York Group, Inc.

> On December 3, 2001, the Company completed the acquisition of The York Group, Inc., a manufacturer of caskets in the United States.



## PRIDE AND REMEMBRANCE

2001 will be remembered for the tragedy of September 11th and the events that followed: a change in America's everyday way of life; a significant downturn in the economy; a turbulent stock market; interest borrowing rates at historic low levels; and a great deal of uncertainty about the future.

For nearly half of Matthews' 151-year history, we have produced memorialization and commemoration products. A few of these products are featured on the front cover of this publication. I am also proud to report that the Bronze Division of Matthews donated several of these plaques to New York City, Somerset County (Pennsylvania), and Washington, D.C. to memorialize the victims of September 11th and to commemorate those who participated in the rescue efforts.

Matthews International Corporation and its dedicated employees take pride in these products, which is evidenced by their craftsmanship and quality. We also understand the sentimental value of these products and are conscious that the practice of memorialization is a way for the living to honor the deceased, and that commemoration is a process to recognize the efforts of those who give of themselves to help others.

## ACQUISITIONS AND RECORD GROWTH

For Matthews, the year 2001 was the most significant year in the history of the Corporation due to two acquisitions that greatly expand our presence in the death care industry. The first of these purchases was York Bronze, which was completed May 24, 2001. York Bronze has annual sales of approximately $40 million.

The second acquisition was the purchase of The York Group, Inc. – a publicly traded company headquartered in Houston, Texas, and the second largest casket manufacturer in the United States. The York Group purchase was completed December 3, 2001 and the addition of this product line is expected to increase our annual sales by $130 million.

2

**Exhibit 3**

ANNUAL REPORT 2007





# Matthews

INTERNATIONAL

*A Tradition of Quality Since 1850*



# COMPANY PROFILE • FINANCIAL HIGHLIGHTS

Matthews International Corporation, headquartered in Pittsburgh, Pennsylvania, is a designer, manufacturer and marketer principally of memorialization products and brand solutions. Memorialization products consist primarily of bronze memorials and other memorialization products, caskets and cremation equipment for the cemetery and funeral home industries. Brand solutions include graphics imaging products and services, marking products, and merchandising solutions. The Company's products and services include cast bronze memorials and other memorialization products; caskets; cast and etched architectural products; cremation equipment and cremation-related products; mausoleums; brand management, printing plates, pre-press services and imaging services for the primary packaging and corrugated industries; marking and coding equipment and consumables, and industrial automation products for identifying, tracking and conveying various consumer and industrial products, components and packaging containers; and merchandising display systems and marketing and design services.

*Detailed financial information relating to business segments and to domestic and international operations is presented in Note 15 (Segment Information) to the Consolidated Financial Statements.*

## FINANCIAL HIGHLIGHTS

| Dollar amounts in thousands, except share data | 2007 | 2006 | 2005 |
|---|---|---|---|
| **OPERATING RESULTS** | | | |
| Sales | $749,352 | $715,891 | $639,822 |
| Operating profit | 111,824 | 113,884 | 98,413 |
| Income before income taxes | 103,716 | 105,408 | 93,056 |
| Net income | 64,726 | 66,444 | 58,071 |
| **PER COMMON SHARE** | | | |
| Diluted earnings per share | $2.04 | $2.06 | $1.79 |
| Dividends | .225 | .205 | .185 |
| **FINANCIAL POSITION** | | | |
| Total assets | $771,069 | $716,090 | $665,455 |
| Long-term debt, noncurrent | 142,273 | 120,289 | 118,952 |
| Shareholders' equity | 426,778 | 392,425 | 337,749 |

**Exhibit 4**

## SECOND AMENDMENT TO THE KEY EMPLOYEE
## EMPLOYMENT AGREEMENT

### AND

### ASSET PURCHASE AGREEMENT

This **SECOND AMENDMENT TO THE KEY EMPLOYEE EMPLOYMENT AGREEMENT AND ASSET PURCHASE AGREEMENT** (this "Amendment") is executed this 30th day of May, 2007, by and between The York Group, Inc., a Delaware corporation (the "Company"), Matthews International Corporation ("Matthews"), Milso Industries Corporation ("Milso") and Scott Pontone ("Employee") and further amends the Key Employee Employment Agreement between such parties dated May 28, 2005, as amended by Agreement dated December 8, 2006 (the "Employment Agreement") and certain provisions in the Asset Purchase Agreement dated as of May 28, 2005, as amended by Agreement dated December 8, 2006 (the "Purchase Agreement"), among Milso Industries, Inc., Milso Industries, LLC and SBC Holding Corp. (collectively, the ("Sellers"), the Shareholders signatory thereto, the Company, Midnight Acquisition Corporation and Matthews.

Capitalized terms used in this Agreement and not otherwise defined have the meanings ascribed to those terms in the Employment Agreement or, if not defined there, as defined in the Purchase Agreement.

### W I T N E S S E T H:

WHEREAS, York and Employee wish to amend the Employment Agreement, and certain provisions of the Purchase Agreement, as described below;

NOW THEREFORE, for the consideration described below, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Company and Employee agree that the Employment Agreement and certain provisions of the Purchase Agreement are amended as follows:

### AMENDMENT TO THE EMPLOYMENT AGREEMENT

All provisions of the Employment Agreement remain unchanged unless amended as set forth below:

### ARTICLE I
### EMPLOYMENT

1.01.   Office. *This paragraph in the Employment Agreement is deleted and replaced by the following paragraph:*

1.01.  Office.  Employee shall remain an officer of the Company only until 5:00 PM EDT on the date on which the remaining Bonus Pool of $8.0 Million is paid by the Company and distributed to the Pool Participants, as provided in Section 1.04 below, *provided* that while Employee remains an officer of the Company, he shall exercise no authority as an officer of the Company or Milso Industries Corporation ("Milso") without the express written permission of their respective boards of directors.  Employee shall execute an Agreement of Voluntary Resignation, in the form attached as Exhibit A, to be effective at 5:00 PM EDT on the date on which the remaining Bonus Pool of $8.0 Million is distributed, and by such Agreement of Voluntary Resignation, Employee shall voluntarily and irrevocably resign all officer, director and any other positions in the Company and in Milso; and, thereafter, neither the Company, Milso, nor any of their subsidiaries or affiliates shall have any obligation to make any payment to Employee except for the Severance Payments described in paragraph 1.03 below.

1.03.  Cash Compensation.  *This paragraph in the Employment Agreement is deleted in its entirety and replaced by the following paragraph:*

1.03.  Severance Compensation.  In addition to the consideration received by Employee under the Purchase Agreement, all salary, bonuses and expense reimbursements paid or accrued to date to Employee by the Company, and any bonus consideration received under Section 1.04 below, the receipt and sufficiency of which is hereby acknowledged by Employee, the Company agrees to pay the Employee severance compensation of $300,000 per annum ("Severance Payments"), for a period of three (3) years from the date of this Amendment, payable in equal installments every two (2) weeks, until a total of $900,000 in Severance Payments have been made to Employee subject to any required federal or state withholding or other applicable taxes.

1.04.  Performance Based Bonuses.  *This paragraph in the Employment Agreement is deleted in its entirety and replaced by the following paragraph:*

1.04.  Performance Based Bonuses.  On the date that this Amendment and all other documents required by the Company are executed by Employee, by Scott Pontone, and by the Pool Participants named in the Employment Agreement, the Company shall make a final, one-time bonus payment of $8.0 Million, to be distributed among the Pool Participants (as listed under Schedule 1.03) according to the Bonus Allotted Share, if any, of each of the Pool Participants; and the Bonus Allotted Share shall be defined as the percentage allocable to each of the Pool Participants as determined by Harry Pontone in his capacity as President of the Company.  Upon such payment, all obligations of the Company to make bonus payments under this paragraph shall be fully and finally satisfied.


ARTICLE II
TERMINATION


*This Article is deleted in its entirety and is replaced by the following:*


At 5:00 PM EDT on the day of the Company's final, one-time bonus payment of $8.0 Million, described in Section 1.04 above, Employee's written and voluntary resignation from the Company and Milso shall be deemed effective, and the Employee shall have no further employment relationship with the Company, Milso, or any of their subsidiaries and affiliates.  Any contractual covenants, promises, representations and/or obligations of the Employee to the

Company and Milso, shall survive such resignation and be unaffected by such resignation, including but not limited to those obligations described in Article IV below.

## ARTICLE IV

### EMPLOYEE'S COVENANTS AND AGREEMENTS

4.06. _Restrictions on Competition._ *This paragraph in the Employment Agreement is deleted and replaced by the following paragraph.*

4.06. _Restrictions on Competition._ Employee covenants and agrees that during the period of Employee's employment hereunder and for three (3) years following the effective date of Employee's resignation from the Company, Employee shall not engage, directly or indirectly, whether as principal or as agent, officer, director, employee consultant, shareholder, investor, financer or otherwise, alone or in association with any other person, corporation, or other entity in the manufacture, marketing or sale of caskets or any other product of the type presently manufactured, marketed or sold by The York Group, Inc. or Milso. Notwithstanding the restrictions in this paragraph, Employee may own, directly or indirectly, solely as an investment, (A) securities of any such entity which are traded on any national securities exchange or NASDAQ if Employee (y) is not a controlling person or a member of a group which controls such entity; and (z) does not directly or indirectly own 2% or more of any class of securities of such entity or (B) interests in mutual funds or similar pooled accounts.

4.07. _Non-Solicitation of Customers and Suppliers._ *This paragraph in the Employment Agreement is deleted and replaced by the following paragraph.*

4.07. _Non-Solicitation of Customer and Suppliers._ Employee covenants and agrees that during the period of Employee's employment hereunder and for three (3) years following the effective date of Employee's resignation from the Company, Employee shall not directly or indirectly solicit the trade of, or trade with, any customer of The York Group, Inc. or Milso with respect to the manufacture, marketing or sale of caskets or any other product of the type presently manufactured, marketed or sold by The York Group, Inc. or Milso.

4.08. _Non-Solicitation of Employees._ *This paragraph in the Employment Agreement is deleted and replaced by the following paragraph.*

4.08. _Non-Solicitation of Employees._ Employee agrees that during the period of Employee's employment hereunder and for four (4) years following the effective date of Employee's resignation from the Company, Employee shall not directly or indirectly solicit or induce or attempt to solicit or induce any employee of The York Group, Inc. or Milso to leave either company or hire any such employee. This paragraph shall not prohibit Employee from engaging in general advertising or solicitation not specifically targeted at any one or more

employees of the Company and shall not prohibit Employee from hiring any employee of the Company that contacts Employee as a result of such general advertising or solicitation.

## AMENDMENT TO THE ASSET PURCHASE AGREEMENT

All provisions of the Purchase Agreement remain unchanged, except (and solely as between Employee and the Company) Sections 12.2 and 12.3, entitled respectively "Covenant Not to Interfere" and "Noncompetition", are deleted and replaced by Sections 4.06, 4.07 and 4.08 as set forth above.

SCOTT PONTONE

THE YORK GROUP, INC.

By:
Name: D.J. DECARLO
Title: DIRECTOR

MATTHEWS INTERNATIONAL CORPORATION

By:
Name: D.J. DECARLO
Title: VICE-CHAIRMAN

MILSO INDUSTRIES CORP.

By:
Name: D.J. DECARLO
Title: DIRECTOUR

**Exhibit 5**

May 28, 2005

## KEY EMPLOYEE
## EMPLOYMENT AGREEMENT

THIS KEY EMPLOYEE EMPLOYMENT AGREEMENT (this "Agreement"), is executed this 28 day of May, 2005, by and between The York Group, Inc., a Delaware corporation (the "Company") and Scott Pontone ("Employee") and is to be effective as of the Closing (as defined in the Asset Purchase Agreement, dated the same date as this Agreement, 2005 (the "Purchase Agreement"), among Milso Industries, Inc., Milso Industries, LLC and SBC Holding Corp. (collectively, the "Sellers"), the Shareholders signatory thereto, the Company, Midnight Acquisition Corporation and Matthews International Corporation ("Matthews")). In the event that the Purchase Agreement is terminated prior to the Closing or if the Closing otherwise does not occur, this Agreement shall be of no force or effect. Capitalized terms used in this Agreement and not otherwise defined have the meanings ascribed to those terms in the Purchase Agreement.

## W I T N E S S E T H :

WHEREAS, concurrently with the execution and delivery of this Agreement, the Company is executing and delivering the Purchase Agreement pursuant to which, upon the terms and subject to the conditions set forth therein, the Company has agreed to purchase certain assets and assume certain liabilities and obligations of the Sellers (the "Transaction");

WHEREAS, pursuant to the Transaction, Employee's employment with Employee's former employer is being terminated, and the Company will only consider providing new employment to Employee if Employee agrees to the terms herein, including the confidentiality, non-solicitation and non-compete terms;

WHEREAS, Employee possesses valuable knowledge and skills that will contribute to the successful operation of the Company's business;

WHEREAS, the Company views the Employee as a key and integral person who is vital to the success of the Company in the future;

WHEREAS, Employee will derive good and valuable consideration in connection with Employee's employment hereunder;

WHEREAS, the Company desires to procure the services of Employee, and Employee is willing to be employed by the Company, upon the terms and subject to the conditions hereinafter set forth;

NOW, THEREFORE, intending to be legally bound, the Company agrees to employ Employee, and Employee hereby agrees to be employed by the Company, upon the following terms and conditions:

## ARTICLE I

## EMPLOYMENT

1.01.   Office.   Employee is hereby employed, with effect from the Closing, by the Company and shall perform, for the Company as a whole, duties substantially similar to those performed for the Business as operated on the date of this Agreement by the Sellers and such other duties as may be reasonably assigned to him from time to time by the President of the Company. Throughout the Term, so

1

long as he is employed by the Company, Employee will be a member of the board of directors of the Company. If Harry Pontone ceases for any reason to be President of the Company, then, unless at that time the Performance Standards (as defined below) have not been satisfied as of the end of the Company's most recently-completed fiscal year, Employee shall be President of the Company throughout the balance of the Term. After he becomes President of the Company, Employee shall have all authority customarily associated with that position, including exclusive control over operations, hiring and firing of employees, employee compensation, product pricing, implementation of business strategy and, subject to the written operating business policies of Matthews that are uniformly applicable to all business segments of Matthews, decisions to seek corporate approvals for and to make capital investments; provided that actions with respect to hiring and firing of employees and employee compensation shall be subject to the procedural requirements, such as background checks, written notices and other administrative human resources procedures, but not the substantive requirements, such as any prescribed experience, education level, or operating or production goal requirements, if any, of the standard written operating business policies of Matthews that are uniformly applicable to all business segments of Matthews. After he becomes President of the Company, Employee shall report to the Group President, Bronze and York Casket Division or his superior, and to the Company's board of directors.

1.02.   Term.   Subject to provisions of Article II hereof, Employee's employment hereunder shall commence as of the Closing, and shall continue until the close of business on September 30, 2010 (the period during which Employee is employed hereunder being hereinafter referred to as the "Term").

1.03.   Cash Compensation.   As consideration for the services that Employee shall render hereunder, Employee shall be entitled to compensation as follows:

(a) Employee shall be entitled to annual compensation ("Salary") equal to $100,000 ("Base Salary") plus his Allotted Share (as hereinafter defined) of the Compensation Pool (as hereinafter defined) for each Employment Year (as hereinafter defined) that remains after payment of the Base Salaries (as defined in the employment agreement of each Pool Participant) of each Pool Participant (as hereinafter defined). After he becomes President of the Company, Employee's Base Salary shall be $400,000. The Base Salary shall increase each Employment Year by a percentage equal to the percentage increase in the Consumer Price Index, using the Consumer Price Index most recently published prior to January 1 of each year during the Term and comparing it to such index most recently published as of January 1, 2005.

(b)     During each Employment Year, Employee's Salary shall be payable twice per month in accordance with the Company's standard pay practices, in an amount equal to 1/24 of the Base Salary plus the product of (x) 1/24 multiplied by (y) the Compensation Pool multiplied by (z) Employee's Allotted Share.

(c)     For purposes of this Agreement:

(i)     "Allotted Share" means the percentage established for each Employment Year by Harry Pontone, in his capacity as President of the Company, or if Harry Pontone no longer is President, by Employee provided that he is then employed by the Company (in either case after consultation with the board of directors of the Company or its designee), or if Harry Pontone is no longer President and Employee is not then employed by the Company, the percentage established for the preceding Employment Year; provided that, subject to subsection (ii) below, if a Pool Participant's employment hereunder is terminated, such Pool Participant's Allotted Share shall be allocated to the remaining Pool Participants pro rata based upon the Allotted Share of each.

2

(ii)    "Compensation Pool" means an amount in respect of each Employment Year equal to $1,750,000 (increased each Employment Year by a percentage equal to the percentage increase in the Consumer Price Index, using the Consumer Price Index most recently published prior to January 1 of each year during the Term and comparing it to such index most recently published as of January 1, 2005) less the aggregate of each Pool Participant's Base Salary (as defined in the employment agreement of each Pool Participant). If more than two Pool Participants cease to be employed during the Term, the next and any succeeding termination of employment of any Pool Participant shall result in the Compensation Pool being reduced by the amount of the terminated Pool Participant's Allotted Share of the Compensation Pool in effect in the year of termination. Notwithstanding the foregoing, if Employee shall become President of the Company, the Compensation Pool above shall be reduced by the Base Salary of Employee in effect immediately prior to his becoming President.

(iii)    "Consumer Price Index" means the Consumer Price Index for all urban consumers, as periodically published by the Bureau of Labor Statistics of the U.S. Department of Labor; or, if that index no longer is published, the most comparable index subsequently published , as agreed in good faith by Buyer and the Shareholders' Representative.

(iv)    "Employment Year" means (A) the period beginning on the date of the Closing and ending on the next December 31 occurring thereafter (the "First Employment Year"), (B) each full calendar year during the Term and (C) if the Term does not end on a December 31, the period beginning on the January 1 immediately preceding the end of the Term and ending on the last day of the Term.

(v)    "Pool Participants" means the persons named on Schedule 1.03.

1.04.    Performance Based Bonuses.

(a)  Employee shall be entitled to an annual bonus as follows:

(i)    With respect to each Bonus Year (as hereinafter defined), Employee shall be entitled to an amount equal to the product of (x) the Bonus Pool (as hereinafter defined) for such Bonus Year, if any, multiplied by (y) his Bonus Allotted Share (the "Bonus").

(ii)    The Bonus, if any, shall be due and payable by the Company no later than December 31st of each Bonus Year.

(iii)    For purposes of this Agreement:

(A)    "Adjusted Operating Profit" means, for any period, the net income of the Company and its subsidiaries determined in accordance with GAAP applied consistently with prior periods, excluding (i) any provision for interest expense or income taxes, (ii) any adjustments made for purchase accounting purposes resulting from the Transaction which otherwise would have an impact on Adjusted Operating Profit, including depreciation or amortization resulting from the re-valuation for purchase accounting purposes of tangible and intangible assets acquired in the Transaction and the cost of sales impact related to any re-valuation for purchase accounting purposes of inventory acquired in the

Transaction (but except as provided below, no such adjustments to the calculation of Adjusted Operating Profit shall be made in respect of any acquisitions other than the Transaction), (iii) any non-recurring costs or expenses related to the integration of the Business with the operations of the Company and (iv) all other extraordinary, non-recurring items (as determined in good faith with the agreement of Harry Pontone or Employee, if Employee is then President). In calculating Adjusted Operating Profit, all administrative and financial services performed by Matthews or its Affiliates for the Company (including without limitation accounting, accounts receivable processing, accounts payable processing, payroll processing, human resources and benefits support services, retirement and pension plan administration), shall be charged as an expense at an amount not to exceed the cost to the Business as of the date of this Agreement of any such service. With respect to future acquisitions by the Company, if either Harry Pontone or Employee is the President of the Company, unless the President agrees in writing to include those operating results and the related attributes of the acquisition (such as interest expense, integration costs and depreciation and amortization charges), they shall be excluded from the calculation of Adjusted Operating Profit using such methodologies as shall be agreed in good faith by the President of the Company and Matthews. If the Bonus Pool is determined pursuant to Section 1.02(a)(iii)(C)(2) below (because the Operating Profit is less than $16,000,000), the first $7,500,000 paid from the Bonus Pool shall be disregarded (and therefore not be a charge against net income in calculating Adjusted Operating Profit), but amounts subsequently paid from the Bonus Pool shall be taken into account (and therefore reduce net income) in the fiscal year for which it is accrued. Under no circumstances shall any amounts payable as purchase price pursuant to the Purchase Agreement be treated as charges against net income for purposes of determining Adjusted Operating Profit. If the Bonus Pool is determined pursuant to Section 1.04(a)(iii)(C)(1) below (because Operating Profit is $16,000,000 or greater), the first $7,500,000 paid from the Bonus Pool shall be taken into account (and therefore reduce net income) in the fiscal year for which it is accrued.

(B) "Bonus Allotted Share" means the percentage established for each Bonus Year by Harry Pontone, in his capacity as President of the Company, or if Harry Pontone no longer is President, by Employee provided that he is then employed by the Company (in either case after consultation with the Board of the Company or its designee), or if Harry Pontone is no longer President and Employee is not then employed by the Company, the percentage established for the preceding Bonus Year; provided that if a Pool Participant is not employed by the Company hereunder at the end of a Bonus Year, such Pool Participant's Bonus Allotted Share (to the extent not payable to such Pool Participant pursuant to the provisions of such Pool Participant's employment agreement) shall be allocated to the remaining Pool Participants pro rata based upon the Bonus Allotted Share of each.

(C) The "Bonus Pool" for the applicable Bonus Year shall be determined as follows:

(1)    If the Operating Profit (as defined in the Purchase Agreement) is $16,000,000 or greater:

(x)    with respect to each of the First Bonus Year, the Second Bonus Year and the Third Bonus Year, the Bonus Pool shall be $2,500,000, payable only if the Adjusted Operating Profit for such Bonus Year is equal to or greater than the Operating Profit Target for such Bonus Year; and

(y)    the Bonus Pool for the Fourth Bonus Year (which amount could be zero) shall equal $7,500,000 minus the aggregate amount paid by the Company to the Pool Participants from the Bonus Pools for the First Bonus Year, the Second Bonus Year and the Third Bonus Year, payable only if the aggregate Adjusted Operating Profit for the Third Bonus Year and the Fourth Bonus Year is equal to or greater than the aggregate Operating Profit Target for the Third Bonus Year and the Fourth Bonus Year; provided, however, that if there is no Bonus Pool payable for the Fourth Bonus Year because the above stated test in this subsection (y) is not met, the Bonus Pool for the Fourth Bonus Year nevertheless shall be payable in an amount described below, but only if the aggregate Adjusted Operating Profit for the Fourth Bonus Year is equal to or greater than the Operating Profit Target for such Bonus Year. The Bonus Pool in such case shall equal the lesser of (p) $2,500,000 and (q) $7,500,000 minus the aggregate amount paid by the Company to the Pool Participants from the Bonus Pools for the First Bonus Year, the Second Bonus Year and the Third Bonus Year (which amount could be zero).

(2)    If the Operating Profit (as defined in the Purchase Agreement) is less than $16,000,000:

(x)    with respect to each of the First Bonus Year, the Second Bonus Year and the Third Bonus Year, the Bonus Pool shall be $3,750,000, payable only if the Adjusted Operating Profit for such Bonus Year is equal to or greater than the Operating Profit Target for such Bonus Year; and

(y)    the Bonus Pool for the Fourth Bonus Year (which amount could be zero) shall equal $15,000,000 minus the aggregate amount paid by the Company to the Pool Participants from the Bonus Pools for the First Bonus Year, the Second Bonus Year and the Third Bonus Year, payable only if the aggregate Adjusted Operating Profit for the Third Bonus Year and the Fourth Bonus Year is equal to or greater than the aggregate Operating Profit Target for the Third Bonus Year and the Fourth Bonus Year; provided, however, that if there is no

Bonus Pool payable for the Fourth Bonus Year because the above stated test in this subsection (y) is not met, the Bonus Pool for the Fourth Bonus Year nevertheless shall be payable in an amount described below, but only if the aggregate Adjusted Operating Profit for the Fourth Bonus Year is equal to or greater than the Operating Profit Target for such Bonus Year. The Bonus Pool in such case shall equal the lesser of (p) $3,750,000 and (q) $15,000,000 minus the aggregate amount paid by the Company to the Pool Participants from the Bonus Pools for the First Bonus Year, the Second Bonus Year and the Third Bonus Year (which amount could be zero).

(D) "Bonus Year" means each of the following periods:

(1)    the period beginning on October 1, 2006 and ending on September 30, 2007 (the "First Bonus Year");

(2)    the period beginning on October 1, 2007 and ending on September 30, 2008 (the "Second Bonus Year");

(3)    the period beginning on October 1, 2008 and ending on September 30, 2009 (the "Third Bonus Year"); and

(4)    the period beginning on October 1, 2009 and ending on September 30, 2010 (the "Fourth Bonus Year").

(E)    "Operating Profit Target" means:

(1)    with respect to the First Bonus Year, the product of (x) the sum of $16,000,000 plus the lesser of (aa) $22,000,000 and (bb) the actual York Operating Profit for the fiscal year October 1, 2005 through September 30, 2006 multiplied by (y) 1.07 (the "First Year Target");

(2)    with respect to the Second Bonus Year, an amount equal to the product of (x) the First Year Target, multiplied by (y) 1.07 (the "Second Year Target");

(3)    with respect to the Third Bonus Year, an amount equal to the product of (x) the Second Year Target, multiplied by (y) 1.07 (the "Third Year Target"); and

(4)    with respect to the Fourth Bonus Year, an amount equal to the product of (x) the Third Year Target, multiplied by (y) 1.07 (the "Fourth Year Target").

(F)    "York Operating Profit" means the Adjusted Operating Profit for the fiscal year ending September 30, 2006 minus the Operating Profit.

