UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SCOTT PONTONE, | : |
| Plaintiff, | : No. 08-CV-6314 (WHP) |
| | : |
| v. | : |
| | : |
| THE YORK GROUP, INC., MILSO | : |
| INDUSTRIES CORPORATION, AND | : |
| MATTHEWS INTERNATIONAL | : |
| CORPORATION, | : |
| | : |
| Defendants. | : |
| | : |

# DEFENDANTS' MEMORANDUM OF LAW
# IN OPPOSITION TO PLAINTIFF'S
# MOTION FOR PRELIMINARY INJUNCTION

REED SMITH LLP
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 521-5400
*Counsel for Defendants*

August 18, 2008

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS ........................................................................................4

ARGUMENT ...........................................................................................................20

I.    PLAINTIFF IS NOT ENTITLED TO A PRELIMINARY INJUNCTION .....................20

    A.    STANDARDS FOR PRELIMINARY INJUNCTION.......................................20

    B.    MR. PONTONE CANNOT DEMONSTRATE IRREPARABLE HARM...........21

        1.    The Potential Irreparable Harm is to Defendants—Not Mr. Pontone ...............................................................................21

        2.    Mr. Pontone's Alleged Harm Is Completely Speculative.........................24

        3.    Mr. Pontone's Delay In Acting Negates An Assertion of Irreparable Harm ...............................................................27

    C.    MR. PONTONE HAS NOT SHOWN ANY LIKELIHOOD OF SUCCESS ON THE MERITS ...............................................................29

        1.    The Restrictive Covenants Are Reasonable and Should be Enforced...............................................................................29

    D.    NO SERIOUS QUESTIONS AS TO THE MERITS AND THE BALANCE OF EQUITIES FAVORS DEFENDANTS.......................................32

CONCLUSION........................................................................................................32

# TABLE OF AUTHORITIES

**Page**

## CASES

*Bannert v. Am. Can Co.*,
  No. 75-1480, 1976 WL 194432 (May 27, 1976) ............................................................. 27, 28

*Battenkill Veterinary Equine P.C. v. Cangelosi*,
  1 A.D.3d 856 N.Y.S.2d 504 (3d Dep't 2003) ...................................................................... 23

*Business Intel. Servs. v. Hudson*,
  580 F. Supp. 1068 (S.D.N.Y. 1984) ...................................................................................... 29

*Capri Nail Corp. v. Iris Nail Corp.*,
  13 A.D.3d 129, 786 N.Y.S.2d 167 (1st Dep't 2004) ........................................................... 23

*Century Time Ltd v. Interchron Ltd*,
  729 F. Supp. 366 (S.D.N.Y. 1990) ........................................................................................ 26

*Chernoff Diamond & Co. v. Fitzmaurice, Inc.*,
  234 A.D.2d 200, 651 N.Y.S.2d 504 (1st Dep't 1996) .................................................... 25, 28

*Citibank, N.A. v. Citytrust*,
  756 F.2d 273 (2d Cir. 1986) ................................................................................................. 20

*Doninger v. Niehoff*,
  527 F.3d 41(2d Cir. 2008) ..................................................................................................... 29

*Doran v. Salem Inn, Inc.*,
  422 U.S. 922 (1975) ........................................................................................................ 24, 25

*Estee Lauder Cos. v. Batra*,
  430 F. Supp. 2d 158, 182 (S.D.N.Y. 2006) ............................................................. 25, 28, 29

*Four Times Square Assoc. v. Cigna Investments, Inc.*,
  306 A.D.2d 4, 764 N.Y.S.2d 1 (1st Dep't 2003) ............................................................ 22, 23

*Freedom Holdings, Inc. v. Spitzer*,
  408 F.3d 112 (2d Cir. 2005) ............................................................................................ 24, 26

*Gillon v. Merrill Lynch Interfunding, Inc.*,
  1994 WL 873351, at *3-4 (Sup. Ct. New York County 1994) ............................................ 25

*Greylock Global Opportunity Master Fund Ltd. v. Province of Mendoza*,
  04 Civ. 7643, 2004 WL 2290900 (S.D.N.Y. Oct. 12, 2004) .............................................. 21

*Hay Group, Inc. v. Nadel*,
  170 A.D.2d 398, 566 N.Y.S.2d 616 (1st Dep't 1991) ......................................................... 21

*In re Schultz*,
  250 B.R. 22 (Bankr. E.D.N.Y. 2000) ................................................................................... 22

*In re Teller*,
   75 Misc. 592, 136 N.Y.S. 457 (Sur. Ct. New York County 1912) ........................................... 22

*Ivy Mar Co. v. C.R. Seasons Ltd.*,
   907 F. Supp. 547 (E.D.N.Y. 1995) ...................................................................................... 24

*Jackson Dairy, Inc. v. H.P. Hood*,
   596 F.2d 70 (2d Cir. 1979) ................................................................................................. 20

*Jay's Custom Stringing, Inc. v. Yu*,
   No. 01 CIV 1690, 2001 WL 761067 (S.D.N.Y. July 6, 2001) ......................................... 20, 23

*Jayaraj v. Scappini*,
   66 F.3d 36 (2d Cir. 1995) ................................................................................................... 21

*Kraft Agency, Inc. v. Delmonico*,
   110 A.D.2d 177, 494 N.Y.S.2d 77 (4th Dep't 1985) ........................................................... 22

*Loveridge v. Pendleton Woolen Mills, Inc.*,
   788 F.2d 914 (2d Cir. 1986) ............................................................................................... 21

*Manhattan Real Estate Equities Group, v. Pine Equity, N.Y.*,
   16 A.D.3d 292, 791 N.Y.S.2d 418 (1st Dep't 2005) ........................................................... 21

*Mathais v. Jacobs*,
   167 F. Supp. 2d 606 (S.D.N.Y. 2001) ................................................................................ 27

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) ........................................................................................................... 20

*Medical Soc'y of the State of New York v. Toia*,
   560 F.2d 535 (2d Cir. 1977) ............................................................................................... 20

*Mohawk Maint. Co., Inc. v. Kessler*,
   52 N.Y.2d 276, 437 N.Y.S.2d 646 (1981) ................................................................. 21, 22, 27

*Novartis Consumer Health, Inc. v. Johnson & Johnson Merck Consumer Pharm. Co.*,
   290 F.3d 578 (3d Cir. 2002) ........................................................................................... 24, 25

*Omni Consulting v. Marina Consulting*,
   No. 01-CV-511A, 2007 WL 2693813, at *6 (W.D.N.Y Sept. 12, 2007) ................................ 29

*Park West Radiology v. Carecore Nat. LLC*,
   240 F.R.D. 109 (S.D.N.Y. 2007) ........................................................................................ 26

*Pass & Seymour, Inc. v. Hubbell Inc.*,
   532 F. Supp. 2d 418 (N.D.N.Y. 2007) ................................................................................ 24

*Payment Alliance Int'l Inc. v. Ferreira*,
   530 F. Supp. 2d 477 (S.D.N.Y. 2007) ................................................................................ 27

*Register.com, Inc. v. Verio, Inc.*,
   356 F.3d 393 (2d Cir. 2004) ........................................................................................... 24, 25

*Rodriguez v. DeBuono*,
  175 F.3d 227 (2d Cir. 1999) ............................................................................... 23

*Silipos, Inc. v. Bickel*,
  No. 06-cv-2205, 2006 WL 2265055 (S.D.N.Y. Aug. 6, 2006) ............................... 28

*Tough Traveler, Ltd. v. Outbound Prods.*,
  60 F.3d 964 (2d Cir. 1995) ................................................................................. 26

*Valenti v. Drory*,
  7 Misc. 3d 1023, 2005 WL 1148498 (Sup. Ct. New York County 2005) ......................... 21, 29

*Vanlines.com LLC v. Net Marketing Group, Inc.*,
  486 F. Supp. 2d 292 (S.D.N.Y. 2007) ................................................................. 20

*Willis of New York, Inc. v. DeFelice*,
  299 A.D.2d 240, 750 N.Y.S.2d 39 ....................................................................... 27

## PRELIMINARY STATEMENT

Defendants The York Group, Inc. ("York"), Milso Industries Corporation ("MIC"), and Matthews International Corporation ("Matthews"), by and through their undersigned counsel, respectfully submit this memorandum of law in opposition to the motion brought by Order to Show Cause by Plaintiff Scott Pontone ("Mr. Pontone") seeking a preliminary injunction.  Mr. Pontone essentially seeks an order enjoining Matthews, York and MIC from enforcing certain non-competition and non-solicitation restrictive covenants agreed to with the Defendants, and enjoining Defendants from ceasing to pay Mr. Pontone the $300,000 per year that he is receiving as part of the monetary consideration for these restrictive covenants.  As set forth below, this application for such extreme relief is based on erroneous and misleading "facts," and uses the wrong standard of legal analysis.  Frankly put, this application is patently frivolous and motivated only by greed and hubris.

