UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SCOTT PONTONE,

        Plaintiff,

v.

THE YORK GROUP, INC., MILSO
INDUSTRIES CORPORATION, AND
MATTHEWS INTERNATIONAL
CORPORATION,

        Defendants.

No. 08-CV-6314 (WHP)

**DECLARATION OF**
**JOSEPH C. BARTOLACCI**

---

JOSEPH C. BARTOLACCI, declares under penalty of perjury:

1. I am currently the President and Chief Executive Officer ("CEO") and a Director for Matthews International Corporation ("Matthews"), as well as a corporate officer and a Director of The York Group, Inc. ("York") and Milso Industries Corporation ("MIC"). In addition, I was previously the President of York from March of 2004 through July 11, 2005.

2. I am fully familiar with the facts set forth herein, and submit this declaration, pursuant to 28 U.S.C. § 1746, in support of Defendants' opposition to the motion brought by Order to Show Cause by Plaintiff Scott Pontone ("Pontone") seeking a preliminary injunction.

3. In his motion, and the Complaint upon which it is based, Pontone seeks an order enjoining Matthews, York and MIC from enforcing non-competition and non-solicitation covenants that Defendants obtained in 2005 when they purchased the companies of which Plaintiff was a part-owner.

8040729.1

**Background of Matthews' Investment in the Casket Business**

4. Matthews, founded in 1850, is a designer, manufacturer and marketer principally of memorialization products and brand solutions. In December 2001, Matthews acquired the stock of York, the second largest manufacturer of wood and metal burial caskets in the United States of America. Prior to its acquisition of York, Matthews had not been involved in the business of manufacturing, marketing and selling burial caskets.

5. York, a Delaware corporation, was acquired as a wholly-owned subsidiary of Matthews, a Pennsylvania corporation, and continues to operate as such today. Accordingly, the casket division of Matthews was and continues to be frequently referred to as York.

6. At the time Matthews acquired York, York relied substantially upon a network of nine (9) independent distributors throughout the United States to market and sell its products. York's casket distribution network sold York's products to funeral homes and was frequently referred to as the York Distribution Association ("YDA"). Indeed, York relied upon its authorized YDA network to develop relationships with funeral home customers and, as such, approximately ninety-eight percent (98%) of all products manufactured by York were marketed and sold through independent distribution. Accordingly, prior to May of 2005, York had very limited direct sales and distribution capabilities as reflected by the fact that only approximately two percent (2%) of all products manufactured by York were sold directly by York to funeral home customers.

7. Beginning in 2004, however, Matthews began developing serious concerns regarding the reliability of certain distributors within York's authorized network. Specifically, certain distributors attempted to develop an alternative supply from China. Accordingly, Matthews took affirmative steps to identify various sales and distribution alternatives for York

and, as a result, began proactively considering how best to re-configure its distribution model from a network of independent distributors to a direct distribution sales force.

**Matthews' Decision to Purchase Milso in 2005**

8. For several decades, Milso Industries had been in the business of manufacturing, marketing, selling and delivering caskets and other funeral related items to funeral homes and had recently expanded its distribution capabilities from the Northeast United States into the Southwest United States. Specifically, Milso Industries was a privately-held business headquartered in Brooklyn, New York, that consisted of Milso Industries, Inc., Milso Industries LLC and SBC Holding Corp. (collectively, "Old Milso").

9. Old Milso was owned and operated by members of the Pontone family, including Scott Pontone. The Pontones, including Harry, Scott, Michael, Louis, Thomas, Andrew and Steven, had developed a favorable reputation within the death-care industry for effectively servicing funeral directors and families of the deceased in the sale, ordering and transportation of caskets from Old Milso's and its affiliates' manufacturing facilities to funeral homes. Indeed, as a distribution company, Old Milso had a well-established marketing, sales and distribution network, including strategically located distribution centers and an experienced sales team. Through its marketing, sales and distribution network, the Pontone family capably developed numerous professional relationships with funeral directors in key territories where York had no direct sales personnel and/or direct distribution channel.

10. York and Old Milso's businesses rely upon a series of valuable relationships with funeral home customers who trust York and Old Milso's abilities to service them both timely and with a full range of quality product offerings. Given the subject matter at issue, the death care industry has evolved over a long period of time into a "tightly-knit" community, where personal relationships are prioritized.

