**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT NEW YORK**

| | |
|---|---|
| SCOTT PONTONE, | |
|      Plaintiff, | **Docket No.** |
|      v. | 08-cv-6314 (WHP) |
| THE YORK GROUP, INC., MILSO INDUSTRIES CORPORATION, and MATTHEWS INTERNATIONAL CORPORATION, | August 25, 2008 |
|      Defendants. | |

**REPLY IN SUPPORT OF**
**PLAINTIFF  SCOTT PONTONE'S**
**MOTION FOR PRELIMINARY INJUNCTION**

# Table of Contents

PRELIMINARY STATEMENT ................................................................................ 1

CLARIFICATION OF FACTS ............................................................................... 3

ARGUMENT ............................................................................................................ 10

I.      The Restrictive Covenants Are Unreasonable and Unenforceable
        Under Any Standard............................................................................................ 10

        A.      Defendants Do Not Defend the Restrictive Covenants Under
                New York Employment Law.......................................................................... 10

        B.      The Restrictive Covenants Are Not "Ancillary to the Sale of a
                Business"....................................................................................................... 11

        C.      All Restrictive Covenants Must Be Reasonable — And These
                Restrictive Covenants Are Not .................................................................... 14

II.     The Restrictive Covenants Are Causing Irreparable Harm........................ 16

III.    The Equities Favor the Issuance of a Preliminary Injunction................... 19

CONCLUSION ......................................................................................................... 20

## Table of Authorities

**CASES**

*Alexander & Alexander Services, Inc. v. Maloff*, 482 N.Y.S2d 386
(N.Y. App. Div. 4 Dep't. 1984) ................................................................. 13

*American Broadcasting Co., Inc. v. Wolf*, 420 N.E.2d 363 (N.Y. 1981) ..................................... 10

*BDO Seidman v. Hirshberg*, 712 N.E.2d 1220 (N.Y. 1999) ........................................ 10

*Bus. Intelligence Servs., Inc. v. Hudson*, 580 F. Supp. 1068 (S.D.N.Y. 1984) ........................ 15

*Chernoff Diamond & Co. v. Fitzmaurice, Inc. et al.*, 651 N.Y.S.2d 504
(N.Y. App. Div. 1st Dep't 1996) ................................................................. 14

*Cliff v. R.R.S., Inc.*, 620 N.Y.S.2d 190 (N.Y. App. Div. 3rd Dept. 1994) ................................. 13

*EarthWeb, Inc. v. Schlack*, 71 F. Supp. 2d 299 (S.D.N.Y. 1999) ................................. 11

*EMI Latin v. Bautista*, No. 03 Civ. 0947, 2003 WL 470333 (S.D.N.Y. Feb. 24, 2003) .............. 19

*Estee Lauder Cos., Inc. v. Batra*, 430 F. Supp. 2d 158 (S.D.N.Y. 2006) ........................ 11, 15, 16

*Interphoto Corp. v. Minolta Corp.*, 417 F.2d 621 (2d Cir.1969) ................................. 18

*Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70 (2d Cir. 1979) ............................. 17

*Jay's Custom Stringing, Inc v. Yu*, No. 01 Civ. 1690 (WHP), 2001 WL 761067
(S.D.N.Y. Jul. 6, 2001) ................................................................. 11

*Manley's Mighty Mart, L.L.C. v. Reynolds*, No. 0017822/0041, 2004 WL 5394716
(N.Y. Sup. Ct. Broome Cty. Sep. 22, 2004) ................................................................. 13

*Marietta Corp. v. Fairhurst*, 754 N.Y.S.2d 62 (N.Y. App. Div. 3d Dep't 2003) ........................ 11

*Mathais v. Jacobs*, 167 F. Supp. 2d 606 (S.D.N.Y. 2001) ................................................. 14

*Mohawk Maint. Co., Inc. v. Kessler*, 419 N.E.2d 324 (N.Y. 1981) ................................. 12

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*,
290 F.3d 578, 596 (3d Cir. 2002) ................................................................. 18

*Purchasing Associates, Inc. v. Weitz*, 196 N.E.2d 245 (N.Y. 1963) ........................ 12, 14

*Reed, Roberts Assocs., Inc. v. Strauman*, 353 N.E. 2d 590 (N.Y. 1976) ........................ 10, 14

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004) ................................. 18

*Silipos, Inc. v. Bickel*, No. 1:06-cv-02205, 2006 WL 2265055
   (S.D.N.Y. Aug. 8, 2006) .................................................................... 10, 11, 12, 13, 16

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27 (2d Cir. 1995)................... 17, 18, 19

*Willis of New York, Inc. v. DeFelice*, 750 N.Y.S.2d 39 (N.Y. App. Div. 1st Dep't 2002)............14

## **PRELIMINARY STATEMENT**

Plaintiff Scott Pontone respectfully submits this Reply in Support of his Motion for Preliminary Injunction. Mr. Pontone seeks an injunction prohibiting the Defendants from enforcing unreasonable and invalid three-year restrictive covenants (the "Restrictive Covenants"), which completely bar him from participating in the casket distribution business — the only business that he has known for virtually his entire professional life.

This three-year, industry-wide bar is unreasonable and unenforceable under any standard. It is not tailored to protect any specific, legitimate interest — and Defendants make only cursory efforts to identify one. Defendants cite in passing a boilerplate list of "trade secrets," which does not pass the straight-face test. (Defs.' Opp'n 12.) They rely most heavily on an amorphous desire to protect the "goodwill" of Milso — a company whose assets they acquired in 2005, which they have since fully integrated into their operations. (Id. at 21.) And they seek refuge in caselaw regarding covenants in connection with the purchase of a business. (Id. at 22.)