(b) Upon the occurrence of a Bonus Acceleration Event, an amount equal to (i) $15,000,000 minus (ii) (A) the amount paid by the Buyer under Section 3.1.1 of the Purchase

Agreement plus (B) the aggregate amount paid by the Company to the Pool Participants from the Bonus Pools prior to such Bonus Acceleration Event, shall be immediately due and payable to the Pool Participants employed immediately prior to such Bonus Acceleration Event in accordance with the Bonus Allotted Share of each. Each of the following shall be a "Bonus Acceleration Event":

       (i)     If while Harry Pontone or Employee is President of the Company, his authority, duties or responsibilities as President are materially diminished or reduced by the Company for reasons other than a failure of the Company to meet the Performance Standards (as hereinafter defined); or

       (ii)    the employment of Harry Pontone or Employee is terminated (A) by the Company other than (x) for Cause (as defined in their respective employment agreements with the Company, each dated the date hereof (each a "Pontone Employment Contract")) or (y) pursuant to Section 2.01 or 2.02 of the applicable Pontone Employment Contract, or (B) by Harry Pontone or Employee, respectively, for Good Reason (as defined in the applicable Pontone Employment Contract); or

       (iii)   any of the following shall have occurred: a sale or other disposition of all or substantially of the assets or operations of the Company; a sale or other disposition of a material portion of the assets or operations of the Company to the extent it reasonably could be expected to materially affect the ability to achieve one or more Operating Profit Targets; (provided, that such sale or disposition of a material portion of the assets or operations shall not be considered a Bonus Acceleration Event if prior to such sale or other disposition Matthews provides written notice to Employee and Harry Pontone that such sale or disposition is intended and seeking confirmation that the sale or disposition will not constitute a Bonus Acceleration Event for purposes of this Section 1.04(b), and Employee and Harry Pontone each fails to provide to Matthews written notice within fifteen days after receipt of such notice that he reasonably expects such sale or other disposition to materially affect the ability to achieve one or more Operating Profit Targets); a direct or indirect sale of the Company; any "person," including a "group" (as those terms are used in Sections 13(d) and 14(d) of the Securities and Exchange Act of 1934, as amended (the "Exchange Act")), but excluding Matthews, any entity controlled by or under common control with Matthews, any employee benefit plan of Matthews or any such entity becomes the beneficial owner (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of Matthews representing a majority of either (A) the combined voting power of Matthews' then outstanding securities or (B) the shares of Matthews' common stock then outstanding (in either such case other than as a result of an acquisition of securities directly from Matthews); or any consolidation or merger of Matthews in which the stockholders of Matthews immediately prior to the consolidation or merger, would not, immediately after the consolidation or merger, beneficially own (as that term is defined in Rule 13d-3 under the Exchange Act), directly or indirectly, shares representing in the aggregate 50% or more of the combined voting power of the securities of the corporation issuing cash or securities in the consolidation or merger (or of its ultimate parent corporation, if any); or any sale, lease, exchange or other transfer (in one transaction or a series of transactions contemplated or arranged by any party as a single plan) of all or substantially all of the assets of Matthews.

      (c) The "Performance Standards" shall be deemed satisfied unless the Company's Adjusted Operating Profit for any two consecutive fiscal years beginning not sooner than the

7

fiscal year ending September 30, 2006 shall have declined by more than 15% per year from the prior fiscal year's Adjusted Operating Profit. For this purpose, the Company's Adjusted Operating Profit for the fiscal year ending September 30, 2005 shall be the Adjusted Operating Profit for the Company for that year, calculated to the extent the Transaction is completed before September 30, 2005 on a pro forma stand-alone basis as if the Transaction has not occurred, plus the product of (x) Adjusted Business Operating Profit, multiplied by (y) 1.33.

(i) "Adjusted Business Operating Profit" means the net income of the Business for the nine months ending September 30, 2005, calculated to the extent the Transaction is completed before September 30, 2005 on a pro forma stand-alone basis as if the Transaction had not occurred, excluding (i) any provision for interest expense or income taxes, and (ii) all extraordinary, non-recurring items (as determined in good faith with the agreement of Harry Pontone or Employee, if such person is then President, and if neither is President, with the agreement of Employee). If the Transaction is completed before September 30, 2005, (i) all costs associated with negotiating and implementing the transactions contemplated by the Purchase Agreement, including business integration costs shall be excluded from the calculation of Adjusted Business Operating Profit and (ii) in calculating Adjusted Business Operating Profit, all administrative and financial services performed by Matthews or its Affiliates for the Company (including without limitation accounting, accounts receivable processing, accounts payable processing, payroll processing, human resources and benefits support services, retirement and pension plan administration), shall be charged as an expense at an amount not to exceed the present cost to the Business of any such service.

1.05.   Employee Benefits. At all times during the term of Employee's employment hereunder, Employee shall (a) be covered by such major medical, group life, disability insurance, hospitalization or health benefit plans and qualified or non-qualified retirement plans as are available generally to executive-level personnel of the Company (including plans of its parent, Matthews International Corporation or any successor parent entity) and (b) be covered by such vacation, illness, fringe benefit programs and similar plans and policies contained in the employee handbook of the Company (or its parent, Matthews International Corporation or any successor parent entity), to the extent Employee is eligible under the terms thereof.

1.06.   Other Interests. Employee agrees, during the period of his employment by the Company, to devote substantially all of his business time, energy and best efforts to the business and affairs of the Company and its affiliates and not to engage, directly or indirectly, in any other business or businesses, whether or not similar to that of the Company, except with the consent of the Board or as set forth on Schedule 1.06 hereto. The foregoing notwithstanding, the parties recognize and agree that Employee may engage in passive personal investment and charitable activities that do not conflict with the business and affairs of the Company or interfere with Employee's performance of his duties hereunder.

1.07.   Duty of Loyalty. Employee acknowledges and agrees that he owes a fiduciary duty of loyalty to act at all times in the best interests of the Company, subject to Employee's ability to enforce his rights under this Agreement. In keeping with such duty, Employee shall make full disclosure to the Company of all business opportunities pertaining to the Company's business and shall not appropriate for Employee's own benefit business opportunities concerning the Company's business.

# ARTICLE II
## TERMINATION

2.01.  <u>Illness, Incapacity</u>.  If during the term of Employee's employment hereunder Employee shall be prevented, in the Company's reasonable judgment, from effectively performing his duties hereunder by reason of illness or disability for a consecutive period of 180 days during any twelve month period, then the Company may, by written notice to Employee, terminate Employee's employment hereunder. Upon delivery to Employee of such notice, Employee's employment and all obligations of the Company under Article I hereof shall forthwith terminate; provided that the Company shall immediately pay to Employee an amount equal to all Base Salary and other benefits earned and accrued and customarily paid under the Company's standard policies (but specifically excluding any rights under Section 1.04 hereof, the entitlement to which shall be governed by such Section) through and including the date of termination (and reimbursement for any expenses incurred through and including the date of such termination) and <u>provided, further</u>, that Employee shall remain eligible to receive a Bonus pursuant to the terms and subject to the conditions of Section 1.04 hereof. The obligations of Employee under Article IV hereof shall continue notwithstanding termination of Employee's employment pursuant to this Section 2.01.

2.02.  <u>Death</u>.  If Employee dies during the Term, all obligations of the Company hereunder shall terminate; provided that the Company shall, within five business days of receipt of notice of Employee's death, pay to Employee's estate an amount equal to (i) all Base Salary and other benefits earned and accrued through and including the date of termination (and reimbursement for any expenses incurred through and including the date of Employee's death).  If the death occurs during a Bonus Year, the Company also shall pay to Employee's estate, following the end of the Bonus Year and at the same time as payments are made to other Pool Participants, an amount equal to the Bonus Allotted Share Employee would have received if employed throughout the Bonus Year, multiplied by the quotient of (a) the number of days elapsed in that Bonus Year through and including the date of death, divided by (b) 365.

2.03.  <u>Termination by the Company for Cause</u>.  If the Company reasonably determines that Employee (a) has engaged to the material detriment of the Company in gross negligence, gross incompetence or willful misconduct in the performance of his duties and has failed within a reasonable period after written notice thereof to correct such conduct, (b) has repeatedly refused, without proper reason, to perform his duties (including Employee's violation of Matthews' Code of Conduct for employees) and has failed within a reasonable period after written notice thereof to correct such conduct, (c) has committed an act of fraud, embezzlement or willful breach of a fiduciary duty, in each case to the Company (it being understood that in any proceeding to interpret or enforce this Agreement, the Company shall bear the burden of proof in establishing it had the right to terminate Employee pursuant to this clause (c)), (d) has been convicted of (or pleaded no contest to) a crime involving fraud or any felony involving moral turpitude, or (e) has committed a crime of dishonesty or moral turpitude and by reason of publicity with respect to the same has materially and substantially harmed the Company, the Company may, by written notice (which notice shall set forth such breach in reasonable detail) to Employee, terminate Employee's employment hereunder; the Company shall promptly pay Employee any compensation accrued but not yet paid under Section 1.03 hereof through and including the date of such termination (and reimbursement for expenses incurred through and including the date of such termination) and, upon such payment, all obligations of the Company under Article I hereof shall forthwith terminate. The obligations of Employee under Article IV hereof shall continue notwithstanding termination of Employee's employment pursuant to this Section 2.03.

2.04.  <u>Termination by the Company without Cause or by Employee for Good Reason</u>. Employee's employment hereunder may be terminated at any time by the Company without Cause (except for disability or death, which shall be covered by Sections 2.01 and 2.02 above) by written notice

9

to Employee and Employee may terminate Employee's employment with the Company for Good Reason. In the event of any such termination of employment, (a) the Company shall immediately pay to Employee (i) an amount equal to all Base Salary and other benefits earned and accrued and customarily paid under the Company's standard policies (but specifically excluding any rights under Section 1.04 hereof, the entitlement to which shall be governed by such Section) through and including the date of termination (and reimbursement for any expenses incurred through and including the date of such termination) and (ii) an amount equal to the product of (x) Employee's most recently determined Bonus Allotted Share as of the date of termination multiplied by (y) $15,000,000 minus (A) the aggregate amount paid by the Buyer under Section 3.1.1 of the Purchase Agreement plus (B) the aggregate amount of Bonus Pools previously paid by the Company pursuant to Section 1.04. The obligations of Employee under Article IV hereof shall continue notwithstanding termination of Employee's employment pursuant to this Section 2.04, but only if and to the extent the Company (1) notifies Employee within sixty days of the date of termination that the Company irrevocably commits to make the Subject Payments and to provide the health-related benefits described in clause (3) below, and (2) pays the Employee an amount equal to his then current Base Salary for and throughout the balance of the period that would have remained in the term had Employee's employment hereunder not been so terminated, no less frequently than Employee was paid Base Salary while working for the Company (the "Subject Payments") and (3) for the period that would have remained in the Term had Employee's employment hereunder not be so terminated, provides Employee with such continuing coverage under the health insurance benefit plans and programs Employee was receiving at the time of such termination of employment. If termination pursuant to this Section 2.04 occurs at a time when Harry Pontone or Employee is President of the Company, the decision to pay the compensation and extend the health benefits described in the preceding sentence shall be made only by the board of directors of the Company or its designee.

For purposes of this Agreement, "Good Reason" shall mean, unless otherwise consented to by Employee, (i) any material reduction of Employee's authority, duties and responsibilities, or the assignment to Employee of duties materially inconsistent with the provisions of Section 1.01 hereof, in either case for reasons other than a failure of the Company to meet Performance Standards; (ii) a reduction in Base Salary of Employee by a person other than Harry Pontone; (iii) the relocation of Employee's office outside of the New York metropolitan area or (iv) the Company's material breach of this Agreement and the failure by the Company to correct such breach within a reasonable period after written notice thereof by Employee.

2.05.  **Employee Termination.**  Employee agrees to give the Company sixty days prior written notice of his voluntary termination of employment with the Company. Following a termination of employment with the Company by Employee without Good Reason, and effective as of the date of such termination, any obligations of the Company to Employee pursuant to Article I hereunder shall cease, other than to provide Employee with all Base Salary and other benefits earned and accrued and customarily paid under the Company's standard policies (but specifically excluding any rights under Section 1.04 hereof, the entitlement to which shall be governed by such Section) through and including the date of termination and reimbursement for any expenses incurred through and including the date of such termination. The obligations of Employee under Article IV hereof shall continue notwithstanding termination of Employee's employment pursuant to this Section 2.05.

2.06.  **Deemed Resignations.**  Any termination of Employee's employment shall constitute an automatic resignation of Employee as an officer of the Company and each affiliate of the Company, and an automatic resignation of Employee from the Board (if applicable) and from the board of directors of any affiliate of the Company and from the board of directors or similar governing body of any corporation, limited liability company or other entity in which the Company or any affiliate holds an equity interest and with respect to which board or similar governing body Employee serves as the Company's or such affiliate's designee or other representative.

18

## ARTICLE III
### EMPLOYEE'S ACKNOWLEDGMENTS

As used in Article III and Sections 4.01, 4.02, 4.05, 4.08 and 4.09, the term "Company" shall include The York Group, Inc. and the companies directly or indirectly through one or more intermediaries controlled by, in control of, or under common control with, The York Group, Inc.

Employee recognizes and acknowledges that: (a) in the course of Employee's employment by the Sellers, and in the future by the Company, Employee has acquired and will continue to acquire information which could include, in whole or in part, information concerning the Company's sales, sales volume, sales methods, sales proposals, customers and prospective customers, identity of customers and prospective customers, identity of key purchasing personnel in the employ of customers and prospective customers, amount or kind of customers' purchases from the Company, the Company's sources of supply, the Company's computer programs, system documentation, special hardware, product hardware, related software development, the Company's manuals, formulae, processes, methods, machines, compositions, ideas, improvements, inventions or other confidential or proprietary information belonging to the Company or relating to the Company's affairs (collectively referred to herein as the "Confidential Information"); (b) to the extent provided in Article IV hereof, the Confidential Information is the property of the Company; (c) to the extent provided in Article IV hereof, the misappropriation or disclosure of the Confidential Information (other than as directed by the Company) would constitute a breach of trust and could cause irreparable injury to the Company; and (d) it is essential to the protection of the Company's goodwill and to the maintenance of the Company's competitive position that, to the extent provided in Article IV hereof, the Confidential Information be kept secret and that Employee not disclose the Confidential Information to others (other than as directed by the Company) or use the Confidential Information to Employee's own advantage or the advantage of others. Notwithstanding the foregoing, Employee will not have any obligation for any disclosure of Confidential Information if (i) the Company authorizes Employee to disclose such Confidential Information to third parties by prior written authorization executed by the Company; (ii) it is or becomes available to the general public in a publication of general circulation, other than by an act or omission of Employee or any employee, agent, or other person acting for or on behalf of Employee; (iii) used in an action or proceeding brought by Employee or the Company in pursuit of its rights or in exercise of its remedies hereunder or (iv) required by applicable law or it is ordered to be disclosed by a court, administrative agency, or other governmental body with jurisdiction over the parties hereto, provided that, subject to applicable law, Employee will first have provided the Company with prompt written notice of such required disclosure and will take reasonable steps to allow the Company to seek a protective order with respect to the confidentiality of the information required to be disclosed (Employee will promptly cooperate with and assist the Company in connection with obtaining such protective order).

Employee further recognizes and acknowledges that it is essential for the proper protection of the business of the Company that Employee be restrained to the extent provided in Article IV hereof (a) from soliciting or inducing any employee of the Company to leave the employ of the Company, (b) from hiring or attempting to hire any employee of the Company, (c) from soliciting the trade of or trading with the customers and suppliers of the Company for any business purpose other than in connection with Employee's duties hereunder, and (d) from competing against the Company for a reasonable period following the termination of Employee's employment with the Company.

## ARTICLE IV
### EMPLOYEE'S COVENANTS AND AGREEMENTS

4.01.    Non-Disclosure of Confidential Information. Employee agrees to hold and safeguard the Confidential Information in trust for the Company, its successors and assigns and agrees that he or she

shall not, without the prior written consent of the Company, misappropriate or disclose or make available to anyone for use outside the Company's organization at any time, either during his employment with the Company or subsequent to the termination of his employment with the Company for any reason, including without limitation termination by the Company for Cause or without Cause, any of the Confidential Information, whether or not developed by Employee, except as required in the performance of Employee's duties to the Company.  Without limitation, Employee shall not be permitted to remove Confidential Information from Company computer servers to use for any personal purpose.

Notwithstanding the above restriction, Employee will not have any obligation for any disclosure of Confidential Information if (i) the Company authorizes Employee to disclose such Confidential Information to third parties by prior written authorization executed by the Company; (ii) it is or becomes available to the general public in a publication of general circulation, other than by an act or omission of Employee or any employee, agent, or other person acting for or on behalf of Employee; (iii) used in an action or proceeding brought by Employee or the Company in pursuit of its rights or in exercise of its remedies hereunder or (iv) required by applicable law or it is ordered to be disclosed by a court, administrative agency, or other governmental body with jurisdiction over the parties hereto, provided that, subject to applicable law, Employee will first have provided the Company with prompt written notice of such required disclosure and will take reasonable steps to allow the Company to seek a protective order with respect to the confidentiality of the information required to be disclosed (Employee will promptly cooperate with and assist the Company in connection with obtaining such protective order).

4.02.  Disclosure of Works and Inventions/Assignment of Patents.  Employee shall disclose promptly to the Company or its nominee any and all works, inventions, discoveries and improvements authored, conceived or made by Employee during Term and related to the Company ("Employee Works"), and hereby assigns and agrees to assign all his interest therein to the Company or its nominee. The parties agree that the intent of the foregoing is not to provide for the Company ownership of personal inventions or materials (like writings or artwork) created by Employee that do not relate to the Company and are not created using Company assets.  Whenever requested to do so by the Company, Employee shall execute any and all applications, assignments or other instruments which the Company shall deem necessary to apply for and obtain Letters Patent or Copyrights of the United States or any foreign country or to otherwise protect the Company's interest in such Employee Works.  Such obligations shall continue beyond the Term with respect to Employee Works authored, conceived or made by Employee during the Term, and shall be binding upon Employee's assigns, executors, administrators and other legal representatives.  Employee agrees that in the event of publication by Employee of written or graphic materials related to the business or activities of the Company, the Company will retain and own all rights in said materials, including right of copyright.  The parties agree that the intent of the foregoing is not to provide for Company ownership of personal inventions or materials (like writings or artwork) created by the Employee that do not relate to the Company and are not created using Company assets.

4.03.  Business Opportunities.  Employee agrees to be a loyal employee of the Company. Employee agrees that he shall not usurp any corporate opportunities of the Company.

4.04.  Compliance.  Employee shall be required to adhere to the internal control standards and codes of conduct as defined by the Sarbanes-Oxley Act of 2002, established regulatory standards and published Matthews' policies, to the extent applicable by their terms to Employee.

4.05.  Return of Materials.  Upon the termination of Employee's employment with the Company for any reason, including without limitation termination by the Company for Cause or without Cause, Employee shall promptly deliver to the Company all correspondence, drawings, blueprints, manuals, letters, notes, notebooks, reports, flowcharts, programs, proposals and any documents concerning the Company's customers or concerning products or processes used by the Company and,

without limiting the foregoing, will promptly deliver to the Company any and all other documents or materials containing or constituting Confidential Information.

4.06.   <u>Restrictions on Competition</u>.

(a) Employee covenants and agrees that (i) during the period of Employee's employment hereunder, (ii) for three (3) years after the end of the term of this Agreement under Section 1.02 hereof and (iii) if applicable in accordance with subsections (b), (c) or (d) below, for an additional period equal to what would have been the then remaining term of this Agreement had this Agreement not been otherwise terminated (the "Applicable Term") plus three (3) years (such total period in each of subsection (i), (ii) and (iii) above being referred to herein as the "Non-Compete Period"), Employee shall not engage, directly or indirectly, whether as principal or as agent, officer, director, employee, consultant, shareholder, investor, financer or otherwise, alone or in association with any other person, corporation or other entity, in any Competing Business. For purposes of this Agreement, the term "Competing Business" shall mean any person, corporation or other entity which manufactures, markets or sells caskets, urns, memorials or cremation equipment.

(b) If the Employee voluntarily ceases employment with the Company, including as set forth under Section 2.05 hereof, Employee shall remain subject to Section 4.06(a) for the Non-Compete Period without any further payment due by the Company to Employee beyond the payments required under Section 2.05.

(c) If Employee is terminated pursuant to Section 2.04, Employee shall remain subject to Section 4.06(a) for the Non-Compete Period, to the extent provided therein.

(d) If Employee is terminated pursuant to Section 2.01 or Section 2.03, Employee shall remain subject to Section 4.06(a) for the Non-Compete Period without any further payment due to Employee by the Company beyond the payments requirements under Section 2.01 or Section 2.03, as the case may be.

Notwithstanding the restrictions contained in this Section 4.06, Employee may own, directly or indirectly, solely as an investment, (A) securities of any such entity which are traded on any national securities exchange or NASDAQ if Employee (y) is not a controlling person of, or a member of a group which controls such entity; and (z) does not, directly or indirectly own 2% or more of any class of securities of such entity or (B) interests in mutual funds or similar pooled accounts.

4.07.   <u>Non-Solicitation of Customers and Suppliers</u>.  Employee agrees that while employed under he shall not, directly or indirectly, solicit the trade of, or trade with, any customer, prospective customer or supplier of the Company with respect to the manufacture or sale of caskets, urns, memorials or cremation products for any business purpose other than for the benefit of the Company. Employee further agrees that following the termination of Employee's employment with the Company, to the same extent and for the same period (if any) that the Employee continues to be subject to the restrictions of Section 4.06, Employee shall not, directly or indirectly, solicit the trade of, or trade with, any customers, prospective customers or suppliers of the Company with respect to the manufacture or sale by the Company of caskets, urns, memorials or cremation products, or the supplies necessary to manufacture the same.

4.08.   <u>Non-Solicitation of Employees</u>.  Employee agrees that following termination of Employee's employment with the Company, and to the same extent and for the same period (if any) that the Employee continues to be subject to the restrictions of Section 4.06, Employee shall not, directly or

indirectly, solicit or induce, or attempt to solicit or induce, any employee of the Company to leave the Company for any reason whatsoever, or hire any such employee. This Section 4.08 will not prohibit Employee from engaging in general advertising or solicitation not specifically targeted at any one or more employees of the Company and shall not prohibit Employee from hiring any employee of the Company that contacts Employee as a result of such general advertising or solicitation.

4.09. <u>Non-Disparagement</u>. During Employee's employment with the Company and following any termination of employment with Company, (a) Employee agrees not to disparage, either orally or in writing, the Company, any of its business, products, services or practices, or any of their directors, officers, agents, representatives, stockholders, employees or affiliates and (b) the Company agrees not to, and agrees to cause its directors, officers, agents, representatives, stockholders, employees and affiliates not to, disparage Employee, either orally or in writing.

ARTICLE V

EMPLOYEE'S REPRESENTATIONS AND WARRANTIES

5.01. <u>No Prior Agreements</u>. Employee represents and warrants that he is not a party to or otherwise subject to or bound by the terms of any contract, agreement or understanding which in any manner would limit or otherwise affect his ability to perform his obligations hereunder, including without limitation any contract, agreement or understanding containing terms and provisions similar in any manner to those contained in Article IV hereof. Employee further represents and warrants that his employment with the Company will not require him to disclose or use any confidential information belonging to prior employers or other persons or entities.

5.02. <u>Employee's Abilities</u>. Employee acknowledges that it would cause the Company serious and irreparable injury and cost if Employee were to use his ability and knowledge in competition with the Business in breach of the obligations contained in Article IV.

5.03. <u>Remedies</u>. In the event of a breach by Employee of the terms of this Agreement, the Company shall be entitled, if it shall so elect, to institute legal proceedings to obtain damages for any such breach, or to enforce the specific performance of this Agreement by Employee and to enjoin Employee from any further violation of this Agreement and to exercise such remedies cumulatively or in conjunction with all other rights and remedies provided by law. Employee acknowledges, however, that the remedies at law for any breach by him of the provisions of this Agreement may be inadequate and that the Company shall be entitled to injunctive relief against him in the event of any breach.

ARTICLE VI

MISCELLANEOUS

6.01. <u>Authorization to Modify Restrictions</u>. It is the intention of the parties that the provisions of Article IV hereof shall be enforceable to the fullest extent permissible under applicable law, but that the unenforceability (or modification to conform to such law) of any provision or provisions hereof shall not render unenforceable, or impair, the remainder thereof. If any provision or provisions hereof shall be deemed invalid or unenforceable, either in whole or in part, this Agreement shall be deemed amended to delete or modify, as necessary, the offending provision or provisions and to alter the bounds thereof in order to render it valid and enforceable.

6.02. <u>Entire Agreement</u>. This Agreement and the Purchase Agreement represent the entire agreement of the parties with respect to the subject matter hereof and this Agreement may be amended only by a writing signed by each of them; provided that any such amendment which affects Section 1.04 hereof shall require the prior written consent of (i) Harry Pontone, in his capacity as President of the

, or (ii) if Harry Pontone no longer is President, Employee, provided that he is then employed by Company, or (iii) if Harry Pontone is no longer President and Employee is not then employed by the Company, each of the individuals set forth on Schedule 1.03 hereto that are then employed by the Company.

6.03.   Governing Law.  This agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to the principles of conflict of laws thereof.

6.04.   Jurisdiction Venue and Service of Process.  Each party (a) agrees that any suit, action or proceeding arising out of or relating to this Agreement shall be brought solely in the state or federal courts in Pittsburgh, Pennsylvania or New York, New York; (b) consents to the exclusive jurisdiction of each such court in any suit, action or proceeding relating to or arising out of this Agreement; (c) waives any objection that it may have to the laying of venue in any such suit, action or proceeding in any such court; and (d) agrees that service of any court paper may be made in such manner as may be provided under applicable laws or court rules governing service of process.

6.05.   Counterparts, Section Headings.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.  The section headings of this Agreement are for convenience of reference only and shall not affect the construction or interpretation of any of the provisions hereof.

*Signature page follows.*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement or caused this Agreement to be executed the day and year first above written.

SCOTT PONTONE

Address:

16 Fox Hall Place

Scarsdale NY 10583

THE YORK GROUP, INC.

By: _____

Name:

Title:

IN WITNESS WHEREOF, the parties hereto have executed this Agreement or caused this Agreement to be executed the day and year first above written.

_____

SCOTT PONTONE

Address:

_____

_____

_____


THE YORK GROUP, INC.

By: _____

Name:
Title:

SCHEDULE 1.03

<u>POOL PARTICIPANTS</u>

1.    Harry Pontone

2.    Louis Pontone

3.    Michael Pontone

4.    Steven Pontone

5.    Scott G. Pontone

6.    Thomas Pontone

7.    Andrew Pontone, Jr.

SCHEDULE 1.06

PERMITTED ACTIVITIES

Real estate investments and management as currently conducted by Employee through
affiliates of SBC Holding Corporation.