Scott Pontone is a party to an Asset Purchase Agreement, dated May 28, 2005 (the "Asset Purchase Agreement" or "APA"), and a "Key Employee Employment Agreement" ("2005 Employment Agreement") that were entered in connection with the sale of Milso Industries ("Old Milso"), his family's casket business to Defendants, for ultimately $110 Million.  Mr. Pontone, as a result, was subject to certain limited restrictive covenants that prohibited, *inter alia,* his ability to compete with Defendants and capitalize on his valuable contacts in the death care industry that constituted a significant part of the goodwill assets purchased by the Defendants.  For this, Mr. Pontone received millions of dollars and an executive-management level position with the Defendants that placed him second in line to run the new casket division (after his father).  These restrictive covenants were amended and reaffirmed just last year, in connection with the settlement of a lawsuit commenced by Mr. Pontone and his father ("the 2007 Amendment").  Per this settlement and the 2007 Amendment, Mr. Pontone *voluntarily* resigned from his employment, received *$8 Million* and is receiving a *$300,000 per year severance package* for his recommitment not to compete, etc. for 3 years.  These are the restrictive covenants that Mr. Pontone now seeks to undo a year later.

There is no hint of irreparable harm being suffered by Mr. Pontone.  Mr. Pontone has initiated and funded his own insurance business designed for the death care industry, which currently employs at least 8 salaried sales people and 14 commission-based counselors.  This application was not motivated by any urgent, immediate need for injunctive relief.  The purported potential business arrangements Mr. Pontone relies on for the relief sought are refuted by those very companies.  Moreover, any alleged conversations with these entities occurred months ago.  The timing of this "urgent" application was motivated by only one thing: Mr. Pontone's comfort that he had received everything he was owed by Defendants before commencing this action.  On Friday, July 11, 2008, Mr. Pontone received his final release of funds from a $10 million escrow account created in connection with the APA.  Less than one full business day later, on Monday, July 14th, Mr. Pontone commenced this action.  He apparently methodically planned that, once fully paid under the APA, he would try to convince the Court to allow him also to compete, to see if he could make even more money at the expense of Matthews.

Preliminary injunctions reflect extreme relief and are not routinely granted.  The law in this Circuit is clear that the moving party has the burden to make a "clear showing" that he is entitled to the extraordinary and drastic remedy of a preliminary injunction.  Such a showing requires proof of (a) irreparable harm; and (b) either (1) a likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly to the party requesting the preliminary relief.

On the *first*, and most important prong of the preliminary injunction test, Mr. Pontone makes no showing of irreparable harm.

> ➤ *Mr. Pontone can point to no actual or imminent injury.*  He claims that "but for" the restrictive covenants that are in place he could accept offers from three different casket manufacturers (Batesville, Aurora and "Sinosaurus") to directly compete in Matthews' sales territories.  In fact, declarations from two of these companies (the third is scheduled to be deposed next week) shows there are no such offers.

> ➤ *Allegations of loss or potential loss of profits does not constitute irreparable harm.*  Mr. Pontone's sole claim of damages is based on his inability to "build [his] business

- 2 -

and increase profits." He repeatedly refers to lost profits," in his papers. This is inadequate as a matter of law.

➢ *Mr. Pontone is not being prevented from earning a livelihood and has received, and continues to receive, significant consideration in exchange for his contractually bargained-for restrictive covenants.* Mr. Pontone is the owner of a growing insurance sales business; he employs over 20 sales people and counselors; he is self-funding the business; and he just purchased another agency. As noted, he received $8 million, and is receiving a $300,000 yearly severance payment, in connection with the 2007 Amendment alone.

➢ *Mr. Pontone deliberately delayed the commencement of this action.* Mr. Pontone brings this motion now, despite the fact he signed the Asset Purchase Agreement and his employment agreement in May 2005; despite the fact that both agreements were amended and reaffirmed in May 2007; despite the fact that any purported conversations with potential business partners occurred months ago. As noted, the timing resulted from the final $10 million payment to the sellers of Milso on Friday, July 11, 2008.

➢ *Defendants will be the ones suffering irreparable harm if this relief is granted as they bought the goodwill of Milso.* The case law is clear that irreparable injury is presumed to result from competition from the seller after a buyer's purchase of a business and accompanying good will. Defendants purchased the business owned by Mr. Pontone and his family for $110 million. Over half of the purchase price was attributable to the goodwill and customer base of Mr. Pontone's business. Defendants put Mr. Pontone in a position of authority where he had access to Defendants' high level strategic and business information. Loss to a company's goodwill and customer base or contacts in these situations is protectable by restrictive covenants.

Equally deficient is Mr. Pontone's lack of a showing on the *second* prong of the preliminary injunction test. Mr. Pontone has shown neither (a) a likelihood of success on the merits, nor (b) serious questions as to the merits and that the balance of hardships tips in his favor.

➢ *Restrictive covenants in connection with the sale of a business are enforceable.* Restrictive Covenants of the type here -- bargained-for at arms length as part of the sale of a business -- are routinely enforced because, among other things, the buyers bargained for the goodwill of the seller.

➢ *Mr. Pontone can not challenge the enforceability of the restrictive covenants when he has consistently imposed similar ones.* Mr. Pontone admits that he had 33 of his own sales people enter into similar restrictive covenants at Milso prior to the asset purchase. Mr. Pontone acknowledged at this deposition that such covenants were legally enforceable under New York law. Mr. Pontone also used such covenants (one

as long as five years) in connection with an insurance business that he just purchased. Mr. Pontone should thus be estopped from arguing here that such limits are not reasonable.

➢ *The covenants at issue were freely negotiated by sophisticated parties in an arm's-length transaction.*  Mr. Pontone entered into each of the agreements at issue voluntarily, and with representation of counsel.  Indeed, Mr. Pontone was the lead person who negotiated on behalf of the sellers of Milso.  Mr. Pontone was represented by Clifford Chance, his current counsel, in connection with the APA and 2005 Employment Agreement.

➢ *The balance of hardships plainly favors Defendants.*  The balance of hardships favors Defendants, who spent $110 million for the goodwill, the customer information, the trade secrets of Mr. Pontone's business – *and who continue to pay Mr. Pontone his severance.*  It defies belief that Mr. Pontone would accept millions of dollars from Defendants, and continue to be paid, and now attempt to rewrite these agreements, deny Defendants the benefit of their bargain, and use company trade secrets.

In sum, there should be little doubt but that Mr. Pontone has failed to demonstrate any entitlement to injunctive relief here.  Mr. Pontone can and should be compelled to honor his covenants for the *21 months* that he has remaining on them.

## STATEMENT OF FACTS

### Background of Matthews' Investment in the Casket Business

Matthews, founded in 1850, is a designer, manufacturer and marketer principally of memorialization products and brand solutions.  Bartolacci Dec. ¶ 4.[1]  In December 2001, Matthews acquired the assets of York, the second largest manufacturer of wood and metal burial caskets in the United States of America, as a wholly-owned subsidiary of Matthews and operates York as such today.  Prior to its acquisition of York, Matthews had not been involved in the business of manufacturing, marketing and selling burial caskets.  Bartolacci Dec. ¶ 4.  The casket division of Matthews was and continues to often be referred to as York.  Bartolacci Dec. ¶ 5.

---

[1]    As used herein: "Bartolacci Dec." refers to the Declaration of Joseph C. Bartolacci, dated Aug. 18, 2008, and the exhibits attached thereto, filed contemporaneously herewith; "Cooper Dec." refers to the Declaration of Steve Cooper, dated Aug. 18, 2008, filed contemporaneously herewith; "Pontone Dep. _" refers to the transcript of the deposition of Scott Pontone, taken July 31, 2008, and attached as Exhibit A to the Cooper Dec.  (Although only portions of Mr. Pontone's deposition are excerpted, Defendants have included the entire transcript for the Court's convenience).

After the acquisition, York had very limited direct sales and distribution capabilities. (Only approximately 2% of all products manufactured by York were sold directly by York to funeral home customers). Bartolacci Dec. ¶ 6. Thus, beginning in 2004, Matthews took affirmative steps to identify sales and distribution alternatives for York to re-configure its distribution model from a network of independent distributors to a direct distribution sales force. Bartolacci Dec. ¶ 7. Matthews identified Milso Industries, owned by the Pontone family, as a potential target acquisition.