11. Customer relationships had been formed, fostered and promoted over many years by the Pontone family and Old Milso's sales personnel. Although Matthews did not have the benefit of such well-established customer relationships when it acquired York in December of 2001, in an ongoing effort to better service funeral home customers, York expended significant resources to develop merchandising systems in funeral homes, commonly referred to as "showrooms," to promote its products and increase profitability for funeral homes.

12. Given the Pontones' well-established reputation in marketing, sales and direct distribution and given an eroding confidence in segments of the YDA independent network, Matthews identified Old Milso as a possible acquisition target. Beginning in 2004, Matthews, through York, decided to actively pursue Old Milso with the goal of purchasing the Pontones' goodwill and customer relationships to serve as the basis for its direct sales initiative in territories where it would chose to sever ties with its independent distributor network.

13. Without its own sales force and an essentially non-existent direct distribution channel, Matthews was prepared to pay a premium for the acquisition of Old Milso's experienced sales team, which had well-established relationships with key funeral home customers in areas, including the Northeastern United States, where Matthews' independent distribution network was particularly vulnerable.

14.     York's potential acquisition of Old Milso was favorably viewed by Matthews as a realistic opportunity to utilize the goodwill and professional relationships developed by the Pontones in order to create its own direct distribution channel for the marketing and sales of products manufactured by York. But in return, a key issue for York and Matthews during the negotiations with Old Milso was protecting Old Milso's goodwill and professional relationships, including the ongoing employment of key members of the sales team from Old Milso, including, most importantly, certain members of the Pontone family. This concern is addressed in the restrictive covenants of the asset purchase agreement and employment agreements ultimately agreed-upon and executed by the parties.

15.     During extensive negotiations between Old Milso and York from February through May of 2005, Scott Pontone consistently and exclusively represented the interests of the Pontone family members in meetings with the senior management team from York and Matthews.

**The 2005 Asset Purchase Agreement**

16.     Pursuant to an Asset Purchase Agreement, dated May 28, 2005 ("the Asset Purchase Agreement"), Matthews ultimately acquired the assets of Old Milso for an initial lump sum payment of ninety-five million dollars ($95 million) and with an additional fifteen million dollars ($15 million) of contingent consideration. A copy of the Asset Purchase Agreement (without exhibits) is attached as hereto as Exhibit A. The Asset Purchase closed on July 11, 2005.[1]

---

[1] SBC Holding Corp. received at closing approximately $65.8 million, with the balance allocated among the other Selling entities. *See* Closing Wire Transfer Instructions, attached as Exhibit B hereto. Mr. Pontone directly received $2.7 million of the initial lump sum acquisition price. *See* Pontone K-1 for 2005, attached as Exhibit C hereto.

5

17.     The purchase of the goodwill and relationships of Old Milso was deemed by Matthews a necessary progression given its prior commitment of significant financial resources to develop the York brand within the casket industry. Specifically, the purchase of Old Milso's goodwill and customer relationships was strategically significant as York was completing construction in 2005 of its own state-of-the-art metal casket manufacturing facility, which provided cost-effective and highly efficient manufacturing capabilities.

18.     Matthews, through York, was largely purchasing the name, goodwill and the relationships that the Pontone family and its experienced sales team had developed with funeral homes for the eventual purchase price of $110 million. Indeed, over half of the purchase price was subsequently booked as goodwill. Although Old Milso possessed little in the way of real estate or other more traditional tangible assets, Matthews was prepared to commit to a purchase price potentially in excess of $100 million in order to finally establish its own direct sales capabilities in the casket industry.

19.     In recognition of the fact that a substantial portion of the "assets" being purchased was the goodwill of Old Milso Industries, Section 2.1.2 of the Asset Purchase Agreement expressly provided that the purchased assets included certain "Assumed Contracts." *See* Exh. A, § 2.1.2.

20.     The "Assumed Contracts" in Schedule 2.1.2A to the Asset Purchase Agreement expressly included 33 employment contracts with Old Milso's employees, each of which contained confidentiality, non-solicitation and non-compete provisions. A copy of Schedule 2.1.2A is attached hereto as Exhibit D, ¶90. A copy of one such Old Milso employment contract, for Edward Nazzaro, is attached as Exhibit E, *see* ¶¶ 8, 9. Some of the Old Milso

employment agreements, including the Nazzaro agreement, had been counter-signed on behalf of Old Milso by Scott Pontone. Exh. E, at p. 7.