Defendants are vastly overreaching. Of course, they want to keep Mr. Pontone from competing with them — as the overheated rhetoric of their Opposition and the testimony of their President and CEO clearly demonstrate. (See Bartolacci Dep. 117) (stating that Defendants would keep Mr. Pontone out of the business for "15, 20 years or a lifetime" if they could.)[1] But they are not entitled to shield themselves from legitimate competition. Defendants purchased the assets of Milso three years ago — from *Milso*, not Mr. Pontone. Mr. Pontone became an *employee* of Defendants — along with six of his family members, all of whom still work for them. Defendants then *breached* the terms of Mr. Pontone's and his father's Employment

---

[1] Pages from the depositions of Scott Pontone ("Pontone Dep.") and Joseph Bartolacci ("Bartolacci Dep.") cited in this Reply are attached as Exhibits 1 and 2 respectively to the Declaration of Edmund Aronowitz, dated August 25, 2008, ("Aronowitz Decl.") and filed with this Reply.

Agreements.  In April 2007, Mr. Pontone and his father sued, and two months later Mr. Pontone was out of the company.  The Restrictive Covenants were executed *in connection with the settlement of that employment dispute* — *not* in connection with the prior asset purchase, and were unreasonable and unnecessary to protect *any* legitimate interest Defendants had at that time.

Unable to defend the Restrictive Covenants on their merits, Defendants spend much of their Opposition attacking Mr. Pontone's motives and past success.  Mr. Pontone's past financial success (which Defendants overstate) does not disqualify him from injunctive relief.  And Mr. Pontone needs injunctive relief, as he is suffering real and substantial harm.  Mr. Pontone is ready to compete in the casket distribution business, with a new offering based on multi-product sales by a multi-talented sales force.  (Pontone Dep. 166.)  He cannot provide this offering while the Restrictive Covenants are in place, because the covenants chill casket suppliers from having anything more than preliminary discussions with him.  (Decl. Scott Pontone ¶ 30.)[2]  If he cannot obtain this offering, however, his business may well fail, as his sales force is struggling in today's difficult market conditions.  (Supp. Decl. Scott Pontone ¶ 8.)[3]  Mr. Pontone's resulting inability to launch this new business is causing him immeasurable and unquantifiable — and hence irreparable — harm.

In short, Mr. Pontone is likely to succeed on the merits, and he is suffering irreparable harm.  At the very least, Mr. Pontone has raised a sufficiently serious question worthy of litigation and shown that the balance of the hardships favors an injunction.  Mr. Pontone respectfully asks the Court to enter an injunction prohibiting the enforcement of the Restrictive Covenants against him.

_____

[2] Hereinafter, "Pl. Decl.," attached as Ex. 3 to the Aronowitz Decl.

[3] Hereinafter, "Supp. Pl. Decl.," attached as Ex. 4 to the Aronowitz Decl.

## CLARIFICATION OF FACTS

The parties have engaged in five weeks of discovery, including party depositions, the production of documents, and discovery from five third-party witnesses. The facts obtained through this discovery show — notwithstanding Defendants' attempt to obscure the matter — that the Restrictive Covenants arose as a result of the termination of Mr. Pontone's employment, are preventing him from starting a new line of business, and are causing irreparable harm.

### (1) The Purchase of Milso

In attempting to defend the Restrictive Covenants, Defendants make much of their 2005 acquisition of Milso's assets and the money they paid for those assets. (Defs.' Opp'n 21.) But Defendants do not dispute several key facts. Mr. Pontone was not the sole shareholder or a controlling shareholder of Milso. (Pl. Decl. ¶ 10; Bartolacci Dep. 29-31.) He was but one member of the Pontone family, and he held but 10% of the shares. (Pontone Dep. 11.) The remaining 90% of the shares were owned by Mr. Pontone's father and four uncles. (Id.) Mr. Pontone's father, Harry Pontone, was the head of the company and made the critical decisions for the company. (Id. at 40.) When the family decided to sell Milso, it did so as a collective, under the leadership and at the direction of Harry Pontone. (Id. at 65-66.)[4]

Defendants also omit the fact that they were not the highest bidder for Milso. Defendants wanted Milso because the company was a "leading manufacturer and marketer of caskets." (Form 10-K, Matthews Int'l Corp. (Nov. 27, 2007) at 59 (Aronowitz Decl. Ex. 5).) A contemporaneous bidder offered $125 million for the company — $15 million higher than Defendants. (Bartolacci Dep. 21-24.) But Defendants offered the Pontones the right to continue

---

[4] Defendants refer to the Harry Pontone 2005 Family Trust, which received certain of the proceeds of the sale. Mr. Pontone is a trustee and one of the beneficiaries of the trust (not the sole beneficiary as Defendants claim). (Pontone Dep. at 88.) To-date, the only money Mr. Pontone has taken from the trust has been by loan. (Id. at 89.)

in the combined company, while the competitors' bid did not.  (Id. at 24-25.)  The Pontones selected Defendants' lower bid for that reason — the right to continue in company management was very important to them.  (Id.)  And, at least in the market's view, the company was more valuable without the Pontones than it was with them.

Defendants also overstate Mr. Pontone's role in the company before the acquisition — by conflating "Scott Pontone" and "Old Milso" in their brief, and by omitting the substantial roles played by the other Pontones and hundreds of other employees.  Mr. Pontone was not the nationwide face of Old Milso, he did not have a title, and he did not have control over the general business affairs of the company.  (Pontone Dep. 19.)  Harry Pontone ran the company, and each of the five Pontone families was responsible for a particular region.  (Id. at 40.)  Harry Pontone and Andrew Pontone were responsible for the New York metropolitan area.  (Id.)  Scott grew up under his father in New York, and then left New York to expand into new regions.  (Id. at 41.)  Louis Pontone was responsible for New Jersey and the other mid-Atlantic states.  (Id. at 40.)  Thomas Pontone was responsible for Pennsylvania, Upstate New York, Vermont and western Massachusetts.  (Id.)  Every one of these Pontones had responsibility for customer relationships.  (Bartolacci Dep. at 31-45.)  And every one of them (except for Thomas, who retired) works for Defendants today.  (Id.)