**Exhibit 6**

EXECUTION COPY

ASSET PURCHASE AGREEMENT

BY AND AMONG

THE YORK GROUP, INC.,

MIDNIGHT ACQUISITION CORPORATION,

MILSO INDUSTRIES, INC.,

MILSO INDUSTRIES, LLC,

SBC HOLDING CORPORATION,

THE SHAREHOLDERS IDENTIFIED HEREIN AND

MATTHEWS INTERNATIONAL CORPORATION

MAY 28, 2005

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| ARTICLE I | CERTAIN DEFINITIONS | 1 |
| 1.1 | Accounts Receivable | 1 |
| 1.2 | Accrued Expenses | 1 |
| 1.3 | Adjustment Target Date | 1 |
| 1.4 | Affiliate | 1 |
| 1.5 | Agreement | 2 |
| 1.6 | Ancillary Agreements | 2 |
| 1.7 | Applicable Laws | 2 |
| 1.8 | Assignment and Assumption Agreement | 2 |
| 1.9 | Assumed Contracts | 2 |
| 1.10 | Assumed Liabilities | 2 |
| 1.11 | Assumed Real Property Leases | 2 |
| 1.12 | Balance Sheet | 2 |
| 1.13 | Balance Sheet Date | 2 |
| 1.14 | Base Cash Consideration | 2 |
| 1.15 | Base Operating Profit | 2 |
| 1.16 | Bill of Sale | 2 |
| 1.17 | Books and Records | 2 |
| 1.18 | Buyer Damages | 2 |
| 1.19 | Buyer Indemnitees | 2 |
| 1.20 | Business | 2 |
| 1.21 | Business Day | 2 |
| 1.22 | Buyer | 2 |
| 1.23 | CERCLA | 2 |
| 1.24 | Closing | 2 |
| 1.25 | Closing Balance Sheet | 2 |
| 1.26 | Closing Date | 3 |
| 1.27 | Closing Date Cash Consideration | 3 |
| 1.28 | Closing Inventory | 3 |
| 1.29 | Closing Working Capital | 3 |
| 1.30 | Code | 3 |
| 1.31 | Confidential Information | 3 |

- i -

TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|
| 1.32 | Confidentiality Agreement | 3 |
| 1.33 | Consideration | 3 |
| 1.34 | Contingent Consideration Payment | 3 |
| 1.35 | Contract | 3 |
| 1.36 | Employee | 3 |
| 1.37 | Employment Agreements | 3 |
| 1.38 | Encumbrance | 3 |
| 1.39 | Environment | 3 |
| 1.40 | Environmental Laws | 3 |
| 1.41 | Environmental Liabilities and Costs | 4 |
| 1.42 | Environmental Permits | 4 |
| 1.43 | ERISA | 4 |
| 1.44 | ERISA Plans | 4 |
| 1.45 | Escrow Agent | 4 |
| 1.46 | Escrow Agreement | 4 |
| 1.47 | Escrow Amount | 4 |
| 1.48 | Escrow Fund | 4 |
| 1.49 | Excluded Assets | 4 |
| 1.50 | Excluded Liabilities | 4 |
| 1.51 | GAAP | 4 |
| 1.52 | Governmental Authority | 4 |
| 1.53 | Hazardous Substances | 4 |
| 1.54 | HSR Act | 5 |
| 1.55 | Indemnified Party | 5 |
| 1.56 | Indemnifying Party | 5 |
| 1.57 | Indemnity Period | 5 |
| 1.58 | Independent Accounting Firm | 5 |
| 1.59 | Inventory | 5 |
| 1.60 | Key Employees | 5 |
| 1.61 | Knowledge or to the knowledge of Sellers | 5 |
| 1.62 | Lease | 5 |
| 1.63 | Lease Consent | 5 |

- ii -

NYA 730432.9

TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|
| 1.64 | Leased Property | 5 |
| 1.65 | Losses | 5 |
| 1.66 | Machinery and Equipment | 5 |
| 1.67 | Material Adverse Effect | 5 |
| 1.68 | Matthews | 5 |
| 1.69 | Operating Profit | 6 |
| 1.70 | Other Leases | 6 |
| 1.71 | Party | 6 |
| 1.72 | Payables | 6 |
| 1.73 | Pension Plan | 6 |
| 1.74 | Permits | 6 |
| 1.75 | Permitted Encumbrances | 6 |
| 1.76 | Person | 7 |
| 1.77 | Plans | 7 |
| 1.78 | Prepaid Expenses | 7 |
| 1.79 | Products | 7 |
| 1.80 | Proprietary Rights | 7 |
| 1.81 | Purchased Assets | 7 |
| 1.82 | Real Property | 7 |
| 1.83 | Real Property Leases | 7 |
| 1.84 | Release | 7 |
| 1.85 | Remedial Action | 7 |
| 1.86 | Seller and Sellers | 7 |
| 1.87 | Security Deposits | 7 |
| 1.88 | Seller Damages | 7 |
| 1.89 | Seller Indemnitees | 8 |
| 1.90 | Shareholder | 8 |
| 1.91 | Subsidiary | 8 |
| 1.92 | Supply Letter Agreement | 8 |
| 1.93 | Tax Returns | 8 |
| 1.94 | Taxes | 8 |
| 1.95 | Working Capital Calculation | 8 |

TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|
| ARTICLE II | TRANSFER OF ASSETS AND PROPERTIES; CLOSING | 8 |
| 2.1 | Purchased Assets | 8 |
| 2.3 | Equitable Assignment | 11 |
| 2.4 | Closing | 11 |
| ARTICLE III | PURCHASE PRICE | 12 |
| 3.1 | Purchase Price | 12 |
| 3.2 | Allocation of Purchase Price | 13 |
| 3.3 | Transfer Taxes | 13 |
| 3.4 | Proration of Taxes and Certain Charges | 13 |
| 3.5 | Escrow Agreement | 14 |
| 3.6 | Adjustment to Seller's Consideration | 15 |
| ARTICLE IV | ASSUMPTION OF LIABILITIES; EMPLOYEE MATTERS | 16 |
| 4.1 | General Limitation on Assumption of Liabilities | 16 |
| 4.2 | Assumed Liabilities and Obligations | 17 |
| 4.3 | Offers of Employment | 17 |
| 4.4 | Other Employee Benefits | 18 |
| 4.5 | Employment Taxes | 19 |
| ARTICLE V | CLOSING | 19 |
| 5.1 | Deliveries by Sellers | 19 |
| 5.2 | Deliveries by Buyer | 20 |
| 5.3 | Escrow Fund Delivery | 20 |
| 5.4 | Delivery of Possession | 20 |
| ARTICLE VI | REPRESENTATIONS AND WARRANTIES OF SELLERS AND THE SHAREHOLDERS | 20 |
| 6.1 | Organization, Good Standing and Power | 20 |
| 6.2 | Authorization of Agreement and Enforceability | 21 |
| 6.3 | No Violation; Consents | 21 |
| 6.4 | Financial Statements | 21 |
| 6.5 | Accounts Receivable | 21 |
| 6.6 | Inventory | 22 |
| 6.7 | Absence of Certain Changes or Events | 22 |
| 6.8 | Title to Properties; Absence of Liens and Encumbrances | 22 |

NYA 730432.9

TABLE OF CONTENTS
(continued)

| | | | Page |
|---|---|---|---|
| 6.9 | Proprietary Rights | | 23 |
| 6.10 | Contracts and Commitments | | 23 |
| 6.11 | Permits, Licenses | | 24 |
| 6.12 | Compliance with Laws | | 24 |
| 6.13 | Legal Proceedings | | 24 |
| 6.14 | Absence of Undisclosed Liabilities | | 25 |
| 6.15 | Books and Records | | 25 |
| 6.16 | Employees | | 25 |
| 6.17 | Labor Matters, etc | | 25 |
| 6.18 | Employee Benefit Plans and Related Matters | | 25 |
| 6.19 | No Finder | | 26 |
| 6.20 | Interest in Business | | 27 |
| 6.21 | Condition of Assets | | 27 |
| 6.22 | Affiliate Transactions; Loans | | 27 |
| 6.23 | Environmental Matters | | 27 |
| 6.24 | Sufficiency of Assets | | 28 |
| 6.25 | Territorial Restrictions | | 28 |
| 6.26 | Leased Property | | 28 |
| 6.27 | Suppliers; Raw Materials | | 28 |
| 6.28 | Customers | | 29 |
| 6.29 | Product Warranties | | 29 |
| 6.30 | Absence of Certain Business Practices | | 29 |
| 6.31 | Taxes | | 29 |
| 6.32 | Thomas Pontone | | 30 |
| ARTICLE VII | REPRESENTATIONS AND WARRANTIES OF BUYER | | 30 |
| 7.1 | Organization, Good Standing, Power | | 30 |
| 7.2 | Authorization of Agreement and Enforceability | | 30 |
| 7.3 | No Violations; Consents | | 30 |
| 7.4 | Legal Proceedings | | 30 |
| 7.5 | Availability of Funds | | 31 |
| 7.6 | No Finder | | 31 |
| ARTICLE VIII | COVENANTS OF SELLERS PRIOR TO CLOSING DATE | | 31 |

- v -

NYA 730432.9

**TABLE OF CONTENTS**
(continued)

| | | | Page |
|---|---|---|---|
| 8.1 | | Required Actions | 31 |
| 8.2 | | Prohibited Actions | 33 |
| 8.3 | | No Merger, Etc. | 34 |
| 8.4 | | TP Settlement Documents | 34 |
| ARTICLE IX | | COVENANTS OF BUYER PRIOR TO CLOSING DATE | 34 |
| 9.1 | | Required Actions | 34 |
| 9.2 | | Investigation | 35 |
| 9.3 | | Approvals, Consents | 35 |
| 9.4 | | Access to Information | 35 |
| ARTICLE X | | CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER | 35 |
| 10.1 | | Accuracy of Representations and Warranties | 35 |
| 10.2 | | Performance of Agreement | 36 |
| 10.3 | | Sellers' Certificates | 36 |
| 10.4 | | Secretary's Certificates | 36 |
| 10.5 | | Injunction | 36 |
| 10.6 | | Actions and Proceedings | 36 |
| 10.7 | | HSR Act Waiting Period | 36 |
| ARTICLE XI | | CONDITIONS PRECEDENT TO THE OBLIGATIONS OF SELLERS | 36 |
| 11.1 | | Accuracy of Representations and Warranties | 36 |
| 11.2 | | Performance of Agreement | 36 |
| 11.3 | | Buyer's Certificate | 36 |
| 11.4 | | Secretary's Certificate | 36 |
| 11.5 | | Injunction | 37 |
| 11.6 | | Actions or Proceedings | 37 |
| 11.7 | | HSR Act Waiting Period | 37 |
| ARTICLE XII | | OBLIGATIONS AFTER THE CLOSING DATE | 37 |
| 12.1 | | Confidentiality | 37 |
| 12.2 | | Covenant Not to Interfere | 37 |
| 12.3 | | Noncompetition | 37 |
| 12.4 | | Transition of Employees | 38 |
| 12.5 | | Administrative Assistance by Seller | 38 |
| 12.6 | | Further Assurances | 38 |

NYA 730432.9

## TABLE OF CONTENTS
### (continued)

| | | | Page |
|---|---|---|---|
| 12.7 | Retention of and Access to Records; Cooperation | | 38 |
| 12.8 | Accounts Receivable Payment | | 38 |
| 12.9 | Use of Business Name | | 38 |
| 12.10 | Operation of Business | | 38 |
| 12.11 | Director Appointments | | 39 |
| ARTICLE XIII | TERMINATION | | 39 |
| 13.1 | Termination of Agreement | | 39 |
| 13.2 | Return of Documents | | 40 |
| 13.3 | Effect of Termination | | 40 |
| ARTICLE XIV | SURVIVAL OF REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION | | 40 |
| 14.1 | Survival of Representations and Warranties | | 40 |
| 14.2 | Sellers' Agreement to Indemnify | | 40 |
| 14.3 | Sellers' and Shareholders' Agreement to Indemnify | | 41 |
| 14.4 | Limitations on Sellers' and Shareholders' Indemnity | | 41 |
| 14.5 | Buyer's Agreement to Indemnify | | 42 |
| 14.6 | Limitation on Buyer's Indemnity | | 42 |
| 14.7 | Third Party Indemnification | | 43 |
| 14.8 | Payment of Indemnification Obligations | | 43 |
| 14.9 | Interest on Unpaid Obligations | | 43 |
| 14.10 | Cooperation with Proceedings | | 44 |
| 14.11 | Treatment of Indemnification Payments | | 44 |
| 14.12 | Exclusive Remedy | | 44 |
| ARTICLE XV | GENERAL | | 44 |
| 15.1 | Expenses | | 44 |
| 15.2 | Publicity | | 44 |
| 15.3 | Waivers | | 44 |
| 15.4 | Binding Effect; Benefits | | 44 |
| 15.5 | Bulk Transfers Laws | | 45 |
| 15.6 | Notices | | 45 |
| 15.7 | Entire Agreement | | 45 |
| 15.8 | Counterparts | | 46 |

- vii -

**TABLE OF CONTENTS**
(continued)

|  |  |  | Page |
|---|---|---|---|
| 15.9 | Headings | | 46 |
| 15.10 | Matters of Construction, Interpretation and the Like | | 46 |
| 15.11 | Governing Law and Choice of Forum | | 46 |
| 15.12 | WAIVER OF RIGHT TO TRIAL BY JURY | | 46 |
| 15.13 | Severability | | 46 |
| 15.14 | Successors and Assigns | | 46 |
| 15.15 | Shareholders | | 47 |
| 15.16 | Guaranty | | 47 |

EXHIBITS

Exhibit A-1    Real Property Descriptions

Exhibit A-2    Form of Real Property Lease

Exhibit B      Escrow Agreement

Exhibit C      Employment Agreement

Exhibit D      Supply Letter Agreement

NYA 730432.9

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT (this "Agreement") dated as of May 26, 2005 by and among The York Group, Inc., a Delaware corporation ("York"), Midnight Acquisition Corporation, a Delaware corporation ("Subsidiary") (York and Subsidiary are collectively referred to herein as "Buyer"), Milso Industries, Inc., a New York corporation ("Milso Inc."), Milso Industries, LLC, an Indiana limited liability company ("Milso LLC"), SBC Holding Corporation, a New York corporation ("SBC") (each of Milso Inc., Milso LLC and SBC shall also be referred to herein as a "Seller" and collectively as "Sellers"), the shareholders and members of Sellers identified on the signature pages of this Agreement (solely for the purposes described in Section 3.5, 4.3.1, 8.1, 8.2, 8.4, 12.1, 12.3, 12.8, 14.3, 14.4.4, 15.1 through 15.4 and 15.6 through 15.15) (collectively, the "Shareholders") and Matthews International Corporation, a Pennsylvania corporation ("Matthews").

### RECITALS:

This Agreement sets forth the terms and conditions upon which Buyer has agreed to purchase from Sellers, and Sellers have agreed to sell to Buyer, substantially all of the assets used by Sellers in the conduct of the Business (as that term is hereafter defined) (the "Contemplated Transaction").

At the time of the execution and delivery of this Agreement, the Real Property Leases and the Employment Agreements have been executed and delivered by the parties thereto; provided that the same shall only become effective as of the Closing Date.

In consideration of the mutual agreements, covenants, representations and warranties contained herein, and in reliance thereon, Buyer, Sellers and the Shareholders, intending to be legally bound, hereby agree as follows:

### ARTICLE I

### CERTAIN DEFINITIONS

As used herein, the following terms shall have the following meanings:

1.1    Accounts Receivable shall mean as of any date all accounts receivable associated with the Business as of such date, other than any account receivable due from an Affiliate of a Seller including, but not limited to, loans and interest receivables (except for loans related to life insurance policies).

1.2    Accrued Expenses shall mean as of any date accrued payroll and benefits, taxes (other than income taxes) and other accrued expenses associated with and incurred in the ordinary course of the Business as would appear on a balance sheet of the Business as of such date, including those described in Schedule 1.2, but excluding any amounts payable to Affiliates of Sellers or Shareholders, other than their accrued but unpaid salaries, wages, vacation and sick pay, incentive compensation and any other similar current liabilities, obligations and commitments and employment-related expense reimbursement obligations, any compensation to Employees or others contingent solely upon or payable solely as a result of the Contemplated Transaction.

1.3    Adjustment Target Date shall have the meaning given to such term in Section 3.6.1.

1.4    Affiliate shall mean with respect to any Person, any other Person, who, directly or indirectly, controls, is controlled by or is under common control with the Person.

1

1.5     Agreement shall mean this Asset Purchase Agreement.

1.6     Ancillary Agreements shall mean the documents referred to in Section 5.1 and 5.2.

1.7     Applicable Laws shall mean the applicable provisions of all (i) constitutions, treaties, statutes, laws (including the common law), rules, regulations, ordinances, codes or orders of any Governmental Authority, (ii) Governmental Approvals and (iii) orders, decisions, injunctions, judgments, awards and decrees of or agreements with any Governmental Authority, in each case as in effect on the date of this Agreement.

1.8     Assignment and Assumption Agreement shall have the meaning given to such term in Section 5.1.4.

1.9     Assumed Contracts shall have the meaning given to such term in Section 2.1.2.

1.10    Assumed Liabilities shall have the meaning given to such term in Section 4.2.

1.11    Assumed Real Property Leases shall have the meaning given to such term in Section 2.1.2.

1.12    Balance Sheet shall mean the balance sheet of the Business as of March 31, 2005.

1.13    Balance Sheet Date shall mean March 31, 2005.

1.14    Base Cash Consideration shall have the meaning given to such term in Section 3.1.

1.15    Base Operating Profit shall mean $16,000,000.

1.16    Bill of Sale shall have the meaning given to such term in Section 5.1.3.

1.17    Books and Records shall have the meaning given to such term in Section 6.15.

1.18    Buyer Damages shall have the meaning given to such term in Section 14.2.

1.19    Buyer Indemnitees shall have the meaning given to such term in Section 14.2.

1.20    Business shall mean the sales, marketing, manufacture and distribution of products and services in the death care industry as presently conducted by Sellers.

1.21    Business Day shall mean any day other than a Saturday, Sunday or any day on which banks located in the State of New York are authorized or required to be closed for the conduct of regular banking business.

1.22    Buyer shall have the meaning given to such term in the preamble of this Agreement.

1.23    CERCLA shall mean the Comprehensive Environmental Response, Compensation and Liability Act, as amended, 42 U.S.C. 9601 et seq.

1.24    Closing shall have the meaning given to such term in Section 2.4.

1.25    Closing Balance Sheet shall have the meaning given to such term in Section 3.6.1.

2

1.26    Closing Date shall have the meaning given to such term in Section 2.4.

1.27    Closing Date Cash Consideration shall have the meaning given to such term in Section 3.1.

1.28    Closing Inventory shall mean all Inventory used or held for use in the Business on the Closing Date.

1.29    Closing Working Capital shall mean cash and cash equivalents, Inventory, Accounts Receivable, Prepaid Expenses and Security Deposits securing performance by the Business of obligations due to be paid or performed within one year of the Closing Date (but not other Security Deposits)), which are being purchased by the Buyer under this Agreement, minus Accrued Expenses and Payables which are being assumed by Buyer under this Agreement. Closing Working Capital shall be calculated in accordance with Schedule 1.29 attached to this Agreement (the "Matthews Accounting Policies").

1.30    Code shall mean the Internal Revenue Code of 1986, as it may be amended from time to time, and any successor thereto. Any reference herein to a specific section or sections of the Code shall be deemed to include a reference to any corresponding provision of future law.

1.31    Confidential Information shall have the meaning given to such term in Section 12.1.

1.32    Confidentiality Agreement shall mean the Confidentiality Agreement dated as of September 10, 2004 between Matthews and Milso Inc.

1.33    Consideration shall have the meaning given to such term in Section 3.1.

1.34    Contingent Consideration Payment shall have the meaning given to such term in Section 3.1.1.

1.35    Contract shall mean any contract, agreement, indenture, note, bond, loan, instrument, lease, sublease, license, sub license, commitment or other arrangement or agreement, whether oral or written.

1.36    Employees shall have the meaning given to such term in Section 6.18.1.

1.37    Employment Agreements shall mean the employment agreements attached as Exhibit C to this Agreement, each of which by its terms will take effect upon the Closing.

1.38    Encumbrance shall mean any claim, lien, pledge, option, charge, easement, security interest, deed of trust, mortgage, right-of-way, encroachment, building or use restriction, conditional sales agreement, encumbrance or other right of third parties, whether voluntarily incurred or arising by operation of law, and includes any agreement to give any of the foregoing in the future, and any contingent sale or other title retention agreement or lease in the nature thereof.

1.39    Environment shall mean soil, surface waters, groundwaters, land, sediments, surface or subsurface strata, ambient air, and any other environmental medium.

1.40    Environmental Laws shall mean all Applicable Laws relating to pollution, natural resources, protection of the Environment or public health and safety or exposure of persons to Hazardous Substances applicable to the parties to this Agreement, including, without limitation, Applicable Laws relating to the manufacture, processing, distribution, use, sale, treatment, storage, release, disposal,

3

handling or transportation of Hazardous Substances or the operation, handling and disposal of medical and biological waste.

1.41    Environmental Liabilities and Costs shall mean all Losses, whether direct or indirect, known or unknown, current or potential, past, present or future, imposed by, under or pursuant to Environmental Laws, including, without limitation, all Losses related to Remedial Actions, and all fees, disbursements and expenses of counsel, experts, personnel and consultants based on, arising out of or otherwise in respect of: (i) the ownership or operation of the Business or the Real Property by a Seller, or any of their predecessors or Affiliates prior to the Closing Date; (ii) the environmental conditions existing on the Closing Date on, at, under, from, above, or about any Real Property or any other assets, equipment or facilities currently or previously owned, leased or operated by a Seller, or any of their predecessors or Affiliates; and (iii) the transportation, disposal or other disposition prior to the Closing Date of any Hazardous Substances, other wastes or recycled or reclaimed materials generated by a Seller.

1.42    Environmental Permits shall mean any federal, state and local permit, license, registration, consent, order, administrative consent order, certificate, approval or other authorization with respect to a Seller necessary for the conduct of the Business as currently conducted under any Environmental Law.

1.43    ERISA shall mean the Employee Retirement Income Security Act of 1974, as amended.

1.44    ERISA Plans shall mean defined benefit pension plans and defined contribution pension plans qualified under Section 401(a) of the Code.

1.45    Escrow Agent shall mean the Escrow Agent as defined in the Escrow Agreement.

1.46    Escrow Agreement shall have the meaning given to such term in Section 3.5.1.

1.47    Escrow Amount shall have the meaning given to such term in Section 3.5.1.

1.48    Escrow Fund shall mean the amount of the Escrow Amount then held by the Escrow Agent subject to the Escrow Agreement.

1.49    Excluded Assets shall mean those assets that are not included in the sale contemplated hereby and as are further defined in Section 2.2.

1.50    Excluded Liabilities shall mean all liabilities related to the Business that are not Assumed Liabilities.

1.51    GAAP shall mean, as of the applicable date, United States generally accepted accounting principles.

1.52    Governmental Authority shall mean any United States, foreign, international, supranational, national, provincial, regional, federal, state, municipal or local government, any instrumentality, subdivision, court, administrative or regulatory agency or commission or other authority thereof, or any quasi-governmental or private body exercising any regulatory, taxing, importing or other governmental or quasi-governmental authority.

1.53    Hazardous Substances shall mean any substance that: (i) is or contains asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum or petroleum derived substances or wastes, radon gas or related materials, lead-based paint or microbial matter, (ii) requires investigation,

4

removal or remediation under any Environmental Law, or is defined, listed or identified as a "hazardous waste," "hazardous substance," "solid waste," "pollutant" or "contaminant" thereunder, or (iii) is toxic, explosive, corrosive, flammable, infectious, radioactive, carcinogenic, mutagenic, or otherwise hazardous and is regulated by any Governmental Authority or Environmental Law.

1.54    HSR Act shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, 15 U.S.C. Section 18a, and the rules promulgated thereunder.

1.55    Indemnified Party shall have the meaning given to such term in Section 14.7.1.

1.56    Indemnifying Party shall have the meaning given to such term in Section 14.7.1.

1.57    Indemnity Period shall have the meaning given to such term in Section 14.1.

1.58    Independent Accounting Firm shall have the meaning given to such term in Section 3.6.2.

1.59    Inventory shall mean all inventories of raw materials, supplies, work in process and finished products used or held for use in the Business.

1.60    Key Employees shall mean Harry Pontone, Louis Pontone, Michael Pontone, Steven Pontone, Scott G. Pontone, Thomas Pontone (son of Louis Pontone) and Andrew G. Pontone.

1.61    Knowledge or to the knowledge of Sellers (or similar phrases) shall mean the actual knowledge of Harry Pontone, Louis Pontone, Michael Pontone, Steven Pontone, Scott G. Pontone, Thomas Pontone (son of Louis Pontone) and Andrew G. Pontone.

1.62    Lease shall have the meaning given to such term in Section 6.26.

1.63    Lease Consent shall have the meaning given to such term in Section 8.1.7.

1.64    Leased Property shall mean the real property leased by Sellers as lessee and used in connection with the Business as more fully described in Schedule 6.26 hereof.

1.65    Losses shall mean all losses, costs, claims, liabilities, fines, penalties, damages and expenses, including interest which may be imposed in connection therewith and court costs and reasonable fees and disbursements of counsel and consultants, but after taking into account any insurance proceeds received by the party incurring the Losses (net of any premium increases resulting therefrom), any net tax benefits to such party resulting therefrom and any reserves on the books and records relating thereto.

1.66    Machinery and Equipment shall have the meaning given to such term in Section 2.1.1.

1.67    Material Adverse Effect shall mean any state of facts, events, changes or effects that materially impairs the conduct or operation of the Business taken as a whole, other than as a result of (A) changes in economic or business conditions generally or in the burial and memorialization products industry specifically, (B) changes in Applicable Laws impacting the burial and memorialization products industry generally or (C) changes or effects resulting in whole or in part from the execution, announcement or performance of this Agreement or the transactions contemplated by this Agreement.

1.68    Matthews shall mean Matthews International Corporation, a Pennsylvania corporation.

5

1.69   Operating Profit shall mean, for the fiscal year ending September 30, 2006 only, the net income of the Business determined on a pro forma stand alone basis, but otherwise determined in accordance with GAAP, excluding (i) any provision for interest expense or income taxes, (ii) any adjustments made for purchase accounting purposes resulting from the Contemplated Transaction which otherwise would have an impact on Operating Profit, including in depreciation and amortization resulting from the re-valuation for purchase accounting purposes of tangible and intangible assets acquired in the Contemplated Transaction and the cost of sales impact related to the re-valuation for purchase accounting purposes of any inventory acquired in the Contemplated Transaction (but except as provided below, no such adjustments to the calculation of Operating Profit shall be made in respect of any acquisitions other than the Contemplated Transaction) and (iii) any non-recurring costs or expenses related to the integration of the Business with the operations of Buyer or Matthews and (iv) all other extraordinary, non-recurring items (as determined in good faith with the agreement of Harry Pontone or Scott Pontone).  If the Closing occurs after October 1, 2005, the Operating Profit shall be annualized by taking the Operating Profit for the period beginning on the day following the Closing Date through and including September 30, 2006 and multiplying it by a fraction, the numerator of which shall be 365 and the denominator of which shall be the number of days in such period.  In calculating Operating Profit all administrative and financial services performed by Matthews or its Affiliates for the Business (including without limitation accounting, accounts receivable processing, accounts payable processing, payroll processing, human resources and benefits support services, retirement and pension plan administration), and shall be charged as an expense at an amount not to exceed the cost to the Business as of the date of this Agreement of any such service.  With respect to future acquisitions by the Buyer, if either Harry Pontone or Scott Pontone is the President of the Company, unless the President agrees in writing to include those operating results and the related attributes of the acquisition (such as interest expense, integration costs and depreciation and amortization charges), they shall be excluded from the calculation of Operating Profit using such methodologies as shall be agreed in good faith by the President of the Company and Matthews.  Under no circumstances shall any amounts payable as purchase price pursuant to this Agreement be treated as charges against net income for purposes of calculating Operating Profit.