**Matthews' Decision to Purchase Milso in 2005**

Milso Industries was a privately-held business headquartered in Brooklyn, New York, that consisted of Milso Industries, Inc., Milso Industries LLC and SBC Holding Corp. (collectively, "Old Milso"). Old Milso was owned and operated by members of the Pontone family, including Plaintiff Scott Pontone. Milso Industries LLC, the manufacturing arm of the company, was originally owned by five Pontone brothers, including Harry Pontone, plaintiff's father. Pontone Dep. 8:3-23; 10:13-23. Scott Pontone owned 10% of Milso Industries LLC. Pontone Dep. 11:7-13. [2]

The death care industry is a "tightly-knit" community, where personal relationships are key to the business. Bartolacci Dec. ¶ 10. Through Old Milso's marketing, sales and distribution network, the Pontone family formed, fostered and promoted numerous professional relationships with funeral directors in key territories where York had no direct sales personnel and/or distribution channel. Bartolacci Dec. ¶ 9. Mr. Pontone did so, for example, by attending numerous national trade shows, state trade shows, and meeting with funeral home operators, thus establishing a broader national reputation for Old Milso. Pontone Dep. 24-27. Mr. Pontone acknowledged that he was "well known in the casket industry." Pontone Dep. 113:3-6.

---

[2]     Mr. Pontone is also the sole beneficiary of the Harry Pontone 2005 Family Trust, an entity that owns 25% of the shares of SBC Holding Corp. (one of the "Sellers" of Old Milso). Pontone Dep. 88:18-20, Cooper Dec. Exh. 3. SBC Holding accounted for and was allocated well in excess of 60% of the $95 million sale price. Pontone Dep. 87:5-13; Bartolacci Dec. ¶ 16-17, and Exh. B thereto.

Given the Pontones' well-established reputation and direct sales capabilities, Matthews identified Old Milso as a possible acquisition target, and, beginning in 2004, Matthews, through York, actively pursued Old Milso. Bartolacci Dec. ¶ 12.

**The 2005 Asset Purchase Agreement**

Matthews viewed the acquisition of Old Milso as an opportunity to use the goodwill and professional relationships developed by the Pontones in order to create its own direct distribution channel for the marketing and sales of products manufactured by York. Bartolacci Dec. ¶ 14. As a result, Matthews was prepared to pay a premium for the acquisition of Old Milso's experienced sales team, which had well-established relationships with key funeral home customer in areas, including the Northeastern United States, where Matthews' independent distribution network was particularly vulnerable. Bartolacci Dec. ¶ 13. But in return, a key issue for York and Matthews during the negotiations with Old Milso was protecting Old Milso's goodwill, sales force and customer relationships.

During extensive negotiations between Old Milso, York, and Matthews from February through May of 2005, Mr. Pontone represented the interests of the Pontone family members in meetings with the senior management team from York and Matthews. Bartolacci Dec. ¶ 15. Mr. Pontone and the rest of the sellers were represented by Clifford Chance LLP. Pontone Dep. 64; Bartolacci Dec. ¶ 22.

These efforts resulted in the signing of the Asset Purchase Agreement in May 2005, whereby Matthews acquired the assets of Milso for an initial lump sum payment of ninety-five million dollars ($95 million), and an additional fifteen million dollars ($15 million) of contingent consideration. Bartolacci Dec. ¶ 16 and Exhibit A. The APA closed on July 11, 2005. Bartolacci Dec. ¶ 16. From the initial lump sum, Mr. Pontone received $2.7 million for his 10% stake in Milso Industries LLC. Pontone Dep. 92:16-24; Bartolacci Dec. ¶ 16 n.1 and Exh. C thereto. SBC Holding Corp., one of the "Sellers," received approximately $65.8 million at closing of the sale proceeds. Bartolacci Dec. ¶ 16 n.1 and Exh. B thereto. The Harry Pontone 2005 Family Trust owned 25% of the shares of SBC Holding and Mr. Pontone is the sole

beneficiary of that Trust.  Pontone Dep. 87, 88, 90-91, 94; Cooper Dec. Exh. B.  As a result, Mr. Pontone has received or stands to receive an as yet unidentified sum of money from the proceeds through his interest in the Trust.

Over half of the purchase price was attributable to goodwill.  Bartolacci Dec. ¶ 18.  In this regard, Section 2.1.2 of the Asset Purchase Agreement provided that the purchased assets included the "At Will Employment Nondisclosure and Non-Competition Agreements" as "Assumed Contracts."  Bartolacci Dec. ¶ 19.  These 33 contracts with Old Milso's then-current employees, contained their own confidentiality, non-solicitation and non-compete provisions, some of which were counter-signed by Mr. Pontone himself.  *See, e.g.*, Bartolacci Dec. Exh. D, Sch. 2.1.2A, ¶90; Bartolacci Dec. ¶ 20 and Exh. E, at ¶¶ 8, 9.  As Mr. Pontone acknowledges, these were necessary because Old Milso's employees possessed valuable confidential information, and the relationships of its sales force with customers were valued assets. Pontone Dep. at 80:25-82:13; 84-85.  For example, Mr. Pontone told a sales person that the company needed him to sign his employment agreement (i.e., Bartolacci Dec. Exh. E) because the company "needed to have certain safeguards in place for core, dedicated people."  Cooper Dec. Exh. C, at 15.

Mr. Pontone admitted that Old Milso insisted on these agreements to protect the company and its trade secrets, and to prevent its employees from misappropriating the relationships with customers.  Pontone Dep. 80:4-19; 82:14-83:4.   Old Milso's agreements contained express acknowledgments that Old Milso's employees possessed valuable confidential information and trade secrets, including information regarding the Company's services, operations, customers, prospective customers, terms and conditions of sale, pricing, customer requirements, customer creditworthiness, and other such information; information made available to the Company regarding competitors.  Bartolacci Dec. Exh. E, ¶ 8, 9.  Old Milso's employees agreed that for 18 months after separation from the Company, they would not directly or indirectly have any ownership interest in, or work for, advise, manage or act as an agent for, any entity or person that competes with the Company, or that is planning to compete with the Company, in the

Representative's Sales Territory or any Sales Territory (*Id.* ¶ 8(b)(i)(A), (B); 8(b)(ii)(A), (B));
nor could the employee directly or indirectly market or sell burial caskets, cremation products or
any other products or services provided by the Company to the funeral homes assigned to or
called upon by the Representative (*Id.* ¶ 8(b)(iii)(A), (B)); nor "request or advise any customer
or client of the Company, or any person or entity having business dealings with the Company, to
withdraw, curtail, or cease such business with the Company." *Id.* ¶ 9(a). Old Milso also
required each employee to acknowledge that "the terms of this limited non-competition provision
are reasonable, enforceable, and necessary to protect the Company's interests, and are valid and
enforceable." *Id.* ¶ 8(d).

Mr. Pontone reiterated at his deposition that these agreements were enforceable. Pontone
Dep. 84-85. These agreements were relied upon by Mr. Pontone to promote the value of his
business to potential suitors, such as Matthews, pre-acquisition and were, in fact, sold to
Defendants. Bartolacci Dec. ¶¶ 19-21. Indeed, these agreements proved to be essential in
preserving the value of Milso when Mr. Pontone and his family sold their business to Matthews.
*See, e.g.*, Bartolacci Dec. ¶ 29.

**Restrictive Covenants in the 2005 Transaction Documents**

Having determined to ultimately pay up to $110 million, Matthews expected and required
an equal level of protection in the negotiated transaction documents. The Asset Purchase
Agreement, and the employment agreements entered into with "Key Employees" (such as Mr.
Pontone) that were signed in connection with the Asset Purchase Agreement, contained non-
solicitation, non-competition, and confidentiality provisions. Mr. Pontone voluntarily signed
both documents, agreeing to these provisions. Bartolacci Dec. ¶ 22; Pontone Dep. 69:3-5.

As a signatory to the APA, Mr. Pontone agreed that he would indefinitely keep
confidential and otherwise not reveal, among other things, any information relating to the
Seller's business (i.e., the sales, marketing, manufacture and distribution of products and services
in the death care industry as presently conducted by the Sellers), including customer lists or other
customer information, trade secrets, marketing plans or proposals, financial information or other

data, documents and material of a confidential nature. APA, § 12.1. He further agreed that for five (5) years after the closing of the APA he would not directly or indirectly own, manage, operate, finance or participate in any business that manufactured, processed, marketed, distributed or sold products comparable to the product sold by the Sellers in the United States. Bartolacci Dec. ¶ 23, Exh. A (APA), §12.3, p. 37-38.

In connection with the APA, Mr. Pontone and the other "Key Employees" of Milso entered into "Key Employee Employment Agreements" with York. Pontone Dep. 69:3-5. These employment agreements were executed by Mr. Pontone contemporaneously with the APA, delivered with the Asset Purchase Agreement, attached as Exhibit C to the APA, and became effective upon the closing of the APA ("2005 Employment Agreement). Bartolacci Dec. ¶ 24, Exh. F (2005 Employment Agreement).