21.   These agreements expressly recognize that Old Milso's employees possessed valuable confidential information and trade secrets, including information regarding the Company's services, operations, customers, prospective customers, terms and conditions of sale, pricing, customer requirements, customer creditworthiness, and other such information; information made available to the Company regarding competitors. Exh. E, at ¶¶ 8, 9. Thus, Old Milso, and specifically Scott Pontone, insisted on non-competition and non-solicitation restrictive covenants in these employment agreements for 18 months after termination from the Company. *Id.*

**Restrictive Covenants in the 2005 Transaction Documents**

22.   Having determined to ultimately pay in excess of $100 million, Matthews expected and required similar protection in the negotiated transaction documents. Thus, the Asset Purchase Agreement, and the employment agreements entered into with "Key Employees" (such as Scott Pontone) that were signed in connection with the Asset Purchase Agreement, contained non-solicitation, non-competition, and confidentiality provisions. Scott Pontone signed both documents, agreeing to these provisions. He was represented by attorneys from the international law firm of Clifford Chance LLP at the time.

23.   Under Section 12.3 of the Asset Purchase Agreement, for example, Pontone agreed that for a period beginning on the Closing Date and ending on the fifth anniversary thereof, he would not

> directly or indirectly . . . own, manage, operate, finance or participate in the ownership, management, operation or financing of or permit its name to be used by or in connection

with any business or enterprise engaged in the manufacture, processing, marketing, distribution or sale of products comparable to the Products in the United States."2

Exh. A, §12.3, p. 37-38.

24.    In connection with the APA, Pontone and the other "Key Employees" of Old Milso entered into "Key Employee Employment Agreements" with York. These executed employment agreements, were delivered with the Asset Purchase Agreement, and attached as Exhibit C to the APA, and were effective upon the closing of the APA. *See* Exh. A, at p. 1. A copy of Scott Pontone's 2005 Employment Agreement ("2005 Employment Agreement) is attached as Exhibit F.

25.    As a senior employee of York, Mr. Pontone expressly recognized and acknowledged his ongoing obligations with respect to the Company's confidential information. In Article III of the 2005 Employment Agreement, Mr. Pontone acknowledged that, as to the "Company" (defined in Article III to include The York Group, Inc., and the companies directly or indirectly through one or more intermediaries controlled by, in control of, or under common control with, The York Group, Inc.):

> (a) in the course of [his] employment by the Sellers, and in the future by the Company, [Pontone] has acquired and will continue to acquire information which could include, in whole or in part, information concerning the Company's sales, sales volume, sales methods, sales proposals, customers and prospective customers, identity of customers and prospective customers, identity of key purchasing personnel in the employ of customers and prospective customers, amount or kind of customers' purchases from the Company, the company's sources of supply, the Company's computer programs, system of documentation, special hardware, product hardware, related software development, the Company's manuals, formulae, processes, methods, machines, compositions, ideas, improvements, inventions or other confidential or proprietary information belonging to

---

2    Section 1.79 of the APA defined "Products" as "any of the products manufactured, marketed sold or distributed by any Seller in the conduct of the Business as of the Closing Date." Section 1.20 defined "Business" as "the sales, marketing, manufacture and distribution of products and services in the death care industry as presently conducted by Sellers." Exh. A, § 1.79.

> the Company or relating to the Company's affairs (collectively, "Confidential Information");
>
> . . . .
>
> (d) it is essential to the protection of the Company's goodwill and to the maintenance of the Company's competitive position that, to the extent provided in Article IV hereof, the Confidential Information be kept secret and that [Pontone] not disclose the Confidential Information to others . . . or use the Confidential Information to [Pontone's] own advantage or the advantage of others.

2005 Employment Agreement, Art. III.[3]

26. Mr. Pontone also acknowledged in the employment agreement that "it is essential for the proper protection of the business of the Company" for a designated "Non-Compete Period that

> he be restrained from soliciting or inducing any employee of the Company to leave its employ, from hiring or attempting to hire any employee of the Company, from soliciting the trade of or trading with the customers and suppliers of the Company for any business purpose other than in connection with his duties, and from competing against the Company for a reasonable period following termination of his employment.