**(2) Mr. Pontone's Duties After the Acquisition**

The Pontones' duties changed after the acquisition.  Harry Pontone became President of the York Group.  (Bartolacci Dep. 25-26.)  Mr. Pontone became Executive Vice President of the company, reporting to Harry.  (Id.)  Five divisional Vice Presidents reported to Mr. Pontone, responsible for manufacturing, finance and accounting, distribution, and national sales.  (Id. at 57-61.)  Within the core sales and marketing group (for which Mr. Pontone also was

responsible), two vice presidents reported to him. (Bartolacci Dep. 58-62; Casket Division Organizational Chart (Aronowitz Decl. Ex. 6).)    Below them were six regional managers. (Bartolacci Dep. 60-61.)  And on the ground level were more than sixty sales personnel.  (<u>Id</u>.)

With overall responsibility for all of these personnel and all of these matters, common sense shows — and the parties' testimony confirms — that Mr. Pontone had detailed, day-to-day responsibility for none of them.   He did not have day-to-day responsibility for customer relationships. (Bartolacci Dep. 71; Pl. Decl. ¶ 15.)  The ground-level sales force handled day-to-day relationships — and Defendants concede that Mr. Pontone "pushed a lot of that responsibility down." (Bartolacci Dep. 70-73.)  Mr. Pontone did not run the manufacturing plants, he did not set the pricing, he did not draft strategic plans, and he did not manage the financial accounts.  The daily responsibility for those tasks, as well as the detailed knowledge necessary to complete them, rested with others. (Bartolacci Dep. 58-62; Pl. Decl. ¶ 15.)

The documents Defendants produced as "evidence" of the trade secrets they seek to protect bear this out.  Defendants produced a customer list — dated 2005 — that contains thousands of customer names. (Sales by Customer for the Period from January 1, 2005 to December 31, 2005 (Aronowitz Decl. Ex. 7).)  They readily concede that Mr. Pontone could not possibly have known or memorized them all.  (Bartolacci Dep. 136.)  Defendants claim that the customer list is but a fraction of the "customer data" to which Mr. Pontone had access through a computer database — data such as customer-specific contact information, pricing, discounts, ordering preferences, and the like.   (Bartolacci Dep. 134-135.)   Defendants also concede, however, that they do not know whether Mr. Pontone actually accessed that information before he left the company. (Bartolacci Dep. 131-132.)  Nor have Defendants checked their system to see if he did.  (<u>Id</u>.; <u>see also</u> Pl. Decl. ¶25.)

Nor would the data help Mr. Pontone today, even if he did have it. With respect to pricing, Defendants admit that they are not price leaders in the industry. (Bartolacci Dep. 138.) Every fall, their closest competitor, Batesville, issues a national price list. (Id. at 138-139.) Every fall, Defendants obtain a copy of Batesville's price list from one of their customers. (Id. at 139) And every fall, Defendants adjust their prices to meet Batesville's. (Id.) Prices undergo further customer-specific refinement based on region, order history, and individual customer preference — but that is performed customer-by-customer, with the individual sales person. (Id. at 138-140.) Pricing and discount data are widely shared among customers, through trade associations and industry publication. (See, e.g., Funeral Service Insider (April 16, 2007) (funeral director newsletter, sharing data regarding product quality, discounts and pricing) (Aronowitz Decl. Ex. 8).) None of the customer information available to Mr. Pontone during his tenure is useful to him now.[5]

**(3) Mr. Pontone Is Forced Out**

After the acquisition, Defendants did not allow Harry and Scott Pontone to use the authority they were contractually given to run the company. Instead, they interfered with the Pontones' basic management decisions. They meddled in distributorship decisions, including decisions regarding retention and pricing, by going around the Pontones and dealing directly with distributors. (Pontone v. The York Group, Inc., Complaint, ¶ 16 (Aronowitz Decl. Ex. 10).)

---

[5] The other documents produced by Defendants as evidence of "trade secrets" are similarly mundane. For example, Defendants produced generic information from management meetings, including publicly available articles and publicly known corporate histories, which they use to create their "strategic plan." ("Priority Issues Meeting" document (Aronowitz Decl. Ex. 9).) Defendants concede, however, that the strategic plan has already been implemented — indeed, a "to-do" timeline in the plan itself shows most activity occurring in 2007 and 2008 (Id. at D-0150 to D-0108.) Defendants also concede that Mr. Pontone's action items have been implemented, and that planning begins anew each year. (Bartolacci Dep. 48-49; 154-156.)

They intervened in basic decisions regarding inventory, receivables, pricing, and client relations. (Bartolacci Dep. 88-90; 96-97.) By these actions, they prevented the company from hitting its first year targets. (Bartolacci Dep. 108; Pl. Decl. ¶ 19.) That is why they paid the *Pontone family* bonus pool $7 million in December 2006 — to comply with the "provisions of the [Milso] acquisition agreement," as they announced in their SEC filings. (Ex. 5 at 59.) And when the conduct did not stop, Harry and Scott Pontone sued Defendants in the Spring of 2007. (Ex. 10.)