1.70   Other Leases shall mean the leases, subleases, licenses and occupancy agreements pursuant to which any Seller or Shareholder is a lessor, sublessor or licensor of any part of the Real Property.

1.71   Party shall mean any Seller, Shareholder or Buyer, individually, as the context so requires, and the term "Parties" shall mean Sellers, Shareholders and Buyer together.

1.72   Payables as of any date shall mean any of the trade accounts payable incurred in the ordinary course and associated with the Business as of such date, other than accounts payable to any Affiliate of Sellers or Shareholders.

1.73   Pension Plan shall mean a pension plan as defined in Section 3(2) of ERISA which is not an individual account plan as defined in Section 3(34) of ERISA.

1.74   Permits shall have the meaning given to such term in Section 6.11.

1.75   Permitted Encumbrances shall mean with respect to any Purchased Asset any (a) defect in title that does not materially adversely impacts the use of such Purchased Asset or the operation of the Business, (b) Encumbrances securing Assumed Liabilities, (c) Encumbrances securing the performance of bids, tenders, leases, contracts (other than for the repayment of debt), statutory obligations, surety, customs and appeal bonds and other obligations of like nature, incurred as an incident to and in the ordinary course of the Business, (d) Encumbrances imposed by law, such as carriers', warehouseman's, mechanics', materialmen's, landlords', laborers' suppliers' and vendors' liens, incurred in good faith in

6

the ordinary course of the Business and securing obligations which are not yet due or which are being contested in good faith by appropriate proceedings, each of which proceedings is set forth on Schedule 1.75, (e) extensions, renewals and replacements of Encumbrances referred to in (a) through (d) of this sentence; provided that any such extension, renewal or replacement Encumbrance shall be limited to the property or assets covered by the Encumbrance extended, renewed or replaced and that the obligations secured by any such extension, renewal or replacement Encumbrance shall be in an amount not greater than the amount of the obligations secured by the original Encumbrance extended, renewed or replaced, none of which, individually or in the aggregate, have a Material Adverse Effect.

1.76    Person shall mean any natural person, firm, partnership, joint venture, limited liability company, association, corporation, trust, business trust, unincorporated organization, Governmental Authority or other entity.

1.77    Plans shall have the meaning given to such term in Section 6.18.

1.78    Prepaid Expenses as of any date shall mean Sellers' rights to receive goods, services or other benefits in connection with the Business, to the extent paid for and not yet received.

1.79    Products shall mean any of the products manufactured, marketed, sold or distributed by any Seller in the conduct of the Business as of the Closing Date.

1.80    Proprietary Rights shall have the meaning given to such term in Section 6.9.1.

1.81    Purchased Assets shall have the meaning given to such term in Section 2.1.

1.82    Real Property shall mean the real property related to any lease assumed by or entered into by Buyer in connection with the transaction contemplated by this Agreement, including the Real Property Leases with the Sellers, the Shareholders, or their Affiliates.

1.83    Real Property Leases shall mean leases with respect to the Real Property owned by the Sellers or their Affiliates and described in Exhibit A-1, in substantially the form of Exhibit A-2 to this Agreement.

1.84    Release shall mean any releasing, disposing, discharging, injecting, spilling, leaking, leaching, pumping, dumping, emitting, escaping, emptying, seeping, dispersal, migration, transporting, placing and the like, including without limitation, the moving of any materials through, into or upon, any land, soil, surface water, ground water or air, or otherwise entering into the environment.

1.85    Remedial Action shall mean all actions required to (i) clean up, remove, treat or in any other way remediate any Hazardous Substances; (ii) prevent the release of Hazardous Substances so that they do not migrate or endanger or threaten to endanger public health or welfare or the environment; or (iii) perform studies, investigations and care (including any financial responsibility requirement) related to any such Hazardous Substances.

1.86    Seller and Sellers shall have the meaning given to such terms in the preamble of this Agreement.

1.87    Security Deposits shall have the meaning given to such term in Section 2.1.15.

1.88    Seller Damages shall have the meaning given to such term in Section 14.5.4.

7

NYA 730432.9

1.89    Seller Indemnitees shall have the meaning given to such term in Section 14.5.

1.90    Shareholder shall have the meaning given to such term in the preamble of this Agreement.

1.91    Subsidiary shall have the meaning given to such term in the preamble of this Agreement.

1.92    Supply Letter Agreement shall mean an agreement in the form of Exhibit D.

1.93    Tax Returns shall mean all federal, state, local, and foreign Tax returns, declarations, statements, reports, schedules, forms, and information returns and any amended Tax Returns relating to Taxes.

1.94    Taxes shall mean all taxes, duties, charges, fees, levies or other assessments imposed by any taxing authority, including, without limitation, income, gross receipts, value-added, excise, withholding, personal property, real estate, sale, use, ad valorem, license, lease, service, severance, stamp, transfer, payroll, employment, customs, duties, alternative, add-on, minimum, estimated and franchise taxes (including any interest, penalties or additions attributable to or imposed on or with respect to any such assessment).

1.95    Working Capital Calculation shall have the meaning given to such term in Section 3.6.1.

## ARTICLE II

## TRANSFER OF ASSETS AND PROPERTIES; CLOSING

2.1    Purchased Assets.  Subject to the terms and conditions of this Agreement, and except as otherwise expressly provided in this Agreement, at the Closing, Sellers shall sell and convey to Buyer, free and clear of all Encumbrances (other than Permitted Encumbrances), and Buyer shall purchase and accept from Sellers, all of Sellers' rights, title and interest in and to the assets, properties and rights of every kind and description, real, personal and mixed, tangible and intangible, wherever situated which are used or useful in the conduct of the Business (such rights, title and interests in and to all such assets, properties and rights being collectively referred to in this Agreement as the "Purchased Assets"), including, without limitation, the following:

    2.1.1    Equipment, Machinery and other Tangible Personal Property.  All machinery, equipment, leasehold improvements, trucks, automobiles, supplies, materials, office furniture and office equipment, computing and telecommunications equipment and other items of personal property that are owned or leased by Sellers and used primarily in connection with the Business, wherever located, including those set forth in Schedule 2.1.1 hereto (but excluding any asset listed on Schedule 2.1.1 and subsequently disposed of without breach of any covenant contained in this Agreement) ("Machinery and Equipment");

    2.1.2    Contracts Relating to the Business.  To the extent transferable, (a) all leases (including leases and subleases of leased real property ("Assumed Real Property Leases") and of Machinery and Equipment) and (b) all other Contracts primarily related to the Business set forth on Schedule 2.1.2A (the "Assumed Contracts"), but excluding any Contract listed on Schedule 2.1.2B and any Contract subsequently terminated without breach of any covenant contained in this Agreement;

8

2.1.3    Customer Lists, Sales and Marketing Materials.  All customer lists, sales data, catalogs, brochures, supplier names, mailing lists, art work, photographs and advertising material that relate primarily to the Business, whether in electronic form or otherwise;

2.1.4    Permits, Licenses.  All governmental permits, licenses, registrations, orders and approvals relating primarily to the Business and in existence on the Closing Date, including those listed in Schedule 2.1.4 hereto, to the extent such permits, licenses, registrations, orders and approvals are transferable to Buyer;

2.1.5    Trade Secrets.  All trade secrets, secret processes and procedures, engineering, production, assembly, design, installation, other technical drawings and specifications, working notes and memos, market studies, consultants' reports, technical and laboratory data, competitive samples, engineering prototypes, and all similar property of any nature, tangible or intangible, of Sellers relating to the Business;

2.1.6    Intellectual Property.   All patents, trademarks, trademark registrations, trade names, service marks, copyrights and copyright registrations described in Schedule 2.1.6;

2.1.7    Property, Personnel and Accounting Records.  To the extent transferable under applicable law, all other records of Sellers relating to the Business, including property records and copies of personnel records of Employees who become employees of Buyer; provided, however, that Seller shall be entitled to retain copies of all such records;

2.1.8    Goodwill.  All right, title and interest of Sellers in and to the goodwill incident to the Business;

2.1.9    Cash and Cash Equivalents.  All cash and cash equivalents of the Business on the Closing Date;

2.1.10    Inventory.  All Closing Inventory;

2.1.11    Accounts Receivable.  All Accounts Receivable existing on the Closing Date;

2.1.12    Prepaid Expenses.  Except as set forth in Section 2.2.1, all Prepaid Expenses of, or for the benefit of, the Business on the Closing Date including those described in Schedule 2.1.12, to the extent the benefits thereof are transferable to Buyer;

2.1.13    Computer Software.  To the extent transferable, all computer applications software, owned or licensed, whether for general business usage (e.g., accounting, word processing, graphics, spreadsheet analysis, etc.) or specific, unique-to-the-business usage (e.g., order processing, manufacturing, process control, shipping, etc.) and all computer operating, security or programming software, owned or licensed by Sellers and used primarily in the Business;

2.1.14    Other Intangible Assets.  All other assets (including all causes of action, rights of action, contract rights and warranty and product liability claims against third parties, all telephone numbers, telecopier numbers, websites, domain names, and email addresses) that are owned by Sellers and used primarily in the Business, regardless of whether any value is ascribed thereto in the Sellers' financial statements; and

9

2.1.15  Security Deposits.  All prepaid security deposits related to the Assumed Contracts ("Security Deposits").

Notwithstanding the foregoing provisions of this Section 2.1, the transfer of the Purchased Assets pursuant to this Agreement shall not include the assumption of any liability or obligation related to the Purchased Assets, unless such liability or obligation is expressly included in the Assumed Liabilities.

2.2     Excluded Assets.  Notwithstanding anything to the contrary in this Agreement, the Purchased Assets shall not include any of Sellers' rights, title or interests in the following (collectively, the "Excluded Assets"):

2.2.1   Any insurance policies maintained by Sellers with respect to the Business or any of its employees or any Shareholder and all of Sellers' prepaid insurance premiums and insurance deposits and rights to refunds or adjustments in respect of periods prior to the Closing Date with respect to insurance premiums and insurance deposits and all rights to insurance proceeds or other insurance Contract recoveries in respect of periods prior to the Closing Date;

2.2.2   All bank accounts and all accounts receivable from Affiliates of Sellers existing on the Closing Date;

2.2.3   All consideration paid, payable or deliverable to Sellers pursuant to this Agreement, except such funds as may be payable to the Buyer pursuant to the Escrow Agreement;

2.2.4   All claims that Sellers may have against any third Person with respect to any Excluded Asset;

2.2.5   Claims for refunds of Taxes and other governmental charges to the extent such refunds (i) are in respect of Taxes for which the Buyer could not be held liable and which could not result in a lien on a Purchased Asset or (ii) relate to periods ending on or prior to the Closing Date, whether or not relating to the Business;

2.2.6   All property and assets listed on Schedule 2.2.6 and any proceeds from the disposition thereof;

2.2.7   All (i) shares of capital stock or other equity or other ownership interests of any Person that are owned by Seller or any Affiliate of any Seller or securities convertible into, exchangeable or exercisable for shares of capital stock or other equity or other ownership interests of any Person and (ii) corporate seals, minute books, charter documents, stock transfer records, record books, original Tax and financial records and such other files, books and records relating to any of the Excluded Assets or to the organization, existence or capitalization of any Seller or of any other Person;

2.2.8   All Machinery and Equipment and Inventory transferred, consumed or otherwise disposed of by Sellers in the ordinary course of the Business before the Closing Date;

2.2.9   Except for the Assumed Real Property Leases, and subject to the provisions of the Real Property Leases, any interest in real property;

2.2.10  The Contracts listed on Schedule 2.1.2B hereof; and

10

2.2.11  All rights of Sellers under this Agreement and the Ancillary Agreements and any Contract entered into pursuant to the provisions of this Agreement.

2.3   Equitable Assignment.

2.3.1  Notwithstanding anything to the contrary contained in this Agreement, other than Section 10.7 and 11.7, to the extent that the sale, assignment, transfer, conveyance or delivery or attempted sale, assignment, transfer, conveyance or delivery to Buyer, as contemplated hereunder, of any Purchased Asset is prohibited by its terms or by any Applicable Laws or should require any governmental or any third party consent or approval, and any such consent or approval shall not have been obtained prior to the Closing (a "Delayed Consent"), this Agreement shall not constitute a sale, assignment, transfer, conveyance or delivery, or any attempted sale, assignment, transfer, conveyance or delivery, thereof and (subject to the conditions expressly set forth in this Agreement) the parties nonetheless shall complete the Closing. Following the Closing, the Parties shall use commercially reasonable efforts and shall cooperate with each other, to obtain promptly each Delayed Consent (but Sellers shall not be required to incur any material expense or make any material commitment in connection therewith). Pending receipt of each Delayed Consent with respect to a Purchased Asset or if any such Delayed Consent is not obtained, the Parties hereto shall cooperate with each other in any reasonable and lawful arrangements (each an "Equitable Arrangement"), effectively transferring to Buyer from and after the Closing, the rights and benefits of, and entitlements to exercise the Sellers' rights under, and effectively causing the Buyer to assume all Assumed Liabilities with respect to, such Purchased Asset and operations of the Business as if such assets and operations had been transferred by Sellers to Buyer at the Closing and any liabilities or obligations associated with the arrangements specifically established by Buyer and Sellers pursuant to this Section 2.3. Once each Delayed Consent with respect to a Purchased Asset is obtained, the Sellers shall assign, transfer, convey and deliver, or cause to be assigned, transferred, conveyed and delivered, such Purchased Asset to Buyer; provided that no additional consideration shall be paid by Buyer to Sellers for such relevant Purchased Asset.  This Section 2.3 shall not affect Sellers' obligations under Section 8.1.6 or Section 8.1.7 hereof or Buyer's obligations under Section 9.3 hereof.

2.3.2  If (i) an Assumed Real Property Lease is not conveyed to Buyer at Closing, (ii) any Delayed Consent is not received with respect to such Assumed Real Property Lease within 90 days of Closing and (iii) the Parties are not able to reach an Equitable Arrangement with respect to such Assumed Real Property Lease within 90 days of Closing, at Buyer's cost and expense, Seller shall take such actions as may be reasonably requested by Buyer to place Buyer in actual possession and control of any Purchased Assets located at the property subject to such Assumed Real Property Lease.

2.4   Closing.  Subject to the satisfaction or waiver, if permissible, of the conditions set forth in Articles X and XI (other than those conditions that by their nature are to be fulfilled only at the Closing, but subject to the fulfillment or waiver of such conditions), the closing of the Contemplated Transaction (the "Closing") shall take place at the offices of Clifford Chance, New York, New York, no later than ten (10) days after the date that the waiting period, if any, under Title II of the HSR Act applicable to the purchase and sale of the Purchased Assets has terminated or expired (or if that day is not a Business Day, on the next succeeding Business Day), or on such other date as may be agreed upon by Buyer and Sellers (the "Closing Date").

11

# ARTICLE III

## PURCHASE PRICE

3.1   Purchase Price.  The consideration for the Purchased Assets shall be $95,000,000 (the "Base Cash Consideration"), plus the Contingent Consideration Payment, if any, plus the assumption of the Assumed Liabilities (together, the "Consideration"), subject to adjustment after the Closing as provided in Section 3.6 below.  The Base Cash Consideration, less the Escrow Amount (the "Closing Date Cash Consideration"), shall be paid at the Closing to Sellers by wire transfer of immediately available funds to such bank account or accounts as shall be specified in written instructions delivered to Buyer by SBC at least three Business Days prior to the Closing.

3.1.1   Contingent Consideration.  Sellers shall be eligible for a further payment, in addition to the Base Cash Consideration, of $7.5 million (the "Contingent Consideration Payment").  The Contingent Consideration Payment will be payable only if the Operating Profit of the Business exceeds the Base Operating Profit.  As promptly as reasonable practicable after September 30, 2006, but in any event before November 30, 2006, Buyer shall deliver to Sellers a calculation of the Operating Profit showing in reasonable detail the basis therefor (the "Operating Profit Statement").  Buyer shall deliver to Sellers any supporting documentation for the Operating Profit Statement promptly upon request.

3.1.2   Sellers may dispute the calculation of the Operating Profit, but only on the basis that the Operating Profit was not arrived at in accordance with the terms of this Agreement; provided, however, that Sellers shall have notified Buyer in writing of each disputed item, specifying the amount thereof in dispute and setting forth, in reasonable detail, the basis for such dispute, within twenty (20) Business Days following delivery the Operating Profit Statement.  In the event of such dispute, Buyer and Sellers shall attempt to reconcile their differences, and any resolution by them as to any disputed amounts shall be final, binding and conclusive upon Buyer and Sellers.  If Buyer and Sellers are unable to reach a resolution with such effect within twenty (20) days after receipt of such written notice of dispute, Buyer and Sellers shall submit the items remaining in dispute for resolution to an accounting firm independent of Buyer and Sellers mutually acceptable to Buyer and Sellers (the "Independent Accounting Firm"), which shall, within thirty (30) days after such submission, determine and report to Buyer and Sellers upon such remaining disputed items, and such report shall be final, binding and conclusive.  Buyer and Sellers will furnish or cause to be furnished to the Independent Accounting Firm such work papers and other documents and information reasonably relating to the disputed issues as the Independent Accounting Firm may reasonably request and as are reasonably available to that party or its agents and will be afforded the opportunity to present to the Independent Accounting Firm any material relating to the disputed issues and to discuss the issues with the Independent Accounting Firm.  The Independent Accounting Firm shall be authorized to resolve only those items remaining in dispute between Buyer and Sellers, in accordance with the provisions of this Section 3.1.2 within the range of differences between Buyer's position and Seller's position.  The fees and expenses of the Independent Accounting Firm shall be allocated between Buyer and Sellers in the same proportion that the aggregate amount of all such remaining disputed items so submitted to the Independent Accounting Firm that is unsuccessfully disputed by each such party (as finally determined by the Independent Accounting Firm) bears to the total amount of such remaining disputed items so submitted.

3.1.3   The Operating Profit Statement shall be deemed final for purposes of Section 3.1.1 upon the earliest of (i) the failure of Sellers to notify Buyer of a dispute within twenty (20) Business Days following the delivery of the Operating Profit Statement to Sellers,

(ii) the resolution of all disputes, pursuant to Section 3.1.2 by Buyer and Sellers, and (iii) the resolution of all disputes, pursuant to Section 3.1.2, by the Independent Accounting Firm. Within five (5) Business days of the Contingent Consideration Payment being deemed final, such payment shall be made in accordance with written wire instructions provided to Buyer from Sellers.

3.2     Allocation of Purchase Price.    Seventy-two percent of the Consideration shall be allocated to the Purchased Assets of SBC and Mileo Inc. and twenty-eight percent of the Consideration shall be allocated to the Purchased Assets of Mileo LLC. Within a reasonable period of time following Closing, Buyer and Sellers shall agree on the allocation of the Consideration among the Purchased Assets, which allocation shall be consistent with Section 1060 of the Code and the rules and regulations thereunder (the "Tax Allocation"). Except as required by Applicable Law, Buyer and Sellers agree to use the Tax Allocation in filing all required forms under Section 1060 of the Code, and all other Tax Returns. For the avoidance of doubt, the Tax Allocation shall not be made prior to the Closing on account of the Contingent Consideration unless and until such consideration is payable under Section 3.1.1, and if such consideration becomes so payable the parties shall allocate the amount of such consideration solely to goodwill and going concern value. Buyer and Sellers further agree that the payment of the Closing Date Cash Consideration and the Contingent Consideration to Sellers contemplated by Article III may be made to a single Seller that is designated by SBC in writing as being authorized to act as agent for all Sellers, whereupon each Seller shall be deemed to have received the Cash Consideration allocable to the Purchased Assets owned by such Seller in accordance with the allocation determination under this Section 3.2. In connection with the determination of the foregoing Tax Allocation, the parties shall cooperate with each other and provide such information as any of them shall reasonably request. The parties will each report the federal, state and local and other Tax consequences of the purchase and sale contemplated hereby (including the filing of Internal Revenue Service Form 8594) in a manner consistent with the Tax Allocation.

3.3     Transfer Taxes.    Buyer (on the one hand) and Sellers (on the other) each shall bear 50% of the cost of all Taxes (excluding Taxes based on or measured by income, which shall be solely the responsibility of the Sellers) that are or may be imposed by any government or political subdivision thereof and that are payable or arise as a result of this transfer of the Purchased Assets, notwithstanding the Party upon which such Taxes are actually imposed. Buyer and Sellers shall jointly prepare any Tax Returns relating to such Taxes, and the party or parties responsible for filing each such return will file that return. Buyer and Sellers shall cooperate with each other in determining the amount of such Taxes payable and in preparing and filing the applicable Tax Returns. Buyer shall furnish to Sellers properly completed exemption certificates for any Taxes from which Buyer claims to be exempt.

3.4     Proration of Taxes and Certain Charges.    Except as otherwise expressly provided in this Agreement, all real property Taxes, personal property Taxes or similar ad valorem obligations levied with respect to the Purchased Assets for any taxable period that includes the day before the Closing Date and ends on or after the Closing Date, whether imposed or assessed before or after the Closing Date, shall be prorated between Sellers and Buyer as of 12:01 A.M. on the Closing Date. If any Taxes subject to proration are paid by Buyer, on the one hand, or Sellers, on the other hand, the proportionate amount of such Taxes paid (or in the event a refund of any portion of such Taxes previously paid is received, such refund) shall be paid promptly by (or to) the other after the payment of such Taxes (or promptly following the receipt of any such refund). Except as otherwise expressly provided in this Agreement, all installments of special assessments or other charges on or with respect to the Purchased Assets payable by Sellers for any period in which the Closing Date shall occur, including base rent, common area maintenance, royalties, all municipal, utility or authority charges for water, sewer, electric or gas charges, garbage or waste removal, and cost of fuel, shall be apportioned as of the Closing Date and each party shall pay its proportionate share promptly upon the receipt of any bill, statement or other charge with

13

respect thereto. If such charges or rates are assessed either based upon time or for a specified period, such charges or rates shall be prorated as of 12:01 A.M. on the Closing Date. If such charges or rates are assessed based upon usage of utility or similar services, such charges shall be prorated based upon meter readings taken on the Closing Date. Except as otherwise expressly provided in this Agreement, all amounts due or paid pursuant to the terms of the Assumed Contracts, for any period in which the Closing Date shall occur shall be prorated as of 12:01 A.M. on the Closing Date.

3.5    Escrow Agreement.

3.5.1    An amount equal to $10 million (the "Escrow Amount") shall be deposited by wire transfer of immediately available funds with the Escrow Agent, under an escrow agreement to be entered into on the Closing Date by the Escrow Agent, Sellers and Buyer substantially in the form of Exhibit B (the "Escrow Agreement"). The Escrow Fund shall be used for indemnity purposes as set forth in Article XIV, to ensure the retention of Key Employees as described herein and for payment of the Closing Working Capital Adjustment, if any. On the date that is ten (10) days following the end of the Indemnity Period, any remaining amounts in the Escrow Fund not subject to pending claims shall be distributed to the Sellers pursuant to the terms and conditions set forth herein and in the Escrow Agreement and the Shareholder's Representative and Buyer shall direct the Escrow Agent to make such distributions in an instruction letter executed by the Shareholders' Representative and Buyer, which instruction letter shall set forth the amount to be distributed to the Shareholders and the wire instructions with respect to each such payment. The Shareholders' Representative and Buyer shall each instruct the Escrow Agent to, and use commercially reasonable efforts to cause the Escrow Agent to, keep confidential all information relating to this Agreement and the Escrow Agreement; provided that, (a) at the request of the Shareholders' Representative or Buyer such information may be disclosed to the Shareholders' Representative and Buyer, (b) such information may be disclosed as required by Applicable Law and (c) such information may be disclosed in an action or proceeding brought by the Escrow Agent, a Seller, Shareholder or Buyer in pursuit of its rights or in exercise of its remedies under this Agreement or the Escrow Agreement. Each Shareholder agrees and acknowledges that the Shareholder Representative (as defined in the Escrow Agreement) shall have the full power and authority to act on their behalf.

3.5.2    Shareholders' Representative. By executing and delivering this Agreement, each Shareholder hereby irrevocably agrees that the Shareholders' Representative shall be entitled to take any action under Article III and Article XIV of this Agreement without consultation with, notice to, or agreement by, such Shareholder, including the exercise of the power to (i) agree to, negotiate, enter into settlements and compromises of and comply with orders of courts with respect to claims under this Article XIV of this Agreement or the Escrow Agreement, (ii) resolve any claims under this Article XIV of this Agreement or the Escrow Agreement, and (iii) take all actions necessary in the judgment of the Shareholders' Representative for the accomplishment of the foregoing and all of the other terms, conditions and limitations of this Agreement and the Escrow Agreement and the transactions contemplated hereby and thereby. Each Shareholder will be bound by all actions taken by the Shareholders' Representative in connection with this Agreement or the Escrow Agreement and the transactions contemplated hereby and thereby. The Shareholders' Representative will incur no liability to any Shareholder (i) with respect to any action taken or suffered by it in reliance upon any notice, direction, instruction, consent, statement or other document believed by it to be genuine and to have been signed by the proper Person (and shall have no responsibility to determine the authenticity thereof), nor (ii) for any other action or inaction taken pursuant to this Agreement, except for its own willful misconduct or bad faith. In all questions arising under this Agreement or the Escrow Agreement and the transactions contemplated hereby or thereby, the Shareholders' Representative may rely on the

14

advice of counsel, and the Shareholders' Representative will not be liable to any Shareholder for anything done, omitted or suffered in good faith.

3.6    Adjustment to Seller's Consideration.  The Consideration to be paid to Sellers shall be subject to adjustment after Closing Date as follows:

3.6.1    Closing Balance Sheet.

(i)    As soon as practicable, but in no event later than ninety (90) days following the Closing Date (the "Adjustment Target Date"), Buyer shall deliver to Sellers a Closing Balance Sheet of the Business as of the Closing Date ("Closing Balance Sheet") and a reasonably detailed calculation of the Closing Working Capital (the "Working Capital Calculation").  The Closing Balance Sheet shall be audited and prepared in accordance with GAAP and the Matthews Accounting Policies, without giving effect to the Contemplated Transaction.  Buyer shall also deliver to Sellers any supporting documentation for the Closing Balance Sheet and the Working Capital Calculation to the Sellers promptly upon request.