As the Executive Vice-President of York, Mr. Pontone expressly recognized and acknowledged his ongoing obligations with respect to the Company's confidential information. In Article III of the 2005 Employment Agreement, Mr. Pontone acknowledged that, as to the "Company" (defined in Article III to include The York Group, Inc., and the companies directly or indirectly through one or more intermediaries controlled by, in control of, or under common control with, The York Group, Inc.):

> (a) in the course of [his] employment by the Sellers, and in the future by the Company, [Mr. Pontone] has acquired and will continue to acquire information which could include, in whole or in part, information concerning the Company's sales, sales volume, sales methods, sales proposals, customers and prospective customers, identity of customers and prospective customers, identity of key purchasing personnel in the employ of customers and prospective customers, amount or kind of customers' purchases from the Company, the company's sources of supply, the Company's computer programs, system of documentation, special hardware, product hardware, related software development, the Company's manuals, formulae, processes, methods, machines, compositions, ideas, improvements, inventions or other confidential or proprietary information belonging to the Company or relating to the Company's affairs (collectively, "Confidential Information");
>
> . . . .
>
> (d) it is essential to the protection of the Company's goodwill and to the maintenance of the Company's competitive position that, to the extent provided in Article IV hereof, the Confidential Information be kept secret and that [Mr. Pontone] not disclose the Confidential Information to others . . . or use the Confidential Information to [Pontone's] own advantage or the advantage of others.

Bartolacci Dec. Exh. F, at Art. III.[3]

Mr. Pontone also acknowledged in this agreement that it was "essential for the proper protection of the business of the Company" for a designated "Non-Compete Period" that he be restrained from: soliciting or inducing any employee to leave the Company or to hire or attempt to hire any employee of the Company; soliciting the trade of or trading with the customers and suppliers of the Company for any business purpose other than in connection with his duties; and competing against the Company for a reasonable period following termination of his employment.  Bartolacci Dec. Exh. F, Art. III, and §§ 4.06, 4.07, 4.08.  Mr. Pontone covenanted and agreed that during this time he "shall not engage, directly or indirectly, whether as principal or as agent, officer, director, employee, consultant, shareholder, investor, financier or otherwise, alone or in association with any other person, corporation, or other entity, in any Competing Business."  Bartolacci Dec. Exh. F, § 4.06(a).  These covenants extended through the term of Mr. Pontone's employment, and for 3 years thereafter, bringing the original restrictions to September 30, 2013.

Mr. Pontone further agreed that "following the termination of [his] employment with the Company, to the same extent and for the same period (if any) that [Mr. Pontone] continues to be subject to the restrictions of Section 4.06, [Mr. Pontone] shall not directly or indirectly, solicit the trade of, or trade with, any customers or prospective customers or suppliers of the Company with respect to the manufacture or sale by the Company of caskets, urns, memorials or cremation products, or the supplies necessary to manufacture the same."  Bartolacci Dec. Exh. F, § 4.07.

The restrictions on the key employees, including Mr. Pontone, ensuring that the sales relationships could be preserved post-closing, were a fundamental aspect of the APA.  Matthews, through York, would never have ultimately paid a premium of $110 million to acquire Milso without enforceable non-competition, non-solicitation and confidentiality provisions securely in place.  Bartolacci Dec. ¶ 29.

---

[3] Section 4.01 provides an indefinite restriction regarding the disclosure of Confidential Information.

**Post-closing**

Since the purchase of York in 2001, Matthews has been committed to successfully developing the York and Milso brands within the industry, and to developing its direct distribution capabilities.  In that regard, Matthews has invested *over $250 million* into its casket division in the last seven years.  Bartolacci Dec. ¶ 30.

Toward these ends, under the terms and conditions of the Key Employee Employment Agreements, Harry Pontone, the father of Scott Pontone, became President of York and directed the day-to-day operations of Matthews' casket division from Milso's corporate offices in Brooklyn in New York.  Bartolacci Dec. ¶ 31.  Scott Pontone stood to become President of York if Harry Pontone ceased to act as President for any reason.  Bartolacci Dec. Exh. F, § 1.01.

In his capacity as an Executive Vice-President of the casket division of Matthews, Scott Pontone had direct responsibility for coordinating, developing and managing the York and Milso sales forces, including all customer sales and marketing initiatives.  Further, Scott Pontone was wholly entrusted with managing and developing the direct distribution channel for Matthews' casket division.  Bartolacci Dec. ¶ 32.

Immediately following Matthews' acquisition of Milso, York, at the direction of Mr. Pontone, and through the newly formed Milso Industries Corporation ("MIC"), commenced expanding its direct distribution capabilities by opening more strategically located warehouses throughout the United States to cost-effectively service funeral homes.  Bartolacci Dec. ¶ 33. Mr. Pontone was provided with the necessary financial resources by York to effectively service existing customers and aggressively market prospective customers, including the opportunity to acquire additional, smaller regional independent distributors.  Mr. Pontone also regularly attended national and state trade shows, conventions, conferences and meetings with funeral home directors on behalf of York.  Bartolacci Dec. ¶ 34; Pontone Dep. 26-31.  As he had with Old Milso, Mr. Pontone continued to visit customers (funeral directors) with his sales people. Cooper Dec. Exh. C, at 22-23.

In his capacity as an Executive Vice-President, Mr. Pontone had continuous and unrestricted access to highly proprietary information and trade secrets, including, but not limited to:  information concerning past, present and prospective business contacts and acquisition targets; Matthews' business valuation models and acquisition financing capabilities; past, present and prospective customers; customer lists, including key customer contact information; customer purchasing histories, trends and requirements, including profitability of sales on a per customer basis; confidential information of customers, including past and present discount and rebate structure; customer service methods; policies; earnings and cost information; profitability; manufacturing margins; contracts; sales information; sales volume; sales methods; past, present and prospective sales proposals; distribution information; past, present and prospective sources of supply and material specifications; product and service pricing and pricing strategies; inventory; marketing strategies and other marketing information; information and knowledge regarding the business organization, work force and employees of Matthews; identities of past, present and prospective suppliers; business plans, including information and strategies addressing joint ventures, partnerships, mergers and acquisitions considered by Matthews; technical information; financial information; computer programs; information regarding litigation matters, including specific litigation strategies addressing litigation that is either currently pending or contemplated being pursued and/or initiated by Matthews; computer software and codes; know-how; creations; designs; dimensions; materials; equipment; compositions; ideas; processes; procedures or improvements; inventions; technical data; operations material; operational information; manufacturing information; systems and improvements; methods of doing business; research and development information; and internal business policies and practices.  Bartolacci Dec. ¶ 35.

Mr. Pontone was well aware that knowing a customer's purchase preferences, its buying patterns, pricing issues and showroom requirements, further assured a successful sales network and the preservation of sales volume.  Information such as annual purchase volumes and pricing/discount/rebate structure were not and are not widely known in the industry.  Quite

notably, under Mr. Pontone's instruction, the sales team under his direct supervision was required to use "Milso Sales Incentive Agreements" when contracting with new customers and such agreements included comprehensive confidentiality covenants protecting the confidentiality of pricing, discounts and rebates. *See, e.g.,* Bartolacci Dec. Exh. G.

One of the key components of Old Milso's trade secrets was its customer lists, which included the key names of individual contacts at funeral homes. These were purchased, at considerable expense, through the Asset Purchase Agreement, and later expanded following the acquisition. It was and is the express and actual policy of Matthews, it subsidiaries and affiliates to treat all of its proprietary and trade secret information – and particularly its customer lists and related information – as confidential, and to take steps to protect the secrecy of this information. Bartolacci Dec. ¶ 37 and Exh. H, at 7 (Matthew's Policy Manual).[4] These lists permitted the sales team, under Mr. Pontone's leadership, to remain well-positioned to market and sell both Milso and York-branded caskets. Bartolacci Dec. ¶ 37.

From a sales and marketing perspective, Mr. Pontone directly benefited from the York acquisition as it provided him access to the proprietary sales and marketing information of a former competitor and further provided a broader array of products in his sales portfolio to offer to both current and prospective customers of Milso. Indeed, Mr. Pontone now had the opportunity to promote a wider range of product offerings, including wood caskets manufactured at York's facilities. Bartolacci Dec. ¶ 38.

**Payment of the Unearned "Earn-out"**

Under the terms of the Asset Purchase Agreement, the Pontone family members were, in addition to the initial $95 million payment, eligible for a contingent consideration payment of $7.5 million if the operating profit of Milso's business exceeded the base operating profit for the fiscal year ending September 30, 2006. However, Milso's operating profit, for the year ended

---

4    Matthews' Code of Business Conduct and Ethics, binding directors, officers and employees of Matthews and its subsidiaries (such as York), provides that the obligation to maintain the confidentiality of confidential information continues even after employment ends. Bartolacci Dec. Exh. H, at 7.