Exh. F, Art. III, and §§ 4.06, 4.07, 4.08 thereto. This covenant extended through the term of Mr. Pontone's employment, and for three years thereafter, bringing the original restrictions to September 30, 2013.

27. Pontone thus covenanted and agreed that he "shall not engage, directly or indirectly, whether as principal or as agent, officer, director, employee, consultant, shareholder, investor, financier or otherwise, alone or in association with any other person, corporation, or other entity, in any Competing Business." Exh. F, § 4.06(a). For purposes of the Agreement, "Competing Business" was defined to mean "any person, corporation or other entity which manufactures, markets or sells caskets, urns, memorials or cremation equipment." *Id.*

---

[3] Section 4.01 provides an indefinite restriction regarding the disclosure of Confidential Information.

9

28. Pontone further agreed that "following the termination of [his] employment with the Company, to the same extent and for the same period (if any) that [Pontone] continues to be subject to the restrictions of Section 4.06, [Pontone] shall not directly or indirectly, solicit the trade of, or trade with, any customers or prospective customers or suppliers of the Company with respect to the manufacture or sale by the Company of caskets, urns, memorials or cremation products, or the supplies necessary to manufacture the same." Exh. F, § 4.07.

29. The contractual restrictions on the key employees, including Scott Pontone, ensuring that the sales relationships could be preserved post-closing were a fundamental aspect of the Asset Purchase Agreement. Matthews, through York, would never have ultimately paid a premium of $110 million to acquire Old Milso without enforceable non-competition, non-solicitation and confidentiality provisions securely in place.

**Post-closing**

30. Since the purchase of York in 2001, Matthews has been committed to successfully developing the York and Milso brands within the industry, and to developing its direct distribution capabilities. In that regard, Matthews has invested over $250 million into its casket division in the last seven years.

31. Toward these ends, under the terms and conditions of the Key Employee Employment Agreements, Harry Pontone, the father of Scott Pontone, became President of York and directed the day-to-day operations of Matthews' casket division from Milso's corporate offices in Brooklyn in New York. Scott Pontone stood to become President of York if Harry Pontone ceased to act as President for any reason. Exh. F, § 1.01.

32. In his capacity as a Executive Vice-President of the casket division of Matthews, Scott Pontone had direct responsibility for coordinating, developing and managing the York and

Milso sales forces, including all customer sales and marketing initiatives. Further, Scott Pontone was wholly entrusted with managing and developing the direct distribution channel for Matthews' casket division.

33. Immediately following Matthews' acquisition of Milso, York, at the direction of Scott Pontone, and through the newly formed Milso Industries Corporation ("MIC"), commenced expanding its direct distribution capabilities by opening more strategically located warehouses throughout the United States to cost-effectively service funeral homes.

34. As Executive Vice-President, Scott Pontone focused his efforts at York on expanding the direct distribution footprint first developed by Milso in an effort to service new potential customers. This was particularly important in regions of the United States where Milso's direct sales network would ultimately be expected to replace York's independent distributor network. Scott Pontone was consistently provided with the necessary financial resources by York to effectively service existing customers and aggressively market prospective customers. Scott Pontone also regularly attended trade shows, conventions and conferences with funeral home directors on behalf of York.

35. In his capacity as a Executive Vice-President, Scott Pontone had continuous and unrestricted access to highly proprietary information and trade secrets, including, but not limited to: information concerning past, present and prospective business contacts and acquisition targets; Matthews' business valuation models and acquisition financing capabilities; past, present and prospective customers; customer lists, including key customer contact information; customer purchasing histories, trends and requirements, including profitability of sales on a per customer basis; confidential information of customers, including past and present discount and rebate structure; customer service methods; policies; earnings and cost information; profitability;

manufacturing margins; contracts; sales information; sales volume; sales methods; past, present and prospective sales proposals; distribution information; past, present and prospective sources of supply and material specifications; product and service pricing and pricing strategies; inventory; marketing strategies and other marketing information; information and knowledge regarding the business organization, work force and employees of Matthews; identities of past, present and prospective suppliers; business plans, including information and strategies addressing joint ventures, partnerships, mergers and acquisitions considered by Matthews; technical information; financial information; computer programs; information regarding litigation matters, including specific litigation strategies addressing litigation that is either currently pending or contemplated being pursued and/or initiated by Matthews; computer software and codes; know-how; creations; designs; dimensions; materials; equipment; compositions; ideas; processes; procedures or improvements; inventions; technical data; operations material; operational information; manufacturing information; systems and improvements; methods of doing business; research and development information; and internal business policies and practices.