Facing the spectacle and disruption of a lawsuit between a company and its own President and Executive Vice President, Defendants and the Pontones quickly settled. Under the settlement, Defendants "agreed to accelerate the timing of scheduled payments" of $8 million "consistent with the earnout provisions of the employment agreements." (Matthews Int'l Press Release (May 30, 2007) (Aronowitz Decl. Ex. 11).) Under his employment contract, those funds were payable *at the direction of Harry Pontone*. (Second Amendment to the Key Employee Employment Agreement of Harry Pontone § 1.04 (Aronowitz Decl. Ex. 12).) The funds were *not* a quid pro quo for a new covenant not to compete from Scott Pontone. (Pl. Decl. ¶ 23-24.)

Defendants also demanded that Mr. Pontone leave his position of authority in the company. They did offer him a menial position — so menial that they do not recall the title or duties today. (Bartolacci Dep. 102.) The real message to Mr. Pontone, and an express term of the settlement, was that he needed to resign from the company. (Bartolacci Dep. 104; Settlement Agreement and Release ¶4 (Aronowitz Decl. Ex. 13).)

In connection with the settlement, the parties scrapped the prior restrictive covenants in the Asset Purchase Agreement and the 2005 Employment Agreement, and agreed to the new Restrictive Covenants. (Second Amendment to Key Employee Employment Agreement ("2007

Amendment")(Aronowitz Decl. Ex. 15).)[6]    Accordingly, the Restrictive Covenants were demanded in connection with the termination of Scott Pontone's employment, *not* as part of the acquisition of any business. (Bartolacci Dep. 113-115.)  And Defendants have conceded that the three-year term had no objective basis, but was simply an effort to keep Mr. Pontone out of the business for as long as possible.  (Bartolacci Dep. 116-117.)  Indeed, Defendants "would have taken 15, 20 years or a lifetime" if they could have.  (Id.)

Mr. Pontone did not agree with the Restrictive Covenants, because he thought they were unfair.  (Pontone Dep. 97-98.)  But the lawsuit had taken its toll on his family and the company. Harry Pontone instructed Mr. Pontone to end the dispute and settle the case.  At the instruction of his father, Mr. Pontone did so.  (Id.)

**(4) The Proposed Venture**

Defendants do not deny that Mr. Pontone has established a new venture for the sale of insurance products.  They grossly misrepresent the state of that business, however.  It is a start-up business, and it is struggling. (Supp. Pl. Decl. ¶ 8.)

In the first half of 2008, Mr. Pontone has assembled a new company (T-100) by acquiring the insurance businesses of two other companies (Ensure and Trust 100).  These companies employ eight salespeople.  (Supp. Pl. Decl. ¶ 5.)  However, the sales force is generating very little revenue based on pre-need insurance sales.  (Supp. Pl. Decl. ¶ 9.)  The current economy has affected the pre-need insurance business drastically.  (Id.)  As a result, Scott is subsidizing their salaries by  $85,000 per month.  (Id. at ¶ 8.)  He is also bearing another $20,000 per month in travel and marketing expenses on his own.  (Id.)  The pre-need servicing branch of his business,

---

[6] Because the Restrictive Covenants are the only governing provisions, the extensive treatment Defendants give the covenants contained in the prior agreements is unnecessary and irrelevant. (Defs.' Opp'n 6-10.)

employing an additional ten individuals, is generating just enough income to pay those employees' salaries. (Id. at ¶ 10.) Mr. Pontone and his CFO are both working full time for the venture without pay. (Id. at ¶ 8.) Mr. Pontone's other insurance venture generated $60,000 in revenue in the first half of 2008, which was completely offset by expenses. (Id. at 3.)

Mr. Pontone is an entrepreneur, however, and he is eager to implement a solution: The sale of a complete line of death-care related products, including casket sales. The ability to sell a complete line of products would increase the sale of all products — customers will favor the salesperson who can service all of their needs. (Pl. Decl. ¶ 34.) The only bar to implementing this idea is the Restrictive Covenants.

Casket manufacturers are aware of Mr. Pontone's plans and have discussed them with him. And as their declarations make clear, the existence of the Restrictive Covenants has chilled them from dealing with him any further. (See Decl. of William Kirk, Decl. of Mike DiBease and Decl. of Chip Ray (Aronowitz Decl. Ex. 15, 16 and 17).) These declarations do not "refute" Mr. Pontone's claim, as Defendants misleadingly state. (Defs.' Opp'n 2.) They confirm them. Each declaration makes three principal points: (1) the manufacturers have discussed Mr. Pontone's business with him; (2) they learned during those discussions that Mr. Pontone is subject to a non-compete; and (3) they have as yet made no offers to him. (Ex. 15, 16 and 17.) The clear implication (with the exception of Aurora, who apparently has reconsidered) is that the Restrictive Covenants are preventing Mr. Pontone and the casket manufacturers from going further with their discussions. (Ex. 16 ¶ 7.) Moreover, if they could engage in these discussions, the manufacturers would likely do business with Mr. Pontone. Sino Source expressly says that it "would be interested in doing business with Scott Pontone and his new venture if he were not subject to the non-compete provision." (Ex. 15 ¶ 6.)

## ARGUMENT

I.    **The Restrictive Covenants Are Unreasonable and Unenforceable Under Any Standard**

A.    **Defendants Do Not Defend the Restrictive Covenants Under New York Employment Law**

Defendants make no effort to defend the Restrictive Covenants under New York employment law — which strongly disfavors restraints on competition. A restrictive covenant is enforceable under New York law only if it is necessary to protect legitimate employer interests and is reasonable in time and place. BDO Seidman v. Hirshberg, 712 N.E.2d 1220, 1223 (N.Y. 1999). "[T]he general public policy favoring robust and uninhibited competition should not give way merely because a particular employer wishes to insulate himself from competition." Am. Broad. Co., Inc. v. Wolf, 420 N.E.2d 363, 368 (N.Y. 1981).