(ii)    Buyer shall grant such access to the Business and Buyer shall make financial personnel of the Business and Buyer available to Sellers and its agents after the Closing Date during reasonable business hours and as shall be reasonably required to verify the Closing Balance Sheet and the Working Capital Calculation.  The cost of preparation of the Closing Balance Sheet and the Closing Working Capital shall be paid by Buyer.

3.6.2    Disputes.

(i)    Subject to clause (ii) of this Section 3.6.2, the Closing Balance Sheet and the calculation of Closing Working Capital delivered by Buyer shall be final, binding and conclusive.

(ii)    Sellers may dispute the Closing Balance Sheet and the Working Capital Calculation, but only on the basis that (A) the amounts reflected on the Closing Balance Sheet and in the Working Capital Calculation were not arrived at in accordance with this Agreement and (B) such nonconformance caused the Closing Working Capital to vary by more than $50,000 from the amount which it would have been after giving effect to the amounts disputed by Sellers; provided, however, that Sellers shall have notified Buyer in writing of each disputed item, specifying the amount thereof in dispute and setting forth, in reasonable detail, the basis for such dispute, within twenty (20) Business Days following delivery of the Closing Balance Sheet and Working Capital Calculation to Sellers.  In the event of such dispute, Buyer and Sellers shall attempt to reconcile their differences, and any resolution by them as to any disputed amounts shall be final, binding and conclusive upon Buyer and Sellers.  If Buyer and Sellers are unable to reach a resolution with such effect within twenty (20) days after receipt of such written notice of dispute, Buyer and Sellers shall submit the items remaining in dispute for resolution to an accounting firm independent of Buyer and Sellers mutually acceptable to Buyer and Sellers (the "Independent Accounting Firm"), which shall, within thirty (30) days after such submission, determine and report to Buyer and Sellers upon such remaining disputed items, and such report shall be final, binding and conclusive.  Buyer and Sellers will furnish or cause to be furnished to the Independent Accounting Firm such work papers and other documents and information reasonably relating to the disputed issues as the Independent Accounting Firm may reasonably request and as are reasonably available to that party or its agents and will be afforded the opportunity to present to the Independent Accounting Firm any material relating to the disputed issues and to discuss the issues with the Independent Accounting Firm.  The Independent

15

Accounting Firm shall be authorized to resolve only those items remaining in dispute between Buyer and Sellers, in accordance with the provisions of this Section 3.6 within the range of differences between Buyer's position and Sellers' position. The fees and expenses of the Independent Accounting Firm shall be (i) allocated between Buyer and Sellers in the same proportion that the aggregate amount of all such remaining disputed items so submitted to the Independent Accounting Firm that is unsuccessfully disputed by each such party (as finally determined by the Independent Accounting Firm) bears to the total amount of such remaining disputed items so submitted.

3.6.3    Adjustment to Sellers Consideration.    The Closing Balance Sheet and the Working Capital Calculation shall be deemed final for purposes of this Section 3.6 upon the earliest of (i) the failure of Sellers to notify Buyer of a dispute within twenty (20) Business Days following the delivery of the Closing Balance Sheet and the Working Capital Calculation to Sellers, (ii) the resolution of all disputes, pursuant to Section 3.6.2(ii), by Buyer and Sellers, and (iii) the resolution of all disputes, pursuant to Section 3.6.2(ii), by the Independent Accounting Firm. Within five (5) Business Days of the Closing Balance Sheet and the Working Capital Calculation being deemed final, an adjustment to the Consideration shall be made as follows:

(i)    If the Closing Working Capital is less than $21,000,000, the difference, up to $2,500,000, shall be paid by wire transfer from the Escrow Fund to an account specified by Buyer.

(ii)    If the Closing Working Capital is equal to or greater than $21,000,000, no adjustment to the Consideration shall be made.

(iii)    Buyer and the Shareholder's Representative shall promptly give a joint written instruction to the Escrow Agent specifying the dollar amounts to be paid from the Escrow Fund as determined under this Section 3.6.3, if any. Any such payment shall be made without regard to the "Qualifying Claim" and "deductible" provided for in Section 14.4.1.

## ARTICLE IV

## ASSUMPTION OF LIABILITIES; EMPLOYEE MATTERS

4.1    General Limitation on Assumption of Liabilities.    Except for Permitted Encumbrances and as otherwise provided in Section 4.2 below, Sellers shall transfer the Purchased Assets to Buyer free and clear of all Encumbrances, and without any assumption of liabilities and obligations, and Buyer shall not, by virtue of its purchase of the Purchased Assets or otherwise, assume or become responsible for any liabilities or obligations of Sellers or any other Person. For purposes of this Section 4.1, the phrase "liabilities and obligations" shall include, without limitation, any direct or indirect indebtedness, guaranty, endorsement, claim, loss, damage, deficiency, cost, expense, obligation or responsibility, fixed or unfixed, known or unknown, asserted or unasserted, choate or inchoate, liquidated or unliquidated, secured or unsecured.

16

4.2    Assumed Liabilities and Obligations.    Subject to the other provisions hereof, at the Closing, Buyer shall assume or accept assignment from Sellers and thereafter pay, perform or discharge the following, and only the following, liabilities and obligations, excluding any liabilities and obligations to Affiliates of Sellers other than as reflected on the Closing Balance Sheet (as finally determined pursuant to Section 3.6.3) (collectively, the "Assumed Liabilities"):

4.2.1    All liabilities, obligations and commitments of Sellers under the Assumed Contracts, to the extent incurred or arising after the Closing (to the extent not arising from a breach of Sellers or their Affiliates before the Closing);

4.2.2    All liabilities, obligations and commitments of Sellers accruing after the Closing Date under the permits and licenses identified in Schedule 2.1.4; provided that Buyer shall not assume or discharge any obligation relating to a breach of the terms of any permit or license (including the failure to procure any required permit or license) that occurred prior to the Closing Date or is caused by the assignment thereof to Buyer at the Closing;

4.2.3    The Payables and Accrued Expenses reflected on the final Closing Balance Sheet (as finally determined pursuant to Section 3.6.3);

4.2.4    All service obligations and all express or implied warranty obligations of Sellers to repair or replace defective goods sold by the Business under the terms of any written contract, commitment or sale transaction entered into in the ordinary course of business relating to products shipped prior to the Closing Date; provided, that such obligations do not exceed $100,000 in the aggregate and provided further, that Buyer assumes no obligation of Sellers for incidental or consequential damages or for any personal injury, or for intellectual property infringement, the sole warranty obligation of Buyer assumed hereunder being the obligation to repair or replace defective goods;

4.2.5    All liabilities, obligations and commitments of any nature or description which arise from or are incurred in connection with the operation of the Business, or the ownership, use or operation of the Purchased Assets, by Buyer or its Affiliates following the Closing; and

4.2.6    All accrued but unpaid salaries, wages, vacation and sick pay, incentive compensation and any other similar current liabilities, obligations and commitments of Seller with respect to the Transferred Employees, each as reflected on the Closing Balance Sheet.

Except for the obligations expressly assumed by Buyer pursuant to the foregoing provisions of this Section 4.2, it is understood and agreed that Buyer does not and will not assume or become obligated to pay or perform with respect to third parties any debts, liabilities, contracts or other obligations of Sellers or their Affiliates, or intercompany liabilities among Sellers and their Affiliates, whether now existing or hereafter arising, for which Sellers or any of their Affiliates is or may become liable however arising, including without limitation obligations arising pursuant to the law of contracts, tort, strict liability or other applicable laws, rules, regulations, or ordinances.  Without limiting the scope of the foregoing, Excluded Liabilities shall include, but are not limited to (i) any Environmental Liabilities and Costs accrued prior to the Closing Date or (ii) any liabilities or obligations of the Sellers or the Business for Taxes accrued prior to the Closing Date.

4.3    Offers of Employment.  The following shall apply with respect to employment matters:

4.3.1    Sellers will use all reasonable efforts to cause the employees employed by Sellers to make available their employment services to Buyer.  For a period of two (2) years from the

17

Closing Date, Sellers and Shareholders will not, and will not permit any of their Affiliates to, solicit, offer to employ or retain the services of or otherwise interfere with the relationship of Buyer with any Person employed by or otherwise engaged to perform services for Buyer in connection with the operation of Business.

4.3.2   Buyer shall offer employment on and as of the Closing Date, on an at-will basis, to the persons named on Schedule 4.3.2, other than the Key Employees, at base wages or salaries which are no less than those presently in effect as described on Schedule 4.3.2. In addition, for a period of twenty-four months after Closing (other than with respect to group health coverage, for which such period shall be the 12 months following the Closing), the welfare, benefit plans, programs and arrangements and salary and wages provided to any Transferred Employee (as defined below) shall be substantially similar in the aggregate to the programs and arrangements and salary and wages applicable to such employee immediately prior to the Closing Date. In determining any Transferred Employee's eligibility to participate in and vesting under Buyer's defined contribution retirement plans, employee welfare and benefit plans, programs and arrangements, and the level of vacation under Buyer's policies, the Transferred Employees will receive full credit, to the extent legally permitted, for all service with Seller prior to the Closing (to the same extent such Transferred Employees received such credit with respect to such plans, programs and arrangements maintained by Seller). For a period of twenty-four months after Closing, each Transferred Employee shall be entitled to not less than three days of sick pay per year. Buyer will provide group health coverage to the Transferred Employees and their dependents without imposing any pre-existing condition exclusions, waiting periods or actively-at-work requirements except to the extent such requirements were applicable to the Transferred Employee or dependent under an applicable group health plan of Seller immediately prior to the Closing Date. Those employees who accept such offers of employment effective as of the Closing Date shall be referred to herein as the "Transferred Employees." Effective as of the Closing Date, Buyer shall assume the liability of Sellers in respect of the Transferred Employees for accrued but unpaid salaries, wages, vacation and sick pay and incentive compensation, but only to the extent such liability is reflected on the Balance Sheet or arose after the Balance Sheet Date in the ordinary course of business, consistent with the prior practice of Sellers. Buyer shall assume no such liability or obligations with respect to employees who are not Transferred Employees and Sellers shall retain, consistent with their normal employment practices, all liabilities and obligations with respect to such employees. Sellers shall remain responsible for payment of any and all employee termination costs, retention, change in control, severance or other similar compensation or benefits which are or may become payable in connection with the consummation Contemplated Transaction.

4.4   Other Employee Benefits.   Sellers agree that, with respect to claims for workers' compensation and all claims under Sellers' employee benefit programs by persons working for the Business arising out of events occurring prior to the Closing, whether reported or unreported as of the Closing and whether insured or uninsured (including, but not limited to, workers' compensation, life insurance, medical and disability programs), Sellers shall, at their own expense, honor or cause its insurance carriers to honor such claims in accordance with the terms and conditions of such programs or applicable workers' compensation statutes. Without limiting the scope of the preceding sentence, Sellers shall be responsible for any and all claims and liabilities arising out of or relating to (i) employment by Sellers of the Employees (other than Transferred Employees as provided in Section 4.3.2), (ii) the termination by Sellers of the employment of any such Employee and (iii) the provision of any employee benefits to such Employees (and their beneficiaries and eligible dependents) attributable to their employment with, or their participation in any plans or programs maintained or contributed to by, Sellers or any of their Affiliates, including, but not limited to, benefits and/or liabilities arising on or before the Closing Date under WARN and/or COBRA which are or may become payable in connection with the

18

consummation of the Contemplated Transaction. By way of amplification of the definition of "Excluded Liabilities," the Sellers shall remain responsible for the payment of all benefits accrued or claims incurred under the terms of the Sellers' or their Affiliates' Plans (as defined by Section 6.18 below) with respect to any employee, former employee or director of Sellers and their Affiliates, including each Transferred Employee. Buyer shall not at any time assume any liability for the benefits of an active, inactive or terminated, vested or retired participant in any of the Sellers' or its Affiliates' Plans.

The terms of Sections 4.3 and 4.4 are an agreement between the Sellers and the Buyer only. Nothing in Sections 4.3 or 4.4, whether express or implied, confers upon any employee of Sellers or Buyer, any Transferred Employee or any other Person any rights or remedies, including, but not limited to, (A) any right of employment or recall, (B) any right to continued employment for any specified period, or (C) any right to claim any particular compensation, benefit or aggregate of the benefits, of any kind or nature whatsoever, as a result of Sections 4.3 and 4.4.

4.5     Employment Taxes.

4.5.1     For tax purposes only, Sellers and Buyer will (i) treat Buyer as a "successor employer" and Sellers as a "predecessor," within the meaning of Sections 3121(a)(1) and 3306(b)(1) of the Code, with respect to Transferred Employees who are employed by Buyer for purposes of Taxes imposed under the United States Federal Unemployment Tax Act ("FICA") or the United States Federal Insurance Contributions Act ("FUTA") and (ii) cooperate with each other to avoid, to the extent possible, the filing of more than one IRS Form W-2 with respect to each such Transferred Employee for the calendar year within which the Closing Date occurs.

4.5.2     At the request of Buyer with respect to any particular applicable Tax law relating to employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care or other similar Tax other than Taxes imposed under FICA and FUTA, Sellers and Buyer will (i) treat Buyer as a successor employer and Sellers as a predecessor employer, within the meaning of the relevant provisions of such Tax law, with respect to Transferred Employees who are employed by Buyer and (ii) cooperate with each other to avoid, to the extent possible, the filing of more than one individual information reporting form pursuant to each such Tax law with respect to each such Transferred Employee for the calendar year within which the Closing Date occurs.

## ARTICLE V

## CLOSING

5.1     Deliveries by Sellers. At the Closing, Sellers shall execute and deliver the following instruments:

5.1.1     Certified resolutions of Sellers approving this Agreement and the Ancillary Agreements and all documents and instruments incident thereto;

5.1.2     Duly executed certificates of Sellers as set forth in Sections 10.3 and 10.4 below;

5.1.3     A duly executed bill of sale in a form reasonably acceptable to Buyer and Sellers (the "Bill of Sale");

5.1.4     A duly executed counterpart of assignment and assumption agreement in a form reasonably acceptable to Buyer and Sellers (the "Assignment and Assumption Agreement").

19

together with all consents of third parties that are required to make each such assignment effective as to such third parties;

    5.1.5   A duly executed counterpart of the Escrow Agreement;

    5.1.6   Certificates of title to all vehicles included in the Purchased Assets with assignments to Buyer;

    5.1.7   Appropriate assignments and transfer documents for the Intellectual Property described on Schedule 2.1.6;

    5.1.8   A duly executed counterpart of the Supply Letter Agreement;

    5.1.9   Duly executed counterparts of the Real Property Leases;

    5.1.10   Appropriate lien releases for all liens and encumbrances on the Purchased Assets, duly executed by Sellers' lenders or other creditors; and

    5.1.11   Such additional instruments of conveyance and transfer as Buyer may reasonably require in order to more effectively vest in it, and put it in possession of, the Purchased Assets in accordance with the provisions of this Agreement.

5.2    _Deliveries by Buyer_. At the Closing, Buyer shall deliver the following to Sellers:

    5.2.1   The Closing Date Cash Consideration, payable in the manner described in Section 3.1;

    5.2.2   A duly executed counterpart of the Assignment and Assumption Agreement;

    5.2.3   Duly executed certificates of Buyer as set forth in Sections 11.3 and 11.4 below;

    5.2.4   A duly executed counterpart of the Escrow Agreement;

    5.2.5   A duly executed counterpart of the Supply Letter Agreement;

    5.2.6   Duly executed counterparts of the Real Estate Leases; and

    5.2.7   Such additional instruments of conveyance and transfer as Sellers may reasonably require in order to more effectively vest in Buyer, and put Buyer in possession of, the Purchased Assets.

    5.3    _Escrow Fund Delivery_. At the Closing, Buyer shall deliver the Escrow Amount to the Escrow Agent.

    5.4    _Delivery of Possession_. Prior to the Closing Date, Sellers shall take such actions as may be necessary or appropriate so that on the Closing Date, Buyer shall be placed in actual possession and control of all of the Purchased Assets.

    4

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF SELLERS AND THE SHAREHOLDERS

Sellers jointly and severally make the following representations and warranties to Buyer, except as otherwise set forth in written disclosure schedules (the "Schedules") delivered to Buyer on or prior to the date hereof, a copy of which is attached hereto:

6.1    Organization, Good Standing and Power.  Each Seller is a legal entity validly existing under the laws of the jurisdiction of its organization and has the requisite organizational power and authority to own or lease and to operate all of its properties and assets and to carry on its business as it is now being conducted and as presently proposed to be conducted. Each Seller is duly qualified or licensed to do business and is in good standing under the laws of each jurisdiction in which the conduct of its business or the character or location of the properties and assets owned, leased or operated by it requires such qualification, except where the failure to be so qualified would not reasonably be expected to have a Material Adverse Effect. Each Seller has the requisite power and authority to execute and deliver this Agreement and the other documents and instruments to be executed and delivered by such Seller pursuant hereto and to perform its obligations hereunder and thereunder.

6.2    Authorization of Agreement and Enforceability.  The execution and delivery by each Seller of this Agreement and the other documents and instruments to be executed and delivered by such Seller pursuant hereto and the performance of each Seller's respective obligations hereunder and thereunder have been duly authorized by all necessary corporate or other action on the part of each Seller. This Agreement has been duly executed and delivered by each Seller and constitutes, and when executed and delivered each of the other documents and instruments to be executed and delivered by a Seller pursuant hereto will constitute, a valid and binding agreement of such Seller enforceable against such Seller in accordance with its terms.

6.3    No Violation; Consents.  The execution, delivery and performance by each Seller of this Agreement and the Ancillary Agreements, and the consummation of the Contemplated Transaction will not (with or without the giving of notice or the lapse of time, or both) (i) violate any provision of the certificate of incorporation, bylaws, certificate of formation, operating agreement or other equivalent organizational document of any Seller, (ii) violate or, except as required by the HSR Act or applicable bulk sales laws, require any consent, authorization or approval of, or exemption by, or filing under any provision of any law, statute, rule or regulation to which any Seller, the Business or the Purchased Assets are subject, (iii) violate any judgment, order, writ or decree of any court applicable to any Seller, the Business or the Purchased Assets, (iv) conflict with, result in a breach of, constitute a default under, or accelerate or permit the acceleration of the performance required by, or require any consent, authorization or approval under any contract, agreement or instrument to which  Seller is a party or any of the Purchased Assets is bound or (v) result in the creation or imposition of any Encumbrance (other than a Permitted Encumbrance) upon the Purchased Assets, which violation, conflict, breach, default, acceleration or Encumbrance, or the failure to make or obtain such filing, consent, authorization or approval, with respect to the matters specified in clauses (ii) through (v) could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

6.4    Financial Statements.  Sellers have delivered to Buyer true and complete copies of (i) the combining balance sheets of SBC and Milso LLC at December 31, 2002, 2003 and 2004 and the related combining statements of operations and shareholders' equity and members' capital for the years then ended, reviewed by Margolin, Miner & Evans LLP, certified public accountants; and (ii) the unreviewed combining balance sheets of SBC and Milso LLC at March 31, 2005 and the related combining statements of operations and shareholders' equity and members' capital for the interim periods then

21

ended. True and correct copies of such financial statements are attached hereto as Schedule 6.4. The foregoing financial statements have been prepared in accordance with GAAP consistently applied throughout the periods involved except as may be noted therein. Such financial statements, including the related notes, fairly present the financial position of the respective entities referred to therein at the dates indicated and the results of operations and cash flows of those entities for the periods indicated. References in this Agreement to the "Balance Sheet" shall mean the combining balance sheets at March 31, 2005 referred to above, and references in this Agreement to the "Balance Sheet Date" shall be deemed to refer to March 31, 2005.

6.5    Accounts Receivable.    All Accounts Receivable as set forth on the Balance Sheet (i) arose only in the ordinary course of business consistent with past practice for goods sold and delivered or services performed and (ii) are or will be valid and collectible in full at the recorded amounts thereof (subject to no defenses, setoffs or counterclaims) in the ordinary course of business (without resort to litigation or assignment to a collection agency), net of any allowance for bad debts reflected on the Balance Sheet.

6.6    Inventory.    The Inventory as set forth on the Balance Sheet was acquired and maintained in accordance with the regular business practices of the Business and, on the Balance Sheet Date, consisted of new and unused items of a quality and quantity useable or saleable in the ordinary course of business consistent with past practice. Raw materials reflected on the Balance Sheet were valued at purchase costs, and work in progress and finished goods reflected on the Balance Sheet were valued at the lower of cost or market value.

6.7    Absence of Certain Changes or Events.    Except in respect of periods after the date of this Agreement for actions required or expressly permitted under this Agreement, since the Balance Sheet Date, in its conduct of the Business, Sellers have not:

6.7.1    amended in any material respect or terminated any Assumed Contract other than in the ordinary course of the Business consistent with past practice;

6.7.2    incurred any damage or destruction by fire, storm, or similar casualty, whether or not covered by insurance, except as would not reasonably be expected to result in a Material Adverse Effect;

6.7.3    waived or released any rights with respect to the Purchased Assets or the Business, except as would not reasonably be expected to result in a Material Adverse Effect;

6.7.4    transferred or granted any rights to any Proprietary Rights, except as would not reasonably be expected to result in a Material Adverse Effect;

6.7.5    entered into any transaction or made any commitments (for capital expenditures or otherwise) other than in the ordinary course of the Business consistent with past practice;

6.7.6    changed their methods of accounting in respect of the Business other than as required by GAAP or Applicable Law;

6.7.7    increased the compensation of Employees, except following normal review procedures or as reasonably deemed necessary in the ordinary course of the Business consistent with past practice; or

22

6.7.8   except for changes required or expressly permitted pursuant to this Agreement or associated with the announcement or implementation of the transactions provided for in this Agreement and except as would not reasonably be expected to result in a Material Adverse Effect, altered their customary course of dealing with suppliers or customers of the Business.

6.8   Title to Properties; Absence of Liens and Encumbrances. Sellers have the power and right to sell, assign, transfer and deliver, as the case may be, to Buyer the Purchased Assets and, at the Closing, Buyer will acquire all of each Seller's right, title and interest in, to and under all of the Purchased Assets (or in the case of any leased or licensed Purchased Asset, each Seller's rights under such leases or licenses), in each case free and clear of any and all Encumbrances other than Permitted Encumbrances.

6.9   Proprietary Rights.

6.9.1   Schedule 2.1.6 sets forth a correct and complete list of all patents, logos, trademarks, trade names, service marks and applications or registrations therefor used in and material to the Business, and Schedule 6.9 sets forth a correct list of all other inventions, intellectual property and trade secret assets used in and material to the Business (collectively, the "Proprietary Rights").

6.9.2   Seller owns or possesses adequate licenses or other valid right to use all the Proprietary Rights. The Proprietary Rights included in the Purchased Assets constitute all such rights necessary to conduct the Business in accordance with past practice and are being conveyed to Buyer together with the other Purchased Assets. To the Knowledge of the Sellers, the validity of the Proprietary Rights and the rights therein of Sellers have not been questioned in any litigation to which either Seller is a party, nor has any such litigation been threatened. To the Knowledge of the Sellers, the conduct of the Business does not materially conflict with patent rights, licenses, trademark rights, trade name rights, copyrights or other intellectual property rights of others.

6.9.3   Seller has no Knowledge of any material infringement of any Proprietary Rights owned or licensed by Seller. No present or former director, officer, employee or consultant of Seller or any Affiliate of Seller has any ownership interest in any of the Proprietary Rights.

6.9.4   All personnel, including employees, agents, consultants, and contractors, who have contributed to or participated in the conception and development of the Proprietary Rights on behalf of Sellers either (1) have been party to a "work-for-hire" arrangement or agreement with the Seller, in accordance with applicable federal and state law, that has accorded a Seller full, effective, exclusive, and original ownership of all tangible and intangible property thereby arising, or (2) have executed appropriate instruments of assignment in favor of a Seller as assignee that have conveyed to Seller full, effective, and exclusive ownership of all tangible and intangible property thereby arising.

6.10   Contracts and Commitments. Other than Contracts that may be entered into following the date hereof without a breach of this Agreement, no Seller is, with respect to the Purchased Assets or the Business, a party to any written or oral:

6.10.1   agreement, contract or commitment for the future purchase of, or payment for, supplies or products, or for the performance of services by another party, involving in any one case $75,000 or more;

23

6.10.2   agreement, contract or commitment to sell or supply products or to perform services, involving in any one case $75,000 or more;

6.10.3   agreement, contract or commitment continuing over a period of more than six months from the date hereof that exceeds $75,000 in value;

6.10.4   representative, sales agency, dealer or distributor agreement, contract or commitment;

6.10.5   note, debenture, bond, conditional sale agreement, equipment trust agreement, letter of credit agreement, loan agreement or other contract or commitment for the borrowing or lending of money (including without limitation loans to or from employees) or guarantee, pledge or undertaking of the indebtedness of any other Person;

6.10.6   agreement, contract or commitment for any charitable or political contribution;

6.10.7   agreement, contract or commitment limiting or restraining Seller or any successor or assign from engaging or competing in any lines of business with any Person;

6.10.8   license, franchise, distributorship or other agreement, including those that relate in whole or in part to any patent, trademark, trade name, service mark or copyright or to any ideas, technical assistance or other know-how of or used by the Business; or

6.10.9   any other material agreement, contract or commitment not made in the ordinary course of business.

Except for those that have terminated in accordance with their terms or have been terminated without a breach of this Agreement, each of the agreements, contracts, commitments, leases and other instruments, documents and undertakings listed on Schedule 2.1.2A is in full force and effect and constitute valid and binding agreements of the Sellers party thereto, enforceable in accordance with their respective terms against such Seller, and to the Knowledge of Sellers, the other parties thereto. No consent or approval of any party to any agreement, contract, commitment, lease or other instrument, document or undertaking listed on Schedule 2.1.2A is required for the execution of this Agreement or the consummation of the Contemplated Transaction. No Seller or, to the Knowledge of Sellers, any other party to any agreement, contract, commitment, lease or other instrument, document or undertaking listed on Schedule 2.1.2A is in violation or breach of, or in default under, nor has there occurred any other event or condition that with the passage of time or giving of notice (or both) would constitute a default under, or permit the termination of, any of the same, except in any case referred to in this sentence as would not reasonably be expected to have a Material Adverse Effect.