September 30, 2006, was only $14.0 million, which was $2.0 million short of the target of $16.0 million and, as a result, meant that the Pontones were not entitled to the initial contingent payment of $7.5 million under the Asset Purchase Agreement.  As a good will gesture to the Pontone family members, Matthews, through York, offered to pay $7.0 million and to make a remaining additional bonus opportunity of $8.0 million (which represented a total of $15 million in additional contingent consideration).  The Pontone family members, including Mr. Pontone, accepted this good will gesture by Matthews and amended the Asset Purchase Agreement and Key Employee Employment Agreements in December 2006 to reflect this understanding. Bartolacci Dec. ¶ 40 and Exh. I.  And although the Pontone management team at York had under-performed in failing to meet the targeted earnings for the casket division during the first full fiscal year following the acquisition, Harry Pontone remained President of York and Scott Pontone remained the Executive Vice-President of Matthews' casket division.  Bartolacci Dec. ¶ 41.

**Mr. Pontone's First Lawsuit Against York**

Nonetheless, barely a few months after this good will gesture, in April 2007, Scott and Harry Pontone filed a complaint against York in the United States District Court for the Southern District of New York alleging, in part, that York had breached certain provisions of the Key Employee Employment Agreement concerning the right to control York's business operations. Bartolacci Dec. ¶ 42.  (As in the case at bar, where Mr. Pontone commenced this action after receiving escrow funds, this is another example of Mr. Pontone waiting to be paid money, and then commencing litigation.).

The parties resolved the dispute right away by entering into a settlement agreement, agreeing, among other things, to accelerate the remaining bonus which the Pontone families were eligible for by paying the entire additional $8 million contingent payment to Scott Pontone on May 30, 2007.  Bartolacci Dec. ¶ 43 and Exh. K; Pontone Dep. 97.  The settlement agreement involved no admission of liability by any party, and contained a release from Scott and Harry Pontone, of, among other things, all claims of a breach of contract by Matthews, York and MIC,

for any monies due and owing them under their Key Employee Employment Agreements as amended.  Bartolacci Dec. ¶ 44 and Exh. K, p. 3.

In connection with the settlement, the 2007 Amendment was entered into, which had the effect of amending the Key Employee Agreement of Mr. Pontone (and Harry Pontone) and the Asset Purchase Agreement.  Bartolacci Dec. Exh. L (the 2007 Amendment).  Mr. Pontone was represented by counsel and voluntarily signed these documents.  Pontone Dep. 98:20-99:11.

The 2007 Amendment amended the restrictive covenants against non-competition and non-solicitation that Mr. Pontone was bound by under both the APA and his employment agreement.  Specifically, Sections 12.2 and 12.3 of the APA, and Sections 4.06, 4.07 and 4.08 of the 2005 Employment Agreement were deleted and replaced by Sections 4.06, 4.07 and 4.08 in the 2007 Amendment document.  Bartolacci Dec. Exh. L.

In new Section 4.06, Mr. Pontone covenanted and agreed, in pertinent part, that "for three (3) years following the effective date of [Mr. Pontone's] resignation from the Company, [Mr. Pontone] shall not engage, directly or indirectly, whether as principal or as agent, officer, director, employee, consultant, shareholder, investor, financer or otherwise, alone or in association with any other person, corporation, or other entity, in the manufacture, marketing or sale of caskets or any other product of the type presently manufactured, marketed or sold by The York Group, Inc. or Milso [Industries Corp.]."  Bartolacci Dec. Exh. L, § 4.06.

In new Section 4.07, Mr. Pontone covenanted and agreed, in pertinent part, that "for three (3) years following the effective date of [Mr. Pontone's] resignation from the Company, [Mr. Pontone] shall not engage, directly or indirectly, solicit the trade of, or trade with, any customer of The York Group, Inc. or Milso [Industries Corp.] with respect to the manufacture, marketing or sale of caskets or any other product of the type presently manufactured, marketed or sold by The York Group, Inc. or Milso [Industries Corp.]."[5]  Bartolacci Dec. Exh. L.

---

5    Section 4.08 is a 4-year prohibition on soliciting employees.  Bartolacci Dec. Exh. L, § 4.08.

These amendments had the effect of actually *shortening* the restricted periods in that the restrictive covenants in place pursuant to the 2005 Employment Agreement expired on September 30, 2013.  Bartolacci Dec. Exh. F, § 4.06(a)(b).  The 2007 Amendment changed this to a three year period from the effective date Mr. Pontone resigned from the Company, or until May 31, 2010.  Bartolacci Dec. Exh. L, § 4.06, 4.07.

**Mr. Pontone Voluntarily Resigns from the Company**

Pursuant to the terms of the settlement, Harry Pontone agreed to be re-assigned to Chairman of the Board of Directors of York.  Although Matthews' and York's management team specifically requested that Scott Pontone remain employed by the casket division of Matthews, Scott Pontone chose to voluntarily resign from employment following the filing of the lawsuit.  In addition to the other compensation he received, York agreed to pay Scott Pontone an annual salary of $300,000, which is essentially a continuation of his salary, which York currently continues to pay.  Bartolacci Dec. ¶ 50.

With the exception of Scott Pontone, all of the other Pontone family members remain employed by York, including Harry, Michael, Louis, Thomas, Andrew and Steven.  In addition, Thomas Pontone, the cousin of Scott Pontone, has been promoted to an executive management position within the casket division of Matthews.  Bartolacci Dec. ¶ 51.

**Mr. Pontone Initiates the Current Suit**

Mr. Pontone received what he was entitled to from Matthews from the purchase of Old Milso.  He received $2.7 million of the initial lump sum acquisition price.  Bartolacci Dec. ¶ 52 and Exh. C.  Mr. Pontone also is the sole beneficiary of the Harry Pontone 2005 Family Trust, which has a 25% interest in SBC Holding Corp., which received $65.8 million in connection with the APA.   Mr. Pontone received a significant portion of $7 million as contingent consideration payments contemplated in the APA as "earn-outs," that were paid to the Sellers of Old Milso.  Bartolacci Dec. ¶ 52.  Mr. Pontone received the $8 million of contingent consideration payments on May 31, 2007.  Bartolacci Dec. ¶ 52 and Exh. J.  He also received a base salary of approximately $100,000 per year plus his "allotted share" of the "compensation

pool" of the Key Employees under the terms of the 2005 Employment Agreement. Bartolacci Dec. ¶ 52 and Exh. F, p. 2-3. Since the settlement in 2007, York agreed to pay, and has been paying Mr. Pontone $300,000 a year in severance.[6]  Bartolacci Dec. ¶ 52. Finally, on July 11, 2008, the Harry Pontone 2005 Family Trust, received an additional $2,250,000 of the $10 million released from monies held in escrow. Bartolacci Dec. ¶ 52; Cooper Dec. Exh. B. This payment was the last payment due the sellers of Milso. Bartolacci Dec. ¶ 52. Less than one (1) full business day later, on Monday, July 14, 2008, Mr. Pontone filed this lawsuit.

Mr. Pontone waited until these last monies were paid before commencing this premeditated lawsuit. This was three years after his voluntary execution of the Asset Purchase Agreement and the 2005 Employment Agreement, and one year after his voluntary agreement to the amendment to the Asset Purchase Agreement and the 2005 Employment Agreement, in which Mr. Pontone affirmed the validity and scope of the restrictive covenants.

**Mr. Pontone Is Suffering No Irreparable Harm**

Mr. Pontone claims in his moving papers that without an injunction he will suffer irreparable harm because he has been offered the opportunity to enter into competing business ventures "but for" the presence of the Restrictive Covenants in his employment agreement. Mr. Pontone alleges in his Complaint that "several manufacturers and distributors of burial caskets have approached him about the possibility of engaging in new ventures to market and sell caskets using the same sales force he uses to offer insurance products." Complaint ¶ 40. He has identified three such "manufacturers and distributors": Aurora Casket Company, Aurora, Indiana; Batesville Casket Company, Batesville, Indiana; and "Sinosaurus," San Francisco, California. Cooper Dec. Exh. D (Pontone Interrogatory Response.) Resp. No. 2; Pontone Dep. 108:12-18.

---

6    Pontone asks the Court to issue an order enjoining any "retaliatory cessation" of Mr. Pontone's benefits. Pontone Mem. at 18-19. This claim is wholly unfounded as there has not been any cessation of his payments (Bartolacci Decl. ¶ 52) and reflects the hubris of Pontone, who seeks to be paid by Matthews while seeking to be set free to contemporaneously compete with Matthews by court order. Respectfully, the Court should refuse such a request, especially given there is no matter in controversy.

At his July 31, 2008 deposition, Mr. Pontone claimed that Mike DiBease of Batesville, Chip Ray of Aurora, and Bill Kirk of "Sinosaurus" approached him to sell caskets. Pontone Dep. 108:19-109:15. He claims that at a dinner with Dibease in March 2008, Dibease said to Mr. Pontone "he'd like to sell, have me sell caskets, and he said, you know, they would not want to get involved in a lawsuit if I had a noncompete." Pontone Dep. 109:16-22. Mr. Pontone claims that DiBease essentially made him "an offer to go sell me caskets if [Mr. Pontone] didn't have a noncompete." Pontone Dep. 111:19-23. As to this "offer," Mr. Pontone said they did not talk about holding this "offer" open for a certain period of time. Pontone Dep. 117:3-9. Mr. Pontone claims Chip Ray of Aurora made a similar offer. Pontone Dep. 115:5-8. Mr. Pontone also disclosed in answers to interrogatories and testified at his deposition that a company named "Sinosaurus" in San Francisco, California, made a similar offer and that this offer is only open for a short time. Pontone Dep. 116:15-19;118:10-16; Cooper Dec. Exh. D, at p. 3.