36.    Scott Pontone was well aware that knowing a customer's purchase preferences, its buying patterns, pricing issues and showroom requirements, further assured a successful sales network and the preservation of sales volume. Information such as annual purchase volumes and pricing/discount/rebate structure were not and are not widely known in the industry. Quite notably, under Scott Pontone's instruction, the sales team under his direct supervision was required to use "Milso Sales Incentive Agreements" when contracting with new customers and such agreements included comprehensive confidentiality covenants protecting the confidentiality

of pricing, discounts and rebates. A copy of a form of the Milso Sales Incentive Agreements is attached as Exhibit G.

37. One of the key components of Milso's trade secrets was its customer lists, which included the key names of individual contacts at funeral homes. These were purchased, at considerable expense, through the Asset Purchase Agreement, and later expanded following the acquisition. These lists also permitted the sales team, under Scott Pontone's leadership, to remain well-positioned to market and sell both Milso and York-branded caskets.

38. From a sales and marketing perspective, Scott Pontone directly benefited from the York acquisition as it provided him access to the proprietary sales and marketing information of a former competitor and further provided a broader array of products in his sales portfolio to offer to both current and existing customers of Milso. Indeed, Scott Pontone now had the opportunity to promote a wider range of product offerings, including wood caskets manufactured at York's facilities.

39. It was and is the express and actual policy of Matthews, it subsidiaries and affiliates to treat all of its proprietary and trade secret information – and particularly its customer lists and related information – as confidential, and to take steps to protect the secrecy of this information. Matthews' Code of Business Conduct and Ethics, binding on directors, officers and employees of Matthews and its subsidiaries (such as York and which Scott Pontone was plainly aware of), recognizes the confidentiality of customer information and provides that the obligation to maintain the confidentiality of confidential information continues even after employment ends. *See* Code of Business Conduct and Ethics, a copy of which is attached as Exh. H, at 7.

**Payment of the Unearned "Earn-out"**

40.     Under the terms of the Asset Purchase Agreement, dated May 28, 2005, the Pontone family members, in addition to the initial $95 million payment, were eligible for a contingent consideration payment of $7.5 million if the operating profit of Milso's business exceeded the base operating profit for the fiscal year ending September 30, 2006. However, Milso's operating profit for the year ended September 30, 2006 was only $14.0 million, which was $2.0 million short of the target of $16.0 million and, as a result, meant that the Pontones were not entitled to the initial contingent payment of $7.5 million under the Asset Purchase Agreement. As a good will gesture to the Pontone family members, Matthews, through York, offered to pay $7.0 million and to make a remaining additional bonus opportunity of $8.0 million (which represented a total of $15 million in additional contingent consideration). The Pontone family members, including Scott Pontone, accepted this good will gesture by Matthews and amended the Asset Purchase Agreement and Key Employee Employment Agreements in December 2006 to reflect this understanding. A copy of the First Amendment to the Asset Purchase Agreement and Key Employment Agreement of Scott Pontone is attached as Exhibit I.

41.     Although the Pontone management team at York had under-performed in failing to meet the targeted earnings for the casket division during the first full fiscal year following the acquisition, Harry Pontone remained President of York and his son, Scott Pontone, remained the Executive Vice-President of Matthews' casket division.

**Pontone's First Lawsuit Against York**

42.     Barely a few months after this goodwill gesture, in April 2007, Scott and Harry Pontone filed a complaint against York in the United States District Court for the Southern District of New York alleging, in part, that York had breached certain provisions of the Key Employee Employment Agreement concerning the right to control York's business operations.

43.     The parties quickly resolved the dispute in May 2007 by entering into a settlement agreement, agreeing, among other things, to accelerating the remaining bonus which the Pontone families were eligible for by paying the entire $8 million contingent payment to Scott Pontone on May 30, 2007. A copy of the payment to Pontone is attached as Exhibit J.