The Restrictive Covenants are neither necessary to protect legitimate interests nor reasonable in time and place. The interests Defendants offer in support of the covenants — a boilerplate list of purported "trade secrets," cut-and-pasted in identical paragraphs in their interrogatory responses (Defs.' Resp. Interrog. 6 (Aronowitz Decl. Ex. 18)), the declaration of their President and CEO (Bartolacci Decl. ¶ 35), and their Opposing Brief (Defs.' Opp'n 12) — are wholly inadequate. The bulk of the information they cite is stale and mundane, such as prior-years' budgets, three-year-old customer lists, and handouts from marketing meetings. (See supra n.5 and accompanying text.) Courts have uniformly rejected companies' reliance on this sort of "knowledge of the intricacies of a business operation," Reed, Roberts Assocs., Inc. v. Strauman, 353 N.E. 2d 590, 594 (N.Y. 1976), "business [and] financial information," Silipos, Inc. v. Bickel, No. 1:06-cv-02205, 2006 WL 2265055 at *4 (S.D.N.Y. Aug. 8, 2006), and "information regarding 'market strategies'" or "pricing data," Marietta Corp. v. Fairhurst, 754 N.Y.S.2d 62, 67 (N.Y. App. Div. 3d Dep't 2003), to keep former employees out of the market.

The customer and pricing information that Defendants principally cite also is readily available elsewhere. Defendants concede that their customer data depends on the individual preferences and choices of the customers. (Bartolacci Dep. 129.) "[I]t is well established that "an employee's recollection of information pertaining to specific needs and business habits of particular customers is not confidential." EarthWeb, Inc. v. Schlack, 71 F. Supp. 2d 299, 315 (S.D.N.Y. 1999). And "trade secret protection will not attach to customer information that easily can be recalled or obtained from the customers themselves." Jay's Custom Stringing, Inc v. Yu, No. 01 Civ. 1690 (WHP), 2001 WL 761067 at *6 (S.D.N.Y. Jul. 6, 2001). This is especially true where, as here, prices are updated annually, discounts are subject to constant negotiation, and strategic plans are implemented and replaced each year. (Bartolacci Dep. 138); see also Estee Lauder Cos., Inc. v. Batra, 430 F. Supp. 2d 158, 180 (S.D.N.Y. 2006). Whatever information Mr. Pontone may have seen when he worked for Defendants is of little use to him now.

Finally, Defendants do not show that the covenants are tailored in scope and duration to the protection of any specific interest, as New York law requires. The global reach of the covenants is unsupportable as a matter of law and fact. Global covenants are inherently unenforceable. Silipos, 2006 WL 2265055 at *6. Mr. Pontone's customer-specific roles were limited in scope and occurred years ago (Pl. Decl. 4, 15) and Defendants concede that the three-year duration is arbitrarily chosen. (Bartolacci Dep. 116-117.) Under New York employment law, the Restrictive Covenants are unenforceable on their face.

**B.    The Restrictive Covenants Are Not "Ancillary to the Sale of a Business"**

Seeking to escape these well-established principles, Defendants claim the Restrictive Covenants are presumptively enforceable as "ancillary to the sale of a business." (See Defs.' Opp'n 27-28 (citing, e.g., Mohawk Maint. Co., Inc. v. Kessler, 419 N.E.2d 324, 329-330 (N.Y. 1981).) Defendants are wrong on the law — even covenants ancillary to the sale of a business

-11-

must be reasonable, and the Restrictive Covenants are not.  *See infra* Part C.  Defendants also are

wrong on the facts.  The Restrictive Covenants were not created in connection with the sale of a

business; they were created in connection with the termination of Mr. Pontone's employment.

To determine whether a restrictive covenant is ancillary to the sale of a business or a

consequence of the employment relationship, the Court must "ascertain the true nature of the

transaction" that led to the covenant in question.  Purchasing Associates, Inc. v. Weitz, 196

N.E.2d 245, 248 (N.Y. 1963).  A mere connection with an asset purchase is not enough.

Silipos provides a perfect example.  That case involved an employee who had grown up

and become a shareholder in his family's business.  Silipos, 2006 WL 2265055 at *1.  "*In

conjunction with [Silipos'] purchase of the company*," the employee received $4.5 million for his

shares, signed an employment agreement, and became Executive Vice President of the acquiring

entity.  Id. (emphasis added).  Also as a result of the transaction, he became the "highest sales

executive at Silipos." Id.[7]

The relationship soon soured, the employee left the company, and Silipos sued him.  The

court analyzed the restrictive covenant under the traditional standard for employment agreements

— not as a covenant ancillary to the sale of a business — even though the covenant was agreed

---

[7] Defendants attempt to distinguish Silipos as involving a mere "shareholder and passive investor."  (Defs.' Opp'n at 28.)  This is no distinction at all — Mr. Pontone also was a mere shareholder in the companies underlying the Milso asset purchase.  Moreover, as "Executive Vice President" the employee in Silipos "was responsible for oversight of a sales and marketing team," maintained "direct contact with most of Silipos's customers, vendors, and distributors," "negotiated special pricing arrangements with customers," "had access to confidential internal business information" such as "pricing information, financial data . . . , and future market strategies — as well as technical information about Silipos's current and upcoming products." Silipos, 2006 WL 2265055, at *1-2.  These are the exact same duties Defendants claim Mr. Pontone had when he served as Executive Vice President for them.

to "*in conjunction with the sale of the business*" to Silipos. Id. (applying BDO Seidman, 712

N.E.2d at 1223-25). And the Court found the restrictive covenant to be unreasonable. Id. at *6.[8]

      Here, the Restrictive Covenants were agreed-to in the context of the settlement of Harry

and Scott Pontone's 2007 lawsuit over Defendants' breach of their Employment Agreements.