6.11   Permits, Licenses.   Seller has all material permits, licenses, registrations, orders and approvals of federal, state or local government or regulatory bodies that are required to operate the Business (including without limitation those required under any Environmental Law) (collectively, the "Permits") and Seller is in compliance with the material terms and conditions of the Permits, except as would not reasonably be expected to have a Material Adverse Effect. Schedule 2.1.4 hereto sets forth a correct and complete list of all material Permits, each one of which is in full force and effect. To Sellers' Knowledge, no suspension or cancellation of any of the Permits has been threatened and no cause exists for such suspension or cancellation. Any Permits that cannot be transferred are identified as such on Schedule 2.1.4 hereto.

24

6.12    Compliance with Laws. Seller has at all times conducted, and is presently conducting, the Business so as to comply with all laws, ordinances and regulations applicable to the conduct or operation of the Business or the ownership or use of the Purchased Assets, in each case except where the failure to comply would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. This Section 6.12 does not apply to environmental matters, employee benefits and ERISA-related matters, labor law matters or tax matters, which are covered exclusively by, respectively, Sections 6.23, 6.18, 6.17 and 6.33.

6.13    Legal Proceedings. There is no claim, action, suit, proceeding, investigation or inquiry pending before any federal, state or other court or governmental or administrative agency or to the Knowledge of Sellers threatened against the Business or any of the Purchased Assets, or relating to the Contemplated Transaction that would reasonably be expected to have a Material Adverse Effect. No Seller is a party to or subject to the provisions of any judgment, order, writ, injunction, decree or award of any court, arbitrator or governmental, regulatory or administrative official, body or authority that relates to the Purchased Assets or the Business or that might affect the Contemplated Transaction and that reasonably would be expected to have a Material Adverse Effect.

6.14    Absence of Undisclosed Liabilities. Sellers have no liabilities or obligations (as defined in Section 4.1) relating to the Business and that will be Assumed Liabilities except (i) those liabilities and obligations set forth on the Balance Sheet and not subsequently paid or discharged; (ii) those liabilities and obligations arising in the ordinary course of business consistent with past practice under any agreement, contract or commitment specifically disclosed on Schedule 2.1.2A hereto; and (iii) those liabilities and obligations incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date.

6.15    Books and Records. All material books of account and other financial records of Sellers relating to the Business (the "Books and Records") are complete and correct in all material respects and have been made available to Buyer.

6.16    Employees. Schedule 6.16 sets forth a true and correct list of all individuals employed by Sellers in the conduct of the Business and their present position, rate of compensation and incentive pay, date of hire and current employment status.

6.17    Labor Matters, etc. No Seller is a party to or bound by any collective bargaining agreement and there are no labor unions or other organizations representing, purporting to represent or attempting to represent any employees employed by a Seller. Since December 31, 2004 there has not occurred or, to the Knowledge of Sellers, been threatened any material strike, slowdown, picketing, work stoppage, concerted refusal to work overtime or other similar labor activity with respect to any employees employed by a Seller. There are no material labor disputes currently subject to any grievance procedure, arbitration or litigation and there is no trade union representation petition pending with respect to the Transferred Employees. Seller has complied with all provisions of Applicable Law pertaining to the employment of the Transferred Employees, including, without limitation, all such laws relating to labor relations, equal employment, fair employment practices, entitlements, prohibited discrimination or other similar employment practices or acts, except for any failure so to comply that, individually or together with all such other failures, has not and will not result in a material liability or obligation on the part of Buyer, and has not had or resulted in, and will not have or result in, a Material Adverse Effect.

6.18    Employee Benefit Plans and Related Matters.

6.18.1    Employee Benefit Plans. Schedule 6.18 sets forth a true and complete list of each "employee benefit plan" as such term is defined in section 3(3) of the ERISA, whether or

25

not subject to ERISA, and each bonus, incentive or deferred compensation, severance, termination, retention, change of control, stock option, stock appreciation, stock purchase, phantom stock or other equity-based, performance or other employee or retiree benefit or compensation plan, program, arrangement, agreement, policy or understanding, whether written or unwritten, that provides or may provide benefits or compensation in respect of any employee or former employee employed or formerly employed by Seller or the beneficiaries or dependents of any such employee or former employee (such employees, former employees, beneficiaries and dependents collectively, the "Employees") or under which any Employee is or may become eligible to participate or derive a benefit and that is or has been maintained or established by Seller or any other trade or business, whether or not incorporated, which, together with Seller is or would have been at any date of determination occurring within the preceding six years treated as a single employer under Section 414 of the Code (such other trades and business collectively, the "Related Persons"), or to which Seller or any Related Person contributes or is or has been obligated or required to contribute or with respect to which Seller may have any liability or obligation (collectively, the "Plans"). With respect to each such Plan, Seller has provided Buyer complete and correct copies of: all written Plans; descriptions of all unwritten Plans; the most recent Forms 5500 and all schedules thereto; the most recent IRS determination letter; current summary plan descriptions; statements or other communications regarding withdrawal or other multiemployer plan liabilities, if any; and all amendments and modifications to any such document.

6.18.2 Qualification. Each Plan intended to be qualified under section 401(a) of the Code, and the trust (if any) forming a part thereof, has received a favorable determination letter from the IRS as to its qualification under the Code and to the effect that each such trust is exempt from taxation under section 501(a) of the Code, and nothing to the Knowledge of Sellers has occurred since the date of such determination letter that could adversely affect such qualification or tax-exempt status.

6.18.3 Compliance; Liability.

(i)    No liability has been or is expected to be incurred by Seller or any Related Person (either directly or indirectly, including as a result of an indemnification obligation) under or pursuant to Title I or IV of ERISA or the penalty, excise tax or joint and several liability provisions of the Code relating to employee benefit plans that could, following the Closing, become a liability of Buyer or of any employee benefit plan established or contributed to by Buyer and, to the best knowledge of Seller after due inquiry, no event, transaction or condition has occurred or exists that could result in any such liability to Seller or, following the Closing, Buyer.

(ii)    To the Knowledge of Sellers, each of the Plans has been operated and administered in all respects in compliance with all Applicable Laws, except for any failure so to comply that, individually or together with all other such failures, has not and will not result in a material liability or obligation on the part of Seller, or, following the Closing, Buyer, and has not had or resulted in, and will not have or result in, a Material Adverse Effect.

(iii)    No Plan is a "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA or is a "multiple employer plan" within the meaning of section 4063 or 4064 of ERISA.

(iv)    No Transferred Employee is or may become entitled to post-employment benefits of any kind by reason of employment by Seller, including, without limitation, death or

medical benefits (whether or not insured), other than (a) coverage provided pursuant to the terms of any Plan specifically identified as providing such coverage in Schedule 6.18 or mandated by section 4980B of the Code, (b) retirement benefits payable under any Plan qualified under section 401(a) of the Code or (c) deferred compensation accrued as a liability on the Balance Sheets or incurred after December 31, 2003 in the ordinary course of business consistent with the prior practice of Seller, pursuant to the terms of a Plan.

6.19    No Finder.  With the exception of fees payable to UBS Investment Bank which will be paid by Sellers, no Seller has taken any action that would give to any Person a right to a finder's fee or any type of brokerage commission in relation to, or in connection with, the transactions contemplated by this Agreement.

6.20    Interest in Business.  Seller has not granted, and there is not outstanding, any option, right, agreement or other obligation pursuant to which any Person could claim a right to acquire in any way all or any part of, or interest in, the Business or the Purchased Assets.

6.21    Condition of Assets.  All tangible assets and properties which are part of the Purchased Assets are in good operating condition and repair and are usable in the ordinary course of the Business consistent with past practice and conform in all material respects to all applicable laws and regulations relating to their construction, use and operation.

6.22    Affiliate Transactions; Loans.  Schedule 6.22 hereto sets forth a summary of all purchases of goods or services by Affiliates of Seller for the three years ended December 31, 2004, 2003 and 2002.  Except as set forth in Schedule 6.22 hereto, Seller and its Affiliates provide no services or products to the Business.  All amounts due and owing to the Sellers from Shareholders or Affiliates have been or will be satisfied or released prior to Closing.

6.23    Environmental Matters.

6.23.1    Permits.  All Environmental Permits are identified in Schedule 6.23.1, and Sellers currently hold such Environmental Permits as are necessary to conduct the Business.  No Seller has been notified by any relevant Governmental Authority that any material Environmental Permit will be modified, suspended, cancelled or revoked, or cannot be renewed in the ordinary course of business without any material change in any of the terms or conditions.

6.23.2    No Violations; Releases.  Sellers have complied and are in compliance in all material respects with all Environmental Permits and all applicable Environmental Laws.  To the Knowledge of Sellers, during the last five years there has not been a Release to the Environment of any Hazardous Substance at, upon, in, from or under (i) any of the real property subject to the Assumed Real Property Leases or the Real Property Leases or (ii) at any location to or from which a Seller has transported or arranged for the transportation of Hazardous Substances.

6.23.3    Other.

(i)    To Sellers' Knowledge, none of the current or past operations, or any by-product thereof, and none of the currently or formerly owned property or assets of Seller, including without limitation the Assets and the Real Property, is related to or subject to any investigation or evaluation by any Governmental Authority, as to whether any Remedial Action is needed to respond to a Release or threatened Release of any Hazardous Substances.

27

(ii)    No Seller is subject to any outstanding order, judgment, injunction, decree or writ from, or contractual or other obligation to or with, any Governmental Authority or other Person in respect of which Buyer will be required by reason of the completion of the Contemplated Transaction to incur any Environmental Liabilities and Costs arising from the Release or threatened Release of a Hazardous Substance.

(iii)    No Seller has transported or arranged for transportation (directly or indirectly) of any Hazardous Substances relating to the Purchased Assets or the Real Property to any location that is, listed or proposed for listing under CERCLA, or on any similar state list, or the subject of federal, state or local enforcement actions or investigations or Remedial Action.

(iv)    No work, repair, construction or capital expenditure is required or planned in respect of the Real Property pursuant to or to comply with any Environmental Law, nor has either Seller received any notice from any Governmental Authority of any such requirement, except for such work, repair, construction or capital expenditure as is not material to the ordinary course of business.

(v)    There are no Hazardous Substances or underground storage tanks in, on, or under any real property owned or leased by the Sellers as of the date hereof, except those that are in compliance with all applicable Environmental Laws and Environmental Permits.

(vi)    To the Knowledge of the Sellers, there has been no Release of Hazardous Substances for which Sellers could have any liability under any applicable Environmental Law at any of the Real Property.

6.23.4    Full Disclosure.  Sellers have disclosed and made available to Buyer all studies, analyses and test results in the possession, custody or control of Sellers relating to (i) the environmental conditions on, under or about the Real Property, and (ii) Hazardous Substances used, managed, handled, transported, treated, generated, stored or Released by Seller or any other Person at any time on any Real Property.

6.24    Sufficiency of Assets.  Except for the Excluded Assets, the Purchased Assets constitute all assets that are owned, leased or licensed by Sellers and primarily used or held for use in the Business as currently conducted.

6.25    Territorial Restrictions.    No Seller is restricted by any written agreement or understanding with any other Person from carrying on its business anywhere in the world. Buyer, solely as a result of its purchase of the Purchased Assets from Seller pursuant hereto and the assumption of the Assumed Liabilities, will not thereby become restricted in carrying on any business anywhere in the world.

6.26    Leased Property.  Schedule 6.26 contains a complete and correct list of (i)(A) all real property owned by Sellers or Shareholders or any of their Affiliates which is leased to the Business or is used or useful to the Business and (B) each other lease for real property which is leased in connection with the Business, and in the case of each of (A) and (B) above setting forth the address, landlord, tenant and rental rate for each such lease and (ii) each of the Other Leases, setting forth the address, landlord, tenant and rental rate for each Other Lease. All written and oral leases described in subsections (i)(A) and (B) above are referred to herein as "Leases" and the property with respect thereto is referred to herein as "Leased Property." Sellers have made available to Buyer true and complete copies of all of the Leases and Other Leases. Sellers enjoy peaceful and undisturbed possession under their respective Leases for the Leased Property.  There are no eminent domain or other similar proceedings pending or, to the

NYA 730432.9

Knowledge of Sellers, threatened affecting any portion of the Brooklyn Properties or the Richmond, Indiana manufacturing facility. To the Knowledge of Sellers, there are no eminent domain or other similar proceedings pending or threatened affecting any material portion of the Leased Property.

6.27    Suppliers; Raw Materials. Each contract, agreement or arrangement with a supplier with an aggregate purchase requirement of $500,000 or more during a twelve-month period is terminable, without penalty or cancellation charge, on no more than sixty (60) days notice.

6.28    Reserved.

6.29    Product Warranties. Except as set forth in Schedule 6.29 and for warranties under applicable law, (a) there are no warranties express or implied, written or oral, with respect to the Products presently sold in the Business and (b) there are no pending or threatened claims with respect to any such warranty, and Seller has no liability with respect to any such warranty, whether known or unknown, absolute, accrued, contingent or otherwise and whether due or to become due.

6.30    Absence of Certain Business Practices. No Seller, any officer, employee or agent of Sellers, nor any other person acting on their behalf, has, directly or indirectly, within the past five years given or agreed to give any gift or similar benefit to any customer, supplier, governmental employee or other person who is or may be in a position to help or hinder Sellers (i) which subjected or might have subjected Sellers to any damage or penalty in any civil, criminal or governmental litigation or proceeding, (ii) which if not given in the past, might have had a Material Adverse Effect, (iii) which if not continued in the future, might have a Material Adverse Effect or subject Sellers to suit or penalty in any private or governmental litigation or proceeding, (iv) for any of the purposes described in Section 162(c) of the Code or (v) for the purpose of establishing or maintaining any concealed fund or concealed bank account.

6.31    Taxes.

6.31.1    Sellers have (or by the Closing will have) duly and timely filed all Tax Returns with respect to Taxes described in the next sentence required to be filed on or before the Closing

*The remainder of this page is intentionally left blank.*

29

Date ("Tax Returns"). Sellers have (or by the Closing Date will have) paid all material Taxes that, if unpaid, would become payable by Buyer or chargeable as a lien upon the Purchased Assets (such material Taxes, "Applicable Taxes"). All material Taxes required to be withheld by or on behalf of Seller in connection with amounts paid or owing to any employee, independent contractor, creditor or other party (such material taxes, "Withholding Taxes") have been withheld, and such withheld taxes have either been duly and timely paid to the proper Governmental Authorities or set aside in accounts for such purpose.

6.31.2  There are no Applicable Taxes or Withholding Taxes asserted in writing, or to the Knowledge of Sellers threatened to be asserted, by any Governmental Authority to be due. No issue has been raised in writing by any Governmental Authority in the course of any audit with respect to Applicable Taxes or Withholding Taxes that have not been paid. No Applicable Taxes or Withholding Taxes are currently under audit by any Governmental Authority.

6.31.3  Buyer will not be required to deduct and withhold any amount pursuant to Section 1445(a) of the Code upon the transfer of the Purchased Assets to Buyer.

6.31.4  There is no litigation or administrative appeal pending or, to the Knowledge of Seller, threatened against or relating to Seller in connection with any Applicable Taxes.

6.32  Thomas Pontone.  Buyer has received a true and correct copy of all release and settlement documents related to the equity or other interests held by or for the benefit of Thomas Pontone in any of the Sellers (the "TP Settlement Documents").

## ARTICLE VII

## REPRESENTATIONS AND WARRANTIES OF BUYER

To induce Sellers to enter into this Agreement, Buyer hereby makes, as of the date hereof and as of the Closing Date, the following representations and warranties to Sellers:

7.1  Organization, Good Standing, Power.  Buyer is a Delaware corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation and has all requisite corporate power and authority to own and lease all of its properties and assets and to carry on its business as it is now being conducted and as presently proposed to be conducted and to execute and deliver this Agreement and the Ancillary Agreements to which Buyer is a party, to consummate the Contemplated Transaction and to perform all the terms and conditions hereof and thereof to be performed by it.

7.2  Authorization of Agreement and Enforceability.  Buyer has taken all necessary corporate action to authorize the execution and delivery of this Agreement and the Ancillary Agreements to which Buyer is a party, the performance by it of all terms and conditions hereof and thereof to be performed by it and the consummation of the Contemplated Transaction. This Agreement constitutes, and the Ancillary Agreements, upon Buyer's execution and delivery thereof, will constitute, the legal, valid and binding obligations of Buyer, enforceable in accordance with their terms.

7.3  No Violations; Consents.  The execution, delivery and performance by Buyer of this Agreement and the Ancillary Agreements to which Buyer is a party and the consummation of the Contemplated Transaction and the transactions contemplated thereby will not (with or without the giving of notice or the lapse of time, or both) (i) violate any provision of the charter or bylaws of Buyer, (ii) violate, or, except as required by the HSR Act or applicable bulk sales law, require any consent,

NYA 730432.9

authorization or approval of, or exemption by, or filing under any provision of any law, statute, rule or regulation to which Buyer is subject, (iii) violate any judgment, order, writ or decree of any court applicable to Buyer, (iv) conflict with, result in a breach of, constitute a default under, or accelerate or permit the acceleration of the performance required by, or require any consent, authorization or approval under any contract, agreement or instrument to which Buyer is a party or any of its assets is bound or (v) result in the creation or imposition of any Encumbrance upon its assets, which violation, conflict, breach, default, acceleration or Encumbrance, or the failure to make or obtain such filing, consent, authorization or approval, with respect to the matters specified in clauses (ii) through (v) could, individually or in the aggregate, reasonably be expected to have a material adverse effect on Buyer or prevent or delay the consummation of the Contemplated Transaction.

7.4     Legal Proceedings. There is no claim, action, suit, proceeding, investigation or inquiry pending before any Governmental Authority or administrative agency or threatened against Buyer or any of Buyer's properties, assets, operations or businesses that might prevent or delay the consummation of the Contemplated Transaction.

7.5     Availability of Funds. Buyer currently has sufficient immediately available funds and will have at the Closing sufficient immediately available funds to pay the Base Cash Consideration. Buyer will have sufficient immediately available funds to pay the Contingent Consideration Payments at the time such payments may be required to be made.

7.6     No Finder. Buyer has not taken any action which would give to any Person a right to a finder's fee or any type of brokerage commission in relation to, or in connection with, the Contemplated Transaction.

## ARTICLE VIII

## COVENANTS OF SELLERS PRIOR TO CLOSING DATE

8.1     Required Actions. Between the date of this Agreement and the Closing Date, Sellers and Shareholders covenant that they will, in their conduct of the Business, except as otherwise agreed by Buyer in writing:

8.1.1     Access to Information. Subject to Applicable Laws, give to Buyer and its counsel, accountants, consultants and other representatives, at their sole expense and risk, reasonable access, during normal business hours, to such of the properties, books, accounts, contracts and records of Sellers as are relevant to the Purchased Assets and the Business, and furnish or otherwise make available to Buyer all such information concerning the Purchased Assets and the Business as Buyer may reasonably request, provided, however, that Buyer's inspection of Sellers' properties shall not include any environmental sampling of any kind without Sellers' prior written consent, and provided further that the confidentiality of any data or information so acquired shall be maintained as confidential by Buyer and its representatives in accordance with Section 9.1.1 and the Confidentiality Agreement.

8.1.2     Conduct of Business. Except as set forth on Schedule 8.1.2, or as otherwise contemplated by this Agreement, operate the Business only in the usual, regular and ordinary manner as such Business was conducted prior to the date hereof and, to the extent consistent with such operation, use its commercially reasonable efforts until the Closing Date to (i) preserve and keep intact the Business, (ii) keep available the services of the Key Employees, (iii) preserve its relationships with customers, suppliers and others having material business dealings with a Seller

31

in connection with the Business and (iv) not accelerate the payment of accounts receivable or liquidate inventory other than in the normal and ordinary course of business.

8.1.3    Maintenance of Properties. Maintain the Purchased Assets, whether owned or leased, in good repair, order and condition, in accordance with manufacturers' instructions and Sellers' past practices, reasonable wear and tear excepted, other than as would not reasonably be expected to have a Material Adverse Effect.

8.1.4    Maintenance of Books and Records. Maintain the Books and Records in the usual, regular and ordinary manner, on a basis consistent with past practice.

8.1.5    Compliance with Applicable Law. Comply in all material respects with all Applicable Laws to which the Purchased Assets or the Business are subject, other than as would not reasonably be expected to have a Material Adverse Effect.

8.1.6    Approvals; Consents. Subject to the terms and conditions provided in this Agreement, as promptly as practicable, (i) make all filings and submissions under the HSR Act, (ii) use commercially reasonable efforts to cooperate with Buyer in (x) determining which filings are required to be made prior to the Closing Date with, and which material consents, approvals, permits or authorizations are required to be obtained prior to the Closing Date from, any Governmental Authority in connection with the execution and delivery of this Agreement and the consummation of the Contemplated Transaction and (y) timely making all such filings and timely seeking all such material consents, approvals, permits or authorizations, and (iii) use commercially reasonable efforts to take, or cause to be taken, all other action and do, or cause to be done, all other things reasonably necessary or appropriate with respect to any Governmental Authority to consummate the Contemplated Transaction as soon as practicable. In connection with the foregoing, to the extent permitted by Applicable Law, Sellers will promptly provide to Buyer, copies of all correspondence, filings or communications (or memoranda setting forth the substance thereof) between such party or any of its representatives, on the one hand, and any Governmental Authority or members of its staff, on the other hand, with respect to all filings and submissions required under this Agreement. Upon the terms and subject to the conditions of this Agreement, Sellers shall use their commercially reasonable efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable consistent with Applicable Law to cause the conditions precedent to the Closing to be satisfied and to cause the Closing to occur on or prior to the Termination Date and to otherwise consummate the Contemplated Transaction in accordance with the terms of this Agreement.

8.1.7    Leased Property Consents. Use commercially reasonable efforts to secure all necessary consents from Sellers' landlords for the assignment of all Leased Property to Buyer (each, a "Lease Consent"); provided, that Seller shall not be required to incur any material expense or make any material concessions in connection therewith.

8.1.8    Notice of Material Damage. Give to Buyer prompt written notice of any damage by fire or other casualty upon the Purchased Assets or the Business that would reasonably be expected to have a Material Adverse Effect.

8.1.9    Advise of Changes. Give prompt notice to Buyer of (i) the occurrence, or failure to occur, of any event which occurrence or failure would be likely to cause any representation or warranty of Sellers contained in this Agreement to be untrue or inaccurate in any material respect and (ii) any material failure of Sellers to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder; provided, however, that such

32

disclosure shall not be deemed to cure any breach of a representation, warranty, covenant or agreement or to satisfy any condition. Sellers shall promptly notify Buyer of any development that occurs before the Closing that would reasonably be expected to have a Material Adverse Effect.

8.1.10 Termination; WARN Act. Terminate the employment of all Transferred Employees as of the Closing Date. With respect to such termination of the Transferred Employees, comply, at its sole cost and expense, with the provisions of the Worker Adjustment and Retraining Notification Act, 29 U.S.C. Sections 2101 et seq., to the extent applicable to such terminations (but not to any subsequent terminations).

8.1.11 Transaction Fees. All Shareholders and Sellers costs and expenses related to the transaction proposed hereby (including all costs, expenses and fees of UBS Investment, counsel and accountants to the Sellers and the Shareholders) that have not either been paid or accrued as a liability in the Seller financial statements dated March 31, 2005, shall be paid or payable from the Base Cash Consideration and not by the Business.

8.1.12 Union Matters. The Sellers shall keep the Buyer informed concerning any current labor negotiations. This shall include disclosure of the current bid and ask amounts with respect to such union negotiations. The Sellers shall not enter into any new or amended collective bargaining agreement with regard to the Business without the written consent of the Buyer.

8.2 Prohibited Actions. Except as set forth on Schedule 8.2 or as otherwise contemplated by this Agreement, between the date of this Agreement and the Closing Date, in their conduct of the Business, Sellers and Shareholders shall not, except as otherwise agreed by Buyer in writing:

8.2.1 Sale of Purchased Assets. Sell, transfer, assign, lease, encumber or otherwise dispose of any of the Purchased Assets other than in the ordinary course of the Business consistent with past practices;

8.2.2 Business Changes. Change in any material respect the character of the Business;

8.2.3 Incurrence of Material Obligations. Incur any material fixed or contingent obligation or enter into any material agreement, commitment or other transaction or arrangement that is not in the ordinary course of the Business consistent with past practices;

8.2.4 Incurrence of Liens. Subject to lien, security interest or any other Encumbrance, other than Permitted Encumbrances or Encumbrances that will be released at or prior to the Closing, any of the Purchased Assets;

8.2.5 Change in Employee Compensation and Benefits. Increase the rate of compensation paid, or pay any bonus, to anyone connected with the Business, except for those increases or bonuses planned, in the ordinary course of business consistent with past practices, or amend, modify, establish or adopt any collective bargaining agreement, pension or profit-sharing plan, deferred compensation agreement or employee benefit arrangement of any kind whatsoever covering or affecting Sellers' Employees or workforce;

8.2.6 Publicity; Advertisement. Except as required by law, publicize, advertise or announce to any third party, except as required pursuant to this Agreement to obtain the consent

33

of such third party, the entering into of this Agreement, the terms of this Agreement or the Contemplated Transaction;

8.2.7    No Release.   Except in the ordinary course of the Business consistent with past practice, cancel, release or relinquish any material debts of or claims against others held by Sellers with respect to the Business or waive any material rights relating to the Business;

8.2.8    No Termination or Modification.   Terminate or materially modify any Assumed Contract or other agreement affecting the Business or the Purchased Assets or the operation thereof except in the ordinary course of business; or

8.2.9    Confidentiality.   Not publish or disclose and not authorize or permit any of their respective officers, employees, directors, agents or representatives or any third party to publish or disclose any trade secrets, data, business or financial books, records or other information of or pertaining to Buyer, which have been furnished to Sellers or Shareholders by Buyer or to which Sellers or Shareholders, or any of their officers, employees, directors, agents, attorneys or accountants, or any financial institution have had access during any investigation made in connection with this Agreement and which is not otherwise available to Sellers or Shareholders, except as required by law.

8.3    No Merger, Etc.   Sellers shall not directly or indirectly, (a) solicit any inquiries or proposals or enter into or continue any discussions, negotiations or agreements relating to (i) the sale or exchange of Sellers' capital stock, (ii) the merger of any Seller with, or the direct or indirect disposition of a significant amount of the Purchased Assets or the Business to, any Person other than Buyer or (iii) the licensing of Sellers' Proprietary Rights to any Person other than in the ordinary course of business consistent with past practice or (b) provide any assistance or any information to or otherwise cooperate with any Person in connection with any such inquiry, proposal or transaction. Sellers hereby represent that neither Sellers nor any of their Affiliates is now engaged in discussions or negotiations with any party other than Buyer with respect to any transaction of the kind described in clauses (a)(i) through (a)(iii) of the preceding sentence (a "Proposed Acquisition Transaction"). Sellers agree not to, and to cause each of its Affiliates not to, release any third party from, or waive any provision of, any confidentiality or standstill agreement to which any of them is a party. Sellers shall immediately notify Buyer (orally and in writing) if any offer is made, any discussions or negotiations are sought to be initiated, any inquiry, proposal or contact is made or any information is requested with respect to any Proposed Acquisition Transaction.