Batesville and Aurora, however, have submitted sworn declarations indicating that neither company has made any offer to Mr. Pontone nor do they intend to. Cooper Dec. Exh. E (Batesville Declaration), ¶ 6; Exh. F (Aurora Declaration) ¶4. Both unequivocally state that they have not made "any offer to hire Scott Pontone or enter into a specific project, venture, or business with him." Cooper Dec. Exh. E. ¶ 6; Exh. F ¶ 4. As to "Sinosaurus," a diligent search of the White Pages for San Francisco, the internet, the California Secretary of State website, and other sources, revealed no such company's name. Cooper Dec. ¶ 6. Defendants have served "SinoSource International Company, Inc.," of Burlingame, California, with a Subpoena, currently returnable on August 25, 2008, in case "SinoSource" is the company that Mr. Pontone erroneously referred to. In any event, there does not appear to be any substance to Mr. Pontone's claim that he has offers, let alone for a limited time only.

Moreover, Mr. Pontone, since his separation from Matthews in 2007, has not been prevented from pursuing his livelihood. He admittedly is a salesman by trade. Pontone Dep. 112. He has established and financed a business that sells insurance products in the funeral industry. Pontone Dep. 120:6-12. Since departing York less than 15 months ago, Mr. Pontone

has acquired new businesses and now owns Trust 100 LLC, which sells a multitude of insurance products Dep. 120.  Specifically, he sells property and casualty insurance and pre-need insurance (i.e., the pre-funding and prearrangement of funerals).  He has a sales staff that calls on customers (funeral homes or families of funeral homes) to promote the insurance services and products that his company sells.  Pontone Dep. 105-106.  He also wholly owns Whitmore Consulting, that sells property and casualty insurance.  Pontone Dep. 126:8-9.  He employs 8 salespeople, 14 or 15 funeral counselors, who are paid salaries or commissions, and an unpaid CFO.  Pontone Dep. 127:22-128:9.

Further, he recently completed on July 20, 2008 the acquisition of Vanguard America Company and the Ensure Agency LLC, that were rolled into Trust 100.  Pontone Dep. 131; Cooper Dec. Exh. G, H.  Mr. Pontone is the sole investor in these companies, and he has put nearly $1 million of his own money into them.  Pontone Dep. 134:17-23.  These are significant transactions in which, it appears, Mr. Pontone was once again represented by Clifford Chance, his current counsel and counsel on the original sale of Old Milso.  Cooper Dec. Exh. G, § 2.6.  The Asset Purchase Agreement (Cooper Dec. Exh. G) and the Share Purchase Agreement (Exh. H) are extensively detailed transaction documents which, significantly here, contain specific non-compete and non-solicitation covenants.  The T100/Vanguard Asset Purchase Agreement contains a three (3) year non-competition and non-solicitation covenant.  Cooper Dec. Exh. G, § 5.2, p. 10.  The T100/Ensure Share Purchase Agreement contains a five (5) year non-competition and non-solicitation covenant.  Cooper Dec. Exh. H., § 5.2.

The foregoing factual recitation makes plain that Mr. Pontone's application is frivolous. Given the history of the relationships, how much money Mr. Pontone has been paid by Matthews, the bargained-for contractual restrictions, the absence of any facts indicating he is being prevented from pursuing his livelihood, Mr. Pontone's own insistence on non-compete and non-solicitation agreements in his own purchase of business transactions, the timing of this motion, etc., it is respectfully submitted that the Court should deny Mr. Pontone's application.[7]

---

7       Defendants reserve the right to seek sanctions.

## ARGUMENT

### I.   PLAINTIFF IS NOT ENTITLED TO A PRELIMINARY INJUNCTION

#### A.   STANDARDS FOR PRELIMINARY INJUNCTION

Preliminary injunctive relief is an "extraordinary and drastic remedy which should not be routinely granted." *Jay's Custom Stringing, Inc. v. Yu*, No. 01 CIV 1690, 2001 WL 761067 (S.D.N.Y. July 6, 2001) (Pauley, J.) (denying motion for preliminary injunction) (citing *Medical Soc'y of the State of New York v. Toia*, 560 F.2d 535, 538 (2d Cir. 1977)). Such a motion should not be granted "unless the movant, by a *clear showing*, carries the burden of persuasion." *Vanlines.com LLC v. Net Marketing Group, Inc.*, 486 F. Supp. 2d 292, 294-95 (S.D.N.Y. 2007) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)) (emphasis in original).

To obtain a preliminary injunction, the moving party must thus show "(a) irreparable harm; and (b) either (1) a likelihood of success on the merits, or  (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly to the party requesting the preliminary relief." *Vanlines.com LLC*, 486 F.Supp.2d at 294-95 (citing *Jackson Dairy, Inc. v. H.P. Hood*, 596 F.2d 70, 72 (2d Cir. 1979)). A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir. 1986).

Unlike most restrictive covenant cases where the employer brings the action and bears the burden of proof, Mr. Pontone has the burden, and can not meet it. He has utterly failed to offer any proof of irreparable harm. He has not shown a likelihood of success on the merits. He has neither raised any serious questions going to the merits of his claims nor overcome the balance of hardships that plainly tilts in *Defendants'* favor.

#### B.   MR. PONTONE CANNOT DEMONSTRATE IRREPARABLE HARM

Mr. Pontone, as the moving party, must first demonstrate that irreparable injury is likely before the other requirements for the issuance of an injunction will be considered. *Citibank, N.A.* 756 F.2d at 275. "To establish irreparable harm, a party must sufficiently demonstrate that "there is a continuing harm which cannot be adequately redressed by final relief on the merits

and for which money damages cannot provide adequate compensation." *Greylock Global Opportunity Master Fund Ltd. v. Province of Mendoza*, 04 Civ. 7643, 2004 WL 2290900 (S.D.N.Y. Oct. 12, 2004); *Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir. 1995). "[W]here money damages are adequate compensation, a preliminary injunction will not issue since equity should not intervene where there is an adequate remedy at law." *Loveridge v. Pendleton Woolen Mills, Inc.*, 788 F.2d 914, 918 (2d Cir. 1986) (citation omitted). For this reason alone, the Court should deny Mr. Pontone's motion.

### 1.    <u>The Potential Irreparable Harm is to Defendants—Not Mr. Pontone</u>

The only irreparable harm that will be suffered is by the *Defendants*, if the preliminary injunction is issued. The case law is clear that in a non-competition agreement in relation to a sale of a business, "irreparable injury is presumed…to protect the buyer's purchase of the business and accompanying good will." *Valenti v. Drory*, 7 Misc. 3d 1023, 2005 WL 1148498 (Sup. Ct. New York County 2005); *Manhattan Real Estate Equities Group, v. Pine Equity, N.Y.*, 16 A.D.3d 292, 791 N.Y.S.2d 418, 419 (1st Dep't 2005) ("irreparable injury is presumed from the breach of a non-competition agreement entered into to protect a buyer's purchase of a business and accompanying goodwill"); *see also Hay Group, Inc. v. Nadel*, 170 A.D.2d 398, 400, 566 N.Y.S.2d 616 (1st Dep't 1991) (where claim is based on the sale of a business and good will, irreparable injuries were established without showing actual loss of customers). Irreparable harm is presumed to protect the *Defendants*, as buyers, and not Mr. Pontone as one of the sellers of the business.