44.     The settlement agreement involved no admission of liability by any party, and contained a release from Scott and Harry Pontone, of, among other things, all claims of a breach of contract by Matthews, York and MIC, for any monies due and owing them under their Key Employee Employment Agreements as amended. *See* copy of the Settlement Agreement, attached hereto as Exhibit K, at 3.

45.     In connection with the settlement, the Key Employee Agreement of Scott Pontone (and Harry Pontone) and the Asset Purchase Agreement were amended ("the 2007 Amendment"). A copy of the 2007 Amendment is attached as Exhibit L.

46.     Among other things, the 2007 Amendment amended the restrictive covenants against non-competition and non-solicitation that Pontone was bound by under both the APA and his employment agreement. Specifically, Sections 12.2 and 12.3 of the APA, and Sections 4.06, 4.07 and 4.08 of the 20045 Employment Agreement were deleted and replaced by Sections 4.06, 4.07 and 4.08 in the 2007 Amendment document.

15

47.     In new Section 4.06, Pontone covenanted and agreed, in pertinent part, that "for three (3) years following the effective date of [Pontone's] resignation from the Company, [Pontone] shall not engage, directly or indirectly, whether as principal or as agent, officer, director, employee, consultant, shareholder, investor, financer or otherwise, alone or in association with any other person, corporation, or other entity, in the manufacture, marketing or sale of caskets or any other product of the type presently manufactured, marketed or sold by The York Group, Inc. or Milso [Industries Corp.]." Exh. L.

48.     In new Section 4.07, Pontone covenanted and agreed, in pertinent part, that "for three (3) years following the effective date of [Pontone's] resignation from the Company, [Pontone] shall not engage, directly or indirectly, solicit the trade of, or trade with, any customer of The York Group, Inc. or Milso [Industries Corp.] with respect to the manufacture, marketing or sale of caskets or any other product of the type presently manufactured, marketed or sold by The York Group, Inc. or Milso [Industries Corp.]." Exh. L.

49.     In new Section 4.08, Pontone covenanted and agreed, in pertinent part, that "for four (4) years following the effective date of [Pontone's] resignation from the Company, [Pontone] shall not engage, directly or indirectly, solicit or induce or attempt to solicit or induce any employee of The York Group, Inc. or Milso [Industries Corp.] to leave either company or hire any such employee." Exh. L.

**Pontone Voluntarily Resigns from the Company**

50.     The settlement contemplated Harry Pontone being re-assigned to Chairman of the Board of Directors of York. Although Matthews' and York's management team specifically requested that Scott Pontone remain employed by the casket division of Matthews, Scott Pontone chose to voluntarily resign from employment following the filing of the lawsuit. In addition to

16

the other compensation he received in connection with this bargained-for settlement, York agreed to pay Scott Pontone an annual salary of $300,000 (essentially a continuation of his salary), which York continues to pay.

51.  With the exception of Scott Pontone, all of the other Pontone family members remain employed by York, including Harry, Michael, Louis, Thomas, Andrew and Steven. In addition, Thomas Pontone, the cousin of Scott Pontone, has been promoted to an executive management position within the casket division of Matthews.

**Pontone Initiates this Lawsuit**

52.  Mr. Pontone received what he was entitled to from Matthews from the purchase of Old Milso. Mr. Pontone received $2.7 million of the initial lump sum acquisition price. Mr. Pontone also is the sole beneficiary of the Harry Pontone 2005 Family Trust, which has a 25% interest in SBC Holding Corp., which received $65.8 million in connection with the APA. Mr. Pontone received a portion of $7 million as contingent consideration payments contemplated in the APA as "earn-outs," that were paid to the Sellers of Milso. Mr. Pontone received the $8 million of contingent consideration payments on May 31, 2007. Additionally, York agreed to pay, and has been paying, Pontone an additional $300,000 a year in severance in connection with the settlement. Finally, on July 11, 2008, the Harry Pontone 2005 Family Trust, of which Pontone is the sole beneficiary, received $2,250,000 of the $10 million released from monies held in escrow. This payment was the last payment due the sellers of Milso. This last payment was made on Friday, July 11, 2008, and, less than one business day later, on Monday, July 14, 2008, Mr. Pontone filed this lawsuit.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 18th day of August, 2008.

_____
Joseph C. Bartolacci