The settlement included several components. Because Defendants had interfered with the

Pontones' authority and control over the business, Defendants "agreed to accelerate the timing of

scheduled payments . . .consistent with the earnout provisions of the employment agreements."

(Ex. 11; see also Ex. 13 ¶ 1 (Settlement Agreement) ("On or before June 1, 2007, York agrees to

pay the $8 million Remaining Bonus Pool pursuant to the Amended Key Employee Employment

Agreements of Harry Pontone and Scott Pontone dated May 30th, 2007.").) Harry Pontone

stepped down as President of the York Group. (Ex. 13 ¶ 2.) And Scott Pontone resigned from

the company. (Id. at ¶ 3.)

      In addition, the parties executed amendments to their employment agreements and the

APA. They "*deleted*" all prior restrictive covenants. (Ex. 14 §§ 4.06 and 4.07 (emphasis

added).)[9] And, among other terms effectuating Mr. Pontone's separation from the company,

they agreed to the Restrictive Covenants. (Id.)

---

[8] Other courts have similarly examined restrictive covenants based on the actual transaction at
issue. Alexander & Alexander Services, Inc. v. Maloff, 482 N.Y.S2d 386, 388 (N.Y. App. Div.
4 Dep't. 1984) ("The covenants at bar, though arising out of a sales contract, pertain to
employment between the parties and, therefore, must meet the criteria applicable to employment
contracts."); Cliff v. R.R.S, Inc., 620 N.Y.S.2d 190, 192-93 (N.Y. App. Div. 3rd Dept. 1994)
(analyzing restrictive covenant arising from asset purchase agreement under the employment law
standard); Manley's Mighty Mart, L.L.C. v. Reynolds, No. 0017822/0041, 2004 WL 5394716 at
*10 (N.Y. Sup. Ct. Broome Cty. Sep. 22, 2004) (unpublished opinion) (same).

[9] Defendants' repeated contention that the parties "reaffirmed" the prior covenants does not
square with this plain language. (Defs.' Opp'n 26.) To "delete" is "to eliminate" especially "by
blotting out, cutting out, or erasing." To "affirm" is "to validate, confirm," or "to state
positively." Merriam-Webster's Collegiate Dictionary (10th ed. 2002).

A fair assessment of these events shows that the Restrictive Covenants were agreed-to in connection with the settlement of an employment dispute and termination of Mr. Pontone's employment, *not* in connection with the purchase of a business two years previously. Defendants' reliance on the "sale of a business" line of cases is misplaced.

### C. All Restrictive Covenants Must Be Reasonable — And These Restrictive Covenants Are Not

In any event, the Restrictive Covenants are invalid and unenforceable under any standard. *All* anticompetitive covenants, whether ancillary to an employment contract or ancillary to the sale of a business, "must satisfy the overriding requirement of reasonableness." Reed, Roberts, 353 N.E.2d at 592-3. They must be reasonable in time, scope and extent. Id. And, where they arise out of the purchase of a business, they must not be "more extensive, in terms of time and space, than is reasonably necessary to the buyer for the protection of his legitimate interest in the enjoyment of the asset bought." Purchasing Assoc., 196 N.E.2d at 247.[10]

Here, a three-year, world-wide bar on participation in the entire casket industry is wholly unreasonable. The Restrictive Covenants are too long in duration, they cover too wide a geographic area, and they are completely unnecessary to protect the "goodwill" Defendants cite. In the context of an acquisition, "goodwill" is merely the difference between the purchase price

---

[10] The cases Defendants rely upon, (Defs.' Opp'n 27-29,) show that restrictive covenants are enforceable only if they are reasonable, even in the context of the purchase of a business. See Mathais v. Jacobs, 167 F. Supp. 2d 606, 611-13 (S.D.N.Y. 2001) (finding a restrictive covenant barring contact with participants in a business to be unreasonable); Willis of New York, Inc. v. DeFelice, 750 N.Y.S.2d 39, 41-42 (N.Y. App. Div. 1st Dep't 2002) (affirming a preliminary injunction enforcing a two-year non-solicitation agreement against *only one* of three employees based on "special and unique services," and only "as narrowed" for certain customers); Chernoff Diamond & Co. v. Fitzmaurice, Inc. et al., 651 N.Y.S.2d 504, 505 (N.Y. App. Div. 1st Dep't 1996) (affirming 2-year restriction on dealings with employer's actual clients where covenant did not prohibit employee from competing in insurance industry generally); Estee Lauder, 430 F. Supp. 2d at 181-82 (affirming a covenant only after reducing its duration from twelve to five months); Bus. Intelligence Servs., Inc. v. Hudson, 580 F. Supp. 1068, 1072-73 (S.D.N.Y. 1984) (affirming a one-year covenant).

and the value of the hard assets of the company. (Bartolacci Dep. 118.)  This figure reflects the value of intangible assets (such as customer relationships, future income streams, trade names, and the like), plus any other "soft" reason for paying more than the breakup value of the company (such as synergies between the two companies). (Bartolacci Dep. at 119-120.)  Thus, Defendants' repeated assertion that "goodwill" represented more than 50% of the Milso purchase price simply means that they paid double the value of the hard assets for Milso.  It says nothing about the specific contribution of Mr. Pontone.

Defendants have had three years to absorb Milso's goodwill and integrate Milso into their operation.  Defendants' President and CEO concedes that the goodwill in the acquired company is "fully integrated" for this purpose. (Bartolacci Dep. 126.)  Mr. Pontone was only a 10% shareholder in the company and only one of seven Pontones to work for the Defendants. (Pl. Decl. ¶ 10, 11.)  Six of the Pontones continue to work for Defendants. (Id. at ¶ 27.)  Finally, Defendants' concede that the departure of Mr. Pontone did not impair the goodwill obtained in the Milso acquisition, and that *even the invalidation of the Restrictive Covenants* would not impair that goodwill. (Bartolacci Dep. 124-125.)