8.4    TP Settlement Documents.   None of the Sellers or the Shareholders shall amend, modify or terminate the TP Settlement Documents, before the Closing, without the prior written consent of Buyer, which consent shall not be unreasonably withheld.

## ARTICLE IX

## COVENANTS OF BUYER PRIOR TO CLOSING DATE

9.1    Required Actions.   Between the date of this Agreement and the Closing Date, Buyer shall, except as otherwise agreed by SBC in writing:

9.1.1    Confidentiality.   Not publish or disclose and not authorize or permit any of its officers, employees, directors, agents or representatives or any third party to publish or disclose any trade secrets or other Confidential Information or any data or business or financial books, records or other information of or pertaining to Sellers, which have been furnished to Buyer by

Sellers or to which Buyer, or any of its officers, employees, directors, agents, attorneys or accountants, or any financial institution have had access during any investigation made in connection with this Agreement and which is not otherwise available to Buyer, except as required by law;

      9.1.2   Advise of Changes. Advise Sellers promptly in writing of any fact that, if known at the Closing Date, would have been required to be set forth or disclosed in or pursuant to this Agreement, or which would result in the breach in any material respect by Buyer of any of its representations, warranties, covenants or agreements hereunder; and

      9.1.3   Compliance with Agreement. Not undertake any course of action inconsistent with satisfaction of the conditions applicable to it set forth in this Agreement, and do all such acts and take all such measures as may be reasonably necessary to comply with the representations, agreements, conditions and other provisions of this Agreement.

      9.1.4   Publicity; Advertisement. Except as required by law, or as provided by this Agreement, not publicize, advertise or announce to any third party the entering into of this Agreement, the terms of this Agreement or the transactions contemplated hereby.

   9.2   Investigation. Prior to the Closing, Buyer shall use reasonable efforts to conduct its investigation of the Business in such a manner as to prevent disruption of relations with the employees, customers and suppliers of Sellers.

   9.3   Approvals, Consents. Subject to the terms and conditions provided in this Agreement, as promptly as practicable, Buyer shall (i) make all filings and submissions under the HSR Act, (ii) use commercially reasonable efforts to cooperate with each other in (x) determining which filings are required to be made prior to the Closing Date with, and which material consents, approvals, permits or authorizations are required to be obtained prior to the Closing Date from, any Governmental Authority in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby and (y) timely making all such filings and timely seeking all such material consents, approvals, permits or authorizations, and (iii) use commercially reasonable efforts to take, or cause to be taken, all other action and do, or cause to be done, all other things reasonably necessary or appropriate with respect to any Governmental Authority to consummate the Contemplated Transaction as soon as practicable. In connection with the foregoing, Buyer will promptly provide to Sellers, copies of all correspondence, filings or communications (or memoranda setting forth the substance thereof) between such party or any of its representatives, on the one hand, and any Governmental Authority or members of its staff, on the other hand, with respect to all filings and submissions required under this Agreement. Upon the terms and subject to the conditions of this Agreement, Buyer shall use its commercially reasonable efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable consistent with Applicable Law to cause the conditions precedent to the Closing to be satisfied and to cause the Closing to occur on or prior to the Termination Date and to otherwise consummate the Contemplated Transaction in accordance with the terms of this Agreement.

   9.4   Access to Information. From and after the Closing Date, Buyer shall give Sellers and Sellers' representatives and agents reasonable access during normal business hours to the books and records pertaining to the Excluded Assets and Excluded Liabilities and, to the extent that Sellers retain any liabilities or obligations with respect to such items, the Purchased Assets or Assumed Liabilities. Buyer shall, and shall cause each of it Affiliates to, cooperate with Sellers as may reasonably be requested by Sellers for such purposes.

## ARTICLE X

## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER

The obligations of Buyer hereunder are subject to the fulfillment at or prior to the Closing of each of the following conditions:

10.1    Accuracy of Representations and Warranties. Other than as would not have a Material Adverse Effect, the representations and warranties of Sellers contained in this Agreement (without regard to any materiality or Knowledge qualifier contained in any such representation or warranty) shall have been true on the date hereof and shall be true on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date (except for changes permitted or contemplated by this Agreement and except that the representations and warranties that were made as of a specific date need be true and correct only as of such date).

10.2    Performance of Agreement. Sellers shall have performed in all material respects all obligations and agreements and complied in all material respects with all covenants contained in this Agreement to the extent required to be performed or complied with by it at or prior to the Closing Date.

10.3    Sellers' Certificates. Buyer shall have received a certificate from each Seller, dated as of the Closing Date, reasonably satisfactory in form and substance to Buyer and its counsel, certifying as to the matters specified in Section 10.1 and Section 10.2 hereof.

10.4    Secretary's Certificates. Buyer shall have received a certificate, dated the Closing Date, of the Secretary or any Assistant Secretary of each Seller with respect to the incumbency and specimen signature of each officer or representative of each Seller executing this Agreement, the certificate referred to in Section 10.3 and the Ancillary Agreements to which each Seller is a party.

10.5    Injunction. On the Closing Date, there shall be no injunction, writ, preliminary restraining order or any order of any nature in effect issued by a court of competent jurisdiction directing that the Contemplated Transaction not be consummated as herein provided.

10.6    Actions and Proceedings. All corporate actions, proceedings, instruments and documents required to carry out the transactions contemplated by this Agreement or incidental thereto and all other related legal matters shall be reasonably satisfactory to counsel for Buyer, and such counsel shall have been furnished with such certified copies of such corporate actions and proceedings and such other instruments and documents as it shall have reasonably requested.

10.7    HSR Act Waiting Period. Any waiting period applicable to the consummation of the transactions contemplated by this Agreement under the HSR Act shall have expired or terminated.

## ARTICLE XI

## CONDITIONS PRECEDENT TO THE OBLIGATIONS OF SELLERS

The obligations of Sellers are subject to the fulfillment at or prior to the Closing of each of the following conditions:

11.1    Accuracy of Representations and Warranties. The representations and warranties of Buyer contained in this Agreement (without regard to any materiality or knowledge qualifier contained in any such representation or warranty) shall have been true in all material respects on the date hereof and

NYA 730432.9

shall be true on and as of the Closing Date in all material respects with the same force and effect as though made on and as of the Closing Date.

11.2    Performance of Agreement. Buyer shall have performed in all material respects all obligations and agreements and complied in all material respects with all covenants and conditions contained in this Agreement to be performed or complied with by it at or prior to the Closing Date.

11.3    Buyer's Certificate. Sellers shall have received a certificate from Buyer, dated as of the Closing Date, reasonably satisfactory in form and substance to Sellers and their counsel, certifying as to the fulfillment of all matters specified in Section 11.1 and Section 11.2 hereof. The matters set forth in such certificate shall constitute representations and warranties hereunder.

11.4    Secretary's Certificate. Sellers shall have received a certificate, dated the Closing Date, of the Secretary or any Assistant Secretary of Buyer with respect to the incumbency and specimen signature of each officer or representative of Buyer executing this Agreement, the certificate referred to in Section 11.3 and the Ancillary Agreements to which Buyer is a party.

11.5    Injunction. On the Closing Date, there shall be no injunction, writ, preliminary restraining order or any order of any nature in effect issued by a court of competent jurisdiction directing that the transactions provided for herein, or any of them, not be consummated as herein provided.

11.6    Actions or Proceedings. All corporate actions, proceedings, instruments and documents required to carry out the transactions contemplated by this Agreement or incidental thereto and all other related legal matters shall be reasonably satisfactory to counsel for Sellers, and such counsel shall have been furnished with such certified copies of such corporate actions and proceedings and such other instruments and documents as it shall have reasonably requested.

11.7    HSR Act Waiting Period. Any waiting period applicable to the consummation of the transactions contemplated by this Agreement under the HSR Act shall have expired or terminated.

## ARTICLE XII

## OBLIGATIONS AFTER THE CLOSING DATE

12.1    Confidentiality. Sellers and Shareholders hereby covenant and agree that, except as may be required by law, rule or regulation or court order, or as permitted by this Agreement, unless this Agreement is terminated, they will not at any time reveal, divulge or make known to any Person (other than Buyer or its agents or Affiliates) any information that relates to this Agreement, the transactions contemplated hereby or the Business (whether now possessed by Sellers or furnished by Buyer after the Closing Date), including, but not limited to, customer lists or customer information, trade secrets or formulae, marketing plans or proposals, financial information or any data, written material, records or documents used by or relating to the Business that are of a confidential nature (collectively, the "Confidential Information").

12.2    Covenant Not to Interfere. Both Sellers and Buyer hereby covenant and agree that, unless this Agreement is terminated, for a period of five (5) years after the Closing Date, they will not, whether for their own account or for the account of any other Person, endeavor to entice away from the other Party any person who is an employee of such Party.

12.3    Noncompetition. For the period beginning on the Closing Date and ending on the fifth anniversary thereof, no Seller or Shareholder will, directly or indirectly, unless acting in accordance with

37

Buyer's written consent, own, manage, operate, finance or participate in the ownership, management, operation or financing of or permit its name to be used by or in connection with any business or enterprise engaged in the manufacture, processing, marketing, distribution or sale of products comparable to the Products in the United States. Each Seller and Shareholder acknowledges that the provisions of this Section are reasonable and necessary to protect the interests of Buyer, that any violation of this Section will result in an irreparable injury to Buyer and that damages at law would not be reasonable or adequate compensation to Buyer for violation of this Section and that, in addition to any other available remedies, Buyer shall be entitled to have the provisions of this Section specifically enforced by preliminary and permanent injunctive relief without the necessity of proving actual damages or posting a bond or other security and to an equitable accounting of all earnings, profits and other benefits arising out of any violation of this Section. In the event that the provisions of this Section shall ever be deemed to exceed the time, geographic, product or other limitations permitted by applicable law, then the provisions shall be deemed reformed to the maximum extent permitted by applicable law.

12.4    Transition of Employees.    From and after the Closing Date, Buyer and Sellers shall reasonably cooperate to ensure an orderly transition of the Transferred Employees.

12.5    Administrative Assistance by Seller.    Except as otherwise agreed, Sellers shall provide such accounting, data processing and other support services to Buyer as are reasonably required in connection with the transfer of the Business to Buyer without cost to Buyer. Sellers shall cooperate with Buyer's auditors in connection with the preparation of any report or filing required in connection with the transactions contemplated hereby, such cooperation to be provided by Sellers at no cost to Buyer.

12.6    Further Assurances.    In addition to the provisions of this Agreement, from time to time after the Closing Date, Sellers and Buyer will use commercially reasonable efforts to execute and deliver such other instruments of conveyance, transfer, or assumption, as the case may be, and take such other action as may be reasonably requested to implement more effectively the transactions contemplated hereby.

12.7    Retention of and Access to Records; Cooperation.    For a period of not less than seven years after the Closing Date, Buyer shall preserve and retain the corporate, accounting, legal, auditing and other books and records of the Business (including but not limited to, any governmental or non-governmental actions, suits, proceedings or investigations arising out of the conduct of the business and operations of the Business prior to the Closing Date); provided, however, that such seven-year period shall be extended in the event that any action, suit, proceedings or investigation has been commenced or is pending or threatened at the termination of such seven-year period and such extension shall continue until any such action, suit, proceeding or investigation has been settled through judgment or otherwise or is no longer pending or threatened. Notwithstanding the foregoing, Buyer may discard or destroy any of such books and records prior to the end of such seven-year period or period of extension, if applicable, if it has given Sellers 60 days prior written notice of its intent to do so and Sellers have not taken possession of such books and records, at its expense, within such 60-day period. Notwithstanding anything to the contrary in this Section 12.7 or elsewhere in this Agreement, Sellers shall retain all tax records of the Business prepared prior to the Closing Date, for a reasonable period of time based upon the nature of such tax records. Buyer shall provide reasonable access to Sellers to review any records that Buyer retains and to make copies thereof and shall cooperate fully with Sellers (including, without limitation, making available employees to assist Sellers at reasonable rates to be agreed by the Parties) in preparation and documentation of all necessary financial statements, tax returns and reports or the resolution of any tax audits, claims, litigation or disputes concerning Sellers' tax liabilities or the Assumed Liabilities. In the event Buyer sells or otherwise transfers the Business before the seventh anniversary of the Closing Date, to the extent reasonably obtainable Buyer agrees to include in the documents transferring such Business a

38

provision obligating the new purchaser or transferee to abide by these provisions, in which event Buyer shall be relieved of any obligation hereunder.

12.8    Accounts Receivable Payment.  In the event that either Party hereto at any time receives any funds from any third party that are properly payable to the other Party hereto, the Party receiving such funds shall promptly remit such funds to the Party entitled to such funds.

12.9    Use of Business Name.  After the Closing, no Seller will, directly or indirectly, do business, or allow any Affiliate to do business, or assist any third party in using or doing business, under the name and mark "Milso" (or any other name confusingly similar to such names and marks).  Promptly after Closing Sellers shall change their corporate names to not include "Milso."

12.10    Operation of Business.  After Closing, and in the continued operation of the Business, the Key Employees shall be required to adhere to the internal control standards and codes of conduct as defined by the Sarbanes-Oxley Act of 2002, established regulatory standards and published Matthews' policies.

12.11    Director Appointments.  From and after the Closing Matthews shall cause two Key Employees to be appointed to the York board of directors.  Harry Pontone and Scott Pontone shall be appointed to the board of directors pursuant to the foregoing so long as each is employed by York.  In the event that either Harry Pontone or Scott Pontone is no longer employed by York, the other shall be entitled to designate the second Key Employee to be appointed to the York board of directors by Matthews pursuant to this Section.  If neither Scott Pontone nor Harry Pontone is employed by York, a majority of the remaining Key Employees shall be entitled to designate the two Key Employees to be appointed to the York board of directors by Matthews pursuant to this Section.

## ARTICLE XIII

## TERMINATION

13.1    Termination of Agreement.  This Agreement may be terminated at any time prior to the Closing Date:

13.1.1   by written agreement of SBC and Buyer;

13.1.2   by SBC or Buyer, by written notice to the other, if the Closing has not been consummated within sixty days following the date hereof (as may be extended pursuant to this Section 13.1.2, the "Termination Date"); provided, however, that if the Closing has not occurred by such date solely due to the waiting period (or any extension thereof) or approvals under the HSR Act not having expired or been terminated, then such date shall be extended, but in no event to a date later than six months from the date hereof; and provided further, that the right to terminate this Agreement under this Section 13.1.2 shall not be available to any Party whose failure to fulfill any obligation under this Agreement shall have been a primary cause of the failure of the Closing to occur prior to such date;

13.1.3   by Buyer or SBC, by written notice to the other, if there is any law or regulation that makes consummation of the Contemplated Transaction illegal or otherwise prohibited, or if any judgment, injunction, order or decree permanently restraining, prohibiting or enjoining Buyer or Sellers from consummating the Contemplated Transaction is entered and such judgment, injunction, order or decree shall become final;

39

13.1.4  by Buyer, upon written notice to Sellers, if there shall have been a breach by any Seller of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Article X, and such breach shall be incapable of being cured prior to the Termination Date or, if capable of being cured prior to the Termination Date, (x) shall not have been cured within 20 days after written notice thereof shall have been received by the Sellers and (y) such Seller shall not have provided Buyer with adequate assurances of such Seller's ability to remedy such breach on or prior to such 20th day; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 13.1.4 if Buyer is in material breach of any of its representations or warranties contained in this Agreement or has failed in any material respect to perform any of its obligations under this Agreement; or

13.1.5  by SBC, upon written notice to Buyer, if there shall have been a breach by Buyer of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Article XI, and such breach shall be incapable of being cured prior to the Termination Date or, if capable of being cured prior to the Termination Date, (x) shall not have been cured within 20 days after written notice thereof shall have been received by Buyer and (y) Buyer shall not have provided the Sellers with adequate assurances of Buyer's ability to remedy such breach on or prior to such 20th day; provided, however, that the Sellers shall not have the right to terminate this Agreement under this Section 13.1.5 if any Seller is in material breach of any of its representations or warranties contained in this Agreement or has failed in any material respect to perform any of its obligations under this Agreement.

13.2    Return of Documents.  If this Agreement is terminated for any reason pursuant to this Article XIII, each Party shall promptly, and in any event within ten (10) Business Days, return to the other Party all documents and copies thereof which shall have been furnished to it by such other Party or, with the agreement of the other Party, shall destroy all such documents and copies thereof and certify in writing to the other Party any such destruction.

13.3    Effect of Termination.  In the event of termination of this Agreement pursuant to Section 13.1, this Agreement shall become null and void and have no effect and no party hereto shall have any liability to the other parties hereto or their respective Affiliates, directors, officers, employees, representatives or shareholders, except (i) that the obligations of the parties to this Agreement contained in Sections 13.3 15.1, 15.2, 15.4 and 15.6 through 15.15 and the Confidentiality Agreement shall continue in full force and effect and (ii) that nothing in this Agreement will relieve any party from liability for any breach of any representation, warranty, covenant or agreement set forth in this Agreement prior to such termination (a "Breach").  The Parties acknowledge and agree that any claim for a Breach must be brought within 180 days after this Agreement is validly terminated.

**ARTICLE XIV**

**SURVIVAL OF REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION**

14.1    Survival of Representations and Warranties.  All representations and warranties of the Parties shall survive for two (2) years after the Closing Date (the "Indemnity Period"); provided, that any claim that has been duly asserted prior to the termination of such survival period shall survive such period until resolved in accordance with this Article XIV.  Except as otherwise expressly provided in this Agreement, all covenants, agreements, undertakings and indemnities set forth in this Agreement shall survive indefinitely.  No investigation made by any Parties hereto (whether prior to, on or after the Closing Date) shall in any way limit the representations and warranties of the other Parties.

40

NYA 730432.9

14.2    <u>Sellers' Agreement to Indemnify</u>.  Subject to the terms and conditions set forth herein, from and after the Closing, Sellers shall indemnify and hold harmless Buyer and Matthews and their respective directors, officers, employees, affiliates, controlling persons, agents and representatives and their successors and assigns (collectively, "<u>Buyer Indemnitees</u>") from and against all liabilities, demands, claims, actions or causes of action, assessments, losses, damages, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) (collectively, "<u>Buyer Damages</u>") asserted against or incurred by any Buyer Indemnitee as a result of or arising out of (i) a breach of any representation or warranty contained in Article VI of this Agreement, (ii) the Excluded Liabilities or Excluded Assets, (iii) a breach of any agreement or covenant of any Seller in this Agreement, (iv) any attempt (whether or not successful) by any Person to cause or require Buyer to pay any liability of, or claim against, Sellers of any kind in respect of the operation of the Business prior to the Closing Date, to the extent not specifically assumed or subject to an indemnity by Buyer under the terms of this Agreement, (v) any and all claims made by Thomas Pontone, (vi) all Environmental Liabilities and Costs in any way related to Seller's operation of the Business before the Closing Date or any environmental conditions in, on, under, from or about the Real Property, the Purchased Assets or other properties or assets owned, leased or used by Sellers, which were created, existed or arose prior to the Closing Date, except to the extent that any such environmental condition was exacerbated by Buyer's actions after Closing, or which relate to the Excluded Assets, or (vii) any product liability claim with respect to products sold by the Business prior to the Closing.

14.3    <u>Sellers' and Shareholders' Agreement to Indemnify</u>.  Subject to the terms and conditions set forth herein, from and after the Closing, Sellers and Shareholders shall, jointly and severally, indemnify and hold harmless the Buyer Indemnitees from and against all Buyer Damages asserted against or incurred by any Buyer Indemnitee as a result of or arising out of (i) all Environmental Liabilities and Costs in any way related to Sellers' operation of the Business or any environmental conditions in, on, under, from or about the following properties: 536 Union Street, 538 Union Street, 540 Union Street, 542 Union Street, 577 Union Street, 495 President Street, 496 President Street, 497 President Street, 499 President Street, 534 Union Street, 586 Sackett Street and 585 Union Street, each in Brooklyn, New York (the "<u>Brooklyn Properties</u>"), which Environmental Liabilities and Costs were created, accrued, existed or arose prior to the Closing Date, and (ii) liability for any Taxes which were created, accrued, existed or arose prior to the Closing Date.

14.4    <u>Limitations on Sellers' and Shareholders' Indemnity</u>.  Sellers' obligations to indemnify Buyer Indemnitees pursuant to Section 14.2 hereof, and Sellers' and Shareholders' obligation to indemnify Buyer Indemnitee pursuant to Section 14.3 hereof, are subject to the following limitations:

14.4.1    No indemnification shall be made by Sellers or the Shareholders with respect to any claim unless (x) the amount of such claim exceeds $20,000 (any such claim, a "<u>Qualifying Claim</u>") and (y) the aggregate amount of Buyer Damages under all Qualifying Claims exceeds $500,000 and, in such event, indemnification shall be made by Sellers and the Shareholders only to the extent Buyer Damages exceed $500,000 in the aggregate, it being understood that such amount shall be a "deductible."

14.4.2    Sellers' aggregate obligation to indemnify Buyer Indemnitees for all claims made pursuant to Section 14.2 shall not exceed the Escrow Fund and Buyer Indemnitees' claims with respect thereto shall be made only against, and shall be limited solely to, the Escrow Fund as provided in the Escrow Agreement. This limitation shall not apply to Sellers' and Shareholders' obligation to indemnify Buyer Indemnitees for any claims made pursuant to Section 14.3.

14.4.3    The amount of any Buyer Damages shall be reduced by (i) any amount received by a Buyer Indemnitee with respect thereto under any insurance coverage or from any other party

41

alleged to be responsible therefor and (ii) the amount of any tax benefit available to the Buyer or the SBC as a result, directly or indirectly, of the damages. Buyer Indemnitees shall use commercially reasonable efforts to collect any amounts available under such insurance coverage and from such other party alleged to have responsibility. If a Buyer Indemnitee receives an amount under insurance coverage or from such other party with respect to Buyer Damages at any time subsequent to any indemnification provided by Sellers pursuant to this Article XIV, then such Buyer Indemnitee shall promptly reimburse Sellers, for any payment made or expense incurred by Sellers in connection with providing such indemnification up to such amount received by Buyer Indemnitee, but net of any expenses incurred by such Buyer Indemnitee in collecting such amount.

14.4.4 Sellers and the Shareholders shall have no obligation to indemnify or hold harmless any Buyer Indemnitee with respect to any claim asserted under Section 14.2(vi) or otherwise with respect to any Environmental Liabilities and Costs unless Shareholders are given notice asserting a claim before the eighth anniversary of the Closing Date. In no event shall the aggregate liability of the Shareholders under Section 14.3 exceed 100% of Purchase Price.

Sellers shall be obligated to indemnify Buyer Indemnitees under Section 14.2 only for those claims giving rise to Buyer Damages as to which Buyer Indemnitees have given Sellers and Escrow Agent written notice prior to the end of the Indemnity Period (to the extent the Indemnity Period applies to such Buyer Damages). Any written notice delivered by a Buyer Indemnitee to Sellers and Escrow Agent with respect to Buyer Damages shall set forth with as much supporting detail as is reasonably practicable the basis of the claim for Buyer Damages and, to the extent reasonably practicable, a reasonable estimate of the amount thereof.

14.5    Buyer's Agreement to Indemnify. Subject to the terms and conditions set forth herein, from and after the Closing, Buyer shall indemnify and hold harmless each Seller and their respective directors, officers, employees, affiliates, controlling persons, agents and representatives and their successors and assigns (collectively, the "Seller Indemnitees") from and against all liability, demands, claims, actions or causes of action, assessments, losses, damages, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) (collectively, "Seller Damages") asserted against or incurred by any Seller Indemnitee as a result of or arising out of (i) the Assumed Liabilities, (ii) a breach of any representation or warranty contained in Article VII of this Agreement or (iii) a breach of any agreement or covenant of Buyer in this Agreement.

14.6    Limitation on Buyer's Indemnity. Buyer's obligation to indemnify Seller Indemnitees pursuant to Section 14.5 hereof is subject to the following limitations:

14.6.1  No indemnification shall be made by Buyer with respect to any such claim unless (x) such claim is a Qualifying Claim and (y) the aggregate amount of Seller Damages under all Qualifying Claims exceeds $500,000 and, in such event, indemnification shall be made by Buyer only to the extent Sellers' Damages exceed $500,000 in the aggregate, it being understood that such amount shall be a "deductible."

14.6.2  Buyer's aggregate obligation to indemnify Seller Indemnitees for all claims made pursuant to Section 14.5 shall not exceed $10 million.

14.6.3  The amount of any Seller Damages shall be reduced by (i) any amount received by a Seller Indemnitee with respect thereto under any insurance coverage or from any other party alleged to be responsible therefore and (ii) the amount of any tax benefit available to the Seller as a result, directly or indirectly of the damages. Seller Indemnitees shall use commercially

42

reasonable efforts to collect any amounts available under such insurance coverage and from such other party alleged to have responsibility. If a Seller Indemnitee receives an amount under insurance coverage or from such other party with respect to Seller Damages at any time subsequent to any indemnification provided by Buyer pursuant to Article XIV, then such Seller Indemnitee shall promptly reimburse Buyer for any payment made or expense incurred by Buyer in connection with providing such indemnification up to such amount received by the Seller Indemnitee, but net of any expenses incurred by such Seller Indemnitee in collecting such amount.

Buyer shall be obligated to indemnify the Seller Indemnitees only for those claims giving rise to Seller Damages and to which the Seller Indemnitees have given Buyer written notice thereof prior to the end of the Indemnity Period. Any written notice delivered by a Seller Indemnitee to Buyer with respect to Seller Damages shall set forth with as much specificity as is reasonably practicable the basis of the claim for Seller Damages and, to the extent reasonably practicable, a reasonable estimate of the amount thereof.

14.7    Third Party Indemnification. The obligations of any Indemnifying Party to indemnify any Indemnified Party under this Article XIV with respect to Buyer Damages or Seller Damages, as the case may be, resulting from the assertion of liability by third parties (a "Claim"), will be subject to the following terms and conditions:

14.7.1    Any party against whom any Claim is asserted (the "Indemnified Party") will give the party required to provide indemnity hereunder the "Indemnifying Party") written notice of any such Claim promptly after learning of such Claim, and the Indemnifying Party may at its option undertake the defense thereof by representatives of its own choosing. Failure to give prompt notice of a Claim hereunder shall not affect the Indemnifying Party's obligations under this Section, except to the extent that the Indemnifying Party is materially prejudiced by such failure to give prompt notice. If the Indemnifying Party, within thirty days after notice of any such Claim, fails to assume the defense of such Claim, the Indemnified Party against whom such claim has been made will (upon further notice to the Indemnifying Party) have the right to undertake the defense, compromise or settlement of such claim on behalf of and for the account and risk, and at the expense, of the Indemnifying Party, subject to the right of the Indemnifying Party to assume the defense of such Claim at any time prior to settlement, compromise or final determination thereof.