Here, Defendants' purchased Plaintiff's casket manufacturing and distribution business for $110 million. The purchase price included the good will and customer base of Plaintiff's business. Matthews is thus entitled to have the courts enforce the restrictive covenants it bargained for and paid for handsomely. The leading case is *Mohawk Maint. Co., Inc. v. Kessler*, 52 N.Y.2d 276, 286 (1981). In *Mohawk Maintenance*, the Court of Appeals held that defendants remained under a positive and *permanent* duty to refrain from interfering with the rights acquired by plaintiff as a result of it acquisition of good will. *Id.* at 287. In articulating this "implied

covenant" not to solicit former customers, the Court of Appeals noted that this duty is imposed "by law in order to prevent the seller from taking back that which he has purported to sell." *Id.* at 285. Specifically, the Court noted that a seller cannot actively interfere with the purchaser's relationship with his newly acquired customers by capitalizing on their loyalties with an effort to recapture them as customers because it would impair the good will. *Id.* at 285-86. Importantly, the Court of Appeals held that the duration of duty to refrain from acting to impair "good faith" transferred in connection with the sale of a business, i.e., the implied covenant not to solicit, is not in any way limited by durational provisions contained in any express restrictive covenant or by the legal principle that covenants must be reasonable in scope. *Id.* at 279. In light of this rationale, the Court concluded that it would make little sense to lift the prohibition after a "reasonable" time. *Id.* at 286. Finally, the court noted that the duty not to impair good will exists independent of any additional obligations undertaken pursuant to express restrictive covenants. *Id.*

"[G]ood will" is an intangible asset which may be transferred to a purchaser and reflects the purchaser's right to "expect that the firm's established customers will continue to patronize business." *Kraft Agency, Inc. v. Delmonico*, 110 A.D.2d 177, 494 N.Y.S.2d 77 (4th Dep't 1985) (holding that covenant not to compete was ancillary to buy and sell agreement and not to employment contract) (citing *Mohawk*, 52 N.Y.2d at 285); *see also In re Schultz*, 250 B.R. 22, 25 (Bankr. E.D.N.Y. 2000) (noting that good will includes "name recognition, consumer brand loyalty, or special relationships with suppliers or clients."); *In re Teller*, 75 Misc. 592, 136 N.Y.S. 457, 459 (Sur. Ct. New York County 1912) ("[t]he good will of a commercial partnership is an asset of the firm, separate and distinct from its stock of goods, capital or other assets, and consists of the advantage or benefit of which inures to the firm beyond the mere value of the physical property, in consequence of the general public patronage which it receives from constant or habitual customers, on account of its location, reputation…").

New York courts have recognized that the loss to a company's good will and customer base or contacts constitute irreparable harm. *See, e.g., Four Times Square Assoc. v. Cigna*

*Investments, Inc.*, 306 A.D.2d 4, 764 N.Y.S.2d 1 (1st Dep't 2003) (concluding that the threat to good will and creditworthiness is sufficient to establish irreparable injury warranting preliminary injunction); *Battenkill Veterinary Equine P.C. v. Cangelosi*, 1 A.D.3d 856, 859, 768 N.Y.S.2d 504 (3d Dep't 2003) (noting that irreparable injury may be shown through a loss of customers, permanent loss of revenues and loss of referral business usually garnered from clients). Moreover, the violation of a non-compete provision in connection with the sale of a business establishes irreparable harm even without the necessity of showing actual loss of customers. *See, e.g., Capri Nail Corp. v. Iris Nail Corp.*, 13 A.D.3d 129, 786 N.Y.S.2d 167 (1st Dep't 2004).

The sale of Old Milso to Matthews was clearly a sale of good will and irreparable harm should be presumed to Defendants, not Mr. Pontone.

### 2.    Mr. Pontone's Alleged Harm Is Completely Speculative

Irreparable harm must be imminent, not remote or speculative. *Jay's Custom*, 2001 WL 761067, at *8 ("[t]he mere possibility of harm is not sufficient: the harm must be imminent and the movant must show it is likely to suffer irreparable harm if equitable relief is denied . . . . If irreparable harm is remote, speculative, or a mere possibility, the motion must be denied") (citations omitted); *see also Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) (Movant must show that the alleged injury to him is neither remote nor speculative, but actual and imminent, and cannot be remedied "if a court waits until the end of trial to resolve the harm"). The record, here, however, shows the complete paucity of any proof that Mr. Pontone will suffer any imminent harm.

Though Mr. Pontone has asserted that "but for" the restrictive covenants currently in place, he has offers to enter into a business with three other casket manufacturers, Batesville Casket Company, Aurora Casket Company, and "Sinosaurus," Batesville and Aurora have submitted sworn declarations indicating that neither company has made any offer to Mr. Pontone nor do they intend to. Cooper Dec. Exh. E, ¶ 6, and Exh. F, ¶ 4. As to "Sinosaurus," there is no such company. Cooper Dec. ¶ 6.

Moreover, what Mr. Pontone is mainly complaining about is that he stands to lose sales and sales profits. *See*, *e.g.*, Complaint ¶ 43 (combining insurance and casket sales "more profitable" and restrictive covenants are causing "loss of profit"); ¶ 44 (Pontone unable to "increase profit"). Such allegations of potential future loss of sales and profit do not constitute irreparable harm. *See, e.g.*, *Pass & Seymour, Inc. v. Hubbell Inc.*, 532 F. Supp. 2d 418 (N.D.N.Y. 2007) (noting that loss of sales does not constitute irreparable harm). The *Hubbell* Court noted that "neither the difficulty of calculating losses in market share, nor speculation that such losses might occur" justify the extraordinary relief of injunction. *Id.* at 432. Here, Plaintiff's "imaginative, worst case scenario" simply does not justify injunctive relief. *Ivy Mar Co. v. C.R. Seasons Ltd.*, 907 F. Supp. 547, 564-65 (E.D.N.Y. 1995).

Mr. Pontone cites to *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112 (2d Cir. 2005) and other cases for the proposition that loss of market share may constitute irreparable harm. Pontone Mem. at 17. These cases are inapposite. They have nothing to do with the effect of contractually bargained-for restrictive covenants of any kind. *Freedom Holdings*, for example, arises out of the tobacco industry class action litigation, where the plaintiffs, cigarette importers, argued that complying with New York state laws requiring them to make annual payments into state escrow account would cause them irreparable harm because of potential market share loss to these companies and possibility that they might have to sell their cigarettes at higher prices. *Id.* at 114. The Court *rejected* plaintiff's wholly-speculative argument that the State's conduct would force Plaintiffs out of business or fundamentally change the nature of their operations and denied the preliminary injunction as there was no showing that damages could not be the remedy at the end of trial. *Id.* at 115. Equally here, Mr. Pontone has not shown that the alleged potential loss of sales in a market is not speculative and remote, precisely the lack of showing of injury that does not warrant an injunction. *Id.* at 114.[8]

---

8  Similarly inapposite is *Doran v. Salem Inn, Inc.*, 422 U.S. 922 (1975), *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004), and *Novartis Consumer Health, Inc. v. Johnson & Johnson Merck Consumer Pharm. Co.*, 290 F.3d 578 (3d Cir. 2002), none of which involve restrictive covenants in the sale of a business. *Doran* involved three corporations that operated bars who brought suit to challenge the constitutionality of a town ordinance that prohibited
Continued on following page

The restrictive covenants at issue here do not prevent Plaintiff from earning a livelihood, further undercutting any argument that Mr. Pontone will be irreparably harmed. *See, e.g., Estee Lauder Cos. v. Batra*, 430 F. Supp. 2d 158, 182 (S.D.N.Y. 2006) (concluding that absence from an industry for a few months will not significantly impair ability to earn a livelihood in the future and therefore will not cause undue hardship); *Gillon v. Merrill Lynch Interfunding, Inc.*, 1994 WL 873351, at *3-4 (Sup. Ct. New York County 1994) (denying motion for preliminary injunction and noting that plaintiff will not be deprived of livelihood in the business, but only from working in one aspect); *see also Chernoff Diamond & Co. v. Fitzmaurice, Inc.*, 234 A.D.2d 200, 651 N.Y.S.2d 504 (1st Dep't 1996) (noting that restrictive covenant did not prohibit party from pursuing his profession… "there is no reason to suppose that this limitation will prevent defendant from pursuing his livelihood or that it will have the effect of precluding him from operating a successful insurance business.").

While Courts may be concerned with a restrictive covenant that impairs an individual's ability to earn a livelihood, such concern is largely mitigated when the individual continues to receive a salary in return for not competing. *See Estee Lauder*, 430 F. Supp. 2d at 182 (granting preliminary injunction to former employer since, among reasons, the risk of former employee's loss of livelihood "is entirely mitigated by the fact that Estee Lauder will continue to pay his salary of $375, 000 per year for the duration of the 'sitting out' period" and can earn additional compensation from non-competitive work).

Similarly here, not only was the limited restrictive covenant freely negotiated, but he was, and continues to be, generously compensated in exchange for his covenant not to compete. As

---

Continued from previous page

topless dancing. *Id.* at 922. The Court emphasized that preliminary relief is appropriate where there is a showing of a "substantial loss of business and perhaps even bankruptcy." *Id.* at 932. Here, Pontone has not (and cannot) allege the type of substantial loss to his entire business that could lead to eventual bankruptcy. *Novartis* and *Register.com* relied on a deliberate act of wrongdoing as causing loss of business, potentially justifying injunctive relief. *Register.com*, 356 F.3d at 404 (provider's misleading sales practices warranted injunctive relief); *Novartis,* 290 F.3d at 596. Of course, Mr. Pontone cannot point to any such affirmative wrongdoing by Defendants.

such, Mr. Pontone cannot now argue that he is irreparably harmed by the restrictive covenant when he received, and continues to receive, ample consideration in exchange.