Defendants barely defend the world- and industry- wide scope of the covenants.  The cases upon which they rely involve covenants tailored to the protection of specific customer contacts or specific trade secrets, not a complete industry ban.[11]  Defendants identify no such

---

[11] In Estee Lauder and Bus. Intelligence Servs., on which Defendants rely (Defs.' Opp'n at 28-29), the worldwide restrictive covenants were tailored to specific interests in protecting legitimate trade secrets, such as confidential product launch dates or secret computer code, and were of far shorter duration than the Restrictive Covenants.  See Estee Lauder, 430 F. Supp. 2d at 178-79 ("[B]y its express terms, the covenant does not prohibit Batra from employment with all Competitors of Estee Lauder and all Estee Lauder products, but rather limits this prohibition to positions with other companies in which Batra could misuse the trade secrets and confidential information to which he became privy while employed with Estee Lauder.").

specific interests here, and they cannot. Before York acquired Milso's assets, Mr. Pontone's contacts were primarily regional — he had contacts in New York (six years prior to the acquisition), and then successively in New England, Oklahoma City and Dallas-Fort Worth (which he handed off to others years ago). (Pl. Decl. ¶ 4; Pontone Dep. 41.) And after the acquisition, he "pushed...down" any responsibility for direct customer contact to the individual sales representatives. (Bartolacci Dep. 73; Pl. Decl. ¶ 15.) Defendants only cite routine appearances at trade shows and routine introductions to clients as an upper-level manager as Mr. Pontone's principal customer contact. (Bartolacci Dep. 74.) These high-level efforts do not justify an anticompetitive covenant against ground-level customer contact that stretches across all fifty states. Silipos, 2006 WL 2265055 at *5-6 (rejecting reliance on trade show appearances because employer's legitimate interest included only the specific clients for whom employee's services were a significant part of the transaction). In short, the Restrictive Covenants are invalid even under the "reasonableness" standard.

## II.    The Restrictive Covenants Are Causing Irreparable Harm

In twenty-five pages devoted to undermining Mr. Pontone's showing of harm, Defendants completely ignore the specific irreparable harm that the Restrictive Covenants are causing. Mr. Pontone is attempting to create a new, as-yet untested business. (Pontone Dep. 165-68; Supp. Pl. Decl. ¶ 4.) His unique idea is to provide salespeople who serve the funeral industry with an array of products — "one stop shopping" — for their funeral director customers. (Pontone Dep. 166; Pl. Decl. ¶ 34.) This is a new idea in the death-care industry; previously, casket salespeople have focused on caskets, while insurance salespeople have focused on insurance. (Pontone Dep. 166-168.) But this also is a transition time in the industry, as both insurance companies and casket manufacturers are consolidating. (Supp. Pl. Decl. ¶ 5; Ex. 9 D-

0052 to D-0059).    As the funeral industry consolidates, the combination of these lines of business will create new synergies. (<u>Id</u>.)

The Restrictive Covenants are preventing Mr. Pontone from pursuing this new venture. Casket manufacturers are unwilling to talk specifics or extend offers with the Restrictive Covenants in place. (Ex. 15, 16 and 17.)  It is clear, however, that manufacturers would do business with Mr. Pontone if the Restrictive Covenants were declared invalid.  (Pontone Dep. 100, 116; Ex. 15 and 16.)  Thus, the Restrictive Covenants are preventing the launch of the new product line and new business, causing inestimable harm to Mr. Pontone.  Moreover, potential competitors are now attempting to copy him, seizing the first-mover advantage and causing additional irreparable harm.  (Pontone Dep. 166-68.)

This Circuit's law makes clear that the loss of a business or line of business is irreparable harm because of the grave difficulty in quantifying monetary damages sufficient to redress the loss.  <u>Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.</u>, 60 F.3d 27, 37-39 (2d Cir. 1995). Accordingly, preliminary injunctions in such cases are appropriate.  <u>Id</u>.; <u>see also</u> <u>Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.</u>, 596 F.2d 70, 72 (2d Cir. 1979) ("it has always been true that irreparable injury means injury for which a monetary award cannot be adequate compensation"). According to the Second Circuit:

> Where the availability of a product is essential to the life of the business *or* increases business of the plaintiff beyond sales of that product — for example, by attracting customers who make purchases of other goods while buying the product in question — the damages caused by loss of the product will be far more difficult to quantify than where sales of one of many products is the sole loss.  In such cases, injunctive relief is appropriate. This rule is necessary to avoid the unfairness of denying an injunction to a plaintiff on the ground that money damages are available, only to confront the plaintiff at a trial on the merits with the rule that damages must be based on more than speculation.

<u>Tom Doherty</u>, 60 F.3d at 38; <u>see also</u> <u>Interphoto Corp. v. Minolta Corp.</u>, 417 F.2d 621, 622 (2d Cir.1969) (per curiam) (affirming a finding of irreparable harm where plaintiff "would be unable

to calculate its damages since it would suffer not merely loss of profits with respect to [defendant's] goods but loss of good will from the lack of a 'full line'").[12]

In this case, if an injunction does not issue, Mr. Pontone will not be able to add a type of product to his product line. Thus, he cannot "attract[] customers who make purchases of other goods" — insurance — "while buying the product in question"— caskets. Tom Doherty, 60 F.3d at 38. Furthermore, Mr. Pontone's injuries are both imminent and ongoing. The funeral industry is highly competitive, and casket suppliers will not wait before entering into arrangements with others to distribute their products. (Ex. 15 ¶ 6 ("If Mr. Pontone has a valid non-compete obligation, Sino Source will look for other partners to distribute its caskets and funeral urns, alone or with other products such as insurance.").) Mr. Pontone's injury thus is not remote or speculative; the Restrictive Covenants presently and concretely prevent Mr. Pontone's participation in the casket industry. Thus, the damages caused by the loss of this product line are difficult to quantify, the harm is irreparable and "injunctive relief is appropriate." Tom Doherty, 60 F.3d at 38.