14.7.2    Anything in this Section to the contrary notwithstanding, (i) the Indemnified Party shall not settle a claim for which it is indemnified without the prior written consent of the Indemnifying Party, which consent shall not be unreasonably withheld, and (ii) the Indemnifying Party shall not enter into any settlement or compromise of any action, suit or proceeding or consent to the entry of any judgment for other than monetary damages to be borne by the Indemnifying Party without the prior written consent of the Indemnified Party, which consent shall not be unreasonably withheld.

14.7.3    If the Indemnifying Party shall not assume the defense of any such claim by a third party, or litigation resulting therefrom, after receipt of notice from the Indemnified Party, the Indemnified Party may defend against such claim or litigation in such manner as it deems appropriate.

14.7.4    If the Indemnifying Party shall not, within thirty (30) days after its receipt of the notice required by Section 14.7 hereof, advise the Indemnified Party that the Indemnifying Party denies the right of the Indemnified Party to indemnity in respect of the claim, then the amount of such claim shall be deemed to be finally determined between the Parties hereto. If the

43

Indemnifying Party shall notify the Indemnified Party that it disputes any claim made by the Indemnified Party, then the Parties hereto shall endeavor to settle and compromise such claim, and if unable to agree on any settlement or compromise, such claim for indemnification shall be settled by appropriate litigation, and any liability established by reason of such settlement, compromise or litigation shall be deemed to be finally determined. Any claim that is finally determined in the manner set forth above shall be paid promptly by the Indemnifying Party.

14.8    Payment of Indemnification Obligations. Each Party with indemnity obligations under this Article XIV shall pay promptly to any Party being indemnified the amount of all damages, losses, deficiencies, liabilities, costs, expenses, claims and other obligations to which the foregoing provisions of this Article XIV relates.

14.9    Interest on Unpaid Obligations. If all or part of any indemnification obligation under this Agreement is not paid when due, the Party with indemnity obligations under this Article XIV shall pay the Party being indemnified interest on the unpaid amount of such obligation for each day from the date the amount became due until it is paid in full, payable on demand, at the rate equal to the lower of (i) the maximum rate permitted by law or (ii) two percent (2%) per annum plus the "Prime Rate" as published from time to time in The Wall Street Journal.

14.10    Cooperation with Proceedings. The parties hereto agree to cooperate with each other and to provide each other with all information and documentation reasonably necessary to permit the defense in connection with any and all proceedings (including, without limitation tax audits) and to promptly provide each other party with any and all notices that may be received by any of them that could reasonably be expected to result in a claim for indemnification under this Article XIV.

14.11    Treatment of Indemnification Payments. All indemnification payments made by Parties under this Article XIV shall be deemed adjustments to the Consideration.

14.12    Exclusive Remedy. Following the Closing, indemnification pursuant to this Article XIV shall be the sole and exclusive remedy for each Party and its respective Affiliates with respect to any and all claims based on any breach of, or inaccuracy in any representation or warranty contained in, this Agreement.

## ARTICLE XV

## GENERAL

15.1    Expenses. Except as otherwise provided in this Agreement, and whether or not the transactions herein contemplated shall be consummated, Buyer, Sellers and the Shareholders shall pay their own fees, expenses and disbursements, including the fees and expenses of their respective counsel, accountants and other experts, in connection with the subject matter of this Agreement and all other costs and expenses incurred in performing and complying with all conditions to be performed under this Agreement.

15.2    Publicity. All notices to third parties and all other publicity concerning the transactions contemplated by this Agreement shall be jointly planned and coordinated by and between Buyer and Sellers. Except as may be required by Applicable Law, no Party shall act unilaterally in this regard without the prior written approval of the other Party, such approval not to be unreasonably withheld. It is contemplated that immediately following the execution this Agreement, each of SBC and Buyer will consult with each other regarding the language of and issue a press release or press releases disclosing such action. Thereafter, prior to the Closing, except as otherwise agreed to by the Parties, no Party shall

44

issue any report, statement or press release or otherwise make any public statements with respect to this Agreement or the transactions contemplated hereby, except as required by Applicable Law, in which case SBC and Buyer will consult with each other prior to the issuance of such a report, statement or press release.

15.3    Waivers.  The waiver by any Party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

15.4    Binding Effect; Benefits.  This Agreement shall inure to the benefit of the Parties hereto, and shall be binding upon the Parties hereto and their respective successors and assigns.  Except for the express provisions of Article XIV, nothing in this Agreement, express or implied, is intended to confer on any Person other than the Parties hereto, or their respective successors and assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

15.5    Bulk Transfers Laws.  Buyer hereby waives compliance by Sellers with the provisions of any and all laws relating to bulk transfers in connection with the sale of the Purchased Assets.  Sellers covenant and agree to indemnify and save harmless Buyer from and against any and all losses, liability, cost and expense (including reasonable attorney's fees) arising out of noncompliance with such bulk transfers laws.

15.6    Notices.  All notices, requests, demands, elections and other communications which either Party to this Agreement may desire or be required to give hereunder shall be in writing and shall be deemed to have been duly given if delivered personally, by a reputable courier service which requires a signature upon delivery, by mailing the same by registered or certified first class mail, postage prepaid, return receipt requested, or by telecopying with receipt confirmation (followed by a first class mailing of the same) to the Party to whom the same is so given or made.  Such notice, request, demand, waiver, election or other communication will be deemed to have been given as of the date so delivered or electronically transmitted or seven days after mailing thereof.

If to Sellers or Shareholders, to:

Milso Industries
534 Union Street
Brooklyn, NY 11215
Fax: 718-852-5990
Attn: Harry Pontone
Attn: Scott Pontone

If to Buyer, to:

The York Group, Inc.
Two NorthShore Center
Suite 100
Pittsburgh, PA 15212
Fax No: (412) 995-1690
Attn: Joseph Bartolacci, President

45

With a copy to:

Reed Smith LLP
435 Sixth Avenue
Pittsburgh, PA 15219
Fax No: (412) 288-3063
Attn: Pasquale Gentile, Esq.

or to such other address as such Party shall have specified by notice to the other Party hereto.

15.7    Entire Agreement.  This Agreement (including all exhibits, schedules and annexes hereto), the Confidentiality Agreement and the instruments and documents to be executed pursuant hereto constitute the entire agreement among the Parties hereto relating to the subject matter of this Agreement and supersede all other prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties.  This Agreement may be amended, supplemented or modified only by a written instrument executed by the Buyer and SBC, or in the case of a waiver, by the Party waiving compliance; provided that SBC may execute a waiver on behalf of all Sellers.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision of this Agreement (whether or not similar), and no such waiver shall constitute a continuing waiver unless otherwise expressly provided.

15.8    Counterparts.  This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one and the same instrument.

15.9    Headings.  The article, section and other headings contained in this Agreement are for reference purposes only and shall not be deemed to be a part of this Agreement or to affect the meaning or interpretation of this Agreement.

15.10   Matters of Construction, Interpretation and the Like.  The Buyer and the Sellers and the Shareholders have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Buyer and the Sellers and the Shareholders  and no presumption or burden of proof shall arise favoring or disfavoring either the Buyer and the Sellers and the Shareholders because of the authorship of any of the provisions of this Agreement.  Any reference to any United States Federal, state, local or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  Unless the context of this Agreement otherwise requires, (a) words of any gender are deemed to include each other gender; (b) words using the singular or plural number also include the plural or singular number, respectively; (c) the terms "hereof," "herein," "hereby," "hereto," and derivative or similar words refer to this entire Agreement; (d) the terms "ARTICLE" or "Section" refer to the specified ARTICLE or Section of this Agreement; (e) the term "or" means "and/or"; (f) the term "party" means, on the one hand, the Buyer, on the other hand, the Sellers and the Shareholders, (g) the word "including" means "including without limitation"; and (h) all references to "dollars" or "$" refer to currency of the United States of America.  The exhibits and schedules specified in this Agreement are incorporated herein by reference and made a part hereof.

15.11   Governing Law and Choice of Forum.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to the rules of conflicts of laws of the State of Delaware.  Each Seller and Buyer (a) agree that any suit, action or proceeding arising out of or relating to this Agreement shall be brought solely in the state or federal courts of Delaware; (b) consents to the exclusive jurisdiction of each such court in any suit, action or proceeding relating to or

46

arising out of this Agreement; (c) waives any objection that it may have to the laying of venue in any such suit, action or proceeding in any such court; and (d) agrees that service of any court paper may be made in such manner as may be provided under applicable Laws or court rules governing service of process.

15.12  WAIVER OF RIGHT TO TRIAL BY JURY.  SELLERS AND BUYER HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

15.13  Severability.  In the event that any one or more of the provisions of this Agreement shall for any reason be held to be invalid, illegal or unenforceable, the remaining provisions of this Agreement shall be unimpaired, and the invalid, illegal or unenforceable provision shall be replaced by a mutually acceptable provision, which being valid, legal and enforceable, comes closest to the economic effect and intent of the parties underlying the invalid, illegal or unenforceable provision.

15.14  Successors and Assigns.  None of the Sellers, the Shareholders or Buyer shall assign, or otherwise transfer this Agreement or any interest in or obligation under this Agreement to any other Person; provided that Buyer may assign its rights under this Agreement to one or more wholly-owned subsidiaries of Buyer, which assignment shall not relieve Buyer of any of its obligations under this Agreement.

15.15  Shareholders.  The persons named below under "Shareholders" are joining in the Agreement solely for the purpose of confirming their agreement to the obligations of the Shareholders described in Sections 3.5, 4.3.1, 8.1, 8.2, 8.4, 12.1, 12.3, 12.8, 14.3, 14.4.4, 15.1 through 15.4 and 15.6 through 15.15.

15.16  Guaranty.  Matthews unconditionally and irrevocably guarantees the timely payment and performance of all agreements, covenants, obligations and liabilities of Buyer and Buyer's Affiliates (and their respective permitted successors and assigns) under this Agreement and under any other agreement entered into pursuant to the provisions hereof to which Buyer or an Affiliate of Buyer and a Seller or an Affiliate of a Seller are parties (the "Guaranty"). The Guaranty is in no way conditioned upon any event or contingency, and shall be binding upon and enforceable against Matthews without regard to the validity or enforceability of this Agreement or any term hereof or any other agreement, or term thereof, entered into pursuant to the provisions hereof to which Buyer or an Affiliate of Buyer and a Seller or an Affiliate of a Seller are parties.  The obligations of Matthews under the Guaranty shall be continuing, absolute, unlimited and unconditional, and shall not be subject to any counterclaim, set-off, deduction or defense based upon any claim that Matthews may have against the Sellers or any of their Affiliates, and shall remain in full force and without regard to, and, to the extent permitted by Applicable Laws, shall not be released, discharged or in any way affected by any circumstance or condition (whether or not Matthews shall have any knowledge or notice thereof) whatsoever which might constitute a legal or equitable discharge or defense.

*Signatures appear on the following pages*

47

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the date first written above.

THE YORK GROUP, INC.

By: _____
    Name:
    Title:

MIDNIGHT ACQUISITION CORPORATION

By: _____
    Name:
    Title:

MILSO INDUSTRIES, INC.

By: _____
    Name:
    Title:

MILSO INDUSTRIES, LLC

By: _____
    Name:
    Title:

SBC HOLDING CORPORATION

By: _____
    Name:
    Title:

MATTHEWS INTERNATIONAL CORPORATION

By: _____
    Name:
    Title:

05/27/2005  23:19    17188525998              MILSO                           PAGE  04/29
05/27/2008 23:20 FAX                      CLIFFORD CHANCE US LLP                     002/025

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the date first written above.

THE YORK GROUP, INC.

By: _____
    Name:
    Title:

MIDNIGHT ACQUISITION CORPORATION

By: _____
    Name:
    Title:

MILSO INDUSTRIES, INC.

By: _____
    Name:
    Title: PRES

MILSO INDUSTRIES, LLC

By: _____
    Name:
    Title:

SBC HOLDING CORPORATION

By: _____
    Name:
    Title:

MATTHEWS INTERNATIONAL CORPORATION

By: _____
    Name:
    Title:

05/27/2005  22:13    17188525990              MILSO                    PAGE  01/07

06/27/2005  21:43    17188525990              MILSO                    PAGE  01/01
05/27/2003 21:28 FAX                     CLIFFORD CHANCE US LLP

SHAREHOLDERS:

_____
HARRY FONTONE

_____
LOUIS FONTONE

_____
ANDREW FONTONE, SR.

_____
ANDREW FONTONE, JR.

_____
MICHAEL FONTONE

_____
SCOTT FONTONE

_____
STEVEN FONTONE

_____
THOMAS FONTONE


HARRY FONTONE 2005 FAMILY TRUST

By: _____
    Name:  Scott Fontone
    Title:  Trustee


ANDREW FONTONE GRANTOR TRUST

By: _____
    Name:  Michael Fontone
    Title:  Trustee

NYA 730428

**LOUIS PONTONE 2004 FAMILY TRUST**

By: _[signature]_

      Name:  Josephine Pontone

      Title:  Trustee

By: _[signature]_

      Name:  Thomas J. Pontone

      Title:  Trustee


**MICHAEL PONTONE 2005 FAMILY TRUST**

By: _[signature]_

      Name:  Martha Pontone

      Title:  Trustee

NYA 730432

<u>SCHEDULE 2.1.2A</u>

<u>Assumed Contracts</u>

1.     Agreement, dated July 1, 1993, between Charles Montano (Landlord) and Milso Inc. (Tenant) (35 Commerce Ave, Albany, New York), as extended by letter agreement dated February 7, 2003.

2.     Lease Agreement, dated February 13, 2003, between Milso Inc (Tenant) and Cottrone Development Co, Inc. (Landloard) (1170 Lexington Ave. Rear-Rochester) and Letter Agreement re lease of additional space, dated February 4, 2004, between Milso Inc. and Cottrone Development Co, Inc. (1170 Lexington Ave. Rear-Rochester).

3.     Lease Agreement, dated January, 2004, between Crossroads Properties, LLC (Lessor) and Milso Inc. (Lessee) (1610 SE 66th Street, Oklahoma City, Oklahoma).

4.     Improved Property Commercial Lease, dated October 1, 2003, between Milso Inc. (Tenant) and Lancaster Trust II (Landlord) (10,000 sq. ft., 1201 Minters Chapel Road, Grapevine, Texas) and Commercial Lease, dated January 1, 2004, between Milso Inc. (Tenant) and Lancaster Trust II (Landlord) (6000 sq. ft., 1201 Minters Chapel Road, Grapevine, Texas).

5.     Lease, dated January 7, 1998, between SBC (Tenant) and DiCenso-Wilmington, LLC (Landlord, formerly Robert A. DiCenso and Claudi M. Rucky as Trustees of DiCenso Investment Properties) (100 Progress Way, Wilmington, MA), as amended by the Amendment and Lease Extension dated August 17, 2000 and the Second Amendment and Extension of Lease dated December 1, 2003.

6.     Lease Agreement, dated January 12, 1996, between D&P. 175 Runnemede, LLC (Landlord) and Milso Inc. (as successor to Reliable Miller Casket Co., Inc., Tenant) (175 Ninth Avenue, Camden, NJ), as amended by the First Addendum.

7.     Lease, dated October 4, 2001, between Cabot Industrial Properties Holding, Inc. (Landlord) and (as successor to Reliable Miller Casket Co., Inc., Tenant) (8332 Bristol Court, Jessup, MD).

8.     Lease Agreement, dated September 1, 2004, between Liberty Property Limited Partnership (Landlord) and Milso Inc. (Tenant) (7028 Snowdrift Road, Allentown, PA).

9.     Lease, dated October 1, 2003, between Gordon A. Queen and Diana K. Queen (Lessor) and Milso LLC (Lessee) (11359 Grooms Road, Blue Ash, OH), plus additional space commencing February 1, 2005.

10.     Lease, dated August 6, 2004, between Larry Crye (Lessor) and Milso LLC (Lessee) (150 Industrial Parkway, Richmond, IN).

11.     Lease, dated August 1, 2004, between IFD (Lessor) and Milso LLC (Lessee) (150 Industrial Parkway, Richmond, IN).

12.     Agreement between Professional Staff Management, Inc. regarding employees is not assignable without prior written consent.

13.     Consulting Agreement, dated January 7, 2004, between Milso Inc. and David Hirt Consulting, Inc.

28

14.    Natural Gas Sales and Service Agreement, effective as of January 1, 2005, between ProLiance Energy, LLC and Milso LLC and the related Acknowledgement of Appointment of Agent.

15.    Three Letter Agreements dated February 24, 2005 between Milso Inc. and Than YI Trading Co., Ltd. regarding tooling and Letter Agreement dated May 21, 2004 between Milso Inc. and Than YI Trading Co., Ltd.

16.    Milso Inc. Tooling arrangement with Dixline Corporation.

17.    Product Agreement, dated December 1, 2003, between Weiler Welding Co., Inc. and Milso LLC.

18.    Agreement, dated March 1, 2001, by and between Local 813 (affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America) and SBC.

19.    Agreement, dated October 7, 2004, between Local 422S (affiliated with Production Service and Sales District Council, United Food and Commercial Workers International Union, AFL-CIO, CLC) and SBC.

20.    Agreement, dated as of March 1, 2004, between R. Conte Casket Company and Local 2682, United Brotherhood of Carpenters and Joiners of America, AFL-CIO.

21.    Requirements Contract, dated April 2, 2004, between Milso Industries, Inc. and Elderlite Express, Inc.

22.    See the Fortis Program Description and Acknowledgement.

23.    See Exhibit 2.1.2A hereto.

24.    See Table I.

25.    Promissory Note, dated August 17, 2004, by Milso LLC to Old National Bank in the principal amount of $42, 742.81 (2004 GMC Cab Chassis).

26.    Commercial Security Agreement, dated August 17, 2004, between Milso LLC and Old National Bank.

27.    Promissory Note, dated July 13, 2004, by Milso LLC to Old National Bank in the principal amount of $40,791.00 (2004 GMC Cab Chassis).

28.    Commercial Security Agreement, dated July 13, 2004, between Milso LLC and Old National Bank.

29.    Business Loan Agreement, dated November 4, 2004, between Milso LLC and Old National Bank.

30.    Promissory Note, dated November 4, 2004, by Milso LLC to Old National Bank in the principal amount of $107,566.81 (Dryer and Separator, Compressor, Compressor Control, 20 Ton Press, Embroidery Machines).

31.    Commercial Security Agreement, dated November 4, 2004, between Milso LLC and Old National Bank.

32. Promissory Note, dated March 12, 2004, by Milso LLC to Old National Bank in the principal amount of $110,787 (2004 GMC Cab Chassis and Ingersol Rand Equipment), as amended.

33. Commercial Security Agreement, dated March 12, 2004, between Milso LLC and Old National Bank.

34. Promissory Note, dated April 9, 2004, by Milso LLC to Old National Bank in the principal amount of $84,860.26 (2004 GMC Savanna Extended Van).

35. Commercial Security Agreement, dated April 9, 2004, between Milso LLC and Old National Bank.

36. Promissory Note, dated August 1, 2003, by Milso LLC to Old National Bank in the principal amount of $42,972.00 (Vehicle), as amended.

37. Promissory Note, dated August 15, 2002, by Milso LLC to Old National Bank in the principal amount of $17,288.98 (Equipment), as amended.

38. Commercial Security Agreement, dated August 15, 2002, between Milso LLC and Old National Bank.

39. Promissory Note, dated December 20, 2002, by Milso LLC to Old National Bank in the principal amount of $64,236.66 (2002 International 4300 4X2 Straight Truck).

40. Commercial Security Agreement, dated December 20, 2002, between Milso LLC and Old National Bank.

41. Promissory Note, dated May 30, 2003, by Milso LLC to Old National Bank in the principal amount of $27,425 (TAJIMA).

42. Commercial Security Agreement, dated May 30, 2003, between Milso LLC and Old National Bank.

43. Retail Installment Sale Contract, dated September 30, 2003, between Milso LLC and Studebaker Buick-Pontiac GMC (2004 GMC Savana).

44. Retail Installment Sale Contract, between Milso LLC and Studebaker Buick-Pontiac GMC (2003 GMC Sierra).

45. Retail Installment Sale Contract, dated September 30, 2003, between Milso LLC and Studebaker Buick-Pontiac GMC (2003 GMC Sierra).

46. Retail Installment Sale Contract, dated March 31, 2003, between Milso LLC and Studebaker Buick-Pontiac GMC (2003 GMC Truck).

47. Loan, dated December 10, 2002, in the principal amount of $474,510.20 (Peoples 6900).

48. Johnson Rubber Company Sales Contract, dated February 20, 2004.

49. Notes Payable (Vehicles Installments Payments), dated March 31, 2005.

50. Retail Installment Contract (GMC Yukon 4x4), dated October 4, 2004.

30

51.   Retail Installment Contract (GMC 3500 4x2), dated [June 2002].

52.   Retail Installment Contract (GMC TW3S042), dated [May 3, 2002].

53.   Retail Installment Contract (GMC TW3S042), dated [July 9, 2002].

54.    Retail Installment Contract (GMC 3500 4x2), dated [July 18, 2002].

55.   GMAC Statement (GMC Sierra, Acct. Number 024-9005-54316), dated October 2003.

56.   GMAC Payment Coupon, dated February 2005; Coupon Book Cover; Registration Certificate (GMC DS registered to Ravine Corp.); and Insurance Identification Card (GMC Truck; insured: Ravine Corp.).

57.   GMAC Payment Coupon, dated April 2005; Coupon Book Cover; and Vehicle Registration (GMC Van registered to Ravine Corp.).

58.   Ford Credit Statement (Lincon LS), dated April 7, 2005; Vehicle Registration (Linconl LS registered to Ravine Corp.).

59.   Retail Installment Contract (GMC 3500 4x2), dated December 6, 2002.

60.   Retail Installment Contract (GMC 3500 4x2), dated January 2, 2003.

61.   Retail Installment Contract (GMC Savana 1500), dated February 27, 2003.

62.   Retail Installment Contract (GMC 3500 4x2), dated April 23, 2003.

63.   Retail Installment Contract (GMC 3500 4x2), dated June 25, 2003.

64.   Retail Installment Contract (GMC Sierra), dated [September 2003].

65.   GMAC Payment Coupon, dated May 2005; Coupon Book Cover; and Vehicle Registration (GMC Van registered to Ravine Corp.).

66.   GMAC Payment Coupon, dated May 2005; Coupon Book Cover; and Vehicle Registration (GMC Truck registered to Ravine Corp.).

67.   GMAC Payment Coupon, dated May 2005; Coupon Book Cover; and Vehicle Registration Renewal Application (GMC Van registered to Ravine Corp.).

68.   Retail Installment Contract (GMC Truck TG23406), dated April 29, 2003.

69.   Retail Installment Contract (GMC Savana 1500), dated March 19, 2003.

70.   Retail Installment Contract (GMC 3500 4x4), dated June 18, 2003.

71.   Retail Installment Contract (GMC 3500 4x4), dated October 31, 2003.

72.   Motor Vehicle Retail Installment Sale Agreement (Mercury Grand Marquis), dated July 11, 2003.

73.   Master Motor Vehicle Security Agreement (Mitsubishi FE 639 L), dated March 18, 2003.

31

74. Closed End Motor Vehicle Lease (Mitsubishi FE 649), dated August 4, 2003.

75. Retail Installment Contract (Mitsubishi FE 649), dated October 16, 2003.

76. Retail Installment Contract (GMC 3500 4x4), dated December 30, 2003.

77. Retail Installment Contract (GMC Savana 1500), dated February 20, 2004.

78. Retail Installment Contract (GMC Sierra 3500), dated April 15, 2004.

79. Retail Installment Contract (GMC 3500 4x4), dated October 20, 2004.

80. Retail Installment Contract (GMC Topkick), dated October 13, 2004.

81. Retail Installment Contract (GMC Truck TW4SC42), dated 16 January 2004.

82. Retail Installment Contract (GMC Savana 1500), dated August 27, 2003.

83. Retail Installment Contract (GMC TK 364030), dated April 15, 2004.

84. Retail Installment Contract (GMC 3500 4x2), dated May 14, 2004.

85. Retail Installment Contract (GMC Truck TG23405), dated February 10, 2004.

86. Closed End Motor Vehicle Lease (Misubishi FE6390), dated February 18, 2005.

87. Retail Installment Contract (GMC Truck TW45042), dated June 30, 2004.

88. Retail Installment Contract (GMC Truck TG23405), dated October 27, 2004.

89. Retail Installment Contract (GMC 3500 4x4), dated January 31, 2005.

NYA 730630.6

90.    At-will Employment, Nondisclosure and Non-Competition Agreement of the following employees:

| MILSO INC | | | MILSO LLC | | |
|---|---|---|---|---|---|
| Location | Last Name | First Name | Location | Last Name | First Name |
| Haupp | Barrett | William | New Castle | Balogh | Mike |
| Runn | Batten | Joseph P | Richmond | Brock | Howard |
| Jessup | Boudreau | Richard | Richmond | Flaherty | Pat |
| Kearny | Cotton | Beverly | New Castle | Haaz | Ted |
| Albany | Doran | Daniel | Richmond | Lackey | Mark |
| Hamden | Duffy | Michael F | Richmond | Oglesby | Jay |
| Yonkers | Faber | Edwin | New Castle | Warne | Ashley |
| Brooklyn | Gallagher | John | | | |
| Kearny | Grimaldi | Anthony | | | |
| Hamden | Habersaat | Robert | | | |
| Allentown | Handling | Jeffrey | | | |
| Kearny | Knudsen | Mark | | | |
| Wilm | Larkin | Edward H | | | |
| Kearny | Lucariello | Donald Alfred | | | |
| Wilm | Martin | John | | | |
| Albany | Matte | Robert | | | |
| Kearny | McCaffery | Gerard | | | |
| Wilm | Mosher | David C. | | | |
| Hamden | Nazzaro | Edward C | | | |
| Allentown | Peterka | Paul | | | |
| Albany | Priddle | Larry | | | |
| Haupp | Reed | James | | | |
| Rochester | Reich | Ronald S | | | |
| Jessup | Richardson | Ronald | | | |
| Wilm | Sandler | Jeffrey S | | | |
| Yonkers | Speciale | Anthony | | | |

33