### 3.    Mr. Pontone's Delay In Acting Negates An Assertion of Irreparable Harm

Mr. Pontone's delay and timing in bringing his motion for a preliminary injunction also undercuts any claim of irreparable harm.  *See Century Time Ltd v. Interchron Ltd*, 729 F. Supp. 366 (S.D.N.Y. 1990) (holding that the party's unexplained delay in bringing a claim warranted denial of injunctive relief).  Mr. Pontone's motion has been brought in connection with a restrictive covenant that was incident to a sale of the business that Defendants purchased from Mr. Pontone and his family on May 28, 2005, over three years ago, and one year since Mr. Pontone reaffirmed the restrictive covenants.  Thus, Plaintiff's significant delay undercuts his assertions of irreparable harm.  *See Park West Radiology v. Carecore Nat. LLC*, 240 F.R.D. 109 (S.D.N.Y. 2007); *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 969 (2d Cir. 1995) ("[t]he failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.").

In addition to the unexcused delay, the timing of Mr. Pontone's filing for injunctive relief shows that Mr. Pontone made a completely tactical decision in filing suit.  On Friday July 11, 2008, Mr. Pontone received a significant portion of the release of $10 million in escrow monies for the sale of the business.  The following Monday, July 14, 2008, Mr. Pontone commenced this action.  The timing of his motion suggests that Mr. Pontone conveniently waited to receive his wire transfer and then filed the suit to gain a tactical advantage.  *Century Time*, 729 F. Supp. 366 (finding that the party's unexplained delay in bringing a claim for injunctive relief suggested that the timing of claim was motivated by tactical and procedural considerations that tipped the balance of hardships on favor of the non-moving party and warranted denial of injunctive relief).

C.    **MR. PONTONE HAS NOT SHOWN**
       **ANY LIKELIHOOD OF SUCCESS ON THE MERITS**

1.    <u>**The Restrictive Covenants Are Reasonable and Should be Enforced**</u>

Mr. Pontone is also not entitled to a preliminary injunction because he has not demonstrated a likelihood to succeed on the merits since the covenants at issue will likely be found to be reasonable and enforceable.

Generally, restrictive covenants in a contract for the sale of a business are enforceable and "limit the seller's rights to launch a new enterprise which competes with the business sold." *Mathais v. Jacobs*, 167 F. Supp. 2d 606, 610 -611 (S.D.N.Y. 2001). Restrictive covenants in this context "are routinely enforced because the buyer has in part bargained for the good will of the sellers customers." *Id.*; *Payment Alliance Int'l Inc. v. Ferreira,* 530 F. Supp. 2d 477, 483 (S.D.N.Y. 2007) (finds a covenant not to compete ancillary to sale of business, granting company motion for preliminary injunction, enjoining former senior executive from competing for two-year period); *see also Mohawk Maint. Co.,* 52 N.Y.2d at 284 (noting the modern trend to give covenants in connection with the sale of business and its accompanying good will full effect). If the seller is permitted to initiate a competing enterprise, the buyer would not be getting the full benefit of the bargain. *Mathais*, 167 F. Supp. 2d at 611.

Restrictive covenants that do not impose professional hardships nor deprive a party of ability to earn a livelihood have been held to be reasonable. *See, e.g.*, *Willis of New York, Inc. v. DeFelice*, 299 A.D. 2d 240, 242, 750 N.Y.S.2d 39 (restrictive covenant will not impose professional hardship and "will not deprive him of a livelihood or prevent him from being successful in his new job."). Here, the restrictive covenants prevent Mr. Pontone from participating in a competing casket manufacturing and distribution business for the next 21 months. The covenant does not prevent Mr. Pontone from earning a living as a salesman or working in distribution in any other industry. In fact, he has done so in his insurance business.

The restrictive covenants at issue here were freely negotiated by two sophisticated parties, represented by experienced counsel, in arms length transactions. *See Bannert v. Am. Can Co.*, No. 75-1480, 1976 WL 194432 (May 27, 1976) ("[t]he greater deference granted a covenant

- 27 -

not to compete incident to a sale of business is rooted primarily in the recognition of the substantially equal bargaining power of freely contracting parties…"); *see also Chernoff*, 234 A.D.2d at 202. In upholding a covenant not to compete, the *Chernoff* court highlighted that the restriction was freely bargained for as part of a negotiated contract. Similarly, here, the restrictive covenant was freely negotiated by sophisticated parties in exchange for consideration.

Mr. Pontone would have this Court believe he was a mere employee, without knowledge of Defendants' trade secrets, and that the restrictive covenants are not protecting any legitimate interests of Defendants. *See*, *e.g.*, Pontone Mem. at 12 (citing, for example, *Silipos, Inc. v. Bickel*, No. 06-cv-2205, 2006 WL 2265055 (S.D.N.Y. Aug. 6, 2006)). However, Mr. Pontone was no mere employee. He was Vice President of the Casket Division, who was, by contract, the next person to succeed his father as President. He was exposed to an extensive array of high level information concerning company sales, sales volume, sales proposal, customers and prospective customers, the identities of key purchasing personnel in the customers' employ, discounts and pricing, strategic business plans, marketing strategies, and the like. Bartolacci Dec. ¶ 35 and Exh. F (2005 Employment Agreement), Art. III.

Moreover, Plaintiff's reliance on his purported lack of knowledge of trade secrets is misplaced. That this case concerns restrictive covenants attendant to the sale of a business is readily apparent. As a result, *Silipos* and the many other cases cited by Mr. Pontone in his moving papers are inapposite as such cases analyzed restrictive covenants in connection with employment agreements, which courts analyze under a different standard of review than the sale of business context. *Silipos* is also distinguishable in that there, the plaintiff had been a shareholder and passive investor. Here, however, Mr. Pontone was not only a shareholder but a key executive who had negotiated the sale of Old Milso to Matthews.

Mr. Pontone also cites to *Silipos* for the proposition that a global reach of a restrictive covenant is inherently unreasonable. *See* Pontone Mem. at 14. However, Mr. Pontone fails to acknowledge that restrictive covenants with worldwide scope have been upheld as reasonable given the nature and scope of the business. *See Estee Lauder Co.*, 430 F. Supp.2d at 181. The

*Estee Lauder* court concluded that the international scope of the restriction was reasonable under the circumstances give the international scope of the business and the cosmetic business in general.  Similarly, in *Business Intel. Servs. v. Hudson*, 580 F. Supp. 1068 (S.D.N.Y. 1984), the court found that the worldwide scope was reasonable and valid because it was sufficiently limited in time.  This argument is also of no moment since Mr. Pontone is not even seeking or considering any  international opportunities.  Pontone Dep. 119:16-120:3.[9]

### D.    NO SERIOUS QUESTIONS AS TO THE MERITS AND THE BALANCE OF EQUITIES FAVORS DEFENDANTS

Mr. Pontone raises no serious questions regarding the merits, or compelling argument as to how the balance of the equities favors him in this motion.  Pontone Mem. 18.  If anyone could be harmed here, it is Defendants who spent $110 million in securing these rights.

Mr. Pontone also offers no valid legal argument.  He, for example, cites to *Doninger v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008) (Pontone Mem. at 18) which is wholly distinguishable.  The plaintiff in *Doninger* alleged violations of his first amendment rights, putting the Court's analysis of the preliminary injunction is in a wholly different context.  527 F.3d at 47.  The Court assumed for the purpose of the appeal that the burden of showing irreparable harm was met because of the likely chilling effect on free speech (*Id.* at 47-48); here, Mr. Pontone cannot benefit from any such presumption of irreparable harm.  Finally, the *Doninger* Court held that a preliminary injunction was not warranted.  Therefore, Plaintiff's reliance on *Doninger* is entirely misplaced.

Given that the law presumes irreparable harm to the purchaser of a business "to protect the buyer's purchase of the business and accompanying good will" (*Valenti,* 2005 WL 1148498, at *2), irreparable harm should be  presumed to protect the Defendants, as buyers here, thus tilting the balance of the equities decidedly in Defendants' favor.

---

9       Here, the restrictive covenants at issue are reasonable in both scope and duration.  Of course, if the Court finds the limitation to be unreasonable, it can "blue pencil" the covenant to restrict the term to a reasonable geographic limitation, and grant partial enforcement for what it considers to be an overly broad restrictive covenant.  *See, e.g., Omni Consulting v. Marina Consulting,* No. 01-CV-511A, 2007 WL 2693813, at *6 (W.D.N.Y Sept. 12, 2007).

## **CONCLUSION**

For all the foregoing reasons, Plaintiff Scott Pontone's motion for a preliminary injunction must be denied in all respects.


DATED:  August 18, 2008.                    REED SMITH LLP


                                   By:_____/s/_____
                                      John H. Doyle, III
                                      Steven Cooper
                                      Lawrence J. Reina
                                      599 Lexington Avenue
                                      New York, New York  10022
                                      (212) 521-5400
                                      Attorneys for Defendants