The amount of money Mr. Pontone directly or indirectly received through the sale of Milso, which Defendants stress, has nothing to do with the irreparable harm he has shown. Even billion-dollar businesses (which Mr. Pontone is not) can suffer irreparable harm. See EMI Latin

---

[12] Defendants attempt to distinguish Novartis and Register.com from the facts in this case by stating the findings of irreparable harm in those cases required the harmed party to suffer as the result of deliberate acts of wrongdoing. (Defs.' Opp'n at 24-25 n.8.) But irreparable harm was found in both cases based of the difficulty in redressing the lost business damages at issue with money damages alone. Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co., 290 F.3d 578, 596 (3d Cir. 2002) ("In a competitive industry where consumers are brand-loyal, we believe that loss of market share is a 'potential harm which cannot be redressed by a legal or an equitable remedy following a trial.'"); Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 404 (2d Cir. 2004) ("irreparable harm may be found where damages are difficult to establish and measure"). And in this case, the enforcement or threatened enforcement of the unreasonable, and hence void and illegal, Restrictive Covenant by Defendants *would* constitute a deliberate act of wrongdoing.

v. Bautista, No. 03 Civ. 0947, 2003 WL 470333 at *14 (S.D.N.Y. Feb. 24, 2003) (Pauley, J.) (granting a preliminary injunction to a successful record label to prevent injury that is "incapable of being fully remedied by monetary damages"). If Mr. Pontone cannot expand his product line, he can never fully recover for the injury. This is irreparable harm.

## III.    The Equities Favor the Issuance of a Preliminary Injunction

The equities clearly favor the issuance of an injunction. Mr. Pontone has not violated the Restrictive Covenants and has acted with the utmost good faith. Indeed, unlike every former employee in every case cited by the parties (who generally proceed with their new ventures and hope not to be sued), Mr. Pontone has come to this Court for a determination of invalidity in advance. If an injunction is not entered, Defendants will obtain the benefits of the invalid covenants for the duration of this lawsuit, as Mr. Pontone will be shut out of competition. All of these factors favor entry of an injunction. Conversely, Defendants' contention that an injunction would cause them irreparable harm is specious. (Defs.' Opp'n at 21-23.) The only harm caused by enjoining an illegal restrictive covenant is the harm from free and fair competition. Defendants cannot legitimately complain about that.

Defendants' other arguments about the equities are a red herring. Defendants make much of the timing of this lawsuit. (Defs.' Opp'n 26-27.) But when would they have had Mr. Pontone file it? Mr. Pontone is creating a start-up business, and it is impossible to pinpoint the exact time at which the prospect of this business line became sufficiently concrete for the Restrictive Covenants to cause him harm. (Supp. Pl. Decl. ¶ 4-7.) The suit was filed on July 14 — within weeks of the one-year anniversary of the 2007 settlement agreement, within two weeks of his meeting with Sino Source in June, and two weeks before he completed the integration of the various components of his business under T100. (Id.) Nothing about that timing demonstrates

inequitable delay — indeed, Defendants inconsistently claim that Mr. Pontone is not suffering harm now.[13]

Finally, Defendants invoke an estoppel argument by citing other restrictive covenants to which "Old Milso" was a party and Mr. Pontone's new businesses are parties. (Defs.' Opp'n 3, 7, 19.) The validity of a covenant not to compete depends on the facts and circumstances of each case, and nothing about these covenants undermines Mr. Pontone's showing that the Restrictive Covenants are invalid in his case. For example, the Milso covenants that Defendants cite barred Milso's ground-level salespeople from soliciting their former customers, and only for 18 months. (Defs. Opp'n at 7.) The question in each case is whether the covenant is tailored to protect legitimate interests — and the Restrictive Covenants are not.

## CONCLUSION

The three-year worldwide anticompetitive covenants that completely bar Mr. Pontone's participation in the casket industry are unnecessary to protect any legitimate interest, and serve only to block legitimate competition. The covenants are causing immeasurable, and hence irreparable, injury to Mr. Pontone and his fledgling business every day their enforcement is not enjoined. Mr. Pontone respectfully asks the Court to issue the requested injunction.

---

[13] The July 11, $10 million payout Defendants repeatedly cite (Defs.' Opp'n 2, 3, 17, 26) was not payable to Mr. Pontone. It was payable to the sellers of the assets of Milso — including the six Pontone family members who work for Defendants. Mr. Pontone's timing was "strategic" with respect to that payout as Defendants claim (Defs.' Opp'n 26) only if one assumes that Defendants would have interfered with the payout had Mr. Pontone filed earlier.

Dated: New York, New York
      August 25, 2008

Respectfully submitted,

Edmund Aronowitz (EA 0542)
Clifford Chance US LLP
31 W 52nd St.
New York, New York 10019
Phone: (212) 878-8000
Fax:    (212) 878-8375
E-mail:
edmund.aronowitz@cliffordchance.com

Stephen M. Nickelsburg
Clifford Chance US LLP
2001 K Street NW
Washington, DC 20006
Phone: (202) 912-5000
Fax:    (202) 912-6000
E-mail:
steve.nickelsburg@cliffordchance.com

*Attorneys for*
*Plaintiff Scott Pontone*